**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE**

| | | |
|---|---|---|
| **LOUISIANA-PACIFIC CORPORATION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 3:18-cv-00447** |
| | ) | |
| **JAMES HARDIE BUILDING PRODUCTS, INC.,** | ) | **JUDGE MCCALLA** |
| | ) | |
| | ) | **JURY DEMAND** |
| **Defendant.** | ) | |

---

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF LOUISIANA-PACIFIC'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

---

Plaintiff, Louisiana-Pacific Corporation ("LP") in support of its Motion for Temporary Restraining Order and Preliminary Injunction regarding Defendant James Hardie Building Products, Inc.'s ("Defendant's") false and/or misleading advertisements, states as follows:

## I.    INTRODUCTION

This Motion for Temporary Restraining Order and Preliminary Injunction is limited to a request to restrain and enjoin Defendant's false advertising materials that it is displaying and distributing at the "Parade of Homes" event in Madison, Wisconsin.  The present Motion requests relief to the pending Motion for Preliminary Injunction (Dkt. 10) but seeks an additional temporary restraining order for activity only discovery on Saturday, the date the "Parade of Homes" started.

Per the Declaration of Angie Kieta ("Kieta Dec."), Plaintiff has observed Defendant displaying and broadcasting its false and/or misleading claims across the event, which is attended by tens of thousands of customers and potential customers. (*Id.* at ¶¶4, 5, 8, 10-16).  Accordingly,

Plaintiff now moves the Court for a temporary restraining order enjoining Defendant from its unlawful advertising campaign at the Parade of Homes. A temporary restraining order is necessary to prevent the ongoing irreparable harm Plaintiff is sustaining at the Parade of Homes. Moreover, the requested relief will preserve the status quo – namely, the last undisputed position of the parties, which would be the time before the offending advertising was distributed and displayed at the Parade of Homes event.

LP and Defendant are direct competitors in the exterior siding market. LP manufactures and distributes, among other things, strand-based engineered wood siding products, which it has developed over decades and continues to develop. Defendant manufactures and distributes fiber cement siding products, composed of water, cellulose fiber, filler material, and cement. Hardie's websites, printed material, and other means of advertising portray Defendant's siding products as superior to LP's engineered wood siding products in ways that are false and/or deceptively misleading.[1]

As set forth in the Complaint (Dkt. 1), LP alleges Defendant has made a number of false and/or deceptively misleading statements as part of its recently launched "No Wood Is Good" advertising campaign. Although the Complaint notes a number of false and/or deceptively misleading statements, Plaintiff's original Motion for Preliminary Injunction and the present Motion are narrowly targeted to three sets of statements and associated images with those statements. The present Motion is limited to those same activities occurring in connection with the Parade of Homes event.

---

[1] Hardie's advertisements consistently refer to LP's SmartSide® strand-based engineered wood siding products as "OSB", ostensibly meant to stand for "Oriented Strand Board" but are obviously referencing LP siding products, as LP is Defendant's leading competitor and synonymous in the industry with strand-based engineered wood siding.

2

First, LP seeks a restraining order and an injunction that prevents Defendant and its related parties from using at the Parade of Homes the woodpecker in the images and video that was layered on top of what appears to be LP's strand-based engineered wood siding through use of computer software. In other words, the fabricated photo of the woodpecker coming out of a hole in LP's strand-based engineered wood siding. Second, LP seeks to enjoin Defendant from representing at the Parade of Homes, directly or indirectly, that LP's strand-based engineered wood siding products are susceptible to termite damage or other pest damage that is otherwise deterred by LP's zinc borate-based process. LP has done years of extensive testing through exposure to Formosan terminates, widely recognized as one of the world's most destructive pests. Third, LP seeks to enjoin Defendant's use at the Parade of Homes of an image of buckling siding that Defendant indicates is strand-based engineered wood siding, because not only is the image not in fact LP's strand-based engineered wood siding but is not strand based siding at all as indicated in the publication and the disclaimer regarding the likely cause of the buckling is remote, small, and unlikely to be viewed by the consumer, in addition to being literally false.

All of the factors to be considered for granting a temporary restraining order and/or preliminary injunctive relief are met here. LP has a strong likelihood of success on the merits of its claims for violations of the Lanham Act including false advertising and unfair competition, violations of the Tennessee Consumer Protection Act, common law unfair competition, and common law tortious interference. LP will be irreparably harmed if a restraining order and injunction are not granted. The relative balance of harms weighs heavily in LP's favor, because LP is not seeking to stop Defendant from selling products or advertising generally. LP only seeks to enjoin certain limited statements and related images. Finally, Defendant's false and/or deceptively misleading statements cause harm to the public. Homeowners and business people, who do not have the expertise in this area, often have no choice but to believe Defendant's

3

advertising, and they have been or are likely to be deceived by these false and/or misleading statements. Thus, the interests of the public demand an injunction of these deceptive practices as well.[2]

## II.    FACTUAL BACKGROUND

### A.    LP and Its Strand-Based Engineered Wood Siding Products

LP is a Delaware corporation with a principal place of business in Nashville, Tennessee that manufactures and distributes building supplies, including exterior siding products. Declaration of Lance Olson at ¶4 (already on file with the Court as Dkt. No. 12). Since 1972, LP has been a market leader in the manufacture and distribution of building materials, including exterior siding products. *Id*. ¶5. LP is currently the undisputed leading manufacturer of strand-based engineered wood siding products in the United States. *Id*. ¶6. LP markets and sells its current line of strand-based engineered wood siding under the SmartSide® brand. *Id*. ¶7. LP has invested significant time and money on the research and development of its strand-based engineered wood siding, and it continues to develop new innovations, including but not limited to, innovations to stand up to pests and moisture. *Id*. ¶8.

The SmartSide® products are treated with a proprietary zinc borate-based process that resists damages from pests. *Id*. ¶9. To put the termite resistance of LP siding products to the ultimate test, LP regularly expose samples to Formosan termites, widely recognized as one of the world's most destructive pests. *Id*. at ¶ 10. Each sample is placed on a plastic grid, surrounded by untreated bait samples, then laid directly on top of termite colonies. *Id*. ¶11. Even after three years, the LP SmartSide® siding showed no structural damage, while the bait samples were completely destroyed within three months. *Id*. ¶12.

---

[2] LP has sent Defendant a Cease and Desist notification, the response to which is filed in this Court as *Exhibit A* to the prior motion for preliminary injunction. (Dkt. 10-1).

4

LP's SmartSide® products are treated to the core with LP's proprietary SmartGuard® process that resists weather-related damage and moisture damage. *Id.* ¶13. LP SmartSide® siding has undergone brutal testing in Hilo, Hawaii. *Id.* ¶14. An average temperature of more than 70 degrees, high levels of humidity and almost 170 inches of annual rainfall make Hilo's climate the perfect breeding ground for wood's worst enemies – termites, moisture and fungal decay. *Id.* ¶15. Even after many years of exposure, LP SmartSide products continue to perform. *Id.* ¶16. Strict internal and third-party quality assurance ensures consistency with both prescriptive and performance requirements. *Id.*

B.     <u>Defendant James Hardie Building Products, Inc.</u>

Defendant is a Nevada corporation that manufactures and distributes building supplies, including exterior siding products. Olson Dec. at ¶ 17. Defendant markets its fiber cement siding products as alternatives to LP's strand-based engineered wood siding products. *Id.* ¶18. Defendant markets its siding products to distributors, retailers, subcontractors, contractors, and directly to end consumers through printed advertising, websites (*e.g.*, www.nowoodisgood.com, www.jameshardie.com), industry and trade gatherings, direct marketing, and other means. *Id.* ¶19.

C.     <u>Defendant's False Advertising Campaign</u>

Defendant recently launched its "No Wood Is Good" advertising campaign. *Id.* ¶20. The campaign includes the www.nowoodisgood.com website[3], a number of advertisements on the internet (e.g. advertisements that appear on trade publication websites), and printed marketing materials. *Id.* ¶22. In the advertisements and materials, Defendant refers to competitors' wood-based siding products as "OSB" (to abbreviate Oriented Strand Board), "engineered wood", "engineered wood product" or simply as "wood." *Id.* ¶23. Although Defendant may attempt to

---

[3] A screenshot of www.nowoodisgood.com as it appeared on June 8, 2018 is attached to the Olson Declaration as *Exhibit 2*.

argue that the campaign is directed to all wood siding products, the implication is clear based on the pictures in the campaign. *Id*. ¶24. Defendant predominantly features what appears to be LP's products. *Id*. ¶25. This makes sense because Defendant's largest competitor in the siding market is LP. *Id*. ¶26.

On Defendant's website, www.nowoodisgood.com, there is a graphic with two columns under the title "The Ugly Truth About OSB Siding" followed by the sentence: "No matter how it is treated or processed, it still acts like wood." *Id*. ¶27 and Ex. 2. Below the primary phrase are two columns of captioned graphics under the heading "OSB SIDING VS. JAMES HARDIE SIDING", and the opposing captioned graphics purport to demonstrate the alleged advantages of Defendant's fiber cement siding over "OSB" siding:



*Id.* The top comparative row shows a layered "doctored" image of a woodpecker penetrating LP's strand-based engineered wood siding. *Id.* ¶28. Although the average consumer might not realize the picture and video of the woodpecker was layered on top existing images and video, a careful inspection reveals that the image and video were fabricated. *Id.* The image and video are fake. In response to the cease and desist letter sent by LP's counsel, Defendant admitted that the woodpecker was superimposed but attempts to pass it off as "puffery." (Dkt. 10-1 at 2). Although the www.nowoodisgood.com website has other disclaimers, Defendant does not disclaim that the woodpecker did not do the damage portrayed or that the image and video are fabricated.

Additionally, in that same website graphic, Defendant displays a picture of warped exterior siding under the "OSB" column, with the caption "SOAKS UP TROUBLE" as shown below:



Olson Dec. at ¶29 and Ex. 2. Even though the picture does not show strand-based engineered wood siding, the picture and caption imply that LP's strand-based engineered wood siding is vulnerable to weather damage that would cause warping and buckling. Olson Dec. at ¶29. And while there is a tiny-font disclaimer corresponding to accompanying asterisks to this picture that reads "Representation of engineered wood product buckling; improper installation may have been a contributing factor.", the disclaimer is in a small font that is remote from the actual image. *Id.* at Ex. 2. In fact, the disclaimer itself is not sufficient, because the disclaimer is literally false as well. In response to the cease and desist letter, Defendant admitted that the image does not show "engineered wood," and claimed that it would correct the mistake but has not done so. (Dkt. 10-1).

D. Madison Area Builders Association Parade of Homes

From June 9, 2018 through June 24, 2018, in Madison, Wisconsin, the Madison Area Builders Association is holding its "Parade of Homes" event. Declaration of Angie Kieta ("Kieta Dec.") ¶3. The event showcases homes, home renovations, building supplies, and other products and services of interest and is geared towards end users and remodelers to give them ideas and guidance for their own projects. *Id.* at ¶4. The event typically hosts around 40,000 attendees, and so far this year, it is on pace to surpass that. *Id.* at ¶5 The attendance for the first two days of the current Parade of Homes has been approximately 8,400 people. *Id.* at ¶6. The Parade of Homes includes nine (9) sites across the Madison and Southern Wisconsin areas with forty-two (42) homes on each site. *Id.* at ¶7. Defendant has advertisements and representatives displayed at no less than twelve (12) of those homes. *Id.* at ¶8, Ex. D. Defendant is displaying the same images and messages referenced above, from its "No Wood is Good" campaign, on printed fliers at the Parade of Homes. *Id.* at ¶¶10-15, Exs. A, C.

## III.  **LAW AND ARGUMENT**

In determining whether to grant injunctive relief, courts must consider (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to another; and (4) whether the public interest would be served by issuing the injunction. *Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*, 453 F.3d 377, 380 (6th Cir. 2006). A temporary restraining order and a preliminary injunction share the same standard. *Ohio Republican Party v. Brunner*, 543 F.3d 357, 361 (6th Cir. 2008). "None of these factors, standing alone, is a prerequisite to relief; rather, they must be balanced." *Taubman Co. v. Webfeats*, 319 F.3d 770, 774 (6th Cir. 2003) (citations omitted). All four factors weigh in LP's favor in this case.

"A somewhat relaxed standard applies to consideration of evidence in the context of a request for preliminary injunctive relief." *Weyerhaeuser NR Co. v. Louisiana-Pac. Corp.*, No. 3:13-00805, 2013 WL 5331246, at *3 (M.D. Tenn. Sept. 23, 2013). "Generally speaking, district courts within this circuit have not required stringent adherence to rules of evidence when reviewing petitions for injunctive relief and have considered [potentially inadmissible] evidence." *Fid. Brokerage Servs. LLC v. Clemens*, No. 2:13-CV-239, 2013 WL 59336671, at *5 (E.D. Tenn. Nov. 4, 2013). In fact, "the Federal Rules of Evidence generally do not apply to preliminary injunction hearings." *Doe #1 by and through Lee v. Sevier Cty., TN*, No. 3:17-CV-41, 2017 WL 1089185, at *2 (E.D. Tenn. Mar. 20, 2017) (internal citations and quotations omitted). Given the purpose of a preliminary injunction, and "given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).

9

Here, Defendant has made false and/or deceptively misleading states in violation of federal and Tennessee law. All of the factors weigh in LP's favor. A temporary restraining order and preliminary injunction to restore the status quo – namely, the last time before unlawful actions at issue – is necessary and appropriate.

A.    LP Is Likely to Succeed on the Merits.

   1.    **Plaintiff Has a Strong Likelihood of Success on the Merits of Its Lanham Act Claim**.

To sustain a claim for unfair competition and false and/or misleading advertising under the Lanham Act, "a plaintiff must establish the following: 1) the defendant has made false or misleading statements of fact concerning his own product or another's; 2) the statement actually or tends to deceive a substantial portion of the intended audience; 3) the statement is material in that it will likely influence the deceived consumer's purchasing decisions; 4) the advertisements were introduced into interstate commerce; and 5) there is some causal link between the challenged statements and harm to the plaintiff." *Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 613–14 (6th Cir. 1999) (citing *U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia,* 898 F.2d 914, 922–23 (3d Cir.1990) *and ALPO Petfoods, Inc. v. Ralston Purina Co.,* 913 F.2d 958, 964 (D.C.Cir.1990)).

   i.    *Defendant's advertising makes literally false and deceptively misleading statements.*

The Lanham Act designates a cause of action for any person who "uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which … misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities" 15 U.S.C. 1125(a). A successful claim for false advertising under the Lanham Act must show "either that the defendant's advertisement is literally

10

false or that it is true yet misleading or confusing." *Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. Of Podiatric Surgery, Inc.*, 185 F.3d 606, 614 (6th Cir. 1999); *Service Jewelry Repair, Inc. v. Cumulus Broadcasting, LLC*, 145 F.Supp. 3d 737, 746 (M.D. Tenn. 2015). "Where the statements are literally false, a violation may be established without evidence that the statements actually misled consumers." *Id*. If the statements are true but misleading or too ambiguous to find literal falsity, actual deception must be proven. *Service Jewelry Repair, Inc. v. Cumulus Broadcasting, LLC* at 746. Whether a statement is too ambiguous to be literally false is a matter of law to be decided by the Court. *Id*.

In the present case, there are multiple literal falsities. First, the picture of the woodpecker, doctored to represent an event that never happened, is a literal falsity. *See Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc.*, 276 F.R.D 278, 316 (D. Minn. 2011) (finding altered images to misrepresent a product were literally false). Both the image and the video show the backside of the woodpecker in the hole in the siding. However, the thickness of the LP's strand-based engineered wood siding ranges between 0.312 inches and 0.375 inches. Olson Dec. at ¶30. The siding is installed over a moisture barrier and attached to either structural framing or wood structural panels or other structural assemblies. *Id*. at ¶31. If the images and video of the woodpecker were truthful and accurate, there would be evidence of the woodpecker going through both the moisture barrier and either the structural framing, wood structural panels, or other structural assemblies. More simply, a hole is the siding alone would not be of sufficient depth (less than .5 inches) to allow a bird to enter the hole with only its head and claws peeking out. Accordingly, the evidence indicates that not only was the woodpecker added to the images and video, but the hole itself was added.

Defendants in this case have admitted to imposing the woodpecker onto the image, even though they claim it to be puffery. (Dkt. 10-1). It is not puffery, which has been defined as

11

"exaggerated advertising, blustering, and boasting upon which no reasonable buyer would rely." *Federal Exp. Corp. v. U.S. Postal Service*, 40 F. Supp. 2d. 943, 954 (W.D. Tenn. 1999) (citing *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir.1997)). Puffery is not "misdescriptions or false representations of specific characteristics of a product." *Id*. at 955 (citing *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 945 (3rd Cir. 1993)). While close inspection may cause a viewer to suspect that the image is doctored, it is clearly intended to strike the eye as a genuine photograph and video. There is no cartoonish or exaggerated element to the image, nor is there a disclaimer. Olson Dec. Ex. 2. The image is a literal falsehood intended to deceive and misrepresent.

Second, the statement that termites "love" LP's strand-based engineered wood siding products is literally false. The SmartSide® products are treated with a proprietary zinc borate-based process that resists damages from pests. Olson Dec. at ¶9. To put the termite resistance of LP siding products to the ultimate test, LP regularly expose samples to Formosan termites, widely recognized as one of the world's most destructive pests. *Id*. at ¶ 10. Each sample is placed on a plastic grid, surrounded by untreated bait samples, then laid directly on top of termite colonies. *Id*. ¶11. Even after three years, the LP SmartSide® siding showed no structural damage, while the bait samples were completely destroyed within three months. *Id*. ¶12. No reasonable, unbiased scientist or other expert would say that termites love LP's strand-based engineered wood siding products.

Third, the image of the warped wood-based siding is literally false. Defendant even admitted as much in a response to LP's Cease and Desist Letter. (Dkt. 10-1). The claim that the picture depicts "engineered wood" (code for LP's SmartSide® products) is false, and to make the claim even more deceptive, it is made in a disclaimer, stating "Representation of engineered wood product buckling; improper installation may have been a contributing factor." The actual picture is intended to confuse and deceive, and even a thorough investigation by a discerning customer to

12

check the corresponding referenced footnote (hidden at the bottom of a long website in tiny font) would only turn up further deception. This is because the wood in the picture is *not* engineered wood – let alone LP's strand-based engineered wood siding. Defendant, who was aware of that fact, published the statement in an attempt to deceive customers.

Defendant's advertising is riddled with statements that are technically not false but confusing or deceiving, such as claims that "wood-based siding" is "subject to damage by woodpeckers, termites, and other pests." The inference, even when Defendant refrains from using LP's name in its advertising, is that LP's products are vulnerable to such damage, because LP is Defendant's largest competitor and has come to be identified with wood-based siding throughout the industry. This misleads customers, because LP's products are proven to resist termite damage. Defendant's claims about "wood-based" or "OSB" or "engineered wood" being subject to water and weather damage is possibly too ambiguous to be considered literally false, but again the implication is that LP's SmartSide® product has these defects, which it does not. However, LP intends to take discovery as soon as permitted[4] and show that these, and other, misleading and deceptive claims do actually confuse and misinform consumers, as they are intended to, by conducting comprehensive market surveys and procuring expert testimony in support thereof.

Thus, a Lanham Act violation is certain, because of the literally false claims, and the true but misleading claims can be shown to actually cause confusion and mistake. Once this Court enjoins Defendant's behavior, and discovery begins, Defendant's intent and the effect of its deception will be revealed.

---

[4] LP filed a Motion for Expedited Discovery and supporting memorandum with the prior motion for preliminary injunction. (Dkts. 13, 14).

13

          *ii.*      *The statements actually or tend to deceive a substantial portion of the intended audience.*

Here, the literally falsity of Defendant's statements and related images and video create the presumption of actual deception. "If a plaintiff proves that the statements were literally false, the plaintiff may prevail without evidence that the false statements actually misled consumers because actual deception is presumed." *LidoChem, Inc. v. Stoller Enters.*, 500 Fed.Appx. 373, 380 (6th Cir. 2012). If a statement is not literally false, or is true but misleading, a plaintiff seeking injunctive relief must show "that the defendant's representations about its product have a tendency to deceive consumers." *Am. Council of Certified Podiatric Physicians & Surgeons*, 185 F.3d at 613-14 (6th Cir. 1999).

Even if the Court finds that the statements, images, and video are not literally false (which Plaintiff disputes), the misleading nature of the statements, images, and video would deceive, if they have not already deceived, a substantial portion of the intended audience. But for a close inspection (and perhaps more importantly, a reason to conduct such close inspection), a consumer would not be able to tell that the woodpecker was placed in the image and video; the statement regarding termites is not supported by evidence and would not apply to LP's products; and the warped siding was not LP's product and faulty installation was likely the cause regardless of the origin of the product. A consumer simply would have no way to know that he/she is being misled by the "No Wood Is Good" advertising campaign including, but not limited to, by the statements at issue in the Motion for Preliminary Injunction.[5]

---

[5] Plaintiff reserves the right to present evidence of deception via expert evidence should the Court not determine the statements, images, and video are literally false.

14

### iii. The statements are material and will influence customer decisions.

False advertisement claims require courts to consider, among other things, "the extent to which the advertisement fails to reveal facts material in the light of such representations or material with respect to consequences which may result from the use of the commodity to which the advertisement relates under the conditions prescribed in said advertisement." 15 U.S.C.A. § 55 Although this Circuit has not addressed the issue, other courts have found that when the claim involves an inherent quality or characteristic of a product, there is a presumption of materiality that can be rebutted only by strong evidence to the contrary. *See, e.g.*, *Southland Sod Farms v. Stover Seed Co.* at 1146; *Nat'l Basketball Ass'n v. Motorola, Inc.,* 105 F.3d 841, 855 (2d Cir.1997); *Precision IBC, Inc. v. PCM Capital, LLC*, No. CIV.A. 10-0682-CG-B, 2012 WL 750744, at *3 (S.D. Ala. Mar. 5, 2012).

In this case, the false and/or misleading assertions made by Defendant involve inherent and essential qualities of LP's products. A significant portion of the significant time, money, and labor of LP's research, development, and marketing is spent on the very elements that Defendant's false claims deceptively attack. When consumers are deciding between exterior siding products, resistance to pests and the elements is high on their list of priorities. Defendant's claims strike directly at those concerns, as they are intended to. There can be no dispute about the effect that these claims have on potential customers.

### iv. The statements were made in interstate commerce.

Defendant is a company that operates and sells products nationwide. The statements made on the www.nowoodisgood.com website are available everywhere. The Internet and Defendant's statements therefore have no geographic boundaries. Upon information and believe, Defendant's marketing materials have been distributed beyond its principal place of business in Chicago,

Illinois. Olson Dec. ¶32. The statements have been and continue to be made in interstate commerce.

> v. *There is a causal link between the statements and the harm to LP.*

Although a causal link cannot be assumed, when the false advertisement is a comparative one between two competitors, courts have determined that such a link is very likely. *See, e.g.*, *Vidal Sassoon, Inc. v. Bristol-Myers Co.*, 661 F.2d 272, 278 (2d Cir. 1981) (stating that two parties "compete in the same market, and it is quite likely that the apparently effective suggestions of competitive superiority, if repeatedly communicated to consumers, would eventually result in loss of sales"); *Am. Rockwool, Inc. v. Owens-Corning Fiberglas Corp.*, 640 F. Supp. 1411, 1443 (E.D.N.C. 1986) ("plaintiff need only show that it and the defendant are competitors within a certain market and that defendant's alleged statements could logically affect plaintiff's sales market").

Here, it is clear that Defendant's objective is to gain market share in the exterior siding market. That is why it has dedicated so much of its advertising campaign, including the advertising being made at the Parade of Homes, to making false claims about "wood" siding: LP's strand-based engineered wood siding products are in direct market competition with Defendant's fiber cement products. It is indeed logical to assume that misinforming potential customers as to the inherent and important characteristics of the respective products in comparative advertisements will result in damage to the disparaged product's market share. As discussed, Defendant's deceptive assertions are directed at the essence of LP's products and potential customers' choices.

### 2. Plaintiff Has a Strong Likelihood of Success on the Merits of Its Tennessee State Law Claims

In addition to the Lanham Act claims, LP also brings forth common law and state law claims, for which LP has a strong likelihood of success.

16

*i.*       *Tennessee Consumer Protection Act*

The Tennessee Consumer Protection Act (TCPA) at Tenn. Code Ann. § 47-18-104 provides a list of deceptive and prohibited practices. In pertinent part, the TCPA forbids:

> \* Representing that goods or services have sponsorship, approval, **characteristics**, ingredients, uses, **benefits** or quantities that they do not have or that a person has a sponsorship approval, status, affiliation or connection that such person does not have;
>
> \* Representing that goods or services are of a particular **standard**, **quality** or grade, or that goods are of a particular style or model, if they are of another;
>
> \* Disparaging the goods, services or business of another by false or misleading representations of fact; [and]
>
> \* Using **statements or illustrations** in any advertisement which create a false impression of the grade, quality, quantity, make, value, age, size, color, usability or origin of the goods or services offered, or which may otherwise misrepresent the goods or services in such a manner that later, on disclosure of the true facts, there is a likelihood that the buyer may be switched from the advertised goods or services to other goods or services

Tenn. Code Ann. § 47-18-104(b) (emphasis added).

Defendant violated each of the above listed provisions of the TCPA. It represents its goods have characteristics that they do not have and that the goods are of a particular standard that they are not. The primary characteristic that is untruthfully represented is that of Defendant's fiber cement being superior to LP's SmartSide® products, and the standard or qualities misrepresented are, *inter alia*, the implications and statements regarding Defendant's products' comparative susceptibility to pests and moisture damage to that of LP's siding products. As previously discussed, Defendant uses false imagery to disparage the goods of LP. Thus, LP's claims under the TCPA are solidly founded and likely to succeed on their merits.

17

## ii.    Tortious Interference

Defendant's false advertising also creates a cause of action for tortious interference with existing and prospective economic relations at common law. The tort requires LP to show (1) a prospective relationship with an identifiable class of third persons; (2) that Defendant knew of the relationship/s; (3) that Defendant intended to cause the termination of the business relationship; (4) that Defendant have "improper motives" or employ "improper means"; and (5) damages caused by the interference. *Watson's Carpet & Floor Coverings, Inc. v. McCormick*, 247 S.W.3d 169, 176 (Tenn. Ct. App. 2007). Some examples given by the Supreme Court of Tennessee of "improper means" are "violence, threats or intimidation, bribery, unfounded litigation, fraud, ***misrepresentation or deceit***, defamation, duress, undue influence, *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 704 n.5 (Tenn. 2002) (emphasis added).

LP certainly has prospective relationships with third persons, easily identifiable as homeowners and business owners who are in the market for quality exterior siding. As LP is Defendant's main competitor in the market, it should be clear that Defendant knew of LP's prospective business relationships. Defendant's intent is also transparent. Defendant wished to disparage and misrepresent the qualities of its products and those of LP. Defendant's constant references to "OSB" and "engineered wood" are just code in the industry for "LP" siding products, because of LP's reputation and market share. Thus, Defendant's intent was to sever LP's prospective business relationships with consumers and existing relationships with vendors and distributors. While further discovery may reveal improper motives, the false claims and deceptive advertising campaign is sufficient evidence of improper means. Finally, the damage done is not neatly quantifiable, but it is actual and substantial. Defendant's faulty campaign has doubtlessly harmed LP's goodwill and market position, and they have done so intentionally, knowingly, and unlawfully.

18

### iii. Common Law Unfair Competition

"[U]nfair competition … can be found when the defendant engages in any conduct that amounts to a recognized tort and when that tort deprives the plaintiff of customers or other prospects." *Dade International, Inc. v. Iverson*, 9 F. Supp. 2d 858, 862 (M.D.Tenn. 1998) (quoting Prosser and Keeton on the Law of Torts § 130 at 1014 (5th ed.1984); *see also PHG Techs., LLC v. St. John Companies, Inc.*, 459 F. Supp. 2d 640, 645 (M.D. Tenn. 2006). As alleged above, Defendant has engaged in other recognized torts. LP also has identified a class of lost prospective customers and existing customers that Defendant intended to steal from LP and cause the termination of relationships with LP. Being direct competitors, Defendant knew of this class of prospective and existing customers. These torts were intentional with the intent to injure LP and its reputation for its products among consumers generally. Accordingly, Defendant has engaged in unfair competition under Tennessee law.

### B. LP Will Be Irreparably Harmed if the False Advertising is Not Restrained and Enjoined.

In cases where false advertising is shown, irreparable harm is presumed. *McNeilab, Inc. v. American Home Prods. Corp.,* 848 F.2d 34, 38 (2d Cir.1988). Proof of falsity is sufficient to sustain a finding of irreparable injury when the false claim is "made in the context of comparative advertisements between the plaintiff's and defendant's products*." N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1227 (11th Cir. 2008). The loss of customer goodwill and business relationships that are a consequence of unfair competition constitute irreparable harm. *See AmeriGas Propane, Inc. v. Crook*, 844 F. Supp. 379, 390 (M.D. Tenn. 1993) (finding that "competitive injuries and loss of customer goodwill" constitutes irreparable harm); *see also*, *Int'l Sec. Mgmt. Grp., Inc. v. Sawyer*, No. 3:06-CV-0456, 2006 WL 1638537, at *8 (M.D. Tenn. 2006) (loss of customer goodwill and loss of fair competition as a result of breach of non-compete

19

agreement deemed irreparable harm). "Loss of good will, client trust, confidence and confidentiality and competitive advantage constitute irreparable harm for which there is no adequate remedy at law." *Basiccomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992). The loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute. *Basiccomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992); *Southern Glazer's Distributors of Ohio, LLC v. Great Lakes Brewing Company* 860 F.3d 844, 852 (6th Cir. 2017).

In this case, Defendant's statements are false and intended to deter consumers from purchasing LP's products. They are also presented in a comparative context. Due to the fact that LP is known as an industry leader in the products that Defendant's advertising falsely represents, it is very likely that these false representations will negatively affect the goodwill LP has established in its products with its customers, which will have consequences on the goodwill it seeks to establish with prospective customers. This damage, if it could ever be calculated because one cannot tell the precise number of consumers that were either lost (to the Defendant or another competitor), is irreparable. This is especially true at an event such as the Parade of Homes, which draws tens of thousands of existing and potential customers.

C.      The Issuance of a Restraining Order and an Injunction Will Not Cause Substantial Harm to Others.

The balance of harms factor weighs in favor of LP. LP has expended considerable amounts of money, time, and resources to developing strand-based engineered wood products that stand up to pests and moisture. Olson Dec. at ¶8. Any harm to Defendant is insignificant when balanced against the irreparable injury to Plaintiff's investments in its products. *See Dunkin' Donuts Franchised Restaurants LLC v. N. Thakkar, Inc.*, No. 1:08-CV-245-SSB-TSB, 2009 WL 10679563, at *5 (S.D. Ohio June 9, 2009)

20

Moreover, Defendant has only recently started its "No Wood Is Good" advertising campaign and will suffer minimal if any harm by ceasing the use of the statements and images at issue. Indeed, the domain name for nowoodisgood.com was first registered on February 15, 2018. Olson Dec. at ¶21 and Ex. 1. LP is not seeking to prevent Defendant from advertising generally or making lawful sales pitches regarding Defendant's products at the Parade of Homes or otherwise. As Defendant has employed for several years, Defendant has alternatives to the false and/or deceptively misleading statements and images at issue in this Motion. These facts tip the balance of harms in favor of LP. *See*, *e.g.*, *Express Mortg. Brokers, Inc. v. Simpson Mortg., Inc.*, No. CIVIL A. 94-71056, 1994 WL 465842, at *5 (E.D. Mich. May 6, 1994).

D. A Temporary Restraining Order and an Injunction Will Serve the Public Interest.

It should be obvious that "preventing false or misleading advertising is in the public interest in general." *PBM Prod., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 127 (4th Cir. 2011). It is also in the public interest to guard against violations of the statutes of the state. *NACCO Materials Handling Grp., Inc. v. Toyota Materials Handling USA, Inc.*, 2005 WL 2649208, at *15 (W.D. Tenn. Oct. 17, 2005). The TCPA states its purposes as, *inter alia*, "[t]o protect consumers and legitimate business enterprises from those who engage in unfair or deceptive acts or practices in the conduct of any trade or commerce in part or wholly within this state … [and t]o encourage and promote the development of fair consumer practices". Tenn. Code Ann. § 47-18-102. The public interest is strong in protecting the rule of law and the informed consumer base. In this case, the public interest is somewhat greater than a typical commercial dispute, because of the utilitarian value that exterior siding has in protecting peoples' homes and other important structures. This factor weighs in LP's favor as well.

21

E.    The Court Should Waive the Requirement of Posting a Bond.

In this Circuit, "the district court possesses discretion over whether to require the posting of security" for preliminary injunctions. *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995). Waiver of a bond requirement can be appropriate when the public interest is significant, the movant has a strong case, and/or when the non-moving party's damages are minimal or speculative. *Bosley v. Wildwett.com*, 310 F. Supp. 2d 914, 936 (N.D. Ohio 2004). In light of Defendant's demonstrably, and even admittedly, false claims, LP's case is strong enough that this Court should waive the requirement of posting a bond for the preliminary injunction. Additionally, the harm to Hardie is scantly existent, in that they will merely have to cease using the false and/or misleading statements at the Parade of Homes, which will ultimately benefit them, as the old but true adage about honesty and good policy suggests.

## IV.    CONCLUSION

For the foregoing reasons, LP respectfully requests the Court grant its Motion and restrain and enjoin Defendant's false and/or misleading advertising activities as set forth in the Motion.

Respectfully submitted,

/s/ Samuel F. Miller
Samuel F. Miller (TN BPR #22936)
Nicholas R. Valenti (TN BPR #35420)
Fifth Third Center – Suite 2000
424 Church Street
Nashville, TN 37219
Telephone/Fax: (615) 988-9011
Email: SamMiller@bahoumiller.com
        NValenti@bahoumiller.com

22

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that on the 13th day of June 2018, a copy of the foregoing was served on counsel of record listed below via email and U.S. Mail:

Maia T. Woodhouse
Adams & Reese LLP
424 Church Street, Suite 2700
Nashville, Tennessee 37219
maia.woodhouse@arlaw.com

/s/ Samuel F. Miller
Samuel F. Miller

23