## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| **LOUISIANA-PACIFIC CORPORATION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 3:18-cv-00447** |
| | ) | |
| **JAMES HARDIE BUILDING** | ) | **DISTRICT JUDGE JON P. McCALLA** |
| **PRODUCTS, INC.,** | ) | |
| | ) | **JURY DEMAND** |
| **Defendant.** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **JAMES HARDIE BUILDING** | ) | |
| **PRODUCTS, INC.,** | ) | |
| | ) | |
| **Counter-Plaintiff/Third-Party** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **LOUISIANA-PACIFIC CORPORATION** | ) | |
| **and THE KRUSE BROTHERS, INC.,** | ) | |
| | ) | |
| **Counter-Defendant and Third-Party** | ) | |
| **Defendant.** | ) | |

_____

### JAMES HARDIE BUILDING PRODUCTS, INC.'S ANSWER TO COMPLAINT AND COUNTERCLAIMS AGAINST LOUISIANA-PACIFIC CORPORATION AND THIRD PARTY COMPLAINT AGAINST THE KRUSE BROTHERS, INC.

_____

In response to the allegations contained in Plaintiff Louisiana-Pacific Corporation's

("LP") Complaint [Doc. 1], Defendant James Hardie Building Products, Inc. ("James Hardie")

states as follows:

## RESPONSES TO SPECIFIC ALLEGATIONS
## CONTAINED IN THE COMPLAINT

1.     James Hardie lacks knowledge sufficient to form a belief as to the truth of the allegations contained in paragraph 1 of the Complaint, and, therefore, denies those allegations.

2.     James Hardie admits the truth of the allegations of paragraph 2 of the Complaint.

3.     In response to the allegations contained in paragraph 3 of the Complaint, James Hardie admits that LP and James Hardie are competitors in the manufactured siding industry. James Hardie denies that James Hardie "routinely and consistently refers to LP's strand-based engineered wood siding products as oriented strand board ("OSB")." James Hardie lacks knowledge sufficient to form a belief as to the truth of the allegation that "there are significant differences between the SmartSide® siding products and common OSB," and, therefore, denies those allegations. James Hardie admits that it offers fiber cement siding under the James Hardie® trademark and JH brand. James Hardie denies the truth of the remainder of the allegations contained in paragraph 3 of the Complaint.

4.     In response to the allegations contained in paragraph 4 of the Complaint, James Hardie admits that LP "asserts" that James Hardie "has made and continues to make literally false and/or deceptively misleading statements in advertising and promoting Defendant's siding that constitute (a) false advertising in violations [*sic*] of Section 43 of the Trademark Act of 1946 (also known as the Lanham Act), as amended, 15 U.S.C. § 1125; (b) unfair competition under Tennessee law; (c) violations of the Tennessee Consumer Protection Act, Tenn. Code Ann. §47-18-1041 [*sic*] *et seq.*; and (d) tortious interference under Tennessee law." James Hardie denies that it "has made and continues to make literally false and/or deceptively misleading statements in advertising and promoting Defendant's siding that constitute (a) false advertising in violations [*sic*] of Section 43 of the Trademark Act of 1946 (also known as the Lanham Act), as amended,

2

15 U.S.C. § 1125; (b) unfair competition under Tennessee law; (c) violations of the Tennessee Consumer Protection Act, Tenn. Code Ann. §47-18-1041 [*sic*] *et seq.*; and (d) tortious interference under Tennessee law." James Hardie further expressly denies that LP is entitled to any relief whatsoever against it.

5.      Paragraph 5 of the Complaint is merely a recitation of statutes and, therefore, requires no response. To the extent a response is required, James Hardie admits that subject matter jurisdiction is proper in this Court. Notwithstanding, James Hardie expressly denies that LP is entitled to any relief whatsoever against it.

6.      Paragraph 6 of the Complaint is merely a recitation of statutes and, therefore, requires no response. To the extent a response is required, James Hardie admits that subject matter jurisdiction is proper in this Court. Notwithstanding, James Hardie expressly denies that LP is entitled to any relief whatsoever against it.

7.      Paragraph 7 of the Complaint is merely a recitation of statutes and, therefore, requires no response. To the extent a response is required, James Hardie admits that supplemental jurisdiction is proper in this Court. Notwithstanding, James Hardie expressly denies that LP is entitled to any relief whatsoever against it.

8.      Paragraph 8 of the Complaint is merely a recitation of statutes and, therefore, requires no response. To the extent a response is required, James Hardie denies that this Court has general personal jurisdiction over James Hardie. James Hardie further denies that this Court has specific personal jurisdiction over James Hardie based on any claims arising out of James Hardie's contacts with this district. Subject to and without waiving the foregoing, James Hardie submits to the jurisdiction of this Court for the limited purpose of this litigation.

3

Notwithstanding, James Hardie expressly denies that LP is entitled to any relief whatsoever against it.

9.      Paragraph 9 of the Complaint is merely a recitation of statutes and, therefore, requires no response.  To the extent a response is required, James Hardie admits that venue is proper in this Court.  Notwithstanding, James Hardie expressly denies that LP is entitled to any relief whatsoever against it.

10.     James Hardie lacks knowledge sufficient to form a belief as to the truth of the allegations contained in paragraph 10 of the Complaint, and, therefore, denies those allegations.

11.     James Hardie lacks knowledge sufficient to form a belief as to the truth of the allegations contained in paragraph 11 of the Complaint, and, therefore, denies those allegations.

12.     James Hardie lacks knowledge sufficient to form a belief as to the truth of the allegations contained in paragraph 12 of the Complaint, and, therefore, denies those allegations.

13.     James Hardie lacks knowledge sufficient to form a belief as to the truth of the allegations contained in paragraph 13 of the Complaint, and, therefore, denies those allegations.

14.     James Hardie lacks knowledge sufficient to form a belief as to the truth of the allegations contained in paragraph 14 of the Complaint, and, therefore, denies those allegations.

15.     James Hardie lacks knowledge sufficient to form a belief as to the truth of the allegations contained in paragraph 15 of the Complaint, and, therefore, denies those allegations.

16.     James Hardie lacks knowledge sufficient to form a belief as to the truth of the allegations contained in paragraph 16 of the Complaint, and, therefore, denies those allegations.

17.     James Hardie lacks knowledge sufficient to form a belief as to the truth of the allegations contained in paragraph 17 of the Complaint, and, therefore, denies those allegations.

18.     James Hardie lacks knowledge sufficient to form a belief as to the truth of the allegations contained in paragraph 18 of the Complaint, and, therefore, denies those allegations.

19.     James Hardie lacks knowledge sufficient to form a belief as to the truth of the allegations contained in paragraph 19 of the Complaint, and, therefore, denies those allegations.

20.     James Hardie denies the truth of the allegations contained in paragraph 20 of the Complaint.

21.     James Hardie lacks knowledge sufficient to form a belief as to the truth of the allegations contained in paragraph 21 of the Complaint, and, therefore, denies those allegations.

22.     James Hardie lacks knowledge sufficient to form a belief as to the truth of the allegations contained in paragraph 22 of the Complaint, and, therefore, denies those allegations.

23.     James Hardie admits the truth of the allegations contained in paragraph 23 of the Complaint.

24.     James Hardie denies the truth of the allegations contained in paragraph 24 of the Complaint.

25.     In response to the allegations contained in paragraph 25 of the Complaint, James Hardie admits that James Hardie and LP are competitors in the manufactured siding industry. James Hardie denies the truth of the remainder of the allegations contained in paragraph 25 of the Complaint.

26.     James Hardie denies the truth of the allegations contained in paragraph 26 of the Complaint.

27.     James Hardie admits the truth of the allegations contained in paragraph 27 of the Complaint.

5

28.     James Hardie denies the truth of the allegations contained in paragraph 28 of the Complaint.

29.     James Hardie denies the truth of the allegations contained in paragraph 29 of the Complaint.

30.     In response to the allegations contained in paragraph 30 of the Complaint, James Hardie admits that it owns and operates the website located at the domain name www.nowoodisgood.com. James Hardie denies that the website located at the domain name www.nowoodisgood.com is properly characterized as an "Offending Website."

31.     In response to the allegations contained in paragraph 31 of the Complaint, James Hardie states that Docket Entry 1-1 appears to be a Civil Cover Sheet, not an exhibit to the Complaint. James Hardie admits that the document filed as Docket Entry 1-2 appears to be a true and correct copy of screenshots of the website located at the domain name www.nowoodisgood.com. James Hardie denies that the website located at the domain name www.nowoodisgood.com is properly characterized as an "Offending Website."

32.     In response to the allegations contained in paragraph 32 of the Complaint, James Hardie admits that the website located at the domain name www.nowoodisgood.com features James Hardie's name and trademarks. James Hardie denies that the website located at the domain name www.nowoodisgood.com is properly characterized as an "Offending Website."

33.     In response to the allegations contained in paragraph 33 of the Complaint, James Hardie admits that the website located at the domain name www.nowoodisgood.com features a copyright notice at the bottom of the homepage that states: "© 2018 James Hardie Building Products Inc. All Rights Reserved." James Hardie denies that the website located at the domain name www.nowoodisgood.com is properly characterized as an "Offending Website."

34.     In response to the allegations contained in paragraph 34 of the Complaint, James Hardie admits that the website located at the domain name www.nowoodisgood.com contains links to other websites owned by James Hardie.  James Hardie denies that the website located at the domain name www.nowoodisgood.com is properly characterized as an "Offending Website."

35.     In response to the allegations contained in paragraph 35 of the Complaint, James Hardie states that Docket Entry 1-2 speaks for itself.  James Hardie denies any allegations contained in paragraph 35 that are inconsistent with Docket Entry 1-2.  James Hardie further denies that the website located at the domain name www.nowoodisgood.com is properly characterized as an "Offending Website."

36.     In response to the allegations contained in paragraph 36 of the Complaint, James Hardie states that Docket Entry 1-2 speaks for itself.  James Hardie denies any allegations contained in paragraph 36 that are inconsistent with Docket Entry 1-2.  James Hardie further denies that the website located at the domain name www.nowoodisgood.com is properly characterized as an "Offending Website."

37.     In response to the allegations contained in paragraph 37 of the Complaint, James Hardie states that Docket Entry 1-2 speaks for itself.  James Hardie denies any allegations contained in paragraph 37 that are inconsistent with Docket Entry 1-2.  James Hardie further denies that the website located at the domain name www.nowoodisgood.com is properly characterized as an "Offending Website."

38.     James Hardie denies the truth of the allegations contained in paragraph 38 of the Complaint.

39.     James Hardie lacks knowledge sufficient to form a belief as to the truth of the allegations contained in paragraph 39 of the Complaint, and, therefore, denies those allegations.

40.　　James Hardie denies the truth of the allegations contained in paragraph 40 of the Complaint.

41.　　In response to the allegations contained in paragraph 41 of the Complaint, James Hardie states that Docket Entry 1-2 speaks for itself. James Hardie denies any allegations contained in paragraph 41 that are inconsistent with Docket Entry 1-2. James Hardie further denies that the website located at the domain name www.nowoodisgood.com is properly characterized as an "Offending Website."

42.　　James Hardie denies the truth of the allegations contained in paragraph 42 of the Complaint.

43.　　James Hardie denies the truth of the allegations contained in paragraph 43 of the Complaint.

44.　　James Hardie denies the truth of the allegations contained in paragraph 44 of the Complaint.

45.　　In response to the allegations contained in paragraph 45 of the Complaint, James Hardie states that Docket Entry 1-2 speaks for itself. James Hardie denies any allegations contained in paragraph 45 that are inconsistent with Docket Entry 1-2. James Hardie further denies that the website located at the domain name www.nowoodisgood.com is properly characterized as an "Offending Website."

46.　　In response to the allegations contained in paragraph 46 of the Complaint, James Hardie admits that the photograph of siding on the website located at www.nowoodisgood.com under the phrase "SOAKS UP TROUBLE" is a photograph of LP's fiber-based siding. James Hardie denies the truth of the remainder of the allegations contained in paragraph 46 of the Complaint.

47. James Hardie denies the truth of the allegations contained in paragraph 47 of the Complaint.

48. In response to the allegations contained in paragraph 48 of the Complaint, James Hardie states that Docket Entry 1-2 speaks for itself. James Hardie denies any allegations contained in paragraph 48 that are inconsistent with Docket Entry 1-2. James Hardie further denies that the website located at the domain name www.nowoodisgood.com is properly characterized as an "Offending Website."

49. In response to the allegations contained in paragraph 49 of the Complaint, James Hardie admits that the photograph of siding on the website located at www.nowoodisgood.com under the phrase "WON'T WEATHER WELL" is a photograph of LP's strand-based engineered wood siding product. James Hardie denies the truth of the remainder of the allegations contained in paragraph 49 of the Complaint.

50. James Hardie denies the truth of the allegations contained in paragraph 50 of the Complaint.

51. In response to the allegations contained in paragraph 51 of the Complaint, James Hardie admits that it published and distributed a flier that states "James Hardie® siding outperforms wood-based siding." James Hardie denies the truth of the allegations contained in paragraph 51 of the Complaint.

52. In response to the allegations contained in paragraph 31 of the Complaint, James Hardie admits that the document filed as Docket Entry 1-3 appears to be a true and correct copy of a flier distributed by James Hardie. James Hardie denies that the flier filed as Docket Entry 1-3 is properly characterized as an "Offending Flier."

9

53.     James Hardie denies the truth of the allegations contained in paragraph 53 of the Complaint.

54.     In response to the allegations contained in paragraph 54 of the Complaint, James Hardie states that Docket Entry 1-3 speaks for itself.  James Hardie denies any allegations contained in paragraph 54 that are inconsistent with Docket Entry 1-3.  James Hardie further denies that the flier filed as Docket Entry 1-3 is properly characterized as an "Offending Flier."

55.     In response to the allegations contained in paragraph 55 of the Complaint, James Hardie states that Docket Entry 1-3 speaks for itself.  James Hardie denies any allegations contained in paragraph 55 that are inconsistent with Docket Entry 1-3.

56.     In response to the allegations contained in paragraph 56 of the Complaint, James Hardie states that Docket Entry 1-3 speaks for itself.  James Hardie denies any allegations contained in paragraph 56 that are inconsistent with Docket Entry 1-3.

57.     In response to the allegations contained in paragraph 57 of the Complaint, James Hardie states that Docket Entry 1-3 speaks for itself.  James Hardie denies any allegations contained in paragraph 57 that are inconsistent with Docket Entry 1-3.  James Hardie further denies that the referenced picture depicts particle board.

58.     In response to the allegations contained in paragraph 58 of the Complaint, James Hardie states that Docket Entry 1-3 speaks for itself.  James Hardie denies any allegations contained in paragraph 58 that are inconsistent with Docket Entry 1-3.  James Hardie further denies that the referenced picture depicts particle board.

59.     In response to the allegations contained in paragraph 59 of the Complaint, James Hardie states that Docket Entry 1-3 speaks for itself.  James Hardie denies any allegations

contained in paragraph 59 that are inconsistent with Docket Entry 1-3. James Hardie further denies that the referenced picture depicts particle board.

60.     In response to the allegations contained in paragraph 60 of the Complaint, James Hardie states that Docket Entry 1-3 speaks for itself. James Hardie denies any allegations contained in paragraph 60 that are inconsistent with Docket Entry 1-3.

61.     James Hardie denies the truth of the allegations contained in paragraph 61 of the Complaint.

62.     James Hardie denies the truth of the allegations contained in paragraph 62 of the Complaint.

63.     In response to the allegations contained in paragraph 63 of the Complaint, James Hardie admits that James Hardie, directly or through its agents or representatives, markets to retailers, contractors, and other consumers in or related to the construction and/or building supplies industries. James Hardie lacks knowledge sufficient to form a belief as to the truth of the allegation that James Hardie "made the same or similar statements as those found on the Offending Website and in the Offending Flier" and, therefore, denies those allegations. James Hardie denies that the website located at the domain www.nowoodisgood.com is properly characterized as an "Offending Website." James Hardie denies that the flier filed as Docket Entry 1-3 is properly characterized as an "Offending Flier." James Hardie further denies that LP is entitled to any relief whatsoever against it.

64.     James Hardie denies the truth of the allegations contained in paragraph 64 of the Complaint.

65.     James Hardie denies the truth of the allegations contained in paragraph 65 of the Complaint.

66.     James Hardie denies the truth of the allegations contained in paragraph 66 of the Complaint.

67.     James Hardie denies the truth of the allegations contained in paragraph 67 of the Complaint.

68.     In response to the allegations contained in paragraph 68 of the Complaint, James Hardie incorporates by reference its responses to the preceding paragraphs as if fully set forth herein.

69.     James Hardie denies the truth of the allegations contained in paragraph 69 of the Complaint.

70.     James Hardie denies the truth of the allegations contained in paragraph 70 of the Complaint.

71.     James Hardie denies the truth of the allegations contained in paragraph 71 of the Complaint.

72.     James Hardie denies the truth of the allegations contained in paragraph 72 of the Complaint.

73.     James Hardie denies the truth of the allegations contained in paragraph 73 of the Complaint.

74.     James Hardie denies the truth of the allegations contained in paragraph 74 of the Complaint.

75.     James Hardie denies the truth of the allegations contained in paragraph 75 of the Complaint.

76.     James Hardie denies the truth of the allegations contained in paragraph 76 of the Complaint.

77.     James Hardie denies the truth of the allegations contained in paragraph 77 of the Complaint.

78.     James Hardie denies the truth of the allegations contained in paragraph 78 of the Complaint.

79.     James Hardie denies the truth of the allegations contained in paragraph 79 of the Complaint.

80.     James Hardie denies the truth of the allegations contained in paragraph 80 of the Complaint.

81.     James Hardie denies the truth of the allegations contained in paragraph 81 of the Complaint.

82.     James Hardie denies the truth of the allegations contained in paragraph 82 of the Complaint.

83.     James Hardie denies the truth of the allegations contained in paragraph 83 of the Complaint.

84.     In response to the allegations contained in paragraph 84 of the Complaint, James Hardie incorporates by reference its responses to the preceding paragraphs as if fully set forth herein.

85.     James Hardie denies the truth of the allegations contained in paragraph 85 of the Complaint.

86.     James Hardie denies the truth of the allegations contained in paragraph 86 of the Complaint.

87.     James Hardie denies the truth of the allegations contained in paragraph 87 of the Complaint.

88.     James Hardie denies the truth of the allegations contained in paragraph 88 of the Complaint.

89.     James Hardie denies the truth of the allegations contained in paragraph 89 of the Complaint.

90.     James Hardie denies the truth of the allegations contained in paragraph 90 of the Complaint.

91.     In response to the allegations contained in paragraph 91 of the Complaint, James Hardie incorporates by reference its responses to the preceding paragraphs as if fully set forth herein.

92.     James Hardie denies the truth of the allegations contained in paragraph 92 of the Complaint.

93.     James Hardie denies the truth of the allegations contained in paragraph 93 of the Complaint.

94.     James Hardie denies the truth of the allegations contained in paragraph 94 of the Complaint.

95.     In response to the allegations contained in paragraph 95 of the Complaint, James Hardie incorporates by reference its responses to the preceding paragraphs as if fully set forth herein.

96.     In response to the allegations contained in paragraph 96 of the Complaint, James Hardie admits that it is aware that LP has customers generally.  James Hardie lacks knowledge sufficient to sufficient to form a belief as to the truth of the remainder of the allegations contained in paragraph 96 of the Complaint, and, therefore, denies those allegations.

14

97.     In response to the allegations contained in paragraph 97 of the Complaint, James Hardie admits that it is aware that LP has customers generally.  James Hardie lacks knowledge sufficient to sufficient to form a belief as to the truth of the remainder of the allegations contained in paragraph 97 of the Complaint, and, therefore, denies those allegations.

98.     James Hardie denies the truth of the allegations contained in paragraph 98.

99.     James Hardie denies the truth of the allegations contained in paragraph 99 of the Complaint.

100.     James Hardie denies the truth of the allegations contained in paragraph 100 of the Complaint.

101.     James Hardie denies the truth of the allegations contained in paragraph 101 of the Complaint.

102.     James Hardie denies the truth of the allegations contained in paragraph 102 of the Complaint.

103.     The remainder of the allegations in the Complaint being merely prayers for relief or demand for a jury trial requires no response. Notwithstanding, James Hardie denies that LP is entitled to any relief whatsoever against it.

104.     Any allegations contained in the Complaint that are not expressly admitted above are hereby denied.

## DEFENSES

105.     The burden of proof with respect to any of the defenses and issues listed below are as provided by Tennessee law.  Characterizing the defenses below as "Affirmative Defenses" does not shift the burden of proof to James Hardie with respect to any issues for which LP carries the burden of proof.

15

106.     LP's Complaint fails to state a claim upon which relief can be granted because James Hardie has not performed any act, and is not proposing to perform any act, in violation of any right validly belonging to LP.

107.     LP's Complaint fails to sufficiently plead claims as required by *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).

108.     LP's request for injunctive relief is barred because LP has delayed in asserting the claims; the claims are not likely to succeed on the merits; the claims do not demonstrate irreparable harm; the balance of harms does not weigh in LP's favor; and issuance of an injunction is not in the public interest.

109.     LP's claims should be denied for the reasons stated in James Hardie's Counterclaims in this case.

110.     LP's claims are barred, in whole or in part, because the advertising claims alleged in the Complaint are not literally and/or impliedly false or misleading.

111.     LP's claims are barred, in whole or in part, because the advertising claims alleged in the Complaint are true.

112.     LP's claims are barred, in whole or in part, because the advertising claims alleged in the Complaint are not material to the purchasing decisions of the relevant consumer.

113.     LP's claims are barred, in whole or in part, because the advertising claims alleged in the Complaint are non-actionable statements of opinion, puffery, and/or exaggerated statements upon which a reasonable buyer would not rely.

114.     LP's claims are barred, in whole or in part, by the applicable statute of limitations, acquiescence, doctrine of laches, waiver, and/or undue delay.

16

115. Through discovery and otherwise, James Hardie intends to develop evidence that some or all of LP's claims are barred, in whole or in part, by the doctrine of unclean hands.

116. Without admitting that the Complaint states a claim, there has been no damage in any amount, manner or at all by reason of any act alleged against James Hardie in the Complaint, and therefore the relief prayed for in the Complaint cannot be granted.

117. James Hardie has not engaged in false advertising, unfair competition, tortious interference, or unfair, misleading, or deceptive acts of any kind.

118. James Hardie reserves the right to amend its pleadings at the appropriate time, including, but not limited to, James Hardie's Answer, Counterclaims, and Third-Party Complaint.

119. James Hardie reserves the right to assert additional defenses at the close of discovery.

## JAMES HARDIE BUILDING PRODUCTS, INC.'S COUNTERCLAIMS AGAINST LOUISIANA-PACIFIC CORPORATION AND THIRD PARTY COMPLAINT AGAINST THE KRUSE BROTHERS, INC.

Defendant/Counter-Plaintiff James Hardie Building Products, Inc., for its causes of action against Plaintiff/Counter-Defendant Louisiana-Pacific Corporation and Third-Party Defendant The Kruse Brothers, Inc. (collectively, "Counter-Defendants"), states as follows:

## I. PARTIES

1. James Hardie Building Products, Inc. ("James Hardie") is a corporation incorporated under the laws of the State of Nevada, with a principal place of business located at 231 La Salle Street, Suite 2000, Chicago, Illinois 60604-1449.

2. Based on the allegations contained in paragraph 1 of the Complaint, Louisiana-Pacific Corporation is a corporation incorporated under the laws of the State of Delaware, with a principal place of business located at 414 Union Street, Suite 2000, Nashville, Tennessee 37219.

17

3.     Upon information and belief, The Kruse Brothers, Inc. ("Kruse Brothers") is a corporation incorporated under the laws of the State of Illinois, with a principal place of business located at 2375 Lake Avenue, Village of Lakewood, Illinois. Upon information and belief, Kruse Brothers may be served with process through service upon its registered agent, James G. Militello III, located at 747 South Eastwood Drive, Woodstock, Illinois 60098.

## II.     NATURE OF THE ACTION

4.     This is an action for unfair competition and false advertising in violation of 15 U.S.C. § 1125; violations of the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101 *et seq.*; unfair competition and tortious interference with existing and prospective business relationships under Tennessee common law; and for declaratory judgment under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.* that certain statements made by James Hardie do not violate federal or state law, including, without limitation, the Lanham Act, 15 U.S.C. § 1051 *et seq.*, the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101 *et seq.*, or Tennessee common law.

## III.     JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 as it involves a federal question; under 15 U.S.C. § 1121 and 28 U.S.C. §§ 1338(a), as it involves claims under the Lanham Act, 15 U.S.C. § 1051 *et seq.*; and under 28 U.S.C. §§ 2201 and 2202, as it involves claims under the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*

6.     This Court has subject matter jurisdiction over the unfair competition claims herein under the provisions of 28 U.S.C. § 1338(b) in that said claims are joined with a substantial and related claim under the Lanham Act, 15 U.S.C. § 1051 *et seq.*

7.     This Court has supplemental jurisdiction over the claims that arise under Tennessee law pursuant to 28 U.S.C. § 1367(a) because they are substantially related to the

18

claims that arise under the Lanham Act of the United States. Furthermore, this Court has supplemental jurisdiction because both the state and federal claims are derived from a common nucleus of operative facts and considerations of judicial economy dictate the state and federal issues be consolidated for a single trial.

8. Upon information and belief, this Court has personal jurisdiction over LP because, among other reasons, LP submitted itself to the jurisdiction of this Court by bringing its Complaint in this Court and maintains its principal place of business in Nashville, Tennessee.

9. Upon information and belief, this Court has personal jurisdiction over Kruse Brothers based upon Kruse Brothers' minimum contacts with residents of Tennessee through the offering of its goods and services in Tennessee, within this judicial district, and elsewhere, and because it has contracted to do business with and on behalf of LP, and holds itself out to be the Contractor Training Team of LP, a corporation maintaining its principal place of business in this District. Upon information and belief, this court also has personal jurisdiction over Kruse Brothers based on its purposeful direction of its promotional and advertising activities to residents and consumers in Tennessee, including, upon information and belief, contracting to do business with and on behalf of LP, holding itself out to be the Contractor Training Team of LP, serving as a facilitator of LP training sessions, participating in LP sponsored advertising and promotional campaigns, committing tortious acts at the direction of and on behalf of LP, including activities related to conducting LP training sessions that were authorized, ordered, controlled, participated, or ratified by LP, in which LP was actively and personally involved, in which LP has a direct financial interest in, and over which LP had the right and ability to supervise Kruse Brothers' activities.

19

10. Further, this Court has personal jurisdiction over Counter-Defendants under Tennessee's long-arm statute, Tenn. Code Ann. § 20-2-201 *et seq.*, because, upon information and belief, (1) Counter-Defendants have transacted business in Tennessee; (2) the tortious acts or omissions occurred in Tennessee; (3) the tortious acts or omissions were directed and/or made on behalf of LP, a company maintaining its principal place of business in Tennessee; (4) Counter-Defendants entered into contracts with for services to be rendered or materials furnished in Tennessee; and/or (5) jurisdiction based on Counter-Defendants' contacts with Tennessee (including, but not limited to, sales of products) is not inconsistent with the Constitution of the State of Tennessee or the Constitution of the United States.

11. Venue is proper in this District because, among other reasons, LP voluntarily appears in this District and asserts its claims against James Hardie in this action; pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to these claims; and, upon information and belief, because Counter-Defendants are subject to personal jurisdiction generally and/or pursuant to Tennessee's long-arm statute, Tenn, Code Ann. § 20-2-201 *et seq.*

## IV.   FACTUAL BACKGROUND

### A.   JAMES HARDIE'S FIBER CEMENT SIDING PRODUCTS

12. The residential and commercial manufactured siding market is comprised of several types of siding products, including, but not limited to, fiber cement, vinyl, engineered wood, stucco, masonry, glass and ceramic, and metal composites.

13. James Hardie manufactures, advertises, and sells fiber cement siding and backerboard ("Fiber Cement Products") to both professional and non-professional consumers, including dealers, distributors, building material wholesalers, retailers, lumberyards, builders, developers, contractors, and individual end-users throughout the United States for both residential and commercial construction projects. James Hardie promotes and offers its highly

20

successful Fiber Cement Products through dealers, distributors, as well as large retailers such as The Home Depot and Lowe's.

14.     James Hardie's Fiber Cement Products come in multiple varieties and are sold under a number of brands including HARDIEPLANK® lap siding, HARDIESHINGLE® siding, HARDIEPANEL® vertical siding, HARDIETRIM® boards, HARDIESOFFIT® panels, ARTISAN® collection, HARDIEBACKER® cement boards, and various related protective materials under the HARDIEWRAP® weather barriers brand.

15.     James Hardie has been in business for over 125 years, and has manufactured fiber cement siding in the United States since the late 1990s.

16.     Approximately thirty years ago, James Hardie invented its version of fiber cement, which since has evolved to be the market standard for fiber cement in the United States.

17.     For the past thirty years, James Hardie has been developing and refining proprietary, technology-driven, and design rich Fiber Cement Products that have been accorded numerous industry accolades, including (a) Green Builder's 2015 Reader's Choice Survey for "greenest siding product" (https://www.greenbuildermedia.com/2015-readers-choice-awards); (b) *Qualified Remodeler* named James Hardie fiber cement siding with ColorPlus® Technology one of the "Top Exterior Products of 2014" in August 2014 (https://qualifiedremodeler.epubxp.com/i/356825-aug-2014/23); and (c) the Good Housekeeping Seal of Approval in May 2013.

18.     James Hardie is the leading manufacturer and supplier of Fiber Cement Products sold in interstate commerce to consumers throughout the United States.

19.     James Hardie has global annual revenues of more than $1.5 billion.

21

20. James Hardie has spent collectively over $100 million in research and development, and continues with an annual research and development investment of approximately $20 million.

21. Since approximately the last 30 years, James Hardie has been the leading fiber cement siding brand in the minds of relevant consumers.

22. Due to James Hardie's Fiber Cement Products' prevalence in the general siding market, and due to James Hardie's prevalence in the fiber cement market, consumers associate quality siding generally and quality fiber cement siding specifically with James Hardie and its Fiber Cement Products.

23. The success and reputation of James Hardie's Fiber Cement Products derive in part from its dedication to providing high performance, cost effective, and durable fiber cement siding that offers consumers a lifetime value. For example, James Hardie has created a consumer facing HardieZone® system to assist consumers in selecting climate appropriate products, and offers the HZ5® and HZ10® products to address wet, freezing conditions and hot, humid, sun-enveloped conditions, respectively.

24. James Hardie's Fiber Cement Products have undergone rigorous testing, including for proper use in compliance with the following: (i) industry standard applicable ASTM testing, including ASTM C 1186 for fiber cement exterior cladding Supplement Test S7 (freeze thaw resistance), Supplemental Test S8 (warm water resistance), and Supplemental Test S9 (heat/rain resistance); and (ii) United States Occupational Health and Safety Administration (OSHA), 29 CFR 1926.1153 regulations, including those governing workplace exposure to or respirable crystalline silica dust.

22

25.     James Hardie's Fiber Cement Products are available both primed and ready for in-field painting or prefinished with James Hardie's proprietary and fade resistant ColorPlus® coating technology.

**B.     LP'S STRAND-BASED WOOD SIDING PRODUCTS**

26.     LP competes with James Hardie by, among other means, manufacturing and marketing in interstate commerce throughout the United States a line of engineered wood siding products under the SMARTSIDE® brand ("SmartSide Products").

27.     The following varieties of engineered wood are sold under the SmartSide brand: lap siding, panel siding, trim and fascia, vertical siding, soffits, cedar texture shake, and perfection shingle.

28.     On information and belief, consumers of LP's SmartSide Products at least overlap with consumers of James Hardie's Fiber Cement Products.

29.     LP's SmartSide Products are marketed as alternatives to James Hardie's Fiber Cement Products.

30.     Many consumers purchase manufactured siding from both James Hardie and LP.

31.     On information and belief, many consumers and purchasers of manufactured siding, including small to medium sized builders, do not generally have internal engineering or legal staff with knowledge of siding technology and applicable governmental regulations and will rely on the expertise of information and advertisements provided by manufacturers, like James Hardie and LP, when making purchasing decisions.

32.     On information and belief, LP owns and operates the websites located at the domain names www.lpcorp.com, www.switchtolpsmartside.com, www.lpsmartside.com, and www.upsidetosmartside.com, each containing the copyright notice attributed to "Louisiana-

Pacific Corporation. All rights reserved." (the "LP Websites"). A true and correct copy of exemplary screenshots of the LP Websites are attached hereto as **<u>Exhibit 1</u>**.

33.     On information and belief, LP advertises and promotes its SmartSide Products on the LP Websites, through trade publications and training and certification programs, and elsewhere throughout the United States.

34.     On information and belief, Kruse Brothers, through its officer and/or agent Steven Kruse, has participated in and facilitated LP's competing sales of SmartSide Products in interstate commerce to consumers in the United States.

35.     On information and belief, LP, directly and through agents such as Kruse Brothers, provides training seminars across the U.S., including Nashville, Tennessee, that include false and misleading comparisons of the characteristics and installation of LP's products and James Hardie's Fiber Cement Products, in interstate commerce to consumers in the United States. A true and correct copy of screenshots and photographs from Steven Kruse's Facebook page are attached hereto as **<u>Exhibit 2</u>** and select photographs are depicted below.





**Steven Kruse** added 4 new photos.
May 5, 2017 · Nashville · 🌐

Hello Nashville! 60+ Contractors attended LP Smartside training event today! Thank you to all that attended and all involved in such a well put together event.



👍❤️ 18

👍 Like          💬 Comment          ↗ Share

## C. LP'S FALSE AND MISLEADING STATEMENTS

36.     Counter-Defendants have made literally and/or impliedly false and misleading statements regarding the nature, characteristics, quality, and efficacy of LP's SmartSide Products and James Hardie's Fiber Cement Products.

37.     LP is representing that the SmartSide Products have qualities or characteristics that the SmartSide Products do not possess.  These statements are literally false and/or misleading because LP is representing that fiber cement siding products, including James Hardie's Fiber Cement Products, possess certain qualities or characteristics in comparison to LP's SmartSide Products, which allegedly do not.

38.     In the course of advertising and promoting SmartSide Products, Counter-Defendants have made and continue to make false and misleading statements regarding LP's SmartSide Products and/or James Hardie's Fiber Cement Products which adversely impact the sales, status, and perception of James Hardie's Fiber Cement Products and the purchasing decisions of its consumers and potential consumers in the marketplace.

39.     On information and belief, Counter-Defendants have made these statements with knowledge of their false and misleading nature and with the intent that they adversely impact the sales, status, and perception of James Hardie's competing Fiber Cement Products, in absolute terms and relative to SmartSide Products in the marketplace.

40.     LP, directly and through its agents, including Kruse Brothers, commercially advertises and promotes the SmartSide Products in interstate commerce through a series of false and misleading advertisements and promotions claiming that, when compared with LP's SmartSide Products, Fiber Cement Products perform poorly because, among other reasons, they (i) are complex, labor-intensive, tool-intensive, and expensive to install or work with, (ii) are hazardous and/or dangerous to install, (iii) cause non-compliance with OSHA regulations during

26

cutting and installation, (iv) are not durable or are less durable than LP's Smartside products, (v) are prone to cracking or breaking, (vi) are brittle, (vii) are more susceptible to water or moisture damage under temperature changes, (viii) are not or are less resistant to heat and sun exposure, (ix) are not built to withstand extreme weather elements including wind gusts and hail, (x) are decreasing in consumer popularity, (xi) require two-individuals for transportation of James Hardie lap siding planks at installation site, (xii) develop efflorescence under normal conditions, and (xiii) represent untested technology. A true and correct copy of illustrative examples at attached hereto as **Exhibit 3**.

41. LP's advertisements and promotional materials falsely and misleadingly describe Fiber Cement Products as an undesirable and/or unsafe purchase when compared to its SmartSide Products, creating an overall comparative and disparaging theme and message to consumers and potential consumers that pervades LP's advertisements on its LP Websites, in trade publications, in certification and contractor trainings, and elsewhere.

42. LP's advertisements and promotional materials make the false and misleading claims described herein in such a manner as to falsely and/or misleadingly suggest that either LP's SmartSide Products and James Hardie's Fiber Cement Products have undergone comparative testing in which the Fiber Cement Products have failed or performed in a materially inferior manner when in fact no such testing has occurred, and/or convey that the Fiber Cement Products in fact perform in a materially inferior manner when they do not, and/or convey that James Hardie's Fiber Cement Products are substandard and/or undesirable due to, among other things, regulatory and safety compliance requirements that are difficult or impossible to achieve and create inevitable health risks.

43.     Specifically, LP recently has commenced an advertising campaign in which it makes literally false and misleading statements intended to cause consumers to believe that the installation of James Hardie's Fiber Cement Products will inevitably result in violations of recently passed United States Occupational Health and Safety Administration (OSHA) regulations, and therefore use of James Hardie's Fiber Cement Products will necessarily lead to safety citations and fines.

44.     On information and belief, LP's false and misleading advertising and promotional statements made in communications to consumers and potential consumers of Fiber Cement Products and SmartSide Products include but are not limited to the following:

      a.     On May 7, 2018, Brad Presley, an individual identifying himself as the Market Development Manager for LP, publicly posted on his LinkedIn page an article originally posted on constructiondive.com titled "Silica citations hit 116 in 6 months" together with the caption "#LPSmartside. Moral of the story.  Don't want to be stung by OSHA. Use LP Smartside as your exterior cladding of choice. #osha #exterior #classing #silica." Below is a screenshot of this LinkedIn post:

28



This is false and misleading because, by re-posting the article in the context of promoting the qualities of LP SmartSide siding over James Hardie Fiber Cement Products, LP falsely and misleadingly conveys that the referenced citations are all related to fiber cement siding when in fact there is nothing in the article suggesting that this is true.

b.    On September 22, 2017, Mark Rose, an individual identifying himself as an LP employee and using an email address mark.rose@lpcorp.com, sent an email with the subject line "OSHA Silica Rule 29 CFR 1926.1153 and its upcoming enforcement date of September 23, 2018" to various recipients including at least one customer of James Hardie. In this email,

29

Mr. Rose, as an employee of LP, falsely stated "OSHA regulations prohibit the utilization of a standard circular saw for cutting fiber cement siding. Doing so, could result in an OSHA imposed citation." This statement is literally false and falsely suggests to consumers and potential consumers in the marketplace, including at least one James Hardie customer, that continued use of circular saws, which are used to cut Fiber Cement Products, (i) is prohibited, (ii) could result in OSHA citations, and (iii) is a practice that consumers should change, and creating a sense of urgency around the foregoing. A true and correct copy of the September 22, 2017 email is attached hereto as **<u>Exhibit 4</u>**.

c.    During at least the period between March 27, 2018 and April 17, 2018, LP sponsored in-person trainings conducted by Kruse Brothers for SmartSide Product installation certification. These training sessions were open to the builders and installers, and directed towards consumers and potential consumers of manufactured siding products, including SmartSide Products. During the training sessions, on information and belief, Counter-Defendants made the following false and misleading statements regarding Fiber Cement Products: (i) respirators are a *requirement* when cutting fiber cement products; (ii) both the *cut man* and *installers* are required to wear respirators when installing fiber cement products; (iii) installers of fiber cement *must* place caution tape around the entire home and warn all the neighbors that [workers] are installing a potentially dangerous product in the area. The foregoing statements in (i) - (iii) are (x) literally false

because, among other reasons, the statements misstate regulations under the United States Occupational Health and Safety Administration (OSHA), 29 CFR 1926.1153 and the conclusions published by the National Institute for Occupational Safety and Health (NIOSH) In-Depth Survey Report *Partnering to Control Dust from Fiber-Cement Siding,* EPHB Report No. 358-12a (2013), and (y) misleading because they characterize Fiber Cement Products as generally "dangerous" and "potentially dangerous" to install.

On information and belief, the above examples are part of a campaign of LP to spread false and misleading advertisements that cause consumers to believe that James Hardie's Fiber Cement Products are substandard and/or undesirable because, among other things, cutting and installing the products requires the use of certain burdensome practices and/or safety equipment that are not in fact necessary; and that a consumer's use of the products will inevitably lead to OSHA violations and fines.

45. Upon information and belief, the cumulative effect of Counter-Defendants' statements made in communications to consumers and potential consumers of Fiber Cement Products and SmartSide Products is impliedly false and/or misleading because Counter-Defendants are representing that fiber cement siding products, including James Hardie's Fiber Cement Products, possess such qualities or characteristics in comparison to LP's SmartSide Products, which allegedly do not.

46. LP's false and misleading statements made in advertising and promoting the SmartSide Products on its LP Websites include but are not limited to the following:

a.  Various statements and visual presentations that suggest fiber cement requires numerous expensive tools, including but not limited to the following: "[W]orking with fiber cement siding requires expensive tools"; requiring "invest[ment] in an array of extra equipment". *How to Save Money on Expensive Fiber Cement Cutting Tool*s, November 13, 2017 (*https://lpcorp.com/products/exterior/siding-trim/blog/blog/how-to-save-money-on-expensive-fiber-cement-cutting-tools/* ("Expensive Tools Article") (attached as **Exhibit 5**);

b.  Fiber cement is a "challenge to cut cleanly" (Expensive Tools Article);

c.  "Fiber Cement Siding Is Decreasing in Popularity." *3 Reasons Contractors are Kicking Fiber Cement Siding to the Curb,* May 25, 2017 (https://www.upsidetosmartside.com/blog/3-reasons-contractors-kicking-fiber-cement-siding-curb/ ("Kick Fiber Cement Article") (attached as **Exhibit 6**).

d.  "[Fiber cement] requires two people to transport on the job site." (Kick Fiber Cement Article).

e.  "Holes may have to be pre-drilled in fiber cement siding prior to installation." (Kick Fiber Cement Article).

f.  "[O]ver time, fiber cement siding can develop an unattractive white film on its surface known as efflorescence." (Kick Fiber Cement Article).

47.  On information and belief, the cumulative effect of LP's statements on its Websites is impliedly false and/or misleading because LP is representing that fiber cement siding

products, including James Hardie's Fiber Cement Products, possess certain qualities or characteristics in comparison to LP's SmartSide Products, which allegedly do not.

48.     LP's false and misleading statements made in connection with advertising and promoting LP's SmartSide Products in videos posted on its YouTube Channel include but are not limited to the following:

a.     *Tools of the Trade* (posted January 11, 2017): The video falsely and misleadingly uses exaggerated and inaccurate visuals and text to contrast the allegedly expensive tools required for working with Fiber Cement Products with those necessary for SmartSide Products installation. In the video, LP depicts a large number of allegedly necessary Fiber Cements Product tools cascading from the top of the screen to the bottom landing with an audible thud, contrasted with a deceptively streamlined, lesser quantity of tools neatly presented as those for "working with LP® SMARTSIDE® TRIM AND SIDING". The video closes with an imploring statement to "Stop using fiber cement[.] Start using Smartside". https://youtu.be/yaayYsbO3mI. Below is a screenshot of the closing visual in the Tools of the Trade Video, a video that is also reproduced and embedded within the Expensive Tools Article:



b. *A Smarter Choice for your next remodeling Project* (posted May 1, 2018)*:* LP states falsely and misleadingly that, unlike Fiber Cement Products, SmartSide Products: (i) *"*Resist[] cracking"; (ii) "[are] built to resist heat and sun exposure"; and (iii) "[are] built to withstand extreme weather elements, such as wind gusts up to 200 mph and hail up to 1.75 inches in diameter." https://www.youtube.com/watch?v=d9F8mfASJPo.  In making these false and misleading claims, LP deceptively conveys false information to consumers because, in fact, James Hardie's Fiber Cement Products comply with applicable International Residential Code (IRC) and International Building Code (IBC) requirements regarding demonstrated resistance to cracking and because ICC Evaluation Service Acceptance Criteria for Treated Engineered Wood Siding AC 321, which is the applicable industry standard test for SmartSide Products, does not contain any cyclic frost/thaw or heat/rain resistance tests to support LP's claims. The remaining claims in this video are false and misleading because,

34

among other reasons, resistance of siding to wind is predominantly governed by the method of installation and, as publicly available publications, *e.g.*, ESR 2290, of the ICC Evaluation Service show, James Hardie Fiber Cement Products can be installed to achieve wind load ratings > 200 mph, and have passed the requisite ASTM 1186 test methods demonstrating heat resistance.

49.     On information and belief, the cumulative effect of LP's statements made in connection with advertising and promoting LP's SmartSide Products in videos posted on its YouTube Channel is impliedly false and/or misleading because LP is representing that fiber cement siding products, including James Hardie's Fiber Cement Products, possess certain qualities or characteristics in comparison to LP's SmartSide Products, which allegedly do not.

50.     LP's false and misleading statements made in connection with advertising and promoting the SmartSide Products in other advertisement and promotional materials include but are not limited to the following:

a.      On information and belief, LP sponsored an article in *Builder Online*, titled *Protecting Siding From Freeze/Thaw Cycle Damage: Learn how different siding types respond to repeated freezing and thawing*. making the following false and misleading claims related to the alleged effect of "freeze-thaw" on Fiber Cement Products: (i) "If water gets trapped in a siding material like fiber cement and the temperature falls below 32° F, it creates extreme pressure on the material as it expands"; (ii) "When the freeze/thaw cycle happens repeatedly, year after year, the cumulative effect can cause cracking and serious structural damage to siding

35

material"; (iii) "Fiber cement is essentially concrete, it's naturally more brittle than engineered wood siding and other material. That makes it more susceptible to cracking or breaking when water penetrates the substrate and expands as temperatures fall"; (iv) "Like fiber cement, vinyl siding is more likely to crack in the winter"; and (v) "There's a lot of talk these days about 'smart concrete' that can resist freeze/thaw damage, but that technology is still in the testing stage" (the "Freeze-Thaw Article"). *See* http://www.builderonline.com/building/structure-durability/protecting-siding-from-freeze-thaw-cycle-damage?utm_source=newsletter&utm_content=Advertorial&utm_medium=email&utm_campaign=BP_022818%20(1)&he=b825c17f436e394b279eb8a356854ee63151d8ef. The Freeze-Thaw Article statements are false and misleading because, among other reasons, they suggest that all Fiber Cement Products are subject to the claimed impacts of freezing and thawing under all and ordinary circumstances when, in fact, any freezing and thawing damage would not occur unless and until the Fiber Cement Products are saturated above the 90% critical degree of saturation. The Freeze-Thaw Article further disparages Fiber Cement Products and suggests to consumers and potential consumers that Fiber Cement Products' durability and performance qualities are untested by falsely suggesting that concrete technology, necessarily including Fiber Cement Products, is still in the testing phase. These false and misleading statements are generally replicated by LP on LP's Website in an article

36

authored by Ben Barrette, identified as Construction Services Manager. *See* https://www.upsidetosmartside.com/blog/freeze-thaw-cycles-affect-popular-siding-materials/. True and correct copies of the articles are attached hereto as **Exhibit 7**.

b. On April 24, 2018, LP sponsored an article in Professional Builder magazine, titled "Say Goodbye to Fiber Cement Tools". *See* *https://www.probuilder.com/say-goodbye-fiber-cement-tools* ("Say Goodbye Article"). In this article, LP makes several false and misleading claims including the following: "Cutting and installing fiber cement siding is a very specialized process, and you can't do it with everyday tools. Fiber cement is difficult to cut cleanly and creates a lot of silica dust when you cut" and offering in the next sentence that SmartSide Products are the "alternative" to these alleged problems. The Say Goodbye Article is identified as sponsored by "LP SmartSide" and presented with a copyright notice stating "© 2018 Louisiana-Pacific Corporation. All rights reserved. All trademarks are owned by Louisiana-Pacific Corporation." A true and correct copy is attached hereto as **Exhibit 8**.

51. On information and belief, the cumulative effect of LP's statements made in connection with advertising and promoting the SmartSide Products in advertisement and promotional materials is impliedly false and/or misleading because LP is representing that fiber cement siding products, including James Hardie's Fiber Cement Products, possess certain qualities or characteristics in comparison to LP's SmartSide Products, which allegedly do not.

52.     On information and belief, Kruse Brothers has made false and misleading statements in connection with advertising and promoting the SmartSide Products on behalf of and as an agent of LP.

53.     On information and belief, Kruse Brothers travel to various cities in the U.S. conducting training sessions for, among other products, LP's SmartSide Products. *See* Exhibit 2.

54.     On information and belief, The Kruse Brothers, on behalf of and as agent of LP, has led, contributed to, or actively participated in LP's training sessions in which Kruse Brothers and/or LP make false and misleading statements regarding SmartSide Products and Fiber Cement Products, as described herein.

55.     On information and belief, at these LP training sessions, Kruse Brothers, through Steven Kruse, presents itself as a facilitator of LP's installation training, presenting the training certification course both alone at together with LP, thus conveying to consumers and potential consumers that Kruse Brothers had the authority to make representations about LP and SmartSide Products.

56.     Counter-Defendants' claims, each individually and collectively, are false and misleading statements both literally and by implication.

57.     Upon information and belief, the cumulative effect of Counter-Defendants' statements is impliedly false and/or misleading because Counter-Defendants are representing that LP's SmartSide Products possess certain qualities or characteristics in comparison to fiber cement siding products, including James Hardie's Fiber Cement Products, which allegedly do not.

58.     Upon information and belief, the cumulative effect of Counter-Defendants' statements is impliedly false and/or misleading because Counter-Defendants are representing that

fiber cement siding products, including James Hardie's Fiber Cement Products, possess certain qualities or characteristics in comparison to LP's SmartSide Products, which allegedly do not.

**D.      LP'S COMPLAINT AGAINST JAMES HARDIE**

59.      LP alleges in its Complaint filed in this action that James Hardie has engaged in false advertising, unfair competition, tortious interference with existing and prospective economic relations, and unfair or deceptive acts, in violation of the Lanham Act, 15 U.S.C. § 1125(a), the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101 *et seq.*, and Tennessee common law, through certain statements contained on the website located at the domain www.nowoodisgood.com (the "No Wood Website") and a promotional flier titled "James Hardie® siding outperforms wood-based siding" (the "JHBP Flier.").

60.      As set forth in its Answer, James Hardie denies that it has or is engaged in any false, deceptive, misleading, wrongful, or tortious conduct.

61.      The No Wood Website, JHBP Flier, and other statements published by James Hardie variously refers to wood, OSB, and engineered wood.

62.      Nowhere on either the No Wood Website nor JHBP Flier forming the basis of LP's Complaint does James Hardie call out LP by name.

63.      LP is not the only manufacturer of engineered wood siding products.  Other manufacturers include, without limitation, Collins and Kaycan (KWP).

64.      The No Wood Website, JHBP Flier, and other statements published by James Hardie accurately and truthfully state certain aspects of fiber cement compared to engineered wood siding material due to the inherent characteristics of wood itself.

65.      LP alleges in its Complaint under the heading "DEFENDANT'S PATTERN OF FALSE AND MISLEADING STATEMENTS" that "Defendant routinely and consistently refers

to LP's strand-based engineered wood products, including but not limited to SmartSide® siding, as 'OSB' siding."

66.     The foregoing statement does not constitute false or misleading advertising as alleged in paragraph 28 of the Complaint because, among other reasons:

a.     "OSB" stands for "oriented strand board," which is the fundamental technology on which products like LP's SmartSide Products are based.

b.     Strand-based engineered wood siding products are colloquially referred to by industry participants as OSB siding.

c.     LP's own website contains documents referring to its SmartSide products as "OSB," including, without limitation, the statement that "'L-P Smartside lap and L-P SmartSide panel' **are OSB siding planks and panels**." (emphasis added).  A true and correct copy of the evaluation listing located at https://lpcorp.com/media/3336/lp-smartside-osb-waferboard_ccmc-11826_6-2-14.pdf is attached hereto as **Exhibit 9**.

d.     In its Fiscal Year ending 2004 10-K filing with the Securities and Exchange Commission, LP states:

Our SmartSide® Products consist of **a full line of OSB-based sidings, trim, soffit and fascia**.  These products have quality and performance characteristics similar to solid wood at more attractive prices due to lower raw material and production costs.

(emphasis added).

e.     The alleged statement does not actually deceive or tend to deceive a substantial portion of the intended audience.

f.     The alleged statement is not material in that it is not likely to influence the consumer's purchasing decision.

g.    LP has not suffered any harm caused by the alleged statement.

67.    LP alleges in its Complaint under the heading "DEFENDANT'S PATTERN OF FALSE AND MISLEADING STATEMENTS" that:

a.    "Defendant's Offending Website states, as part of a graphic depicting alleged disadvantages of 'OSB' siding compared to cement siding, 'PESTS LOVE IT' with a caption above a picture of a woodpecker penetrating a segment of LP's strand-based engineered wood siding."

b.    "Next to the picture of the woodpecker, Defendant or its agent(s) placed the words 'Subject to damage caused by woodpeckers, termites and other pests that can harm wood.'"

c.    "Included in the column representing the alleged disadvantages of strand-based engineered wood siding, a picture of a piece of particle board with pest damage is next to the statement 'Subject to damage caused by woodpeckers, termites and other pests."

68.    The foregoing statements do not constitute false or misleading advertising as alleged in paragraphs 36-40 and 58 of the Complaint, because, among other reasons:

a.    LP admits that its zinc borate treatment has no effect on pests such as woodpeckers, carpenter ants, or carpenter bees. A true and correct copy of LP's Technical Bulletin 15 is attached hereto as **Exhibit 10**.

b.    LP's Prorated 50-Year Limited Warranty for certain SmartSide products ("LP Warranty") acknowledge non-structural pest damage to its SmartSide products is possible, excluding damage from "termite damage which does

41

not affect the structural integrity of the Product(s)[.]" A true and correct copy of the LP Warranty is attached hereto as **Exhibit 11**.

    c.    Wood-based materials are subject to damage caused by pests, as evidenced by the need to treat wood-based products in the first place.

    d.    The image under the "PESTS LOVE IT" section of the Website is taken from an actual photograph of actual woodpecker damage to wood-based siding on an actual home.

    e.    The alleged statements do not actually deceive or tend to deceive a substantial portion of the intended audience.

    f.    The alleged statements are not material in that they are not likely to influence the consumer's purchasing decision.

    g.    LP has not suffered any harm caused by the alleged statements.

69.    LP alleges in its Complaint under the heading "DEFENDANT'S PATTERN OF FALSE AND MISLEADING STATEMENTS" that:

    a.    "Defendant's Offending Website states, as part of a graphic depicting alleged disadvantages of 'OSB' siding compared to cement siding, 'NATURAL FUEL FOR FIRE' with a caption above an alleged photograph of partially charred exterior siding that states 'Can burn, putting your customer's homes at a greater risk for fire damage."

    b.    "Included in the column representing the alleged disadvantages of strand-based engineered wood siding, a picture of a partially charred piece of particle board is next to the statement 'Will burn when exposed to a significant source of heat or flame."

c. "Included in the column representing the alleged advantages of James Hardie® Siding, across from the picture of partially charred particle board is the statement 'Won't burn. Endorsed by fire departments nationwide.*' The asterisk references a statement written in small font below the comparison graphic that reads 'James Hardie siding complies with ASTM E136 as a noncombustible cladding and is endorsed by fire departments across the U.S. including Marietta, GA, Flagstaff, AZ, and Orange County, CA'."

70. The foregoing statements do not constitute false or misleading advertising as alleged in paragraphs 41-44 and 59-62 of the Complaint because, among other reasons:

a. Industry standard testing demonstrates that James Hardie's Fiber Cement Products qualify as NFPA Class A with a flame spread index of zero (per ASTM E84), while LP's SmartSide siding has an NFPA rating of Class C, which corresponds to a flame spread index of 76-200. A true and correct copy of LP's architectural spec sheet is attached hereto as **Exhibit 12**.

b. "Noncombustible" has an industry standard definition; namely, meeting certain criteria under ASTM E136, which James Hardie's Fiber Cement Products meet.

c. Similarly James Hardie's Fiber Cement Products do not "burn" in the sense of supporting a flame, having a flame spread index of zero (0) and smoke developed index of less than 5 per ASTM E 84.

43

d.     Wood-based products will be damaged more readily than fiber cement products when exposed to fire, regardless of compliance with building codes and industry standards.

e.     The alleged statements do not actually deceive or tend to deceive a substantial portion of the intended audience.

f.     The alleged statements are not material in that they are not likely to influence the consumer's purchasing decision.

g.     LP has not suffered any harm caused by the alleged statement.

71.     LP alleges in its Complaint under the heading "DEFENDANT'S PATTERN OF FALSE AND MISLEADING STATEMENTS" that:

a.     "Defendant's Offending Website states, as part of a graphic depicting alleged disadvantages of 'OSB' siding compared to cement siding, 'SOAKS UP TROUBLE' with a caption above a photograph of buckled exterior siding, and the caption to the picture reads 'Susceptible to water absorption, which can lead to expansion, buckling or edge checking.**' The two asterisks reference a disclaimer written in small font at the bottom of the webpage that states 'Representation of engineered wood product buckling; improper installation may have been a contributing factor.'"

b.     "Included in the column representing the alleged disadvantages of strand-based engineered wood siding, a picture of distorted siding is next to the statement 'Shrinks and swells when exposed to moisture, causing paint to crack and peel. Requires frequent upkeep to maintain appearance.'"

c.  "Included in the column representing the alleged disadvantages of strand-based engineered wood siding, a picture of a distorted piece of siding is next to the statement 'Swelling or edge checking normally occurs in all wood-based products as they expand and contract due to changes in climate conditions.'"

d.  "Included in the column representing the alleged disadvantages of strand-based engineered wood siding, a picture of a piece of particle board is next to the statement 'Susceptible to water absorption, which can lead to expansion, buckling, cracking and mold.'"

72.  The foregoing statements do not constitute false or misleading advertising as alleged in paragraphs 45-47 and 55-57 of the Complaint because, among other reasons:

a.  The LP Warranty excludes damage that results from: "swelling and/or edge checking.  Such swelling and/or checking normally occurs in all wood product as they expand and contract in response to changes in climactic conditions[.]"  *See* Exhibit 11.

b.  LP's Application Instructions for certain SmartSide products ("LP Instructions") instruct, for installation of butt joints and joint moulding, that a net 3/16 in. space for expansion."  A true and correct copy of the LP Instructions is attached hereto as **<u>Exhibit 13</u>**.

c.  The No Wood Website includes a specific disclaimer that improper installation may have been a contributing factor to the issues depicted.

d.  The a picture of siding and trim next to the statement "Shrinks and swells when exposed to moisture, causing paint to crack and peel. Requires

frequent upkeep to maintain appearance" is a picture of wood siding and trim with cracked and peeling paint. Natural wood siding is "wood-based," consistent with the JHBP Flier heading.

e.     Engineered wood siding expands and contracts in response to moisture absorption. LP's EU product declaration states that LP Smartside swells in thickness 15% under the test regimen described in EU standard EN13986:2004. It is therefore not false or misleading advertising to claim that wood based siding is "susceptible to water absorption." A true and correct copy of LP's EU product declaration is attached hereto as **Exhibit 14**.

f.     The alleged statements do not actually deceive or tend to deceive a substantial portion of the intended audience.

g.     The alleged statements are not material in that they are not likely to influence the consumer's purchasing decision.

h.     LP has not suffered any harm caused by the alleged statements.

73.     LP alleges in its Complaint under the heading "DEFENDANT'S PATTERN OF FALSE AND MISLEADING STATEMENTS" that:

a.     "Defendant's Offending Website states, as part of a graphic depicting alleged disadvantages of 'OSB' siding compared to cement siding, 'WON'T WEATHER WELL' with a caption above a photograph of exterior siding with faded and dilapidated paint, and the caption to the picture reads 'OSB siding painted by 3rd party pre-finishers can show loss of paint after extended exposure to sunlight.***' The three asterisks

reference a disclaimer written in small font at the bottom of the webpage that states 'Representation of prefinished engineered wood after the equivalent of 12 years of solar exposure per ASTM G90.'"

74.     The foregoing statements as alleged in paragraphs 48-50 of the Complaint do not constitute false or misleading advertising because, among other reasons:

    a.      ASTM standard G90 testing measures performance of siding exposed to sunlight by supplying concentrated exposure of natural sunlight to the subject materials. The photograph in publication reflects the application of the ASTM standard G90 test to LP SmartSide siding samples made commercially available by a certified LP SmartSide Preferred Prefinisher. Under the same test, prefinished James Hardie Fiber Cement Products did not show the same loss of paint as depicted for the wood-based product.

    b.      The alleged statements do not actually deceive or tend to deceive a substantial portion of the intended audience.

    c.      The alleged statements are not material in that they are not likely to influence the consumer's purchasing decision.

    d.      LP has not suffered any harm caused by the alleged statements.

75.     On information and belief, LP filed its Complaint with knowledge that James Hardie's alleged statements in the Complaint accurately and truthfully identify genuine aspects and characteristics of James Hardie's Fiber Cement Products and wood-based siding products.

# V. CAUSES OF ACTION

## COUNT I

## DECLARATORY JUDGMENT THAT JAMES HARDIE'S STATEMENTS
## DO NOT VIOLATE FEDERAL OR STATE LAW

### (*against LP*)

76.     James Hardie incorporates by reference the preceding paragraphs as if fully set forth herein.

77.     An actual and justiciable controversy exists between James Hardie and LP as to the allegations of false advertising, unfair competition, tortious interference under state and federal law, and violations of the Tennessee Consumer Protection Act, as evidenced by LP's Complaint and James Hardie's Answer to the Complaint, set forth above.

78.     Absent a declaration by the Court, LP will continue to wrongfully allege false advertising, unfair competition, and tortious interference under state and federal law, and violations of the Tennessee Consumer Protection Act, against James Hardie and thereby cause James Hardie injury and damage.

79.     James Hardie is entitled to a declaratory judgment that the statements contained on the No Wood Website are not literally and/or impliedly false, misleading, deceptive, tortious, or wrongful.

80.     James Hardie is entitled to a declaratory judgment that the statements contained on the No Wood Website do not actually deceive or tend to deceive a substantial portion of the intended audience.

81.     James Hardie is entitled to a declaratory judgment that the statements contained on the No Wood Website are not material in that they are not likely to influence the consumer's purchasing decision.

48

82.     James Hardie is entitled to a declaratory judgment that LP has not suffered any harm caused by the statements contained on the No Wood Website.

83.     James Hardie is entitled to a declaratory judgment that the statements contained on the No Wood Website do not constitute false advertising in violation of federal or state law.

84.     James Hardie is entitled to a declaratory judgment that the statements contained on the JHBP Flier are not literally and/or impliedly false, misleading, deceptive, tortious, or wrongful.

85.     James Hardie is entitled to a declaratory judgment that the statements contained on the JHBP Flier do not actually deceive or tend to deceive a substantial portion of the intended audience.

86.     James Hardie is entitled to a declaratory judgment that the statements contained on the JHBP Flier are not material in that they are not likely to influence the consumer's purchasing decision.

87.     James Hardie is entitled to a declaratory judgment that LP has not suffered any harm caused by the statements contained on the JHBP Flier.

88.     James Hardie is entitled to a declaratory judgment that the statements contained on the JHBP Flier do not constitute false advertising in violation of federal or state law.

89.     James Hardie is entitled to a declaratory judgment that the alleged statements made by James Hardie in the Complaint are not literally and/or impliedly false, misleading, deceptive, tortious, or wrongful.

90.     James Hardie is entitled to a declaratory judgment that the alleged statements made by James Hardie in the Complaint do not constitute false advertising in violation of federal or state law.

91.     Further, James Hardie is entitled to a declaration that it does not engage in unfair competition or false advertising under 15 U.S.C. § 1125(a), unfair competition or tortious interference with existing or prospective customers under Tennessee law, and/or violate the Tennessee Consumer Protection Act, as alleged in the Complaint.

92.     Pursuant to 15 U.S.C. § 1117(a), this is an exceptional case such that James Hardie is entitled to recover its attorney fees and the costs of defending LP's baseless claims under the Lanham Act.

## COUNT II

### FEDERAL UNFAIR COMPETITION AND FALSE ADVERTISING UNDER THE LANHAM ACT, 15 U.S.C. § 1125(a)

#### (*against all Counter-Defendants*)

93.     James Hardie incorporates by reference the preceding paragraphs as if fully set forth herein.

94.     Counter-Defendants' explicit and implicit promotional claims in interstate commerce about LP's SmartSide Products, including, but not limited to, the statements contained in Section IV(C) *supra*, are literally and/or impliedly false and misleading.

95.     Counter-Defendants' explicit and implicit promotional claims in interstate commerce about fiber cement siding products, including James Hardie's Fiber Cement Products, and including, but not limited to, the statements contained in Section IV(C) *supra*, are literally and/or impliedly false and misleading.

96.     Counter-Defendants' sale of and offers for sale of LP's SmartSide Products, as alleged herein, constitute "use in commerce" as defined in 15 U.S.C. § 1127.

97. Upon information and belief, Counter-Defendants advertise, promote and, in the case of LP, distribute, SmartSide Products throughout the United States to retailers, distributors, builders, developers, individual consumers, contractors, and others.

98. As alleged herein, Counter-Defendants have intentionally made literally false statements in commercial advertising or promotion in interstate commerce which misrepresent the nature, characteristics, qualities, or geographic origin of LP's and/or James Hardie's goods, services, or commercial activities, including, but not limited to, the statements contained in Section IV(C) *supra*.

99. Counter-Defendants' false and/or misleading statements regarding LP's SmartSide Products are material in that the statements will likely influence existing and potential buyers of (a) siding products generally; (b) fiber cement siding products generally; (c) wood-based siding products generally; (d) building materials generally; (e) James Hardie's Fiber Cement Products; and (f) LP's SmartSide Products.

100. On information and belief, many consumers and purchasers of manufactured siding, including small to medium sized builders, do not generally have internal engineering or legal staff with knowledge of siding technology and applicable governmental regulations and will rely on the expertise of information and advertisements provided by manufacturers, like James Hardie and LP, when making purchasing decisions.

101. Counter-Defendants' false and/or misleading statements regarding LP's SmartSide Products have actually deceived or have the tendency to tend to deceive a substantial portion of the intended audience for such statements.

102. Counter-Defendants' false and/or misleading statements regarding fiber cement products generally, including James Hardie's Fiber Cement Products, are material in that the

statements will likely influence existing and potential buyers of (a) siding products generally; (b) fiber cement siding products generally; (c) wood-based siding products generally; (d) building materials generally; (e) James Hardie's Fiber Cement Products; and (f) LP's SmartSide Products.

103.    On information and belief, many consumers and purchasers of manufactured siding, including small to medium sized builders, do not generally have internal engineering or legal staff with knowledge of siding technology and applicable governmental regulations and will rely on the expertise of information and advertisements provided by manufacturers, like James Hardie and LP, when making purchasing decisions.

104.    Counter-Defendants' false and/or misleading statements regarding fiber cement products generally, including James Hardie's Fiber Cement Products, have actually deceived or have the tendency to tend to deceive  a substantial portion of the intended audience for such statements.

105.    Counter-Defendants' false and misleading statements have been introduced into interstate commerce through, among other avenues, Defendants' publication of such statements as alleged in Section IV(C) *supra*.

106.    By these actions, Counter-Defendants have engaged and continue to engage in false advertising and unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a).  As a result, James Hardie has suffered and will continue to suffer damage, including irreparable damage to its business, reputation, and goodwill.

107.    Upon information and belief, Counter-Defendants willfully, knowingly, intentionally, maliciously, and/or recklessly are using in commerce false and/or misleading descriptions of fact or misleading representations of fact concerning the nature, characteristics,

and qualities of LP's SmartSide Products and fiber cement siding products generally, including James Hardie's Fiber Cement Products.

108.     Upon information and belief, Counter-Defendants' acts are willful, wanton, and calculated to deceive, and are undertaken in bad faith.

109.     Counter-Defendants' false and/or misleading statements have caused James Hardie injury and/or are likely to cause James Hardie injury, by direct diversion of sales from James Hardie to LP and by the lessening of goodwill associated with James Hardie's Fiber Cement Products.

110.     James Hardie has been injured by Counter-Defendants' actions and representations because consumers who would otherwise have purchased siding products from James Hardie have made, or will make, purchasing decisions based upon Defendants' false and misleading representations concerning the attributes of LP's SmartSide Products and fiber cement products generally, including James Hardie's Fiber Cement Products.

111.     Unless enjoined by this Court, Counter-Defendants' acts will irreparably injure James Hardie's goodwill and erode its sales, customer base, and share in the market for remote training products.

112.     Counter-Defendants' acts have caused James Hardie damages, and James Hardie seeks judgment pursuant to 15 U.S.C. §1117 for Counter-Defendants' profits, any damages sustained by James Hardie; for all costs, expenses, and reasonable attorney fees (as this is an exceptional case) incurred in bringing the present action  and attempts to remedy Defendants' actions.

113.     Pursuant to 15 U.S.C. § 1116, James Hardie is entitled to preliminary and permanent injunctive relief against Defendants to stop the illegal conduct.

114.     Pursuant to 15 U.S.C. § 1117, James Hardie is entitled to at least three times the amount of Defendants' profits or James Hardie's damages, whichever is greater, due to the nature of Defendants' wanton and willful conduct.

115.     Pursuant to 15 U.S.C. § 1118, James Hardie is entitled to impoundment and destruction of all packaging, containers, devices, products, literature, advertising, or any other material bearing the false, deceptive, and/or misleading statements.

## COUNT III

### UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER THE TENNESSEE CONSUMER PROTECTION ACT, TENN. CODE ANN. § 47-18-101 *et seq.*

#### (*against all Counter-Defendants*)

116.     James Hardie incorporates by reference the preceding paragraphs as if fully set forth herein.

117.     Counter-Defendants' sale of and offers for sale of LP's SmartSide Products, as alleged herein, constitute the offering of or providing of "goods" and constitutes "trade," "commerce," and a "consumer transaction," as defined in Tenn. Code Ann. § 47-18-103(7) and (19).

118.     Counter-Defendants' willful and knowing acts, including, without limitation, their false and/or misleading statements of fact about LP's SmartSide Products and fiber cement products generally, including James Hardie's Fiber Cement Products, and including, but not limited to, the statements contained in Section IV(C) *supra*, constitute unfair methods of competition and unfair or deceptive acts or practices in violation of Tenn. Code Ann. § 47-18-104(b)(5), (7), (8), and (21).

119.     Counter-Defendants have represented and implied, and continue to represent and imply, that LP's SmartSide Products and/or fiber cement products generally, including James

Hardie's Fiber Cement Products, have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have, in violation of Tenn. Code Ann. §47-18-104(5).

120. Counter-Defendants have represented and implied, and continue to represent and imply, that LP's SmartSide Products and/or fiber cement products generally, including James Hardie's Fiber Cement Products, are of a particular standard, quality or grade, when they are of another, in violation of Tenn. Code Ann. § 47-18-104(7).

121. Counter-Defendants have disparaged, and continue to disparage, James Hardie's goods, services or business through the use of false or misleading representations of fact, in violation of Tenn. Code Ann. § 47-18-104(8).

122. Counter-Defendants have used, and continue to use, statements or illustrations in advertisements that create a false impression of the grade, quality, quantity, make, value, age, size, color, usability or origin of the goods or services offered, or which may otherwise misrepresent the goods or services in such a manner that later, on disclosure of the true facts, there is a likelihood that the buyer may be switched from the advertised goods or services to other goods or services, in violation of Tenn. Code Ann. § 47-18-104(21).

123. Counter-Defendants' willful and knowing acts, including without limitation their false and/or misleading statements of fact about LP's SmartSide Products and fiber cement products generally, including James Hardie's Fiber Cement Products, were known by Counter-Defendants to be deceptive and misleading, or through the exercise of reasonable care or investigation could or might have been ascertained to be deceptive and misleading.

124. Counter-Defendants' acts were conducted with the intent or purpose, either directly or indirectly, of selling or disposing of personal property or services, including without

55

limitation, LP's SmartSide Products, or to induce the public to enter into obligations relating to such property or services.

125.    By these actions, Counter-Defendants have engaged and continue to engage in unfair or deceptive acts and practices in violation of the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101 *et seq.*

126.    As a result, James Hardie has suffered, and will continue to suffer, an ascertainable loss of money and property, including lost customers, loss of market share, and damage to its business, reputation, and goodwill.

127.    James Hardie is entitled to injunctive relief and all other available remedies, including but not limited to James Hardie's damages; Counter-Defendants' profits; an award of three times the actual damages sustained under Tenn. Code Ann. § 47-18-109(a), and reasonable attorney fees and costs.

128.    Further, James Hardie is entitled to injunctive relief to stop the illegal conduct.

## COUNT IV

## UNFAIR COMPETITION UNDER TENNESSEE COMMON LAW

### (*against all Counter-Defendants*)

129.    James Hardie incorporates by reference the preceding paragraphs as if fully set forth herein.

130.    Counter-Defendants' explicit and implicit promotional claims in interstate commerce about LP's SmartSide Products, including, but not limited to, the statements contained in Section IV(C) *supra*, are literally and/or impliedly false and misleading.

131.    Counter-Defendants' explicit and implicit promotional claims in interstate commerce about fiber cement siding products, including James Hardie's Fiber Cement Products,

and including, but not limited to, the statements contained in Section IV(C) *supra*, are literally and/or impliedly false and misleading.

132.    Counter-Defendants' foregoing acts constitute unfair competition of James Hardie's common law rights for which James Hardie has no adequate remedy at law.

133.    To the extent the Court determines that there is an adequate remedy at law, James Hardie has been damaged in an amount to be determined at trial, plus prejudgment and post-judgment interest, attorneys' fees, expenses, and costs.

134.    James Hardie is entitled to punitive damages because Counter-Defendants' conduct was intentional, willful, malicious, or made with reckless disregard for the rights of others.

135.    Counter-Defendants' acts as alleged herein were committed with the intent to deceive and defraud the public in order to gain an increase in sales, customer base, and share in the siding product and building materials market and/or eliminate James Hardie from the siding product and building materials market.

## COUNT V

### TORTIOUS INTERFERENCE WITH EXISTING AND PROSPECTIVE BUSINESS RELATIONSHIPS UNDER TENNESSEE COMMON LAW

#### (*against all Counter-Defendants*)

136.    James Hardie incorporates by reference the preceding paragraphs as if fully set forth herein.

137.    James Hardie has existing business relationships with customers of its siding products, and has prospective relationships with an identifiable class of third persons, including both professional and non-professional consumers including dealers, distributors, building

57

material wholesalers, retailers, lumberyards, builders, developers, contractors, and individual end-users.

138.     Upon information and belief, Counter-Defendants had knowledge of those relationships and not a mere awareness of James Hardie's business dealings with others in general.

139.     Upon information and belief, Counter-Defendants intended to cause the breach or termination of James Hardie's existing and prospective business relationships.

140.     Through their actions alleged herein, Counter-Defendants have actually and already caused James Hardie to lose prospective business relationships with potential customers, and, upon information and belief, will continue to cause such harm.

141.     Counter-Defendants' improper motive or improper means is evidenced through their literally and/or impliedly false, misleading, deceptive, and unfair acts alleged herein.

142.     As a result, James Hardie has suffered damages resulting from the tortious interference in an amount to be determined at trial, plus prejudgment and post-judgment interest, attorneys' fees, expenses, and costs.

## VI.     ENTITLEMENT TO INJUNCTIVE RELIEF

143.     James Hardie incorporates by reference the preceding paragraphs as if fully set forth herein.

144.     By reason of Counter-Defendants' acts alleged herein, James Hardie has and will suffer immeasurable, and thus irreparable, damage to its business, reputation, and goodwill.

145.     On information and belief, Counter-Defendants intend to continue to do the acts complained of herein unless restrained and enjoined.

146.     James Hardie's remedy at law is inadequate.

147. James Hardie is entitled to a preliminary and permanent injunction as set forth in the Prayer for Relief hereinafter.

148. Such actions are required to preserve the status quo and/or ensure that Counter-Defendants' unlawful actions cease.

## PRAYER FOR RELIEF

WHEREFORE, James Hardie prays:

A. The Court enter judgment in favor of James Hardie and against Counter-Defendants as to all the causes of action alleged herein;

B. The Court dismiss LP's Complaint with prejudice;

C. The Court deny LP any and all relief it has requested in its Complaint;

D. The Court deny LP any preliminary or permanent injunctive relief sought by LP;

E. The Court enter judgment declaring that James Hardie has not engaged and is not engaging, directly or indirectly, in false advertising or unfair competition under 15 U.S.C. § 1125(a) or Tennessee law;

F. The Court enter judgment declaring that James Hardie has not violated the Tennessee Consumer Protection Act;

G. The Court enter judgment declaring that James Hardie has not engaged and is not engaging directly or indirectly, in tortious interference with prospective or existing customer relationships under Tennessee law;

H. James Hardie be awarded all relief to which it is entitled under 15 U.S.C. § 1051 *et seq.*; and Tennessee statutory and common law;

I. The Court issue preliminary and permanent injunctions pursuant to 15 U.S.C. § 1116, Tennessee law, and equity, enjoining and restraining Counter-Defendants, and their officers, agents, servants, employees, attorneys, and any persons who are in active concert or

59

participation with any of the foregoing, from stating, representing, or implying orally or in writing (including, but not limited to, email communications, print advertisements, marketing materials, websites, blogs, and social media) any statements that misrepresent the nature, characteristics, qualities, source, or geographic origin of LP's SmartSide Products, James Hardie's Fiber Cement Products, and/or any other false and/or misleading statements (including, without limitation, those contained in Section IV(C) *supra*), including, but not limited to:

      i.      directly or indirectly engaging in false and/or misleading advertising or promotion of LP's SmartSide Products or James Hardie's Fiber Cement Products;

      ii.      directly or indirectly engaging in false and/or misleading advertising or promotion that James Hardie's Fiber Cement Products are, themselves or in comparison to SmartSide Products: (a) complex, labor-intensive, tool-intensive, and expensive to install or work with, (b) hazardous and/or dangerous to install, (c) generate non-compliance with OSHA regulations during cutting and installation, (d) are not or less durable, (e) are prone to cracking or breaking, (f) are brittle, (g) are more susceptible to water or moisture damage under temperature changes, (hi) are not or less resistant to heat and sun exposure, (i) are not built to withstand extreme weather elements including wind gusts and hail, (j) are decreasing in consumer popularity, (l) require two-individuals for transportation, (k) develop efflorescence, and (m) represent untested technology; and/or

      iii.      making or inducing others to make false, misleading, or deceptive statements or representations of fact in connection with the promotion,

60

advertisement, packaging, display, sale, offering for sale, manufacture, production, circulation, or distribution of LP's SmartSide Products, including but not limited to, through the making of false and/or misleading representations about James Hardie's Fiber Cement Products;

J.      Counter-Defendants be directed to file with this Court and serve on James Hardie within ten (10) days after the service of a preliminary injunction order, a report in writing under oath, setting forth in detail the manner and form in which they have complied with the preliminary injunction order;

K.      At conclusion of trial, Counter-Defendants, and their affiliates, officers, agents, partners, servants, employees, attorneys, anyone acting with their authority or on its behalf, and anyone acting in active concert with, aiding, assisting, and/or enabling Counter-Defendants, be forthwith permanently enjoined from the acts that James Hardie requests to be preliminarily and permanently enjoined in ¶ I immediately above;

L.      At conclusion of trial, Counter-Defendants be directed to deliver up and destroy all packaging, containers, devices, products, literature, advertising, or any other material (including, but not limited to, the LP Websites) bearing the literally and/or impliedly false, deceptive, and/or misleading statements referenced herein regarding LP's SmartSide Products, James Hardie's Fiber Cement Products, or variants thereof;

M.      Counter-Defendants be directed to publish and distribute corrective advertising (including, but not limited to, on the LP Websites where they have advertised) to reduce the effects of the literally false and/or impliedly false and/or misleading statements regarding LP's SmartSide Products, James Hardie's Fiber Cement Products, or variants thereof;

N.      Counter-Defendants be directed to file with this Court and serve on James Hardie within ten (10) days after the service of a permanent injunction order, a report in writing under oath, setting forth in detail the manner and form in which they have complied with the permanent injunction order;

O.      James Hardie be granted an award of monetary damages in an amount to be determined at trial based on Counter-Defendants' profits, James Hardie's damages, treble damages, punitive damages, prejudgement and post-judgment interest, attorney fees, expenses, and costs;

P.      Counter-Defendants' actions be adjudged exceptional under 15 U.S.C. § 1117(a) in favor of James Hardie, and James Hardie be awarded its costs, attorney fees, and all other expenses incurred in this action;

Q.      The Court award James Hardie treble damages to compensate it for the harm caused by Counter-Defendants' violation of the Tennessee Consumer Protection Act, as well as its attorney fees, expenses, and costs, pursuant to Tenn. Code Ann. § 47-18-109; and

R.      James Hardie be awarded such other relief as the Court deems just and proper.

## <u>JURY DEMAND</u>

Trial by jury is hereby demanded for all issues so triable.

Respectfully submitted,

ADAMS AND REESE LLP

/s/ Maia T. Woodhouse
Tony Swafford, TN BPR No. 017578
Maia T. Woodhouse, TN BPR No. 030438
Fifth Third Center
424 Church Street, Suite 2700
Nashville, Tennessee 37219
Tel: (615) 259-1450
Fax: (615) 259-1470
Email: tony.swafford@arlaw.com
        maia.woodhouse@arlaw.com

*Counsel for James Hardie Building
Products, Inc.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 15th day of June 2018, the foregoing was electronically filed.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  All other parties will be served by U.S. Mail, postage prepaid, and/or hand delivery, as soon as practicable.  Parties may access this filing through the Court's electronic filing system.

Samuel F. Miller
Nicholas R. Valenti
Miller Legal Partners PLLC
Fifth Third Center – Suite 2000
424 Church Street
Nashville, Tennessee 37219
Email: smiller@millerlegalpartners.com
      nvalenti@millerlegalpartners.com

The Kruse Brothers, Inc.
c/o James G. Militello III, Registered Agent
747 South Eastwood Drive
Woodstock, Illinois 60098

/s/ Maia T. Woodhouse
Maia T. Woodhouse

64