## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| LOUISIANA-PACIFIC CORPORATION, | ) | |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 3:18-cv-00447 |
| | ) | |
| JAMES HARDIE BUILDING | ) | DISTRICT JUDGE JON P. McCALLA |
| PRODUCTS INC., | ) | |
| | ) | JURY DEMAND |
| Defendant/Counter-Plaintiff/Third- | ) | |
| Party Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE KRUSE BROTHERS, INC., | ) | |
| | ) | |
| Third-Party Defendant. | ) | |

---

## AMENDED MEMORANDUM OF LAW IN SUPPORT OF JAMES HARDIE BUILDING PRODUCTS INC.'S MOTION FOR PRELIMINARY INJUNCTION AGAINST LOUISIANA-PACIFIC CORPORATION AND THE KRUSE BROTHERS, INC.

---

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. iii

I.    INTRODUCTION .................................................................................. 1

II.   BRIEF FACTUAL BACKGROUND ....................................................... 3

    A.   JHBP And Its Fiber Cement Siding Products ...................................... 3

    B.   LP's SmartSide Products ...................................................................... 4

    C.   OSHA Silica Standard, 29 CFR § 1926.1153 ....................................... 5

    D.   LP's September 22, 2017 Email ............................................................ 6

    E.   Counter-Defendants' Statements During LP Smartside Training Sessions........... 7

    F.   LP's May 7, 2018 LinkedIn Post ......................................................... 8

    G.   REDACTED .......................................................................................... 8

    H.   LP's Statements At Trade Shows .......................................................... 8

    I.   Actual Deception and Loss Of Goodwill Resulting From LP's Statements........... 9

III.  LEGAL STANDARD .............................................................................. 10

IV.   ARGUMENT .......................................................................................... 11

    A.   JHBP Has A Strong Likelihood Of Success On The Merits Of Its False Advertising, Unfair Competition, and TCPA Claims. .......................... 11

        1.   Counter-Defendants' Statements Are Literally False And/Or Misleading. ............................................................................ 12

            a.   Counter-Defendants' Statements Regarding "Required" or "Prohibited" Tools or Controls Under the OSHA Standard. ........ 13

            b.   Counter-Defendants' Statements Regarding OSHA Citations and Fines. .......................................................................... 18

            c.   Counter-Defendants' Statements Regarding OSHA Fines and Safety Risks Associated With Fiber Cement Products. ............... 20

        2.   Counter-Defendants' Statements Have A Tendency To Deceive – And Have Actually Deceived – Relevant Consumers. ..................... 21

        3.   Counter-Defendants' Statements Are Material To The Relevant Consumer's Purchasing Decision. .......................................... 23

        4.   Counter-Defendants' Statements Were Introduced Into Interstate Commerce. ............................................................. 24

        5.   Counter-Defendants' Statements Have Caused Actual Harm To JHBP. . 24

    B.   JHBP Has A Strong Likelihood Of Success On The Merits Of Its Tortious Interference Claim. ............................................................ 25

    C.   JHBP Has Suffered, And Continues To Suffer, Irreparable Harm. ...................... 26

i

D.      JHBP's Harm Outweighs Any Harm To Counter-Defendants Or Others. ........... 29

E.      An Injunction Serves The Public Interest By Preventing Consumer Confusion And Deception, Particularly Where Health And Safety Risks Are Implicated. ... 30

F.      The Gravity Of Counter-Defendants' False Claims And Lack Of Threatened Harm To Counter-Defendants Warrants Waiver Of The Bond Requirement. ..... 31

G.      The Nature and Actual Harm Caused By Counter-Defendants' False Claims Warrant Corrective Advertising. .......................................................................... 31

V.      CONCLUSION ............................................................................................................. 32

CERTIFICATE OF SERVICE ............................................................................................... 34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.L.S. Enters. v. Robinson Outdoor Prods., LLC*,
No. 1:14-CV-500, 2017 U.S. Dist. LEXIS 11946 (W.D. Mich. Jan. 30, 2017) ...................... 23

*Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*,
185 F.3d 606 (6th Cir. 1999) .................................................................................................. 13

*Assist-2-Sell, Inc. v. Assist-2-Build, LLC*,
No. 1:05-CV-193, 2005 U.S. Dist. LEXIS 34696 (E.D. Tenn. Dec. 6, 2005) ......................... 26

*B & L Corp. v. Thomas & Thorngren, Inc.*,
917 S.W.2d 674 (Tenn. Ct. App. 1995) .................................................................................. 12

*B&L Corp. v. Thomas & Thorngren, Inc.*,
162 S.W.3d 189 (Tenn. Ct. App. 2004) .................................................................................. 12

*Bailey v. Chattem, Inc.*,
684 F.2d 386 (6th Cir. 1982) .................................................................................................. 30

*Basicomputer Corp. v. Scott*,
973 F.2d 507 (6th Cir. 1992) .................................................................................................. 28

*Bays v. City of Fairborn*,
668 F.3d 814 (6th Cir. 2012) .................................................................................................. 10

*Borescopes R US v. 1800Endoscope.com, LLC*,
728 F. Supp. 2d 938 (M.D. Tenn. 2010) ................................................................................ 12

*Brake Parts, Inc. v. Lewis*,
443 Fed. App'x 27 (6th Cir. 2011) ........................................................... 10, 28, 29, 30

*Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*,
511 F.3d 535 (6th Cir. 2007) .......................................................................... 11, 29, 30

*Chobani, LLC v. Dannon Co., Inc.*,
157 F. Supp. 3d 190 (N.D.N.Y 2016) ..................................................................................... 30

*Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmbH*,
843 F.3d 48 (2d Cir. 2016) ..................................................................................................... 31

*Conopco, Inc. v. Campbell Soup Co.*,
95 F.3d 187 (2d Cir. 1996) ..................................................................................................... 30

*eBay Inc. v. MercExchange, LLC*,
547 U.S. 388 (2006) ............................................................................................................... 27

*Fed. Express Corp. v. UPS*,
765 F. Supp. 2d 1011 (W.D. Tenn. 2010) .............................................................................. 21

*Grubbs v. Sheakley Grp., Inc.*,
807 F.3d 785 (6th Cir. 2015). ................................................................................................. 11

*Herman Miller, Inc. v. Palazzetti Imps. & Exps., Inc.*,
    270 F.3d 298 (6th Cir. 2001) ........................................................................... 22

*Hickman v. Turitto*,
    No. 1:06-CV-151, 2007 U.S. Dist. LEXIS 26157 (E.D. Tenn. Apr. 9, 2007)........................ 29

*Hoover Transp. Servs. v. Frye*,
    77 Fed. App'x 776 (6th Cir. 2003) (6th Cir. 2003) ........................................................ 28, 30

*Innovation Venture, LLC v. Body Dynamics, Inc.*,
    No. 08-12711, 2009 U.S. Dist. LEXIS 26535 (E.D. Mich. Mar. 30, 2009) ............................ 28

*Innovation Ventures, LLC v. N.V.E., Inc.*,
    694 F.3d 723 (6th Cir. 2012) ........................................................................... 12, 13

*Jones v. City of Monroe*,
    341 F.3d 474 (6th Cir. 2003) ........................................................................... 10

*Journal Commc'ns, Inc. v. Sabo*,
    No. 3:07-00605, 2008 U.S. Dist. LEXIS 24705 (M.D. Tenn. Mar. 26, 2008) ........................ 12

*Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*,
    453 F.3d 377 (6th Cir. 2006) ........................................................................... 24, 26, 30

*Louisiana-Pacific Corp. v. James Hardie Building Products Inc.*,
    Case. No. 3:18-cv-447, Order Denying Motion for Temporary Restraining Order and Order
    Continuing Scheduling Conference (M.D. Tenn. June 15, 2018) .................................... passim

*McDonald's Corp. v. Shop at Home, Inc.*,
    82 F. Supp. 2d 801 (M.D. Tenn. 2000)................................................................... 12

*Merck Eprova AG v. Gnosis S.p.A.*,
    901 F. Supp. 2d 436 (S.D.N.Y. 2012) .................................................................. 24

*NACCO Materials Handling Grp., Inc. v. Toyota Materials Handling USA, Inc.*,
    246 Fed. App'x 929 (6th Cir. 2007) ..................................................................... 31, 32

*Osmose, Inc. v. Viance, LLC*,
    612 F.3d 1298 (11th Cir. 2010) .......................................................................... 27, 29, 31

*Outdoor Optics, Inc. v. Wolf Peak Int'l Inc.*,
    No. 1:02-cv-160, 2003 U.S. Dist. LEXIS 25425 (D. Utah Dec. 23, 2003) ............................ 30

*Pers. Computing Sys. v. Cent. Knox, Inc.*,
    No. 3:11-CV-374, 2012 U.S. Dist. LEXIS 46035 (E.D. Tenn. Mar. 30, 2012) ........................ 25

*PGP, LLC v. TPII, LLC*,
    No. 17-6221, 2018 U.S. App. LEXIS 14315 (6th Cir. May 31, 2018)................................. 27

*Robinson v. Purkey*,
    No. 3:17-cv-1263, 2017 U.S. Dist. LEXIS 165483 (M.D. Tenn. Oct. 5, 2017)........................ 32

*Roth v. Bank of Commonwealth*,
    583 F.2d 527 (6th Cir. 1978) ........................................................................... 31

*Royal Appliance Mfg. Co. v. Hoover Co.*,
    845 F. Supp. 469 (N.D. Ohio 1994)...................................................................... 23

*Telxon Corp. v. Symbol Techs., Inc.*,
    961 F. Supp. 1113 (N.D. Ohio 1996) ..................................................................... 29

*Tempur Sealy Int'l, Inc. v. Wondergel, LLC*,
    No. 5:16-cv-83, 2016 U.S. Dist. LEXIS 44354 (E.D. Ky. Apr. 1, 2016) ................................ 27

*Univ. of Texas v. Camenisch*,
    451 U.S. 390 (1981) ..................................................................................................... 11

*Wendy's of Bowling Green, Inc. v. Marsh USA, Inc.*,
    No. 3-10-1043, 2012 U.S. Dist. LEXIS 13075 (M.D. Tenn. Feb. 3, 2012) ................................ 12

**Statutes**

Tenn. Code Ann. § 47-18-104(5) .......................................................................................... 12

Tenn. Code Ann. § 47-18-104(8) .......................................................................................... 12

**Regulations**

29 CFR § 1926.1153(a) ................................................................................................ 5, 14, 16

29 CFR § 1926.1153(b) .................................................................................................... 5, 14

29 CFR § 1926.1153(c)(1) ........................................................................................ 14, 15, 17, 21

29 CFR § 1926.1153(d) ........................................................................................................ 15

29 CFR § 1926.1153(d)(3)(i) .................................................................................... 14, 17, 18

29 CFR § 1926.1153(e)(1) ..................................................................................................... 17

In support of its Motion for Preliminary Injunction, Defendant/Counter-Plaintiff/Third-Party Plaintiff James Hardie Building Products Inc. ("JHBP") states as follows:

## I.    INTRODUCTION

There can be no greater public interest in advertising than protecting consumers from false statements about a product's purported regulatory, safety, and health risks. That is precisely the relief JHBP seeks from this Court. Plaintiff/Counter-Defendant Louisiana-Pacific Corporation ("LP") and its agent, The Kruse Brothers, Inc. ("Kruse") (collectively, "Counter-Defendants"), have embarked on a widespread campaign to spread false and misleading statements concerning recent enforcement of U.S. Occupational Health and Safety Administration ("OSHA") regulations. Specifically, Counter-Defendants falsely claim that the OSHA regulations "require" the use of certain practices or safety equipment (without which fiber cement siding is "dangerous" to install), and have misled consumers into believing that OSHA has been "cracking down" on siding contractors such that safety citations, fines, and risks are all but guaranteed if they continue to use fiber cement. Such statements are made with wanton disregard for what the OSHA regulations actually provide and are obviously designed as a scare tactic to persuade potential and existing consumers not to use fiber cement siding products, and, specifically, JHBP's products. These statements are not only false and unfairly competitive, but violate the trust the public places in companies like LP.

This is not a case of two competitors engaging in a hard-fought, but fair, comparative advertising campaign in the marketplace. Rather, the nature of Counter-Defendants' false statements render an injunction not only appropriate, but necessary. Each of the four factors militates in favor of this conclusion. First, JHBP has established a strong likelihood of success on the merits of its false advertising and unfair competition, TCPA, and tortious interference claims because Counter-Defendants' statements are demonstrably false and misleading. The

1

plain text of the OSHA regulations makes clear that the so-called "required" or "prohibited" practices or equipment touted by Counter-Defendants are not either. The language of the regulations is so unambiguous that Counter-Defendants' "interpretations" cannot be anything except intentional misrepresentation. Furthermore, LP's clear message that "OSHA is cracking down on the Silica dust created from cutting James Hardie Fiber Cement Siding" misrepresents OSHA's enforcement of the OHSA silica standard. Indeed, while LP suggests that the 209 citations issued since enforcement of the new regulation began all relate to fiber cement siding, only <u>three</u> – 1.4 percent – were issued to siding contractors. Citing these numbers as a warning to consumers so that they do not get "stung by OSHA" and to promote LP's siding products as "your exterior cladding of choice" over fiber cement products necessarily and falsely implies that those citations relate to the use of fiber cement siding. Finally, Counter-Defendant's misleading statements that continued use of fiber cement products is unsafe or "dangerous" misrepresents the health and safety risks and misconstrues the OSHA regulations. Knowing that consumers likely are not familiar with the OSHA regulation, Counter-Defendants prey upon consumers' understandable fear of OSHA fines and safety risks to deceive them into thinking JHBP's products, or fiber cement products generally, are unsafe to install.

Second, JHBP will suffer irreparable harm to its reputation and consumer goodwill in the absence of an injunction. It cannot be disputed that false statements about the alleged regulatory and safety risks of using JHBP's product are material to a consumer's purchasing decision. In fact, JHBP is already aware of several consumers that <u>actually have been deceived</u> by Counter-Defendants' statements, resulting in significant customers nearly terminating their ongoing relationships with JHBP. Those relationships would have been lost but for those customers giving JHBP the opportunity to correct Counter-Defendants' claims. These harms will only

multiply if Counter-Defendants are not enjoined. Conversely, Counter-Defendants will suffer no harm from refraining from making false statements, nor will LP be restrained from selling products or engaging in otherwise fair competition. As such, the third factor – the relative balance of harms – weighs heavily in favor of an injunction.

Finally, not only is the public interest served by preventing customer confusion or deception, but it is especially significant here because safety concerns are implicated. The public interest is not served by advertising regarding false or misleading safety standards. Thus, all four factors support entry of an Order enjoining Counter-Defendants from their unlawful conduct and ordering that they engage in corrective measures to cure the harm they have caused.

## II. <u>BRIEF FACTUAL BACKGROUND</u>

JHBP submits herewith the Declarations of Marcus Kuizenga ("Kuizenga Decl."), Adam King ("King Decl."), Addison Garner ("Garner Decl."), and Delwyn Kubeldis ("Kubeldis Decl."), which are expressly incorporated by reference herein. Such facts are cited below and in the argument section of this Memorandum.

### A. JHBP And Its Fiber Cement Siding Products

The manufactured siding market is comprised of several types of siding products, including, but not limited to, fiber cement, vinyl, engineered wood, stucco, masonry, and metal composites. Kuizenga Decl. ¶ 3. JHBP manufactures, advertises, and sells fiber cement siding and backerboard ("Fiber Cement Products") to both professional and non-professional consumers, including dealers, distributors, building material wholesalers, retailers, lumberyards, builders, developers, contractors, and individual end-users throughout the United States for both residential and commercial construction projects. *Id.* ¶ 4. JHBP's Fiber Cement Products come in multiple varieties and are sold under a number of brands. *Id.* ¶ 5.

3

JHBP has been in business for over 125 years, and has manufactured fiber cement siding in the United States since at least the early 1990s. *Id.* ¶ 6. Over thirty years ago, JHBP invented its version of fiber cement, which has since evolved to be the leading brand of fiber cement in the United States. *Id.* ¶ 7. JHBP is the largest manufacturer and supplier of Fiber Cement Products sold in interstate commerce to consumers throughout the United States. *Id.* ¶ 8. JHBP has global annual revenues of more than $1.5 billion, REDACTED - ATTORNEYS' EYES ONLY

Over the last 30 years, JHBP has become the leading fiber cement siding brand in the minds of relevant consumers. *Id.* ¶ 10. JHBP has spent collectively over $100 million in research and development, and continues its annual research and development investment of approximately $20 million. *Id.* ¶ 11. JHBP's Fiber Cement Products have undergone rigorous testing, including for proper use in compliance with OSHA regulations, including those governing workplace exposure to respirable crystalline silica under 29 CFR 1926.1153. *Id.* ¶ 12.

**B.    LP's SmartSide Products**

LP competes with JHBP by, among other means, manufacturing and marketing in interstate commerce throughout the United States a line of engineered wood siding products under the SMARTSIDE® brand ("SmartSide Products"). JHBP's Counterclaims and Third Party Complaint (ECF No. 28) ("JHBP Countercl.") ¶ 26; LP's Answer to Counteclaims (ECF No. 51) ("LP Ans.") ¶ 26; Kruse's Answer to Counterclaims (ECF No. 56) ("Kruse Ans.") ¶ 26. Consumers of LP's SmartSide Products at least overlap with consumers of JHBP's Fiber Cement Products. JHBP Countercl. ¶ 28; LP's Ans. ¶ 28; Kruse Ans. ¶ 28. LP's SmartSide Products are marketed as alternatives to JHBP's Fiber Cement Products. Kuizenga Decl. ¶ 14. Many consumers purchase siding from both JHBP and LP. JHBP Countercl. ¶ 30; LP's Ans. ¶ 30; Kruse Ans. ¶ 30. On information and belief, many consumers and purchasers of manufactured

4

siding, including small to medium sized builders, do not generally have internal engineering or legal staff with knowledge of siding technology and applicable governmental regulations and will rely on the expertise of and information provided by manufacturers, like JHBP and LP, when making purchasing decisions. Kuizenga Decl. ¶ 15.

LP advertises and promotes its SmartSide Products on various websites owned or operated by LP, through trade publications and training programs, and elsewhere throughout the United States. *Id.* ¶ 16. Kruse has contracted with LP to provide training for the installation of LP products, including in Tennessee. Kruse Ans. ¶¶ 9, 10, 34, 35. Kruse, through its officer and/or agent Steven Kruse, has participated in and facilitated LP's promotion and sales of SmartSide Products in interstate commerce to consumers in the United States. *Id.* LP, directly and through agents such as Kruse, provides training seminars across the U.S., including Nashville, Tennessee. JHBP Countercl. ¶ 35; LP's Ans. ¶ 35; Kruse Ans. ¶¶ 9, 10, 34, 35.

**C.      OSHA Silica Standard, 29 CFR § 1926.1153**

OSHA issued a Respirable Crystalline Silica standard for construction, 29 CFR § 1926.1153 ("OSHA Standard"), on March 25, 2016. 29 CFR § 1926.1153; Kubeldis Decl. ¶ 22. Enforcement of the OSHA Standard went into effect on September 23, 2017. *Id.* The term "Action Level" (AL) as used in the OSHA Standard means a concentration of airborne respirable crystalline silica of 25 $\mu g/m^3$ as 8-hour Time-Weighted Average (TWA). *Id.* ¶ 23; 29 CFR § 1926.1153(b). The term "Permissible Exposure Limit" (PEL) as used in the OSHA Standard means a concentration of airborne respirable crystalline silica of 50 $\mu g/m^3$, as 8-hour TWA. *Id.*

The OSHA Standard does not apply if worker exposure is less than the Action Level for all tasks performed onsite under foreseeable conditions. Kubeldis Decl. ¶ 26; 29 CFR § 1926.1153(a). Put another way, the OSHA Standard only requires employers to limit worker exposures to respirable crystalline silica (RCS) and take other steps to protect workers if

5

exposures exceed the Action Level. *Id.* ¶ 25. Tasks involving fiber cement board with exposures below the Action Level include: scoring, snapping, or shearing fiber cement board; working at least 25 feet from a cutting operation; and storing, moving, or handling fiber cement board. *Id.* ¶ 27. When it applies, the OSHA Standard does not require or prohibit any particular methods of compliance to limit exposures below the PEL, but rather, it mandates the order of control methods. *Id.* ¶ 28. Employers can either use the control methods laid out in Table 1 in the OSHA Standard for a limited number of tasks, or they can measure workers' exposure to silica and independently decide which dust controls work best to limit exposures in their workplace to the PEL. *Id.*.; Kuizenga Decl. ¶ 18, Ex. 1.

### D. LP's September 22, 2017 Email

On September 22, 2017, Mark Rose, Florida Channel Manager of LP Building Products, forwarded to an unknown number of existing and prospective consumers an email from the Center for Construction Research and Training with the subject line "Enforcement of Silica Rule Begins Saturday, Sept. 23. Here are some resources for compliance." (the "Rose email"). King Decl. ¶ 4, Ex. 1. Before forwarding the email, Rose materially and deceptively altered the subject line to read: "**FW: Enforcement of Silica Rule (including fiber cement) Begins Saturday, Sept. 23. Here are some resources for compliance**." *Id.* (emphasis added). Rose further falsely and/or misleadingly states:

- "Beginning tomorrow, Saturday, September 23, 2017, OSHA regulations prohibit the utilization of a standard circular saw for cutting fiber cement siding. Doing so, could result in an OSHA imposed citation."

- "Sorry to be the bearer of bad news, but it is information which continues to be widely unknown and could change the way you do things."

*Id.* ¶ 5, Ex. 1. The Rose email was sent to several existing or prospective JHBP consumers, including, without limitation, REDACTED - ATTORNEYS' EYES ONLY

6

███████████████████ Each of the foregoing customers was confused regarding the application of the amended OSHA rule regarding silica. *Id.* ¶ 7. Each customer referenced the Rose email and expressed that the OSHA regulation prevented these customers from cutting fiber cement board with a circular saw, as stated in the Rose email. *Id.*

## E. Counter-Defendants' Statements During LP Smartside Training Sessions

On April 17, 2018, LP held an in-person training conducted by Kruse and other LP representatives regarding the installation of LP's products. Garner Decl. ¶ 4. Attendees of the training session included company representatives from home construction companies and siding installation companies. *Id.* These attendees are the targeted marketing audience for both JHBP and LP and each represent a potential customer for both JHBP and LP. *Id.*

Counter-Defendants made several false and misleading statements regarding Fiber Cement Products during this training session, including, but not limited to: respirators are a requirement when cutting fiber cement products; and installers of fiber cement must place caution tape around the entire home and warn all the neighbors that the workers are installing a potentially dangerous product in the area. *See id.* ¶¶ 5-7. For example, Counter-Defendants handed out questionnaires which stated that respirators were not required to install LP's engineered wood product, implying that respirators were required to install fiber cement board products. *Id.* ¶ 5, Ex. 1. The questionnaire also asked questions regarding what type of special gear is needed to work with LP's engineered wood. *Id.* In the conversations regarding this question, Counter-Defendants stated to the effect "You need special tools and special gear to protect yourself from silica dust when working with fiber cement." *Id.* Also during the training, Counter-Defendants twice directly referenced JHBP when discussing fiber cement board. *Id.* ¶ 6. After referencing JHBP by name, Counter-Defendants stated that if contractors or installers

7

use fiber cement board, that they will "need to place caution tape around the home." *Id.* The LP representative further stated that, after placing yellow caution tape around the home, the installers of fiber cement board would need to contact the adjacent neighbors to the home and "warn" the neighbors regarding the installation of a "potentially dangerous material." *Id.* ¶ 7.

**F.**     **LP's May 7, 2018 LinkedIn Post**

On May 7, 2018, Brad Presley, Marketing Development Manager for LP, posted a link on his LinkedIn page to an article titled "Silica citations hit 116 in 6 months" published on constructiondive.com. Kuizenga Decl. ¶ 19, Ex. 2. To describe the article, Presley stated: "Moral of the story. Don't want to be stung by OSHA. Use LP Smarside [*sic*] as your exterior cladding of choice." *Id.* Presley then posted the following hashtags to contextualize his statements and to direct consumers interested in the metadata tags to his post: "#LPSmartside"; "#osha;" "#exterior"; "#cladding"; "#silica." *Id.*

**G.**     REDACTED

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████

**H.**     **LP's Statements At Trade Shows**

LP, through Mr. Rose, has now begun a marketing campaign at trade shows that states "THE EASIEST WAY TO OPERATE SAFELY WITH SILICA DUST IS DON'T CREATE IT." *See* King Decl. ¶¶ 13, 14, 16. At these trade shows and through direct customer

8

interactions, Mr. Rose and other LP representatives continue to misrepresent that OSHA regulations prevent the usage of a circular saw to cut fiber cement board, and that the easiest way to operate safely with silica dust is not create it. *Id.* For example, LP hosted a "lunch and learn" presentation during which Mr. Rose again stated that customers would need "special saws" to cut fiber cement board and that the OSHA regulations provide that individuals "can't use a circular saw" to cut fiber cement board. *Id.* ¶ 11.

LP continues to specifically target JHBP. In February 2018, JHBP posted an invitation for a "lunch and learn" presentation on the Northeast Florida Builders Association (NEFBA) website, scheduled for March 14, 2018. *Id.* ¶¶ 12-13. The topic of the presentation was OSHA's new silica guidelines, titled "**How to Operate Safely with OSHA's New Silica Guidelines**." *Id.* 12. On March 8, 2018, NEFBA held a Builders & Remodelers Showcase on in Jacksonville, Florida ("NEFBA Showcase"). *Id.* ¶ 13. Both LP and JHBP were exhibitors at the NEFBA Showcase. *Id.* During that Showcase, LP advertised via a sign outside its booth "**THE EASIEST WAY TO OPERATE SAFELY WITH SILICA DUST IS DON'T CREATE IT**." *Id.* This sign appears to recast JHBP's publicly advertised "lunch and learn" presentation to be given on March 14, 2018 entitled "How to Operate Safely with OSHA's New Silica Guidelines." *Id.* During the NEFBA Showcase, Mr. Rose continued to state that individuals cannot use a circular saw to cut fiber cement board. *Id.*

I. **Actual Deception and Loss Of Goodwill Resulting From LP's Statements**

Because of LP's false and misleading statements, JHBP's customers have been confused and misled regarding the actual OSHA standards that are applicable. *See generally* King Decl. As a direct result of this confusion, JHBP customers have actually initiated the process to terminate their relationship with JHBP. *Id.* ¶ 15. REDACTED - ATTORNEYS' EYES ONLY

9

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████

LP's false and misleading representations regarding the usage of a circular saw and that that the easiest way to operate with silica dust is not create it, is ongoing as its representatives continue to reiterate these positions at trade shows in the Northeast Florida territory and through direct customer interactions. *Id.* ¶ 16.

### III.    LEGAL STANDARD

A district court must balance four factors when considering a motion for a preliminary injunction: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction. *Bays v. City of Fairborn*, 668 F.3d 814, 818-19 (6th Cir. 2012). "A district court is required to make specific findings concerning each of the four factors, unless fewer are dispositive of the issue." *Brake Parts, Inc. v. Lewis*, 443 Fed. App'x 27, 28 (6th Cir. 2011) (internal citation omitted). Yet these competing elements "are factors to be balanced, not prerequisites that must be met." *Jones v. City of Monroe*, 341 F.3d 474, 476 (6th Cir. 2003).

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390,

10

395 (1981).  Given this limited purpose, "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Id.*  Accordingly, a party "is not required to prove his case in full at a preliminary injunction hearing and the findings of fact and conclusions of law made by a court granting the preliminary injunction are not binding at trial on the merits." *Id.*; *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007).

## IV.    ARGUMENT

Counter-Defendants' false and misleading statements about alleged requirements under the OSHA Standard, and potential OSHA violations and safety risks resulting from the use of fiber cement siding products constitute unfair competition and false advertising under the Lanham Act and Tennessee law; violations of the Tennessee Consumer Protection Act ("TCPA"); and tortious interference with business relationships.  All four factors weigh in favor of enjoining Counter-Defendants' false statements.

**A.    JHBP Has A Strong Likelihood Of Success On The Merits Of Its False Advertising, Unfair Competition, and TCPA Claims.**

To succeed on a claim for false advertising under the Lanham Act, a plaintiff must prove: (1) the defendant has made false or misleading statements of fact concerning his own product or another's; (2) the statement actually deceives or tends to deceive a substantial portion of the intended audience; (3) the statement is material in that it will likely influence the deceived consumer's purchasing decisions; (4) the advertisements were introduced into interstate commerce;  and (5) there is some causal link between the challenged statements and harm to the plaintiff. *Grubbs v. Sheakley Grp., Inc.*, 807 F.3d 785, 798 (6th Cir. 2015).  In order to recover under the TCPA, a plaintiff must prove: (1) that the defendant engaged in an unfair or deceptive act or practice declared unlawful by the TCPA and (2) that the defendant's conduct caused an

11

ascertainable loss of money or property. *Wendy's of Bowling Green, Inc. v. Marsh USA, Inc.*, No. 3-10-1043, 2012 U.S. Dist. LEXIS 13075, at *14 (M.D. Tenn. Feb. 3, 2012). Prohibited acts and practices include "[r]epresenting that goods or services have … characteristics … that they do not have" and "[d]isparaging the goods, services or business of another by false or misleading representations of fact." Tenn. Code Ann. § 47-18-104(5), (8). "Unfair competition is a generic name for several related torts involving improper interference with business prospects." *B & L Corp. v. Thomas & Thorngren, Inc.*, 917 S.W.2d 674, 681 (Tenn. Ct. App. 1995). Unfair competition is found "when the defendant engages in any conduct that amounts to a recognized tort and when that tort deprives the plaintiff of customers or other prospects." *B & L Corp. v. Thomas & Thorngren, Inc.*, 162 S.W.3d 189, 216 (Tenn. Ct. App. 2004); this Court's Order (ECF No. 27) ("TRO Order") at 8.

"The same analysis that applies to the federal Lanham Act claims also applies to the state claims of unfair competition under Tennessee common law and of violations of the Tennessee Consumer Protection Act." *McDonald's Corp. v. Shop at Home, Inc.*, 82 F. Supp. 2d 801, 816 (M.D. Tenn. 2000); *see also Borescopes R US v. 1800Endoscope.com, LLC*, 728 F. Supp. 2d 938, 945 (M.D. Tenn. 2010); *Journal Commc'ns, Inc. v. Sabo*, No. 3:07-00605, 2008 U.S. Dist. LEXIS 24705, at *20 (M.D. Tenn. Mar. 26, 2008); TRO Order (denying temporary restraining order on state law claims for same reasons as Lanham Act claim). Thus, these claims may be analyzed together.

### 1.    Counter-Defendants' Statements Are Literally False And/Or Misleading.

Liability for false advertising under the Lanham Act arises if the commercial message or statement is either (1) literally false or (2) literally true or ambiguous, but has the tendency to deceive consumers. *Innovation Ventures, LLC v. N.V.E., Inc.*, 694 F.3d 723, 735 (6th Cir. 2012). "[W]here statements are literally false, a violation may be established without evidence that the

statements actually misled consumers" and actual deception is presumed. *Id.* (internal citations omitted). "A 'literally false' message may be either explicit or 'conveyed by necessary implication when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated.'" *Id.* at 735-36.

Where statements are literally true, yet deceptive, or too ambiguous to support a finding of literal falsity, a violation can only be established by proof of actual deception (*i.e.*, evidence that individual consumers perceived the advertisement in a way that misled them about the plaintiff's product)." *Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 614 (6th Cir. 1999). However, a more lenient standard applies when a plaintiff seeks injunctive relief: "[I]njunctive relief may be obtained by showing <u>only</u> that the defendant's representations about its product have a tendency to deceive consumers[.]" *Id.* at 618 (emphasis added). To satisfy this more lenient standard, a "plaintiff need not present [evidence] demonstrating actual deception, it must present evidence of some sort demonstrating that consumers were misled." *Id.*

### a. Counter-Defendants' Statements Regarding "Required" or "Prohibited" Tools or Controls Under the OSHA Standard.

In this case, Counter-Defendants have represented, and continue to represent, that the new OSHA Standard "requires" or "prohibits" certain equipment, dust control methods, and work practices when working with fiber cement. These statements are a gross and intentional misstatement of the OSHA Standard's provisions, and are literally false. Counter-Defendants' statements are clearly directed toward manufacturers of fiber cement siding – a category within the larger siding market of which JHBP is not just a member, but the leading brand. Kuizenga Decl. ¶¶ 4-10; *see also*, TRO Order at 7. Due to JHBP's Fiber Cement Products' prevalence in the general siding market, and due to JHBP's prevalence in the fiber cement category, consumers

13

necessarily understand Counter-Defendants' statements about fiber cement to mean or refer to JHBP and its Fiber Cement Products.

The OSHA Standard sets forth the Action Level of respirable crystalline silica ("RCS") triggering application of the Standard (25 micrograms per cubic meter of air ($\mu g/m^3$) averaged over an 8-hour work day) and the Permissible Exposure Limit ("PEL") of RCS – 50 $\mu g/m^3$ averaged over an 8-hour work day. 29 CFR § 1926.1153(b); Kubeldis Decl. ¶¶ 23-24. The OSHA Standard does not apply if worker exposure is less than the Action Level:

> *Scope and application*. This section applies to all occupational exposures to respirable crystalline silica in construction work, <u>except where employee exposure will remain below 25 micrograms per cubic meter of air (25 µg/m3) as an 8-hour time-weighted average</u> (TWA) under any foreseeable conditions.

29 CFR § 1926.1153(a) (emphasis added); Kubeldis Decl. ¶ 26. If engaged in a task wherein worker exposure to RCS rises to the Action Level, only then does the Standard require employers to limit worker exposures to RCS – but does not set forth "required" or "prohibited" controls to meet this standard. 29 CFR § 1926.1153(c)(1), (d)(3)(i); Kubeldis Decl. ¶¶ 25-26, 28. Exposures must meet the threshold Action Level before an employer must take any action to limit exposure under the OSHA Standard. Kubeldis Decl. ¶¶ 25-26.

Assuming the Action Level is met, the OSHA Standard does not require or prohibit any particular methods of compliance to limit exposures below the PEL, but does mandate the order of control methods. *Id.* ¶ 28. The Standard provides a table outlining 18 tasks commonly associated with RCS exposure ("Table 1"), matched with engineering controls or work practices. *Id.* ¶ 30. The dust control methods set forth in Table 1 provide a "safe harbor" for employers, but are not required for an employer to be in compliance with the OSHA Standard:

> For each employee engaged in a task identified on Table 1, the employer shall fully and properly implement the engineering controls, work practices, and respiratory protection specified for the task on Table 1, <u>unless the employer assesses and limits the exposure of</u>

14

the employee to respirable crystalline silica in accordance with paragraph (d) of this section.

29 CFR § 1926.1153(c)(1) (emphasis added); Kubeldis Decl. ¶ 31.  Indeed, Table 1 only features 18 of an estimated over 200 construction tasks, and therefore, is not meant to be an exhaustive or exclusive list of the methods of compliance.  *Id.* ¶ 31.  Employers who follow Table 1 fully and properly are not required to conduct monitoring for workers' exposure to silica from those tasks and are presumed to have worker exposures below the PEL.  *Id.* ¶ 30; 29 CFR § 1926.1153(d).

If an employer chooses not to implement the controls set forth in Table 1 when the Action Level is met (which he or she may do), paragraph (d) of the OSHA Standard applies to alternative exposure controls that may be implemented "to reduce and maintain employee exposure to respirable crystalline silica to or below the PEL."  29 CFR § 1926.1153(d).  As explained by OSHA,

> Employers can either use a control method laid out in Table 1 of the construction standard, or they can measure workers' exposure to silica and <u>independently decide which dust controls work best to limit exposures in their workplaces to the permissible exposure limit (PEL)</u>.

Kuizenga Decl. Ex. 1 (emphasis added); Kubeldis Decl. ¶ 29.  In other words, OSHA has provided in Table 1 <u>suggested</u> measures for 18 (of over 200) exemplary tasks, but makes clear that, if the employer chooses not to follow Table 1, it can adopt <u>any other measure(s)</u> that will prevent exposure to RCS above the PEL.  Kubeldis Decl. ¶¶ 28-31, 37-38.  Thus, it is patently false to claim that OSHA requires or prohibits certain tools or control methods to meet this Standard, or that Table 1 is mandatory.

For these reasons, LP's statements that circular saws are now prohibited under the OSHA Standard are literally false, including, without limitation:

- Statements that "OSHA regulations prohibit the utilization of a standard circular saw for cutting fiber cement siding.  Doing so, could result in an OSHA imposed

15

citation" and that the OSHA Standard provides that individuals "can't use a circular saw" to cut fiber cement board;

- Statements that customers would need "special saws" or "special equipment" to cut fiber cement board.

The use of a standard circular saw to cut fiber cement siding products is not prohibited under the OSHA Standard. Kubeldis Decl. ¶¶ 19, 32, 45. First, the OSHA Standard only applies if exposures meet the Action Level – 25 µg/m$^3$ averaged over an 8-hour work day. There are many tasks involving fiber cement that do not generate enough RCS to reach the Action Level. *See* Kubeldis Decl. ¶¶ 26-27. It is highly unlikely that a worker would cut fiber cement continuously for 8 hours. *Id.* ¶ 35. Workers cutting fiber cement siding products do not typically engage in tasks generating RCS (*e.g.*, cutting) continuously over the course of several hours. *Id.* ¶ 47. In those cases. the OSHA Standard (and, specifically, the alleged "prohibition" against using circular saws) would not even apply. 29 CFR § 1926.1153(a). It is literally and intentionally false for Counter-Defendants to make the blanket statement that OSHA prohibits <u>any</u> use of a circular saw when cutting fiber cement, regardless of task, time, or exposure level.

Second, even if the Action Level is met, the OSHA Standard in no way prohibits the use of circular saws (or any specific tools) for cutting fiber cement, as long as either Table 1 is followed or controls are in place to ensure exposures do not exceed the PEL. Kubeldis Decl. ¶¶ 19, 32, 36-38. In fact, Table 1 <u>expressly identifies </u>the use of a hand held circular saw attached to a dust collection system to cut fiber cement as an effective engineering control when cutting fiber cement.[1]  29 CFR § 1926.1153, Table 1; Kubeldis Decl. ¶ 33. Counter-Defendants' statements are unequivocally false and are made recklessly, if not intentionally.

---

[1] Thus, even under Counter-Defendants' misrepresentations that Table 1 is mandatory, such statements are still false because Table 1 does not require respirators for cutting fiber cement.

16

Counter-Defendants' statements that respirators are a "requirement" when cutting or installing fiber cement products also are literally false. Kubeldis Decl. ¶¶ 21, 34, 40, 45. Again, if exposure is below the Action Level, the OSHA Standard would not apply (*i.e.*, would not "require" use of a respirator). If the Action Level is met, the generalization that respirators are required any time a contractor works with fiber cement is still literally false. The OSHA Standard provides, in pertinent part:

> *Engineering and work practice controls.* The employer shall use engineering and work practice controls to reduce and maintain employee exposure to respirable crystalline silica to or below the PEL, unless the employer can demonstrate that such controls are not feasible. <u>Wherever such feasible engineering and work practice controls are not sufficient to reduce employee exposure to or below the PEL,</u> the employer shall nonetheless use them to reduce employee exposure to the lowest feasible level and <u>shall supplement them with the use of respiratory protection</u> that complies with the requirements of paragraph (e) of this section.

29 CFR § 1926.1153(d)(3) (emphasis added). Under the plain text of the OSHA Standard, the use of a respirator is permitted <u>only</u>: (1) when specified under Table 1 (if followed); or (2) when feasible alternative engineering and work practice controls alone cannot keep exposure to RCS below the PEL. 29 CFR § 1926.1153(e)(1). With respect to cutting fiber cement, Table 1 clearly states that <u>respirators are not required</u> when cutting fiber cement with a circular saw in accordance with the requirements of the Table. *Id.* Table 1. With respect to installers, the act of storing, moving, or handling fiber cement board does not result in exposures over the Action Level. Kubeldis Decl. ¶ 27. Since this is below the PEL (and, indeed, below the Action Level triggering application of the Standard), a respirator is not required.

It further is an intentional misrepresentation to state (either explicitly or by necessary implication) that respirators are "required" under the OSHA Standard because respirators are intended to be a last resort, not a requirement. Kubeldis Decl. ¶ 40. Under the OSHA Standard, employers first must utilize engineering controls (such as using water delivery systems and dust

17

collection systems) to ensure a worker's exposure to RCS is below the PEL. *Id.* ¶ 42. If the engineering controls are not adequate to bring exposure levels below PEL, the employer must implement administrative controls or work practices to limit exposure to RCS. *Id.* If, after exhausting both engineering controls and work practices, the employer still cannot bring exposure levels below the PEL, <u>only then</u> does the Standard permit the use of respirators as a dust control method. *Id.*; 29 CFR § 1926.1153(d)(3). In fact, the Standard provides incentives to maintain exposure levels to RCS below the PEL without the use of respirators. *Id.* § 1926.1153(h) (requiring medical surveillance if respirators are used for 30 or more days a year); Kubeldis Decl. ¶ 43. The use of a respirator under the OSHA Standard is the least preferred exposure control method, not a requirement. Kubeldis Decl. ¶ 44. Counter-Defendants' statements to the contrary are intentionally false and misleading. *Id.* ¶¶ 21, 34, 40, 45.

Similarly, Counter-Defendants' statements that installers of fiber cement must place caution tape around the entire home and warn all the neighbors that the workers are installing a "potentially dangerous material" in the area are also literally false. *Id.* ¶¶ 20, 45. The OSHA Standard is devoid of any such requirement for caution tape or warnings to neighbors. *See generally*, 29 CFR § 1926.1153; Kubeldis Decl. ¶ 45. Moreover, it is both inflammatory and false or misleading to claim that the mere handling of fiber cement, whether or not engaged in a task that generates RCS above the PEL – is "dangerous" or "potentially dangerous." Handling or installing fiber cement products alone does not create RCS exposures above the PEL, or even the Action Level triggering application of the OSHA Standard – which is expressly designed to address potential hazards. Kubeldis Decl. ¶ 27.

### b. Counter-Defendants' Statements Regarding OSHA Citations and Fines.

LP's statements that the use of fiber cement will result in OSHA citations and fines are literally false by necessary implication, including, but not limited to, the following claims:

- REDACTED

- LP's statements that the use of a circular saw on fiber cement siding "could result in an OSHA imposed citation;"

- LP's statements that, "Moral of the story. Don't want to be stung by OSHA. Use LP Smartside as your exterior cladding of choice;" and

- LP's reference to "Silica citations hit 116 in 6 months" under the OSHA Standard, together with statements implying that those citations were issued to siding contractors using fiber cement products.

As noted above, the OSHA Standard does not prohibit the use of a circular saw on fiber cement, and continued use of such tools in and of itself will not result in any fines. Nevertheless, workers will necessarily understand LP's statements to mean that OSHA is cracking down on the installation of fiber cement products and issuing a significant number of fines to enforce the OSHA Standard. REDACTED

This clear message is bolstered by LP's continued focus on the alleged citations. For example, LP's LinkedIn post refers to 116 OSHA citations, tells consumers that the "moral of the story" is don't get "stung by OSHA," which will be avoided if the consumer selects LP's SmartSide products as the "cladding of choice." Kuizenga Decl. Ex. 2. In other words, LP is telling consumers to choose SmartSide siding as opposed to fiber cement siding or they will get fined under the OSHA Standard.

Such statements are unambiguously deceptive, either literally or by necessary implication. Nothing in the article titled "Silica citations hit 116 in 6 months" indicates that those 116 citations – or even a majority of those citations – were issued to siding contractors. *Id.*

19

Ex. 4. The article does not state so because it is not so. Of the 209 citations issued since OSHA Standard enforcement began in the fall of 2017, <u>only three were issued to siding contractors</u>. Kubeldis Decl. ¶¶ 46-47, Ex. C. The most frequently mentioned provision was employers failing to measure silica exposure levels – not cutting fiber cement. *See* Kuizenga Decl. Ex. 4. It is a far cry – and literally false – to state that these citations show that "OSHA is cracking down on the Silica dust created from <u>cutting James Hardie Fiber Cement Siding</u>." Kuizenga Decl. Ex. 3. Contrary to LP's statements, these statistics show that primary enforcement of the OSHA Standard has been directed to occupations wherein workers are constantly cutting bricks, rocks, and other silica-based materials for extended periods (*e.g.*, several hours at a time), such as masonry workers, site preparation and water/sewer line contractors, as opposed to siding contractors, where a worker is unlikely to cut fiber cement for 8 hours a day. Kubeldis Decl. ¶ 47. Yet LP misleadingly weaves the article (and other statements about purported citations and fines) into the promotion of its own siding products, conveying the unmistakable message that fiber cement siding – a directly competitive product to LP's manufactured siding, as opposed to rocks or masonry bricks – is the subject of those citations. Such tactics are designed to scare consumers into believing these citations involve siding products, underscored by its proclamation that LP's products are the "cladding of choice."

### c. <u>Counter-Defendants' Statements Regarding OSHA Fines and Safety Risks Associated With Fiber Cement Products.</u>

In addition to being literally false on their face, each of the foregoing statements considered in context are unambiguously deceptive and literally false by necessary implication, or, at a minimum, misleading. LP's unambiguously deceptive message – that installation of fiber cement siding products are the target of OSHA fines (and are thus "unsafe") – is reinforced by LP's recent shift to an OSHA-specific marketing campaign (particularly at trade shows where

20

JHBP is present). In February 2018, JHBP advertised that it would be giving a presentation titled "How to Operate Safely with OSHA's New Silica Guidelines" on March 14, 2018. King Decl. ¶¶ 12-13. Evidencing its intent to target JHBP and misrepresent the OSHA Standard, LP took the title of JHBP's presentation and distorted it to create signage for use at a trade show on March 8, 2018 (and subsequent trade shows) proclaiming that "THE **EASIEST WAY** TO **OPERATE SAFELY** WITH SILICA DUST IS **DON'T** CREATE IT." *Id.* LP continues to focus their advertising on these claims at trade shows and through direct customer communications. *Id.* ¶ 16. Such statements are false and misleading because there are many tasks involving fiber cement – such as scoring, snapping, or shearing fiber cement board; working at least 25 feet from a cutting operation; and storing, moving, or handling fiber cement board – that do not generate actionable levels of RCS (and therefore are easy to "operate safely"). Kubeldis Dec. ¶ 27. The mere handling of fiber cement siding, including cutting fiber cement siding, without more, does not generate the requisite exposure levels to trigger application of the OSHA Standard, which is designed to address potential hazards. *See* 29 CFR § 1926.1153. Even if the OSHA Standard is triggered, as demonstrated by the exemplary controls set forth in Table 1 and proper alternatives, there are effective – that is, safe – and low cost controls that can be implemented to reduce such exposures. *Id.*; Kubeldis Decl. ¶¶ 30-38.

### 2. Counter-Defendants' Statements Have A Tendency To Deceive – And Have Actually Deceived – Relevant Consumers.

JHBP need not prove actual deception to warrant an injunction. For Counter-Defendants' statements that are literally false, "[a]ctual deception is presumed." *Fed. Express Corp. v. UPS*, 765 F. Supp. 2d 1011, 1017 (W.D. Tenn. 2010) (internal citation omitted). For those statements that are literally true but deceptive, or too ambiguous to be literally false, "[a] plaintiff seeking injunctive relief for false advertising faces a lower standard of 'showing only that the defendant's

representations about its product have a tendency to deceive consumers.'" *Herman Miller, Inc. v. Palazzetti Imps. & Exps., Inc.*, 270 F.3d 298, 323 (6th Cir. 2001) (citation omitted).

As noted above, Counter-Defendants' statements about the OSHA Standard's "prohibition" against using circular saws and "requirement" for respirators, caution tape, and warnings to neighbors when working with fiber cement are literally false. Counter-Defendants' statements about the alleged OSHA citations issued to siding contractors is also literally false or misleading because it misrepresents OSHA's enforcement to date. Counter-Defendants' statements about the OSHA Standard "requirements," potential safety violations and fines, and health risks further are literally false by necessary implication because consumers will understand LP's intended message as though explicitly stated: that continuing to use fiber cement products is unsafe. Nevertheless, to the extent the Court finds that Counter-Defendants' statements are not unambiguously deceptive, LP's statements go to the inherent and essential qualities of JHBP's products. It cannot be argued that potential safety or health risks associated with a product are not "material concerns of siding products consumers and would tend to influence a reasonable consumer's decisions." TRO Order at 6. Accordingly, Counter-Defendants' false and misleading statements are material and have a strong tendency to deceive.

Unfortunately, the impact of Counter-Defendants' false statements goes beyond mere tendency. JHBP's supporting declarations make clear that Counter-Defendants' false statements have caused <u>actual</u> deception. JHBP is aware of at least six customers were <u>actually deceived</u> by LP's Rose email stating that the OSHA Standard "prohibits" use of a standard circular saw. King Decl. ¶¶ 6-10, 15. Each customer expressed confusion regarding the application of the amended OSHA rule regarding silica. Each customer expressed their (erroneous) belief that, according to the Rose email, the OSHA regulation prevented these customers from cutting fiber

22

cement board with a circular saw. *Id.* ██REDACTED - ATTORNEYS' EYES ONLY██

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████ These examples unequivocally demonstrate

that Counter-Defendants' false statements have caused actual deception – and these are just the

consumers who took the time to ask JHBP about Counter-Defendants' false and misleading

statements. There likely are countless other consumers that have not or will not reach out, and

will simply cease doing any business with JHBP – and JHBP would never have reason to know.

An injunction is not only proper, but necessary.

      **3.**     **Counter-Defendants' Statements Are Material To The Relevant Consumer's Purchasing Decision.**

LP cannot credibly argue that its statements about the alleged regulatory and safety risks

are not material to a consumer's purchasing decision.  As noted by this Court, statements that

involve "inherent and essential qualities" of a product "involve material concerns of siding

products consumers and would tend to influence a reasonable consumer's decision."  TRO Order

at 6; *see also A.L.S. Enters. v. Robinson Outdoor Prods., LLC*, No. 1:14-CV-500, 2017 U.S.

Dist. LEXIS 11946, at *17 (W.D. Mich. Jan. 30, 2017) ("Evidence that a statement concerned an

inherent quality or characteristic of a product is evidence of a likely influence on purchasing

decisions.").  Any argument to the contrary is belied by LP's increased and significant focus on

the OSHA regulations in its advertising and customer communications.  *See Royal Appliance*

*Mfg. Co. v. Hoover Co.*, 845 F. Supp. 469, 472 (N.D. Ohio 1994) ("The materiality of the

challenged advertising campaign to the purchasing decision may be inferred from the considerable resources Hoover has exhausted defending the campaign."). Indeed, the tenor of Counter-Defendants' statements – namely, the use of scare tactics regarding safety citations, OSHA fines, and purported "requirements" – reinforces that the false statements are directed to qualities that influence a consumer's decision to purchase. The fact that JHBP customers were actually deceived by LP's statements, resulting in some customers initiating the process to terminate their relationship with JHBP (*see* King Decl. ¶¶ 6-10, 15), further demonstrates the materiality of Counter-Defendants' false statements. This factor weighs in favor of injunction.

### 4. Counter-Defendants' Statements Were Introduced Into Interstate Commerce.

There is no dispute that Counter-Defendants' statements were made in interstate commerce. As demonstrated above, LP, directly and through its agents, published the false statements alleged herein to existing and potential consumers through emails, social media posts, and direct interactions at trade shows. Counter-Defendants further made false statements about the OSHA regulations and "dangerous" nature of installing fiber cement siding during contractor training sessions and trade shows occurring in multiple cities demonstrating use of LP's SmartSide products. All of these actions were undertaken in connection with advertising, promoting, and selling LP's products nationwide. "[W]e can think of no clearer 'use' of goods 'in commerce' than offering them for sale." *Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*, 453 F.3d 377, 381 (6th Cir. 2006); *see also*, *Merck Eprova AG v. Gnosis S.p.A.*, 901 F. Supp. 2d 436, 451 (S.D.N.Y. 2012) ("by widely distributing the product specification sheets and sending them to potential customers, Gnosis placed the false statement in interstate commerce.").

### 5. Counter-Defendants' Statements Have Caused Actual Harm To JHBP.

As noted by this Court, "[p]laintiffs are not typically required to quantify their damages in order to obtain injunctive relief; logical likelihood of damages is considered to be sufficient."

TRO Order at 7. The Court further notes that, even where a competitor is not named in advertisement, a causal link may be found when the marketing items are directed to the type of products made by the competitor. *Id.* Here, Counter-Defendants' statements are clearly directed toward manufacturers of fiber cement siding – a category within the larger siding market in which JHBP is the leading brand. Kuizenga Decl. ¶¶ 4-10. Thus, "some impact on [JHBP] appears likely." TRO Order at 7. As demonstrated by the declarations submitted herewith, there is a logical likelihood of damages because JHBP's consumers have been <u>actually deceived</u> by Counter-Defendants' false statements, and some sought to terminate their relationship with JHBP as a result of the deception. King Decl. ¶¶ 6-10, 15. There can be no clearer causal link because JHBP has been directly impacted.[2] These numbers will only continue to multiply if Counter-Defendants are not enjoined.

**B. JHBP Has A Strong Likelihood Of Success On The Merits Of Its Tortious Interference Claim.**

Counter-Defendants' false statements constitute tortious interference with business relationships under Tennessee law. A plaintiff must prove: (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) defendant's intent to cause the breach or termination of the business relationship; (4) defendant's improper motive or improper means, and finally, (5) damages resulting from the tortious interference. *Pers. Computing Sys. v. Cent. Knox, Inc.*, No. 3:11-CV-374, 2012 U.S. Dist. LEXIS 46035, at *11-12 (E.D. Tenn. Mar. 30, 2012).

---

[2] Such causation also supports the requisite element of a TCPA claim to show that defendant's conduct caused an ascertainable loss of money or property. *Wendy's of Bowling Green*, 2012 U.S. Dist. LEXIS 13075, at *14.

JHBP has existing and prospective business relationships with dealers, distributors, retailers, lumberyards, builders, contractors, subcontractors, and individual end users. Kuizenga Decl. ¶ 4. Counter-Defendants are aware of JHBP's relationships because they attend the same trade shows as JHBP, and intentionally directed communications and marketing materials to JHBP's customers, including, without limitation, at least six actual JHBP customers. *See* King Decl. Counter-Defendants' intent to cause consumers to cease doing work with JHBP and "switch to the SmartSide" is clear. *See*, *e.g.*, King Decl. Ex. 1 (editing email subject line to state "Enforcement of Silica Rule (**including fiber cement**)"); LinkedIn post falsely implying that fiber cement siding contractors have been hit with "116" citations and describing LP's products as the "cladding of choice;" LP's advertising claims that, in light of the OSHA Standard, "a builder can substitute LP® SmartSide® engineered wood siding for fiber cement lap siding.").

As shown herein, Counter-Defendants' statements are false and misleading and therefore constitute "improper means." *See Assist-2-Sell, Inc. v. Assist-2-Build, LLC*, No. 1:05-CV-193, 2005 U.S. Dist. LEXIS 34696, at *14 (E.D. Tenn. Dec. 6, 2005) (citing examples of improper means, including "violations of statutes," "misrepresentation or deceit," and "unfair competition," among others). Those improper means have caused actual deception, from which a "logical likelihood of damages" will follow. *See* King Decl. ¶¶ 6-10, 15. Indeed, but for JHBP's ability to explain the falsity of LP's statements, JHBP would have lost significant customers – not to mention the unknown numbers of lost customers that have not notified JHBP. JHBP thus has a strong likelihood of success on the merits of its claim, warranting an injunction.

## C. JHBP Has Suffered, And Continues To Suffer, Irreparable Harm.

The Sixth Circuit has traditionally found that "irreparable injury 'ordinarily follows when a likelihood of confusion or possible risk to reputation appears' from infringement or unfair competition." *Lorillard*, 453 F.3d at 382; *Tempur Sealy Int'l, Inc. v. Wondergel, LLC,* No. 5:16-

cv-83, 2016 U.S. Dist. LEXIS 44354, at *12 (E.D. Ky. Apr. 1, 2016) ("Because Plaintiffs have demonstrated a strong likelihood of showing that Defendants made false or misleading statements in violation of the Lanham Act, the Court presumes irreparable harm.").  Though there remains a split among the circuits as to whether *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006) (abolishing the presumption in the patent context) applies to trademark cases (and Lanham Act cases more generally), the Sixth Circuit recently observed that "[i]f the movant is likely to succeed on an infringement claim, irreparable injury is ordinarily presumed, and the public interest will usually favor injunctive relief."  *PGP, LLC v. TPII, LLC*, No. 17-6221, 2018 U.S. App. LEXIS 14315, at *4 (6th Cir. May 31, 2018).  JHBP is entitled to the presumption of irreparable harm because it has shown a strong likelihood of success on the merits of claims.  "In the trademark context, the first factor is often decisive." *Id.* at *4.

Counter-Defendants' statements, on their face, are likely to cause irreparable harm. The Eleventh Circuit has found that irreparable harm can be established without relying on a presumption when "the advertisements contained serious indictments of the safety of [movant's products] that would likely be remembered by consumers."  *Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1320 (11th Cir. 2010).  As explained above, Counter-Defendants' false advertising campaign contains serious indictments of the safety of fiber cement products to send the unambiguous message that selection of JHBP's products is a risk-ridden purchase that will inevitably result in safety violations and fines.  "The inference that the serious nature of the claims in the advertisements would irreparably harm [JHBP's] goodwill and market position is certainly reasonable." *Id.* Counter-Defendants' false and deceptive marketing bolsters the LP brand while undermining and casting aspersions on JHBP's brand, reputation, and goodwill. *Innovation Venture, LLC v. Body Dynamics, Inc.,* No. 08-12711, 2009 U.S. Dist. LEXIS 26535,

27

at *9 (E.D. Mich. Mar. 30, 2009) (granting preliminary injunction where press release suggesting movant's products were subject to a court-ordered recall damaged movant's reputation and goodwill causing irreparable harm). The Sixth Circuit has expressly identified loss of goodwill and loss of competitive advantage as "distinct, incalculable harms." *Brake Parts, Inc.*, 443 Fed. App'x at 32; *see also*, *Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992).

Even absent a presumption, Counter-Defendants' false claims pose a direct and imminent threat of irreparable harm to JHBP's brand and an attendant loss of sales. While this Circuit has acknowledged that such harm is difficult to calculate, thus making injunctive relief appropriate, the incalculable damage to JHBP has already begun to surface. *See Hoover Transp. Servs. v. Frye*, 77 Fed. App'x 776, 785 (6th Cir. 2003) (6th Cir. 2003). The declarations submitted herewith make the "distinct, incalculable harms" of lost sales and reputational damage to JHBP abundantly clear. *See* King and Garner Decls. Actual JHBP customers have been deceived, and, but for JHBP having the opportunity to correct Counter-Defendants' falsities, JHBP would have lost customers as a direct result from Counter-Defendants' statements. King Decl. ¶¶ 6-10, 15.

With the summer season now here and the building boom continuing to rise, the risk of such harm grows each day that these false claims are permitted to remain in the marketplace. This harm is compounded as other consumers who equally base purchasing decisions on brand and reputational strength and sales momentum and trends – such as distributors and retailers – solidify future stocking and construction decisions. JHBP is at risk of losing (if it has not already) numerous other consumers who will not give JHBP that same opportunity to refute Counter-Defendants' misrepresentations. This is precisely the type of irreparable harm an injunction is designed to prevent.

**D.     JHBP's Harm Outweighs Any Harm To Counter-Defendants Or Others.**

The third factor for a court to consider is "whether the issuance of the injunction would cause substantial harm to others." *Certified Restoration*, 511 F.3d at 550-51.  Any harm to Counter-Defendants resulting from enjoining their unlawful acts does not tip the balance in Counter-Defendants' favor. *See Brake Parts, Inc.*, 443 Fed. App'x at 33 (affirming discounting of harm to non-movant because it "knowingly and illegally placed itself in the position to be placed out of business."); *Lorillard*, 453 F.3d at 382 (dismissing harm to defendant enjoined from counterfeiting as "hardly a legally cognizable one"); *Hickman v. Turitto*, No. 1:06-CV-151, 2007 U.S. Dist. LEXIS 26157, at *8 (E.D. Tenn. Apr. 9, 2007) (discounting harm to defendant in enjoining him "from doing something he already should not be doing").  "It is clear to this Court that the public should be protected from false and misleading statements. Requiring [Counter-Defendants] to stop making such statements will do no harm to [Counter-Defendants]." *Telxon Corp. v. Symbol Techs., Inc.*, 961 F. Supp. 1113, 1123 (N.D. Ohio 1996).

Here, Counter-Defendants will not suffer any harm as a result of an injunction because it would not stop Counter-Defendants from selling products, from conducting training sessions, or making fair, substantiated, and truthful advertisements.  Conversely, Counter-Defendants' false campaign will cause substantial harm to JHBP and consumers if permitted to continue.  *See Osmose*, 612 F.3d at 1321 ("the ads could seriously damage Osmose's goodwill among consumers and the treated wood industry while Viance would not be seriously harmed because it could still publish its test results. . . . The effect of the injunction is only to prohibit Viance from advertising generalizations regarding Osmose's product that . . . are <u>unsupported by Viance's current studies</u>.") (emphasis added).  Thus, given the scope of requested injunction, any arguable harm to Counter-Defendants – of which JHBP contends there is none – is limited.

29

**E.    An Injunction Serves The Public Interest By Preventing Consumer Confusion And Deception, Particularly Where Health And Safety Risks Are Implicated.**

The final factor in deciding upon a motion for preliminary injunction is "whether the public interest would be served by the issuance of the injunction." *Certified Restoration*, 511 F.3d at 551.  There is no question that false advertising is likely to deceive the consuming public. Where, as here, Counter-Defendants make literally false statements, the consuming public <u>is</u> deceived and, an injunction would prevent consumer confusion and deception.  *Lorillard*, 453 F.3d at 383; *Brake Parts, Inc.*, 443 Fed. App'x at 33 ("the public has an interest in the promotion of fair competition and the discouragement of unfair competition."); *Hoover Transp. Servs.*, 77 Fed. App'x at 785; *Bailey v. Chattem, Inc.*, 684 F.2d 386, 391 (6th Cir. 1982).

Here, the motivation to serve the public interest by controlling rampant unfair practices is further bolstered by the context and impact of Counter-Defendants' false statements on consumers. These false statements have led the marketplace, including, at a minimum, those consumers identified above, to mistakenly believe that JHBP's fiber cement products are unsafe or will result in OSHA violations. "[T]he public's interest is especially significant when health and safety concerns are implicated[.]"  *Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 194 (2d Cir. 1996); *Chobani, LLC v. Dannon Co., Inc.,* 157 F. Supp. 3d 190, 205 (N.D.N.Y 2016) (enjoining false messaging stating that certain ingredients render Dannon's products unsafe to consume).  Counter-Defendants prey on lurking consumer fears regarding health and safety matters, a practice against which intervention is certainly in the public's interest.  *Outdoor Optics, Inc. v. Wolf Peak Int'l Inc.*, No. 1:02-cv-160, 2003 U.S. Dist. LEXIS 25425, at *4 (D. Utah Dec. 23, 2003) ("An injunction in this case is not adverse to the public interest because the public interest is not served by advertising regarding safety standards that is not truthful.").

Enjoining Counter-Defendants from further dissemination of false constructions of the OSHA Standard strikes the appropriate balance of protecting the consuming public from receipt of misinformation, while stopping short of hindering Counter-Defendants' continued sale of its products. *Osmose, Inc.* 612 F.3d at 1321 (the public interest was served in affirming injunction preventing unsupported statements).

**F.    The Gravity Of Counter-Defendants' False Claims And Lack Of Threatened Harm To Counter-Defendants Warrants Waiver Of The Bond Requirement.**

Although the Federal Rules of Civil Procedure normally call for the Court to require the applicant to post security, the Sixth Circuit has found that a court "has no mandatory duty to impose a bond as a condition for issuance of injunctive relief." *NACCO Materials Handling Grp., Inc. v. Toyota Materials Handling USA, Inc.*, 246 Fed. App'x 929, 952-53 (6th Cir. 2007). Whether a bond is needed is up to the discretion of the district court. *Roth v. Bank of Commonwealth*, 583 F.2d 527, 539 (6th Cir. 1978). A bond is not required here because all the injunction asks of Counter-Defendants is to stop making false and misleading statements. Because the balance of equities weighs overwhelmingly in favor of JHBP, because the public is best served by deterring false statements, especially about health and safety risks, and because there is no cognizable harm to Counter-Defendants in obeying the law, this Court should exercise its discretion and waive the requirement that JHBP post a bond.

**G.    The Nature and Actual Harm Caused By Counter-Defendants' False Claims Warrant Corrective Advertising.**

Finally, though typically issued in connection with a permanent injunction, *see e.g. Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmbH*, 843 F.3d 48, 72 (2d Cir. 2016), JHBP respectfully requests the Court order Counter-Defendants to issue corrective advertising for, at a minimum, its literally false statements that the OSHA Standard "prohibits" use of a standard circular saw when cutting fiber cement products and that continued use of the

31

tool would result in OSHA safety citations or fines. Counter-Defendants' statements are literally false and misleading, misconstrue the plain language of the OSHA Standard, and implicate false safety risks associated with JHBP's fiber cement siding products. It strains credulity to believe that Counter-Defendants did not intentionally disseminate such facially false statements, knowing that contractors frequently use circular saws and the likely impact. Such statements have already deceived actual JHBP customers, causing at least one (and likely others) to seek to end its business relationship with JHBP as a direct result of LP's literally false statements. King Decl. ¶¶ 6-10, 15. Given the literal falsity of such claims and the actual deception and resultant harm established, JHBP respectfully submits that corrective measures are proper to cure the effects of the harm already caused by Counter-Defendants' claims. *See NACCO Materials*, 246 Fed. App'x at 935 n.2 ("[T]he difference between mandatory and prohibitory injunctive relief does not warrant application of differing legal standards."); *Robinson v. Purkey*, No. 3:17-cv-1263, 2017 U.S. Dist. LEXIS 165483, at *17 (M.D. Tenn. Oct. 5, 2017) (quoting same). Such relief is particularly warranted here because it serves consumers' interests.

## V.      CONCLUSION

For the foregoing reasons, JHBP respectfully requests the Court grant its Motion and enjoin Counter-Defendants from their false, misleading, unfair, deceptive, and tortious acts.

Respectfully submitted,

ADAMS AND REESE LLP

/s/ Maia T. Woodhouse
Thomas Anthony Swafford, TN BPR No. 017578
Maia T. Woodhouse, TN BPR No. 030438
Rocklan W. King III, TN BPR No. 030643
Fifth Third Center
424 Church Street, Suite 2700
Nashville, Tennessee 37219
Tel: (615) 259-1450
Fax: (615) 259-1470
Email: tony.swafford@arlaw.com
         maia.woodhouse@arlaw.com
         rocky.king@arlaw.com

Adam F. Massey (*admitted pro hac vice*)
Adams and Reese, LLP
1221 McKinney Street, Suite 4400
Houston, Texas 77010
Tel: (713) 308-0113
Fax: (713) 308.4053
Email: adam.massey@arlaw.com

Tara L. Swafford, TN BPR No. 017577
The Swafford Law Firm, PLLC
207 Third Avenue North
Franklin, Tennessee 37064
Tel: (615) 599-8406
Fax: (615) 807-2355
Email: tara@swaffordlawfirm.com

*Counsel for James Hardie Building Products Inc.*

33

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 9th day of August 2018, the foregoing was electronically filed. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by U.S. Mail, postage prepaid, and/or hand delivery. Parties may access this filing through the Court's electronic filing system.

Samuel F. Miller
Nicholas R. Valenti
Miller Legal Partners PLLC
Fifth Third Center – Suite 2000
424 Church Street
Nashville, Tennessee 37219
Email: smiller@millerlegalpartners.com
        nvalenti@millerlegalpartners.com

Brian T. Boyd
William M. Leech III
Law Office of Brian T. Boyd
750 Old Hickory Boulevard
Building 2, Suite 150
Brentwood, Tennessee 37027
Email: brian@boydlegal.com
        will@boydlegal.com

/s/ Maia T. Woodhouse
Maia T. Woodhouse