**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| LOUISIANA-PACIFIC CORPORATION, )<br><br>    Plaintiff/Counter-Defendant, )<br><br>v. )<br><br>JAMES HARDIE BUILDING )<br>PRODUCTS, INC., )<br><br>    Defendant/Counter-Plaintiff/Third-<br>    Party Plaintiff, )<br><br>v. )<br><br>THE KRUSE BROTHERS, INC., )<br><br>    Third-Party Defendant. ) | No. 3:18-cv-00447-JPM |

---

## ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PRELIMINARY INJUNCTION

---

The cause is before the Court on Plaintiff Louisiana-Pacific Corporation ("LP")'s

Motion for Preliminary Injunction, filed on June 11, 2018. (ECF No. 10.) The Court has

considered the motion, Defendant James Hardie Building Products, Inc. ("JH")'s response

(ECF No. 95), and LP's reply (ECF No. 134). The Court held a hearing on the motion on July

30-31 and August 13, 2018. For the reasons discussed below, LP's motion is GRANTED IN

PART as to the image of the buckled siding labeled "OSB Siding" and DENIED IN PART as

to the other marketing materials.

# I.    Background

## a.    Factual History

This action for false advertising and related torts arises out of statements JH has made regarding engineered wood siding products in its "No Wood Is Good" marketing campaign. (Compl, ECF No. 1, ¶ 4; ECF No. 1-2.) LP and JH both compete for market share in the manufactured siding industry. (Id., ¶ 3.) Plaintiff LP's products include "strand-based engineered wood siding" sold under the SmartSide® brand. (Id., ¶¶ 13, 16.) It claims to be the "undisputed leading manufacturer and distributor of stand-based engineered wood siding products in the United States." (Id., ¶ 22.) Defendant JH's produces cement-based siding products that it markets as alternatives to engineered wood siding, a product group that includes LP's products. (Id., ¶¶ 23-24, 26.)

JH markets its cement-based products as being superior to engineered wood products on its websites www.nowoodisgood.com and www.nowoodsgood.com, in promotional materials, and in representations made by JH's agents to prospective customers. (Id., ¶¶ 28-63.) JH's marketing materials show engineered wood siding side-by-side with its own cement-based siding and assert that engineered wood sidings are inferior because "pests love" engineered wood sidings, and that engineered wood sidings are "natural fuel for fire," "susceptible to water absorption," and "won't weather well". (Id.) LP alleges that JH's statements regarding engineered wood siding are violations of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), as being false or misleading representations. (Id., ¶¶ 68-83.) LP also asserts a claim for violations of Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101 *et seq.* and Tennessee common law claims for tortuous interference and unfair competition. (Id., ¶¶ 84-102.)

### b. Procedural History

LP filed its complaint on May 13, 2018. (ECF No. 1.) On June 11, 2018, LP filed motions for a preliminary injunction (ECF No. 10) and for expedited discovery (ECF No. 13). The Court granted the motion for expedited discovery on June 12, 2018. (ECF No. 16.)

On June 13, 2018, LP filed a motion for temporary restraining order and preliminary injunction. (ECF No. 17.) Subsequently on June 13, 2018, the Court set a telephonic hearing on the motion (ECF No. 19) and JH filed its response to the motion. (ECF No. 24.) On June 14, 2018, the Court held a telephonic hearing on LP's application for a TRO, and set LP's motion for preliminary injunction for a hearing on August 1-2, 2018. On June 15, 2018, the Court denied LP's application for a TRO. (ECF No. 27.)

On June 15, 2018, JH filed an answer, and asserted pled counter-claims against LP and against third-party defendant The Kruse Brothers, Inc., for unfair competition and false advertising under the Lanham Act and Tennessee statutory and common law. (ECF No. 28.) On July 5, 2018, LP filed its answer to JH's counter-claims; on July 9, 2018, The Kruse Brothers filed its answer to the third-party complaint. (ECF Nos. 51, 56.)

On July 12, 2018, JH filed a motion for a preliminary injunction, seeking to enjoin LP and The Kruse Brothers from making statements that, JH alleges, violate the Lanham Act and Tennessee state tort laws. (ECF No. 58.) JH requested an expedited briefing schedule on its motion for preliminary injunction, as well as expedited discovery and a motion hearing. On July 13, 2018, the Court held a telephonic status conference with the parties and discussed the briefing schedule. On July 19, 2018, the Court held a second telephonic status conference, at which the hearing on LP's preliminary injunction was advanced to July 30-31, 2018. The hearing on JH's motion for preliminary injunction was set for September 17-18, 2018, with

the parties to agree on a complete briefing schedule at a later time. (ECF No. 80.) The hearing on JH's motion for preliminary injunction was later re-scheduled to September 24-25, 2018. (ECF No.

On July 23, 2018, JH filed its response to LP's motion for preliminary injunction. (ECF No. 95.) LP filed its reply on July 27, 2018. (ECF No. 134.) The Court held the hearing on LP's preliminary injunction on July 30-31 and August 13, 2018.

## II.     Legal Standard

LP's application for a preliminary injunction is subject to a four-factor analysis. NE. Ohio Coal. for Homeless, 467 F.3d 999, 1009 (6th Cir. 2006). The factors the Court must consider are: "(1) the likelihood that the movant will succeed on the merits, (2) whether the movant will suffer irreparable harm without the [order], (3) the probability that granting the [order] will cause substantial harm to others[,] and (4) whether the public interest will be advanced by issuing the [order]." Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc., 453 F.2d 377, 379 (6th Cir. 2006).

## III.    Application

LP seeks to enjoin JH from using in its advertising three sets of statements and images associated with those statements ("the advertising materials") that JH published in its "No Wood Is Good" advertising campaign: (1) images and video of a woodpecker within a hole in what appears to be siding material; (2) representations "that LP's strand-based engineered wood siding products are susceptible to termite damages that is otherwise deterred by LP's zinc borate-based process[,]" including the phrase "Pests Love It"; and (3) an image of buckling siding that JH indicates is LP's strand-based engineered wood siding. (ECF No. 11 at 56.) LP asserts that it satisfies each of the four factors involved in the analysis. (Id.) In

response, JH argues that LP has failed to satisfy any of the four factors of the analysis, and that LP's motion should be denied in its entirety.  (ECF No. 95.)

### a.  Likelihood of Success on the Merits

The party seeking a temporary restraining order or preliminary injunction must establish a "strong likelihood of success on the merits[.]"  <u>NE. Ohio Coal. for Homeless</u>, 467 F.3d at 1009.

LP argues that it is likely to succeed on the merits of each of its four causes of action: (1) false advertising under the Lanham Act; (2) violations of the Tennessee Consumer Protection Act; (3) tortious interference under Tennessee common law; and (4) unfair competition under Tennessee common law.  (ECF No. 11 at 63-72.)  JH disputes the likelihood of success as to each claim.  (<u>See</u> ECF No. 95.)  Each of LP's merits claims is addressed in turn.

#### i.  Lanham Act

False advertising under the Lanham Act requires five elements:
(1) the defendant has made a false or misleading statement of fact concerning his own product or another's;
(2) the statement actually deceives or tends to deceive a substantial portion of the intended audience;
(3) the statement is material in that it will likely influence the deceived consumer's purchasing decisions;
(4) the statement was introduced into interstate commerce; and
(5) there is a causal link between the challenged statements and harm to the plaintiff.

<u>Wysong Corp. v. APN, Inc.</u>, 889 F.3d 267, 270 (6th Cir. 2018).  In the instant case, JH does not contest element (4), that the statement was introduced into interstate commerce, but argues that each of the remaining elements is not satisfied.  (<u>See</u> ECF No. 95.)

*1. Literally False or Deceptively Misleading Statements*

A plaintiff can establish Lanham Act false advertising in either of two ways: by showing that the statement is literally false, or by showing that the statement is misleading. Wysong, 889 F.3d at 270-71. "Literally false" statements must be unambiguously deceptive to reasonable consumers. Innovation Ventures, LLC v. N.V.E., Inc., 694 F.3d 723, 737 (6th Cir. 2012) (citing Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co., 290 F.3d 578, 587 (3d Cir. 2002)). Courts presume that literally false statements actually deceive a substantial portion of the intended audience. Wysong, 889 F.3d at 270-71 (citing Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Board of Podiatric Surgery, Inc., 185 F.3d 606, 614 (6th Cir. 1999)). If a statement is not literally false, it can nonetheless violate the Lanham Act by being "misleading." Statements that are not literally false but that are asserted to be misleading must be shown to actually deceive a significant portion of reasonable consumers to support a violation of the Lanham Act. Id. at 271 (citing Am. Council, 185 F.3d at 616). Whether a statement is too ambiguous to be literally false is a matter of law to be decided by the Court. Service Jewelry Repair, Inc. v. Cumulus Broadcasting, LLC, 145 F. Supp. 3d 737, 746 (M.D. Tenn. 2015).

In the instant case, JP argues that each of the three advertising materials is literally false. JH disputes that categorization for each of the three advertising materials.

WOODPECKER PICTURE

LP asserts that this image is literally false because the image has been doctored to include the woodpecker, and possibly to add the hole. (ECF No. 11 at 64-65.) In response, JH argues that the hole was, most likely, created by a woodpecker, and that the addition of the woodpecker itself is non-actionable "puffery." (ECF No. 95 at 1774-76.) LP, in its reply,

maintains that the image is literally false because the image's colors have been edited to make the hole seem more severe and because the image misrepresents SmartSide's susceptibility to woodpecker damage. LP also argues that the woodpecker is not puffery. (ECF No. 134 at 3402-06.)

The record reflects that the hole was, in fact, made in LP siding. (Mahony Decl., ECF No. 105, ¶¶ 6-9; July 31 Hearing Transcript, ECF No. 147 at 4789-90, 63:13-64:13.) LP introduced no evidence to support the proposition that the photograph was edited to include the hole.[1] Additionally, JH has provided circumstantial evidence that the hole may have been created by a woodpecker. (See Ross Decl. ¶¶ 5-10, Mahony Decl., ¶¶ 8-9.) LP has not proven that claim to be false or sought to prove an alternative cause for it. Moreover, the record reflects that engineered wood products (including LP's) are susceptible to woodpecker damage. Based on the record, the image of the hole is a true statement because the hole was, in fact, made in LP's OSB siding. The implication that the woodpecker created the hole is, based on the record, not unambiguously deceptive because the source of the hole has not been identified and it could have been made by a woodpecker.

The record is clear that the woodpecker, unlike the hole, was added to the photograph. JH does not deny doctoring the photograph to include the woodpecker; it argues only that the bird is non-actionable under the Lanham Act because the image is puffery. (ECF No. 95 at 1776.) Puffery is "exaggerated advertising, blustering, and boasting upon which no reasonable consumer would rely." Federal Express Corp. v. United States Postal Service, 40 F. Supp. 2d 943, 954 (W.D. Tenn. 1999) (quoting Southland Sod Farms v. Stover Seed Co.,

---

[1] During the hearing on LP's preliminary injunction, LP did not argue that the photograph had been edited to add the hole, but asserted instead that the photograph had been edited to make the hole appear more severe.

108 F.3d 1134, 1139 (9th Cir. 1997)). Puffery is distinguishable from, and therefore does not

include, "misdescriptions or false representations of specific characteristics of a product."

Castrol Inc. v. Pennzoil Co., 987 F.2d 939, 945 (3d Cir. 1993). See also W. Page Keeton et

al., Prosser and keeton on the Law of Torts § 109 at 756-57 (5th Ed. 1984) ("The 'puffing'

rule amounts to a seller's privilege to lie his head off, so long as he says nothing specific.")

In the instant case, the woodpecker is not puffery. Although the image of the

woodpecker may be exaggerated, it is not blustering or boasting, and is a specific

representation rather than a broad, general one. JH claims that "[n]o reasonable consumer

would believe that JH captured the woodpecker in the act of nesting in the hole." (ECF No.

95 at 1776.) JH does not, however, explain why that is the case, or why the Court should limit

its consideration of puffery to that narrow inquiry. Because the woodpecker image makes a

specific claim, rather than a broad, general one and the claim is not blustering or boasting but

is instead tangible and finite, it is not puffery. The Court must next consider whether the

image is literally false.

The woodpecker image is not literally false because it is at least ambiguously

deceptive to reasonable consumers of the product. Although the photograph is doctored, it is

still arguably identifiable as a fake. LP itself identified several features of the photograph that

identify the woodpecker as a falsity, including that the siding is too thin for the bird to nest

within it and that the photo does not show that the bird has pecked through the moisture

barrier that would be installed underneath the siding. (ECF No. 11 at 64.) Based on these

imperfections, a reasonable consumer (who would be familiar with the dimensions of the

product) may be able to spot the woodpecker as a fake. Based on the record before the Court,

the image of the woodpecker is not unambiguously deceptive, and is therefore not literally false.

"PESTS LOVE IT"

LP asserts that this statement is literally false because its products are treated with a termite-resistant zinc borate-based process that resists damage from pests. (ECF No. 11 at 65.) In response, JH argues that the statement is not literally false or misleading because LP's products are not impervious to pest damage. (ECF No. 95 at 1776-78.) LP, in its reply, maintains that the statement is false both because its products and JH's products are similarly termite-resistant and because LP's products are not structurally damaged by termites. (ECF No. 134 at 3394-99.)

This statement is not literally false because it is not unambiguously deceptive to reasonable consumers. The phrase "Pests Love It" is an exaggeration to emphasize the point that wood siding is vulnerable to pest damage. No reasonable consumer would believe that pests "love" wood siding, or that any siding material would be specifically designed to lure or attract pest damage. This is similar to the outcome in Wysong, 889 F.3d at 271. There, the Sixth Circuit held that images of premium cuts of meat displayed on dog food bags were not literally false, even though the dog food within the bag was not made of those premium cuts. The panel found that reasonable consumers would understand that the images of premium cuts of meat represented the *types* of meat used in the dog food, not the precise *cuts* used. Id. In the instant case, a reasonable consumer would understand that the phrase "Pests Love It" refers to the general susceptibility of engineered wood to pest damage, not to a specific representation that pests are especially attracted to engineered wood or that engineered wood

products are designed to attract pests. Because the statement is not unambiguously deceptive to reasonable consumers, it is not literally false.

### PHOTOGRAPH OF WARPED SIDING

LP argues that this image is literally false because the image does not depict engineered wood siding, and that the disclaimer that corresponds to the image is not effective because of its placement and small font size. (ECF No. 11 at 65.) In response, JH argues that the image is not misleading because it depicts fiber-based engineered wood siding. (ECF No. 95 at 1779-81.) LP, in its reply, maintains that the photo is literally false because it is a photo of fiber-based siding but is labeled as OSB siding, because the damage depicted is due to faulty installation, and because JH's disclaimer is ineffective. (ECF No. 134 at 3399-3401.)

JH has made changes to its advertising materials during the pendency of the action that bear on the disposition of motion as to this image. JH's website and advertising materials originally referred to "OSB Siding." (See, e.g., ECF No. 1-2; Preliminary Injunction Hearing Exs. 8-9.) The website and other materials have since been changed to refer to "Engineered Wood" instead of "OSB Siding." (JH Dep., ECF No. 98 at 1895; Preliminary Injunction Hearing Ex. 10.) JH admits that the image of buckled siding depicts fiber-based wood siding. (ECF No. 95 at 1779). The record is undisputed that OSB siding and fiber-based siding are distinct types of engineered wood siding, and that LP produces and sells both types under the SmartSide brand. (See, e.g., July 31 Hearing Tr., ECF No. 147 at 4796, 70:6-10.) LP's arguments regarding the statements contained in the two marketing materials discussed previously—the hole and woodpecker and the claim that "Pests Love It"—apply equally to both the "OSB Siding" caption and the "Engineered Wood" caption. As to the image of buckled siding, however, one of LP's arguments is unique to the caption of "OSB Siding":

that the image is literally false because the siding was labelled "OSB Siding," but the siding is in fact fiber-based siding.

The image of buckled siding labeled "Engineered Wood" is not literally false because it would not unambiguously deceive reasonable consumers of siding. The record reflects that the image depicts LP's fiber-based SmartSide siding, and that the "Engineered Wood" label is factually accurate. (July 31 Hearing Transcript, ECF No. 147 at 4793, 67:9-18.) The record also reflects that engineered wood siding expands due to absorbing moisture, and that if engineered wood siding is not properly installed, the expansion can result in buckling. (E.g., July 31 Hearing Transcript, ECF No. 147 at 4831, 105:11-20.) The image is therefore partially accurate because engineered wood inevitably absorbs moisture, which can lead to the buckling shown. Moreover, the image is accompanied by a disclaimer that identifies improper installation as a possible cause of the buckling. The disclaimer appears in small font and at a distance from the image itself, and as a result it is not completely effective in identifying improper installation as a cause of the buckling. If a consumer read the disclaimer, however, they would know that the buckling could be caused by improper installation. Although the disclaimer does not cure the image's failure to disclose the possibility of improper installation as a cause of the buckling, it does assuage some of that failure. The disclaimer therefore weighs against the conclusion that the image is unambiguously deceptive to reasonable consumers. The image would not unambiguously deceive consumers because it is at least partially true and is accompanied by a disclaimer. The image is therefore not literally false.

Under the label of "OSB Siding," however, the image is literally false. During the preliminary injunction hearing, Dr. David Ritter testified as to the subtle differences between

LP's OSB and fiber-based SmartSide products, testified that that a non-expert might not recognize those differences on a simple visual inspection, and testified that the visual clues that he used to identify the product as fiber-based SmartSide were not as clear in the image that was used in JH's marketing campaign. (July 31 Hearing Transcript, ECF No. 147 at 4793-95, 67:9-69:23.) Based on the subtly of the differences between the products, the difficulty in identifying them among those familiar with the products, and the difficulty in identifying the type of product depicted in the image, the Court finds that the reasonable consumers would be unambiguously deceived by the image of buckled fiber-based siding labled "OSB Siding."

### 2. *Actual Deception or Tendency to Deceive a Substantial Portion of the Intended Audience*

LP asserts that it is entitled to the presumption of actual deception that follows a showing of literal falsity. (ECF No. 11 at 66-67.) It further argues that a reasonable consumer would be deceived by the marketing items. (Id. at 67.) In response, JH argues that LP has not shown literal falsity and that LP has provided no proof of consumer deception. (ECF No. 95 at 1781-82.) LP argues, in reply, that deception is inherent in the analytics regarding the No Wood Is Good campaign and study regarding advertising concepts, and that the results of Dr. Seggev's marketing survey establish statistical likelihood of influence on consumers.[2] (ECF No. 134 at 3409-10.)

If a statement is not literally false, the presumption of actual deception does not attach and "the claimant must prove that a 'significant portion' of reasonable consumers were

---

[2] LP also argues that a presumption of materiality is appropriate in the instant case. (ECF No. 134 at 3410-11.) Materiality is not part of the Court's inquiry into deception, but is instead considered under the third element of a Lanham Act false advertising claim, "the statement is material in that it will likely influence the deceived consumer's purchasing decisions." Wysong, 889 F.3d at 270.

*actually* deceived by the defendant's messaging." Wysong, 889 F.3d at 271 (quoting Am. Council,185 F.3d at 1616.) (emphasis in original). In the instant case, LP has presented no proof regarding the portion of consumers that were *actually* deceived by the marketing materials. Its arguments and mathematical proofs regarding the campaign's analytic measures are inferences and assumptions regarding influence on consumers. Similarly, its extrapolations from Dr. Seggev's survey are not proof of actual deception.[3] Accordingly, LP has failed to satisfy this element for all portions of the marketing material to which the presumption of actual deception does not apply.

### 3. *Materiality and Influence on Customer Decisions*

LP argues that the advertising materials will impact purchasing decisions because the advertising relates to "inherent and essential qualities" of the products. (ECF No. 11 at 68.) In response, JH asserts that LP has no proof of deception, and that its expert, Dr. Eli Seggev, has concluded that "the woodpecker image, the 'Pests Love It' statement, and online advertising for siding products generally are not material to purchasing decisions of builders, installers, or contractors" based on a survey to test several aspects of the advertising materials and Dr. Eli Seggev's expert report, which relies on results of the survey. (ECF No. 95 at 1784.) LP, in its reply, argues that it is entitled to a presumption of money damages because JH's willful, deceptive statements targeted LP's products. During the preliminary injunction hearing, LP also argued that it was known as the target of the No Wood Is Good campaign within JH as the campaign was developed, and that the advertising campaign was known as "the LP campaign."

---

[3] Moreover, Dr. Seggev's survey did not sample the consumer market as a whole, as discussed further below.

The Sixth Circuit permits "a presumption of money damages where there exist[s] proof of willful deception" where the defendant has been specifically targeted. Balance Dynamics Corp. v. Schmitt Indus., Inc., 204 F.3d 683, 694 (6th Cir. 2000). See also U-Haul Int'l, Inc. v. Jartan, Inc., 793 F.2d 1034, 1040-41 (9th Cir. 1986) ("He who has attempted to deceive should not complain when required to bear the burden of rebutting a presumption that he has succeeded."). This presumption applies to two elements of a Lanham Act claim: influence on consumer purchasing decisions and harm to the plaintiff. See U-Haul v. Jartan, 793 F.2d at 1040-41 (the presumption is "that consumers are, in fact, being deceived."). See also Ethicon Endo-Surgery, Inc. v. Hologic, Inc., 689 F. Supp. 2d 929, 943 (S.D. Ohio 2010) (describing the presumption as being "of causation and injury[.]").

The presumption of money damages extends "only to cases of comparative advertising where the plaintiff's product was specifically targeted. Otherwise . . . 'a plaintiff might enjoy a windfall from a speculative award of damages by simply being a competitor in the same market.'" Balance Dynamics, 204 F.3d at 694 (quoting Porous Media Corp. v. Pall Corp., 110 F.2d 1329 (8th Cir. 1997)) (internal citation omitted). In this context, "targeting" a competitor's product means specifically referring to the competitor or a product identified as the competitor's in the statement. See Porous Media Corp., 110 F.3d at 1334-35 (collecting cases). Unless a competitor's product is specifically compared or referenced, the presumption does not apply. Id. (citing McNeilab, Inc. v. American Home Prods. Corp., 848 F.2d 34 (2d Cir. 1988)).

In the instant case, only the advertisements labeled "OSB Siding" specifically target LP. The record reflects that LP is the only producer of OSB siding in the United States. (E.g., July 31 Hearing Transcript, ECF No. 147 at 4764, 38:6-10.) By referencing "OSB

Siding," JH specifically referenced its competitor's product, and a presumption of damages attaches if the statement amounts to willful deception. The advertising materials labeled "Engineered Wood" do not specifically target LP. The record reflects that other companies manufacture engineered wood products. (July 31 Hearing Transcript, ECF No. 147 at 5014-15, 288:20-289:2.) Because the term "Engineered Wood" refers to a genre of products and not to LP or one of its products specifically, the presumption of money damages does not apply to the advertising materials that use the label "Engineered Wood."

The "OSB Siding" label is conclusively deceptive with respect to the image of buckled siding because the label is literally false; with respect to the other marketing materials, LP has not shown that the label is sufficiently deceptive to warrant the presumption of damages. For the presumption of money damages to apply to the image of buckled siding, however, the deception must be willful. Balance Dynamics, 204 F.3d at 694. Courts have interpreted the term "willful" to include reckless conduct, both within the context of this presumption and beyond it. Bracco Diagnostics, Inc. v. Amersham Health, Inc., 627 F. Supp. 2d 384, 483 (D.N.J. 2009) (extending "willful" to reckless conduct for this presumption) and Safeco Ins. Co. of America v. Burr, 551 U.S. 47, 56-58 (2007) ("[W]here willfulness is a statutory condition of civil liability, we have generally taken it to cover knowing violations of a standard, but reckless ones as well."). JH has not argued that recklessness should not be considered willfulness for the purpose of this presumption.

JH was reckless in labeling the fiber-based engineered wood depicted in the image of buckled siding as "OSB Siding." Recklessness "'is not self-defining,'" but is generally understood to entail "'an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" Safeco, 551 U.S. at 68-69 (quoting Farmer v. Brennan, 511 U.S.

825, 836 (1994)). In the instant case, the record reflects that JH knew that LP produced both OSB and fiber-based SmartSide products. (July 31 Hearing Transcript, ECF No. 147 at 5007, 281:9-11.) JH has not argued or presented evidence that it took any steps to confirm whether the buckled siding was OSB siding, rather than fiber-based siding. Chris Southall, one of JH's base demand representatives, testified that he learned that the siding was SmartSide. (Southall Decl., ECF No. 106, ¶¶ 5-7). The receipt for the siding was submitted as an exhibit. (ECF No. 101-1.) Neither Southall's testimony nor the receipt indicates that the siding was OSB siding rather than fiber-based siding. It was only established that the siding was LP's SmartSide brand. The record therefore shows that JH published the image of fiber-based siding under the label "OSB Siding" while knowing that it risked mis-labeling the siding but without investigating whether the siding depicted was, in fact, OSB siding. Because the SmartSide products are difficult to distinguish on visual inspection (as discussed above), the risk of harm from mislabeling the depicted siding was high. The Court finds that JH's decision to publish the statement with knowledge of that risk without attempting to confirm whether the siding was OSB siding or fiber-based siding amounted to an unjustifiably high risk of harm, which was known to JH at the time it published the No Wood Is Good campaign. JH's statement was therefore reckless, and thus amounts to a willful act for the purpose of the presumption of money damages. The image of buckled siding labeled as "OSB Siding" therefore constitutes willful deception that targeted LP, and the presumption of money damages applies as to those marketing materials.

JH has attempted to address this issue through Dr. Seggev's marketing survey and expert report. (ECF No. 103.) Dr. Seggev's report extracts several conclusions from the marketing survey which support the position that reasonable consumers would not have been

influenced by the marketing materials in the No Wood Is Good campaign. (Id.) For the purposes of this motion, the presumption of consumer influence attaches only to the image of buckled siding labeled "OSB Siding." The Court needs only to consider whether the survey and report rebut the presumption of damages as to that portion of the marketing materials.

JH has not rebutted the presumption of monetary damages. The marketing survey and resulting expert report do not rebut the presumption because they do not address the impact of the marketing materials on the entire consumer population. The marketing survey polled 200 respondents whose job titles placed them in the construction, building, remodeling, or siding industries. (ECF No. 103 at 2059-60.) The record reflects, however, that the consumer market for siding is not limited to people who hold those, or similar, job titles. For example, do-it-yourself home builders and do-it-yourself remodelers are part of the consumer market, but would have been excluded from the survey because they do not hold one of the job titles required. (E.g., July 30 Hearing Transcript, ECF No. 146 at 4395-96, 48:25-49:7.)[4] During the preliminary injunction hearing held on August 13, 2018, Dr. Seggev testified that the survey audience was only a subset of the entire consumer market. The survey and expert report do not attempt to show what percentage of the consumer market is represented by the survey respondents, or what percentage of the market was excluded from the survey. Without additional information regarding the sample of the consumer market represented in the survey, the survey and resulting expert report do not rebut the presumption of consumer influence that is present in the instant case.

---

[4] JH actually created a separate website geared for consumers, www.nowoodsgood.com. The production of the separate website from the website geared for the trade audience, www.nowoodisgood.com, emphasizes the importance of the consumer market segment to JH.

#### 4. *Statements Made in Interstate Commerce*

The parties do not dispute that JH's statements made on the website are statements "in interstate commerce". For the purposes of this motion, the Court finds a strong likelihood of success as to this element of LP's Lanham Act claim.

#### 5. *Causation of Harm to Plaintiff*

LP argues that harm can be inferred from the competitive posture of the parties and the statements' likely impacts on its products. (ECF No. 11 at 69.) In response, JH argues that LP's conclusions are based on assumptions rather than proof, and that LP has admitted no evidence of a material impact on consumers. (ECF No. 95 at 1788 (citing Le Dep., ECF No. 96 at 139:25-140:12).) LP, in its reply, argues that it is entitled to a presumption of money damages based on JH's willful false statements targeting LP's products. (ECF No. 134 at 341-12.)

Plaintiffs are not typically required to quantify their damages in order to obtain injunctive relief; logical likelihood of damages is considered to be sufficient. E.g., American Rockwool, Inc. v. Owens-Corning Fiberglas Corp., 640 F.Supp. 1411, 1443 (E.D. N.C. 1986). In the instant case, some of the marketing materials identify LP through its OSB siding product, but the remainder of the marketing materials reference "Engineered Wood," which is not a product specific to LP. Nonetheless, the marketing items are very likely to impact the manufacturers of engineered wood siding. Although it is not clear how much of that market LP comprises, some impact on LP appears likely. Moreover, the presumption of money damages satisfies this element as to the image of buckled siding labeled "OSB Siding." For purposes of this motion, LP has shown a strong likelihood of success as to this element of its Lanham Act claim.

Based on the foregoing, LP has established a strong likelihood of success as to its

Lanham Act claim regarding the image of buckled siding labeled "OSB Siding." It has not

satisfied this factor as to its Lanham Act claim regarding the other marketing materials.

ii. <u>Tennessee Consumer Protection Act</u>

The Tennessee Consumer Protection Act ("TCPA"), Tenn. Code Ann. § 47-18-104(b),

prohibits, *inter alia*:

> (5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship approval, status, affiliation or connection that such person does not have; . . .
> (7) Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another; . . .
> (8) Disparaging the goods, services or business of another by false or misleading representations of fact; . . .
> (21) Using statements or illustrations in any advertisement which create a false impression of the grade, quality, quantity, make, value, age, size, color, usability or origin of the goods or services offered, or which may otherwise misrepresent the goods or services in such a manner that later, on disclosure of the true facts, there is a likelihood that the buyer may be switched from the advertised goods or services to other goods or services[.]

LP argues that JH has violated each of these provisions. (ECF No. 11 at 69-70.) In

response, JH argues that LP's TCPA claims fail for the same reasons the Lanham Act claims

fail, because the TCPA claims "may be analyzed under the standard applied to false

advertising under the Lanham Act." (ECF No. 95 at 1772.) LP reiterated its original

arguments in its reply. (ECF No. 134 at 3390 n.1.)

Several district courts have interpreted subsection (8) of the TCPA to be the state law

equivalent of a Lanham Act false advertising claim. <u>See</u> Medison <u>America, Inc. v. Preferred

Medical Systems, LLC</u>, 548 F. Supp. 2d 567, 585 (W.D. Tenn. 2007) <u>and</u> <u>Service Jewelry

Repair, Inc. v. Cumulus Broadcasting, Inc.</u>, 145 F. Supp. 3d 737, 750 (M.D. Tenn. 2015).

Accordingly, subsection (8) of the TCPA is interpreted *in pari materia* with the Lanham Act

for the purposes of false advertising claims, and LP's claims have the same likelihood of success under subsection (8) that the claims have under the Lanham Act.

LP has not established a likelihood of success as to its other TCPA claims. Subsection (5) of the TCPA is interpreted independent of Lanham Act false advertising claims. Moore v. Weinstein Co., LLC, 545 Fed. Appx. 405, 412 (6th Cir. 2013) (analyzing a false advertising claim under subsection 5 without mentioning the Lanham Act, but applying Lanham Act unfair competition analysis to a different TCPA claim.) It is unclear how subsections (7) and (21) of the TCPA are interpreted vis-à-vis the Lanham Act, but LP has not established why the Lanham Act analysis would necessarily apply. LP has failed to show a strong likelihood of success as to subsections (5), (7), and (21) of the TCPA because each of the subsections require "an ascertainable loss . . . as a result of . . . an unfair or deceptive act or practice" to prevail on a TCPA claim. T.C.A. § 47-18-109(a)(1). The presumption of money damages applies to LP's claim under subsection (8) of the TCPA; that subsection is interpreted *in pari materia* with the Lanham Act for the purposes of false advertising claims, so the Lanham Act's presumption of money damages applies to subsection (8) of the TCPA as well. LP has not established why the presumption should apply in the remaining subsections, which are not necessarily interpreted in lockstep with the Lanham Act. Accordingly, LP has failed to establish the requisite strong likelihood of success as to its claims under TCPA subsections (5), (7), and (21).

### iii. Common Law Tortuous Interference

Tortious interference requires five elements: (1) a prospective relationship with an identifiable class of third persons; (2) that Defendant knew of the relationship; (3) that Defendant intended to cause the termination of the business relationship; (4) that Defendant

acted with "improper motives" or employed "improper means"; and (5) damages caused by the interference. <u>Watsons's Carpet & Floor Coverings, Inc. v. McCormick</u>, 247 S.W.3d 169, 176-77 (Tenn. Ct. App. 2007).

LP argues that each of these elements is met. (ECF No. 11 at 70-71.) In response, JH argues that LP cannot establish "improper means," damages, or any breached or terminated business relationship, and that it further cannot "identify a single customer that was actually deceived" by the advertising materials. (ECF No. 95 at 1790.) LP did not address this claim in its reply.

The Tennessee Supreme Court has held that element (2)—that Defendant knew of the relationship—refers to knowledge of a specific relationship or prospective relationship, "and not a mere awareness of the plaintiff's business dealings with others in general." <u>Trau-Med of America, Inc. v. Allstate Ins. Co.</u>, 71 S.W.2d 691, 701 (Tenn. 2002). LP has not identified a specific relationship or prospective relationship with which JH has interfered. For at least that reason, LP has not established a strong likelihood of success as to its tortious interference claim.

### iv. Common Law Unfair Competition

"Unfair competition is a generic name for several related torts involving improper interference with business prospects." <u>B&L Corp. v. Thomas & Thorngren, Inc.</u>, 917 S.W.2d 674, 681 (Tenn. Ct. App. 1995) (quoting <u>Prosser and Keeton on the Law of Torts</u> § 130 at 1013 (5th ed. 1984). Common law unfair competition requires as a predicate that the defendant commit another recognized tort. <u>Dade International, Inc. v. Iverson</u>, 9 F. Supp. 2d 858, 862 (M.D. Tenn. 1988) (citing <u>Prosser and Keeton</u>, § 130 at 1014). For the act to be

unfair competition at common law, the predicate tort must deprive the plaintiff of customers or other prospects.  Id.

LP has not established a strong likelihood of success as to this claim because it has not proved that the marketing materials deprived it of customers or other prospects.  Moreover, LP has not argued that the presumption of money damages that applies in the Lanham Act analysis extends to this element of common law unfair competition.[5]  Because the record is bereft of proof that LP was deprived of customers or other prospects, LP has not shown a strong likelihood of success as to this claim.

LP has established a strong likelihood of success as to the Lanham Act and TCPA subsection (8) claims relating to the image of buckled siding labeled "OSB Siding."  LP has failed to satisfy this factor as to the other marketing materials and other claims.

### b.  Irreparable Harm

LP argues that absent a preliminary injunction, it will suffer reputational harm, loss of good will, loss of client trust, and loss of competitive advantage, and that those harms are categorically irreparable.  (ECF No. 11 at 72.)  In response, JH argues that LP is not entitled to a presumption of irreparable harm because LP has not established a likelihood of success on the merits and therefore will not suffer irreparable harm.  (ECF No. 95 at 1791.)  LP, in reply, reiterates that it has been irreparably harmed by the marketing materials.  (ECF No. 134 at 3408.)

Irreparable harm is typically presumed where reputational injuries are at risk due to unfair competition.  Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc., 453 F.3d 377, 382

---

[5] Furthermore, a presumption of money damages would not necessarily require that LP was deprived of customers or prospects; the presumed money damages could be, for example, decreased sales to existing customers.

(6th Cir. 2006) (citing <u>Circuit City Stores, Inc. v. CarMax, Inc.</u>, 165 F.3d 1047, 1056 (6th Cir. 1999)). In the instant case, this factor weighs in favor of granting the motion. LP is correct that reputational injury has been held to be a form of irreparable harm. (<u>See</u> ECF No. 18 at 233-34 (collecting cases).)

JH's argument that the finding of irreparable harm should be conditioned on likelihood of success blurs the lines between two distinct factors in the preliminary injunction analysis. The inquiry that the irreparable harm factor seeks to answer is "whether the movant will suffer irreparable harm without the injunction[.]" <u>Lorillard Tobacco</u>, 453 F.3d at 380. In the instant case, LP *will* suffer reputational harm without the injunction. That injury is considered irreparable due to an inability to quantify it and the difficulty in returning the injured party to the pre-injury position. <u>Id.</u> By conditioning the satisfaction of irreparable harm on a likelihood of success on the merits, the blended approach that JH advocates would pursue a different inquiry: whether the movant will suffer *unjustified* or *unfair* irreparable harm without the injunction. The better method is to consider the four preliminary injunction factors individually; the impact of the factors' interactions is best calculated when the factors are weighed.

### c. Substantial Harm to Others

LP argues that JH "will suffer only minimal if any harm by ceasing the use of the statements and images at issue" and that JH "has only recently started its 'No Wood Is Good' advertising campaign" and "has alternatives to the false and/or deceptively misleading statements and images at issue[.]" (ECF No. 11 at 73.)[6] In response, JH argues that it "will

---

[6] LP further asserts that the balance of harms weighs in its favor, and that "[a]ny harm to Defendants is insignificant when balanced against the irreparable injury to Plaintiff's investments in its products." (ECF No. 11 at 73.) This argument goes to the balancing of the

suffer substantial harm" if forced to bear the costs of withdrawing its advertising campaign. (ECF No. 95 at 1792.)

The record reflects that the injunction would impact only JH. The consideration of harm to others includes the burden on the defendant. E.g., Overstreet v. Lexington-Fayette Urban Cnty. Gov't,. 305 F.3d 566, 579 (6th Cir. 2002) (considering burden on a defendant subject to the injunction under this factor). In the instant case, the record reflects that JH would incur at least some cost in complying with the injunction that LP has requested: it would have to take down its websites and replace the printed advertising materials it has on hand. JH's marketing manager Warren Legner estimates the replacement value of the printed materials remaining on hand to be between( ‗ and‗ ‗ ‗ (ECF No. 145, ¶ 5.)[7] JH did not provide data on the cost of removing or suspending its websites, but those costs would almost certainly be lower than the costs of developing the website, which Legner estimates at

(Id., ¶ 4.) The record therefore reflects that JH would be burdened by less than

in costs by complying the injunction that LP seeks. Although          is not a trivial or *de minimis* amount, the Court finds that given JH's budget for the campaign, the risk of the

burden does not amount to a substantial harm under this factor. Moreover, the risk of loss to JH can be mitigated by the requirement of a bond if LP's injunction is granted. Accordingly, this factor is satisfied.

---

relevant factors, rather than to the satisfaction of the "substantial harm to others" factor. The argument will be considered under the appropriate section.

[7] Legner also estimated the total costs of the campaign (including the costs of printed materials on hand) to be          (ECF No. 145, ¶ 4.) Most of this amount is attributable to the fees JH paid to its advertising agency, Norton. The record reflects that the agency fees were paid          (July 30 Hearing Transcript, ECF No. 146 at 4413-14, 66:25-67:4.) These costs would not be lost if LP's motion is granted, because JH had intended to spend that money regardless of whether

### d. Public Interest

LP argues that the public interest favors granting the injunction because the public has interests in truthful and non-misleading advertising, compliance with the rule of law, and with fair consumer practices. LP adds that the public interest weighs further in its favor "because of the utilitarian value that exterior siding has in protecting peoples' homes and other important structures." (ECF No. 11 at 74.) JH responds that LP is not entitled to a presumption that the public interest favors granting the injunction, and that the public's interest in "fair and robust competition in the marketplace" weighs against granting the injunction. (ECF No. 95 at 1792 (quoting NDSL, Inc. v. Patnoude, 914 F. Supp. 2d 885, 900 (W.D. Mich. 2012)).)

LP has satisfied this factor. The parties have identified important public interests that weigh both for and against granting the injunction. The public's interest is in competition that is vigorous, but not unfair; competition that is robust, but not false or deceptive. These interests are not of equal weight. The public's interest in honest, non-misleading advertising carries more weight than the public's interest in vigorous competition. These weights are evident from the interests' relationship to each other: the interest in honest advertising sets the boundaries of the interest in vigorous competition. This relationship is illustrated in the Lanham Act, the Sherman Antitrust Act, and other statutes restraining competition, which make actionable only unfair or unlawful competition. Because the public's interest in honest competition outweighs its interest in vigorous competition, the public interest weighs in favor of granting the injunction.

### e. Weighing The Factors

Factor (1), the likelihood of success on the merits, favors granting the motion only as to the image of buckled siding labeled as "OSB Siding." Factor (2), irreparable harm, favors granting the motion based on reputational harm to LP. Factor (3), the harm to others, weighs in favor of granting the motion because the cost of complying with the injunction is, in the context of JH's advertising campaign, not a substantial burden and can be accounted for in a bond if the Court grants LP's motion. Factor (4), the public interest, also favors granting the motion

The factors weigh in favor of granting the motion as to the image of buckled siding labeled as "OSB Siding." Factors (1), (2), (3), and (4) all weigh in favor of granting the motion as to this marketing material. Factor (4) weighs less heavily than the other two factors because the public's interest in vigorous competition, which disfavors the injunction, is accounted for in the weight of this factor. Furthermore, JH is burdened even less under factor (3) as to this advertising material only, because it has already removed the label of "OSB Siding" from parts of its website. Because all four factors weigh in favor of granting the injunction as to this marketing material, the motion is GRANTED as to it.

The factors do not weigh in favor of granting the injunction as to the remaining marketing materials. Factor (1), the likelihood of success on the merits, weighs against granting this injunction. Given the lack of evidence as to several of the elements of LP's claims at this time, factor (1) weighs heavily against granting the injunction. With factor (1) not satisfied, factor (2) is given less weight because the risk of unfair irreparable harm is lower. Factors (3) and (4) both weigh in favor of granting the injunction, but not heavily, because JH would still incur some harm if the injunction is granted and because the public's

interest in vigorous competition, which weighs against granting the injunction must be accounted for. After accounting for all four factors, the Court finds that factors (2), (3), and (4) do not outweigh factor (1). The injunction is therefore DENIED as to the marketing materials other than the image of buckled siding labeled as "OSB Siding."

For the foregoing reasons, LP's motion for preliminary injunction is GRANTED IN PART and DENIED IN PART.

## IV.  Security

Federal Rule of Civil Procedure 65(c) provides:

> The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.

In the Sixth Circuit, "the district court possesses discretion over whether to require the posting of security" for preliminary injunctions. Moltan Co. v. Eagle-Picher Indus., Inc., 55 F.3d 1171, 1176 (6th Cir. 1995). When determining whether to require the party seeking an injunction to give security, courts have considered factors such as the strength of the movant's case and whether a strong public interest is present. Id. at 1176. In the instant case, the Court finds that the inevitability of harm to JH, the strength of LP's case, and the public interest favor the requirement that LP post a security bond in the amount of $67,500.

Upon LP's posting of the security bond, JH is hereby ENJOINED from distributing or displaying the image of buckled siding labeled "OSB Siding" until the resolution of this action.

**SO ORDERED**, this 17th day of August, 2018.

/s/ Jon P. McCalla
JON P. McCALLA
UNITED STATES DISTRICT JUDGE