**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE**

| | | |
|---|---|---|
| **LOUISIANA-PACIFIC CORPORATION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 3:18-cv-00447** |
| | ) | |
| **JAMES HARDIE BUILDING PRODUCTS, INC.,** | ) | **JUDGE MCCALLA** |
| | ) | **MAGISTRATE JUDGE HOLMES** |
| **Defendant/Counter-Plaintiff/ Third-Party Plaintiff.** | ) | |
| | ) | **JURY DEMAND** |
| **v.** | ) | |
| | ) | |
| **THE KRUSE BROTHERS, INC.,** | ) | |
| | ) | |
| **Third-Party Defendant.** | ) | |

---

**LOUISIANA-PACIFIC CORPORATION'S RESPONSE IN OPPOSITION TO JAMES
HARDIE BUILDING PRODUCT INC.'S MOTION FOR PRELIMINARY INJUNCTION**

---

In response to James Hardie Building Product Inc.'s ("Hardie's") Amended Motion for Preliminary Injunction (Dkt. 149), Louisiana-Pacific Corporation ("LP") states as follows:

## I. <u>INTRODUCTION</u>

At the heart of Hardie's Motion is what LP can and cannot say about (1) exposure to respirable crystalline silica ("RCS") in dust caused by cutting and drilling Hardie's fiber cement products during installation and (2) 29 CFR §1926.1153 (the "OSHA Standard"), OSHA's standard regarding exposure to RCS in construction settings. Since at least 2016, Hardie's Installation Guides have contained a "Silica Warning" that warns installers that exposure to RSC in dust is dangerous. OSHA recognized the danger from silica-based products, such as Hardie's fiber cement products, and enacted the OSHA Standard to reduce construction workers' exposure to RCS dust by 80% versus the previous standard. Recognizing that the dangers of installing its products are a competitive disadvantage, Hardie filed the Motion, which it has now twice amended. At 4:05 p.m. on September 14, 2018, Hardie amended its Motion for a second time to further remove any allegations that LP or The Kruse Brothers Inc. ("Kruse") had stated Hardie's products are "generally unsafe to install." *Compare* Motion *with* Notice (Dkt. 208). Accordingly, the Motion now is limited to whether LP or Kruse have made statements regarding practices that would be prohibited by the OSHA Standard; required by the OSHA Standard; or violative of the OSHA Standard and result in citations by OSHA against employers.

Even after amending the Motion twice, Hardie's Motion requests broad and non-specific relief that essentially seeks to stop LP from making any statements regarding the OSHA Standard and RCS exposure. For example, Hardie asserts that the statement that installation of LP's SmartSide® siding does not require a respirator is literally false or misleading because it implies that Hardie's products require a respirator during installation, even though nothing in the statement

2

references Hardie, its products, fiber cement (or any other cladding containing silica), or the OSHA Standard. Hardie's Motion is replete with other attempts by Hardie to stop LP from making truthful statements regarding the OSHA Standard and exposure to RCS.

Hardie fails to carry its burden to show the circumstances clearly demand a preliminary injunction. First, Hardie cannot show a likelihood of success on the merits. All of the statements-at-issue either (1) were not made by LP or are barred by the Communications Decency Act; (2) are truthful and not misleading; (3) lack evidence to support a finding that a significant number of customers have been actually confused by any particular statement attributed to LP; (4) lack evidence of materiality; (5) were not made in interstate commerce; and (6) lack any evidence of harm to Hardie, in part, because Hardie has not lost a single customer or sale as a result of any particular statement attributed to LP. Second, Hardie has not shown that it will suffer irreparable harm as a result of any particular statement attributable to LP. Third, the balance of harms weighs in favor of LP because Hardie's requested relief goes so far as to bar LP from making truthful statements regarding its own products. Fourth, the public interest weighs against an injunction because competitors have a right to make truthful statements in commerce and consumers have a right to know of dangerous hazards and the OSHA Standard that impacts use of silica-based products. Finally, Hardie's broad and non-specific requested relief is an impermissible prior restraint on speech that is prohibited by the First Amendment to the United States Constitution. For all of these reasons, the Motion must be denied.

## II. <u>LAW AND ARGUMENT</u>

### A.  HARDIE HAS FAILED TO PROVE THE CIRCUMSTANCES CLEARLY DEMAND A PRELIMINARY INJUNCTION.

A preliminary injunction is a "'drastic remedy' that should be granted with great caution." *International Sec. Mgmt. Group., Inc. v. Sawyer*, 2006 WL 1638537, at *7 (M.D. Tenn. June 6,

2006) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). There are four factors a court must weigh in considering a motion for preliminary injunction: "(1) the likelihood of plaintiff's success on the merits; (2) whether the injunction will save the plaintiff from irreparable injury; (3) whether the injunction would harm others; and (4) whether the public interest would be served." *Performance Unlimited, Inc. v. Questar Pub., Inc*., 52 F.3d 1373, 1381 (6th Cir. 1995). The relief sought by Hardie "is an extraordinary remedy which should be granted only if the movant carries [its] burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban County Government*, 305 F.3d 566, 573 (6th Cir. 2002). Hardie has failed to carry its heavy burden.

1.     **Hardie Has Failed to Prove A Likelihood of Success on the Merits of its Claims.**

a. *Hardie's Claims Under the Lanham Act, Tennessee Consumer Protection Act, and Common Law Unfair Competition Fail.*

To demonstrate a likelihood of success in its false advertising claim under the Lanham Act, Hardie must show (1) LP has made a false or misleading statement of fact concerning its own product or Hardie's product; (2) the statement actually deceives or tends to deceive a substantial portion of the intended audience; (3) the statement is material in that it will likely influence the deceived consumer's purchasing decisions; (4) the advertisements were introduced into interstate commerce; and (5) there is some causal link between the challenged statement and harm to Hardie. *See Grubbs v. Sheakley Grp., Inc*., 807 F.3d 785, 798 (6th Cir. 2015). The same analysis applies to Hardie's claims arising under the Tennessee Consumer Protection Act and Tennessee common law unfair competition.[1] *McDonald's Corp. v. Shop at Home, Inc*., 82 F. Supp. 2d 801, 816 (M.D.

---

[1] The only exception is the Tennessee Consumer Protection Act requires that the actions alleged must have been "committed in Tennessee in whole or in part." *Tucker v. Sierra Builders*, 180 S.W.3d 109, 115 (Tenn. Ct. App. 2005).

Tenn. 2000); *Borescopes R US v. 1800Endoscope.com, LLC*, 728 F. Supp. 2d 938, 945 (M.D. Tenn. 2010). The statements allegedly made by LP do not meet the elements.

*(1) LP Did Not Make Many of the Statements that Hardie Attributes to LP.*

For Hardie's claims to succeed, it is fundamental that LP must have made the statements-at-issue and such statements are actionable. Although Hardie submitted the Declaration of Addison Garner (Dkt. 63) as evidence of statements allegedly made by LP during training sessions, Mr. Garner testified during his deposition that all of the statements he claims LP made were actually only made by one or more trainers from Kruse. Addison Garner Deposition Transcript ("Garner Dep.") at 115:24-116:19, 117:12-15. Mr. Garner unequivocally admitted that his sworn testimony was wrong with respect to any statement actually being made by any LP representative in attendance at the training session referenced in his Declaration.[2] *Id*. at 135:4-20. This pattern of untruthful statements is consistent with the five different false statements Mr. Garner made about events that occurred while attending the training session referenced in his Declaration. *Id*. at 101:18-102:5. Accordingly, any claim based on Mr. Garner's declaration or testimony is fatally flawed at the outset.

The fatal flaw of attributing statements to LP that were not actually made by LP is prevalent through Hardie's Motion. Hardie alleges that LP stated, by adoption or otherwise, that "OSHA is cracking down on the Silica dust created from cutting James Hardie Fiber Cement Siding…" *See* Memorandum in Support of Motion (Dkt. 59, "MISO.") at 19; Email (Dkt. 60-3). In truth, the email at issue is an internal communication within LP that simply forwarded a Facebook post by a third-party who is not an employee or agent of LP. Dkt. 60-3. There is no evidence that LP ever

---

[2] There is a dispute that Kruse actually made the statements at issue. Kruse testified that it never made the statements attributed to Kruse at the training session that Garner attended. TKB Deposition Transcript ("Kruse Dep.") at 133:2-8, 172:20-22.

sent the Facebook post to anyone outside of LP, or that LP instructed or had anything to do with creating the content that was posted on Facebook. In forwarding the Facebook post internally, LP did not make any material contribution to the post.

In such a situation, the Communications Decency Act ("CDA") immunizes LP from liability from, at least, the state law claims. The CDA immunizes various Internet-related activities from liability under state law. It provides in relevant part that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). "Information content provider" is defined to mean "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet." 47 U.S.C. § 230(f)(3). Finally, the law explicitly states that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." 47 U.S.C. § 230(e) (3). "Read in conjunction, these subsections add up to the proposition that, for purposes of a defamation claim [a state law claim], no 'user of an interactive computer service' counts as a 'publisher' of any information that was provided to the user by the person who created that information in the first place." *Novins v. Cannon*, 2010 WL 1688695, at *2 (D.N.J. Apr. 27, 2010). Accordingly, LP is immune from liability under state law for the email (or emails) at issue under the CDA. *See e.g. Mitan v. A. Neumann & Associates, LLC*, 2010 WL 4782771 at *1 (D.N.J. Nov. 17, 2010) (finding that a person who forwarded an email that contained "unsavory and illegal business practices engaged in by the Mitan family" was shielded by the CDA for state law libel claim); *Phan v. Pham*, 182 Cal.App.4th 323, 105 Cal.Rptr.3d 791 (2010) (dismissing claim of defamation based on forwarded email because there was no material contribution in forward and finding the CDA to shield such claim); *see also Charles Novins, Esq., P.C. v. Cannon*, 2010 WL 1688695 at *2 (D.N.J.

Apr. 27, 2010).[3]

Although the CDA carves out application to any law pertaining to intellectual property (47 U.S.C. § 230(e)(2)), Hardie's false advertising claim based on the Facebook post does not actually apply to any intellectual property right (*i.e.*, trademark, patent, copyright, or trade secret) even though it is based in the Lanham Act. Therefore, the Lanham Act claim based on the Facebook post is barred as well.

Hardie also incorrectly characterizes the LinkedIn share of the article entitled "Silica citations hits 116 in 6 months" (Dkt. 60-2) as a statement made by LP. *See* MISO at 19. In truth, the article and its title are simply a share of an article from constructivedive.com. Hardie Deposition Transcript ("JH Dep.") at Ex. K8. The author of that article cites Bloomberg News as the source of the statement that silica citations hit 116 in 6 months. *Id*. at 96:14-22, 106:13-125 and Ex. K8. A cursory review of the cited Bloomberg article reveals Bloomberg News states silica citations hit 116 in 6 months. *Id*. at 106:13-25 and Ex. K10 at 2. Hardie admitted at its deposition that it has read both the Construction Dive and Bloomberg articles and yet still asserts the statement is made by LP. *Id*. at 88:5-89:9; 96:14-97:21. Accordingly, Hardie is attempting to attribute to LP a statement made by at least two other news sources – one of which is the internationally recognized Bloomberg News. *Id*. at 96:14-97:21. As with the Facebook post, Mr. Presley did not make a material contribution to the constructiondive.com article. In fact, he simply did the equivalent of "forwarding" the article. The CDA likewise immunizes LP from state law liability for the LinkedIn share. Hardie's false advertising claim does not actually apply to any intellectual property right even though the claim is based in the Lanham Act. Therefore, the Lanham Act claim

---

[3] Similarly, a "like" of the Facebook post would not be a material contribute that would subject LP to liability.

based the LinkedIn share is barred as well.

Neither the Facebook post, the Construction Dive article, the Bloomberg article, nor the alleged Kruse statements constitute authorized statements made by agents of LP. In particular, there is no evidence to support Hardie's assumption that Kruse was an agent authorized by LP to make the statements. Both LP's testimony and the agreements between Kruse and LP make clear that Kruse is an independent contractor and any agency relationship is expressly disclaimed by LP. LP 30(b)(6) Deposition Transcript ("Williams Dep.") at 66:1-8 and Ex. 3 at ¶ 3.5.

Under the circumstances, Hardie must "adduce specific evidence that [LP] instigated, supported, ratified, or encouraged those actions, or that what was done was done by their agents in accordance with their fundamental agreement." *Alexander v. Local 496, Laborers' Intern. Union of North America*, 177 F.3d 394, 409 (6th Cir. 1999) (internal citations and quotations removed). LP testified that none of the approved outlines for the training sessions contained references to Hardie, RCS, or the OSHA Standard. *See* Williams Dep. at 73:20-74:21. In fact, LP did not provide Kruse with any information regarding any other siding products at all. *Id*. at 93:3-5. LP also testified that it instructed Kruse not to make such statements during the training sessions. *Id*. at 102:2-104:11. All that Hardie has asserted as evidence of ratification is that LP sponsored the training events. However, LP's sponsorship of the events was in place before any of the alleged statements were made during the training events. *Id*. at Exs. 3 and 4. Both agreements between Kruse and LP are dated and were entered into prior to the dates of the alleged statements by Kruse. *Compare id. with* Garner Decl. at ¶4. (Dkt. No. 63). Accordingly, there is no evidence that LP took any subsequent action or created additional obligations that would have ratified or adopted the alleged statements.

Finally, even if an agency relationship is found, LP cannot be liable for statements made

by Kruse unless "the agent's conduct is within the scope of his agency and . . . , with the knowledge of the conditions, the principal intends the conduct or its consequences." <u>Alexander</u>, 177 F.3d 394, 409 (6th Cir. 1999); *see also Brewer v. Amer. Nat. Ins. Co.*, 636 F.2d 150, 153 (6th Cir. 1980) (holding that principals are not liable for verbal acts of their agents occurring outside the scope of authority). There is no evidence that LP intended for Kruse to make the statements. Williams Dep. at 73:20-74:21, 93:3-5; 102:2-104:11. LP, therefore, cannot be liable for Kruse's alleged statements.

*(2) The Statements-At-Issue Are Not Literally False or Misleading.*

Even if all of statements are attributable to LP, Hardie fails to establish either (1) the statements are literally false or (2) the messaging was misleading, though not literally false. *See Wysong Corporation v. APN, Inc. (17-1975)*, 889 F.3d 267, 270-71 (6th Cir. 2018). Failure to show either literal falsity or misleading yet truthful statements is fatal to Hardie's Motion.

Literally false statements are unambiguously deceptive on their face to reasonable customers. *Innovation Ventures, LLC v. N.V.E., Inc*., 694 F.3d 723, 737 (6th Cir. 2012). To be literally false by implication, Hardie must prove that a literally false message would be "conveyed by necessary implication when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it has been explicitly stated. *Innovation Ventures*, 694 F.3d at 735-36. Literal falsity by implication, however, still requires that the statement is unambiguously deceptive. "The greater the degree to which a message relies upon the viewer or consumer to integrate its components and draw the apparent conclusion, however, the less likely it is that a finding of literal falsity will be supported." *Id*. at 736 (*quoting Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 587 (3d Cir. 2002)).

To prove a truthful statement is nevertheless misleading, Hardie must "prove that a

'significant portion' of reasonable consumers were actually deceived by [LP's alleged] messaging." *Wysong*, 889 F.3d at 271. Hardie failed to produce a survey. Therefore, the Court must ask whether the facts support a plausible inference that the challenged advertisements in fact misled a <u>significant</u> number of reasonable customers. *Id*. (emphasis added). In so doing, the Court must bear in mind that "context matters." *Id*. at 272. None of the specific statements or broad categories of speech meet the requirement.

### (a) Relief Request No. 1 – OSHA Prohibits Statements

In its Motion, Hardie first requests an injunction prohibiting LP from stating, representing, or implying:

> The OSHA silica standard, 29 CFR § 1926.1153 et seq. ("OSHA Standard") "prohibits" certain equipment, dust control methods, or work practices when working with fiber cement products, including, but not limited to, the use of a standard circular saw when cutting fiber cement siding products.

Based on its deposition testimony, Hardie's sole basis for the request is an email sent by Mark Rose, which was filed as Dkt. 62-1. JH Dep. at 53:10-17. The portion of the email identified by Hardie states, "OSHA Standards prohibit the utilization of a standard circular saw for cutting fiber cement siding." This email is the only evidence Hardie relied upon to show that LP made the statement that a "standard circular saw" cannot be used to cut fiber cement. *Id*. at 47:14-20; 52:7-53:17.

Mr. Rose's statement is not literally false. The OSHA Standard is clear that a worker cannot simply use a standard circular saw without other engineering controls or testing if the employer is to comply. 29 CFR §1926.1153(c)(1) states in pertinent part, "For each employee engaged in a task identified on Table 1, the employer shall fully and properly implement the engineering controls, work practices, and respiratory protection specified for the task on Table 1, unless the employer assesses and limits the exposure of the employee to respirable crystalline silica in

10

accordance with paragraph (d) of this section." Table 1(iii) states that "[h]andheld power saws for cutting fiber cement board (with blade diameter of 8 inches or less)" may only be used for tasks performed outdoors when, *inter alia*, the saws are "equipped with commercially available dust collection system." Necessarily, even the engineering controls (*i.e.* the saw attached to a dust collection system and following the manufacturer's instructions) compliant with Table 1(iii) are insufficient to permit cutting fiber cement products indoors. Similarly, under Table 1, for tasks that involve "handheld saws (any blade diameter)," the saws must be "equipped with integrated water delivery systems[s] that continuously feed water to the blade" and, if used indoors, must be used in conjunction with a respirator.[4]

If the employer decides to opt out of Table 1 when its workers are using standard circular saws, or engage in a task not on Table 1 – such as using standard circular saws with a blade that is less than 8 inches in diameter to cut fiber cement indoors (which Hardie's installers have done, *see* Exhibit 1 attached hereto, despite Hardie's warnings that special precautions are necessary to cut indoors, *see* JH Dep. at Ex. K24 at 9), the workers still cannot simply use standard circular saws alone and be compliant with the OSHA Standard. 29 CFR §1926.1153(d) provides that if an employer decides not to fully and properly implement the engineering controls, work practices, and respiratory protection described in Table 1, "The employer shall ensure that no employee is exposed to an airborne concentration of respirable crystalline silica in excess of 50 μg/m³, calculated as an 8-hour TWA." This limit is the "permissible exposure limit" or "PEL". 29 CFR §1926.1153(d) gives the employer the option to conduct an exposure assessment or performance option to ensure that the PEL is not exceeded. Such exposure assessment or performance option

---

[4] The Makita Circular Saw is commonly suggested by Hardie. JH Dep. at 181:2-182:1. The instruction manual for the Makita Circular Saw states that proper operation requires a dust mask. *Id*. at 139:17-140:17 and Ex. K25 ("Wear a dust mask and hearing protection when use the tool.").

would have to accompany any use of a standard circular saw on its own. Where the employer implemented all feasible engineering and work practice controls and such controls were not sufficient to reduce exposures to or below the PEL, a respirator also is required to use a standard circular saw when not implementing the standards of Table 1 or undertaking tasks not on Table 1, such as using a standard circular saw by itself indoors. 29 CFR §1926.1153(d)(3).

At worst, "standard circular saw" is an ambiguous term and, therefore, cannot be literally false. In Mr. Rose's mind, a standard circular saw does not include a fiber cement blade, dust collection system, or any other after-market adaptations. Rose Deposition Transcript ("Rose Dep.") at 206:18-207:17. Hardie testified numerous times during its deposition that a fiber cement blade is a "special" (i.e. non-standard) tool and that a standard circular saw does not include a fiber cement blade and dust collection system. JH Dep. at 131:16-21, 132:5-11, 143:18-144:8, 145:21-25. This is further supported by Hardie's statement to OSHA during the rulemaking process where it states that "specialized tools" are required to prevent exposure to RCS dust. *Id*. at 142:10-143:6, 145:21-25 and Ex. K27 ("*There are two very basic ways to manage silica exposure on a job site when working with fiber cement board: (1) do not produce dust, or (2) collect the dust produced at the point of origin. Either practice requires specialized tools that have inherent advantages and disadvantages.*" (emphasis added)). Moreover, Hardie's own installation instructions make clear that a standard circular saw is not one of its good, better, or best approved practices because all three require a fiber cement blade. JH Dep. at 127:24-128:10, 147:10-22 and Exs. K24 at 8, K28 at 6. Messrs. Garner and King (both sales representatives who submitted declarations in support of the Motion) agree that a standard circular saw does not include a fiber cement blade, adapter for a dust collection system, or a built-in dust collection system. King Dep. at 64:2-65:2; Garner Dep. at 148:2-22.

*(b) Relief Request No. 2 – OSHA Requires Statements*

Hardie also requests an injunction prohibiting LP from stating, representing, or implying:

The OSHA Standard "requires" that certain equipment, dust control methods, or work practices be implemented when working with fiber cement products, including, but not limited to, "special saws;" respirators; caution tape; and warnings to neighbors that a "potentially dangerous material" is being installed.

In its deposition, Hardie testified that four statements made in four different ways are the evidence to support this request for relief.

*Allegedly False Statements in Engineering Wood Magazine (Dkt. 60-5)*: First, Hardie incorrectly alleges the summary in the blue box on page 8 of Engineering Wood Magazine (Dkt. 60-5 at 11) is literally false and misleading. The statements in the box are summaries or highlights of the lengthy OSHA Standard. Through use of the title "Highlights of OSHA's New Silica Standard," the reader is made aware that the box contains a summary or highlights. Any reasonable reader would recognize that the contents of an entire regulation could not possibly be captured in such a small space. Moreover, immediately to the right of the box (Dkt. 60-5 at 11), the reader is directed to get more information directly from OSHA as shown below:

+ For more information on OSHA's new silica standard, visit
**osha.gov/dsg/topics/silicacrystalline/**

Even if a consumer was confused as to whether the "highlights" are, the actual language of the OSHA Standard (no such proof of confusion by this article has been presented in any declaration or deposition testimony), the statements in the "highlights" are not literally false or misleading.[5]

---

[5] Although Hardie's Rule 30(b)(6) representative was unable to identify the "Protecting Yourself from Airborne Dust" sales sheet (in either the English or Spanish versions) and, therefore, did not identify any false or misleading statements therein (JH Dep. at 165:7-19: 173:15-174:1 and Ex. K33; K35), the same arguments would apply. The "special tools now required for cutting fiber cement" is simply a summary of the tools that are identified in the OSHA Standard depending on whether the employer is relying upon Table 1(ii) or (iii) or §1926.1153(d). All the tools are directly

The first bullet point correctly defines the PEL as set forth in 29 CFR §1926.1153(d)(1). The PEL under the OSHA Standard is 50 µg/m$^3$ or less, which is what the article states.

The first clause in the second bullet point regarding the fact that employers are required to use engineering controls to limit worker exposure to PEL is accurate for two reasons. First, §1926.1153(c) states that an employer "shall fully and properly implement the engineering control….specified for the tasks on Table 1 unless the employer assesses and limits the exposure of the employee to RSC in accordance with §1926.1153(d). Second, §1926.1153(d)(3) states that an employer "shall" implement engineering controls to keep RSC levels below the PEL.

The second clause of the second bullet point – "provide respirators when engineering controls cannot adequately limit exposure"—is true. §1926.1153(d)(3) Methods of compliance states in pertinent part, "Whenever such feasible engineering and work practice controls are not sufficient to reduce employee exposure to or below the PEL, the employer shall nonetheless use them to reduce employee exposure to the lowest feasible level and shall supplement them with the use of respiratory protection…"

The third clause of the second bullet point – "limit workers access to high exposure areas" —is true. As set forth in §1926.1153(a), the very purpose of the OSHA Standard is to limit workers access to areas from where they might obtain exposure that increases the risk of the hazards of RCS.

The fourth clause of the second bullet point – "develop a written exposure control plan

_____

referenced in the OSHA Standard as required in certain circumstances. *Compare id*. at Ex. 33 *with* §1926.1153(c)(ii), (c)(iii), (c)(vii), and (e). The same holds true for the LP Monthly Digest article entitled "Protecting Yourself from Airborne Dust." *Compare* Williams Dep. at Ex. 18 at 2 *with* §1926.1153(c)(ii), (c)(iii), (c)(vii), and (e). The LP Monthly Digest article states in prominent font and color, "For more information on the new OSHA Standards, visit US Dept of Labor, OSHA Standard 1926.1153." Williams Dep. at Ex. 18 at 2.

which will vary job by job" —is true. §1926.1153(d) states that the employer "shall establish and implement a written exposure control plan" and include, *inter alia*, "a description of tasks" in the particular workplace.

The fifth clause of the second bullet point – "offer medical exams to highly exposed workers"—is true. §1926.1153(h) states that the employer "shall make medical surveillance available at no cost to the employee, and at a reasonable time and place, for each employee who will be required under this section to use a respirator for 30 or more days per year."

The sixth clause of the second bullet point – "train workers on silica risk and how to limit exposure"—is true. §1926.1153(i) mandates that employers train workers regarding, *inter alia*, "the health hazards associated with exposure to respirable crystalline silica" and "specific measure the employer has implemented to protect employees from exposure" to RCS.

*Alleged Statement regarding HAZMAT Suits*: Second, although Hardie testified that an unidentified LP sales representative said "HAZMAT suits" were required while cutting fiber cement, there is no corroborating evidence that LP has ever said "HAZMAT suits" are required while cutting fiber cement. Hardie claims that it learned, via a channel partner (which is hearsay) who attributed the statement to an LP representative who Hardie cannot identify (also hearsay) by way of a sales call from a Hardie representative to a distributor – even more hearsay. JH Dep. at 44:23-45:12; 46:1-14. This statement was allegedly made, if at all, before the OSHA Standard was even implemented. *Id*. at 45:14-25. Regardless, all of the hearsay statements are inadmissible such that corroborating evidence is necessary.

Hardie's only allegedly corroborating evidence is an email by a low-level sales representative that contains the following sentence in small print among other statements: "SmartSide does not require workers to be suited up and contain dust when cutting as required <u>by</u>

Hardie." Williams Dep. at Ex. 40 (emphasis added). This is a truthful statement that is supported by Hardie's Best Practices – Installation Guide Siding and Trim Products, Version 9 – April 2018. JH Dep. at Ex.24. On page 9 of the Guide, Hardie has set forth its "Silica Warning" that includes the mandate that if one undertakes any activities that gives rise to RCS dust (such as "cutting, machining, drilling, routing, sawing, crushing, or otherwise abrading fiber cement"), one "must….(4) when using mechanical saw or high speed cutting tools, work outdoors and use dust collection equipment; and if no other dust controls are available, wear a dust mask or respirator that meets NIOSH requirements…" By virtue of its own warning, Hardie has required (one must) "suit up" (i.e. "wear a dust mask or respirator") and contain dust (i.e. "use dust collection equipment"). At worst, "suit up" is an ambiguous idiom or phrasal verb that can refer to any number of things, such as a general preparation process, which in this setting could mean any of the engineering controls identified by the OSHA Standard.

_Kruse Training Sessions_: As discussed, _supra_, Kruse is not an agent of LP, and to the extent this Court finds otherwise, statements made regarding the OSHA Standard, silica, fiber cement, or Hardie were in no way authorized or even contemplated by LP. On the only occasion Hardie asserts the OSHA Standard was mentioned, which was at the Charleston training session (JH Dep. at 37:22-38:11), it has been in response to attendee questions about silica dust, and Kruse's response has been to consult the OSHA Standards (Garner Dep. at 86:20 – 87:3). Hardie has admitted that none of the statements allegedly taking place during the Kruse training events were directed to or targeted at Hardie, or even fiber cement. _Id_. at 117:12-20; 118:15-119:1-7; 135:16-137:9.

Nevertheless, Hardie takes issue with the below statements allegedly made by Kruse and attempts to hold LP responsible for the statements.

_(i) Workers are required to wear respirators when cutting Hardie's fiber cement_

16

*products.* Although Hardie testified that such statements were made (JH Dep. at 28:15-20; 29:6-10), it was unable to testify who with Kruse made the statement and cannot identify any LP employee who has stated respirators are required when cutting Hardie's products. *See id.* at 29:12-17; 30:2-10; 31:2-9; 31:14-32:1. At the Kruse training event attended by Hardie employee Addison Garner, no one said respirators were required to install fiber cement board products. Garner Dep. at 117:12-15.

The sole evidentiary support for its argument is the 39th question on a questionnaire distributed at the end of the Kruse training session attended by Mr. Garner. JH Dep. at 34:14-25, 162:8-10. Hardie testified at its deposition that nothing else is allegedly false or misleading in the questionnaire. *Id.* at 160:5-162:11. In the questionnaire (*id.* at Ex. 13), the 39th question asks which of four choices are not required when installing SmartSide® siding. The correct answer is that a respirator is not required. This is a truthful statement. As Hardie admitted in its deposition, respirators are not required while cutting LP SmartSide products. *Id.* at 35:9-25; 36:1-37:3.

Neither the 39th question nor its answer mentions or refers to Hardie, the OSHA Standard, or fiber cement products. *Id.* at Exs. 13, K32. Hardie's sole argument is the 39th question is misleading because Hardie was referenced twice during the presentation attended by Mr. Garner. He, however, testified that Hardie was not mentioned in the context of silica or the OSHA Standard. Garner Dep. at 135:21-137:9. Accordingly, there is no support for Hardie's argument that the 39th question misleads the consumer in anyway. Hardie simply seeks to enjoin LP from making a truthful statement regarding LP's products that in no way references Hardie or its products.

Even if the truthful statement could be stretched to encompass Hardie, it would not be misleading. Hardie's own 2016 Installation Guide directed use of respirators when cutting its

products. JH Dep. at 147:10-150:21 and Ex. K28 at 8. Unless Hardie was misleading its own consumers in 2016, it is difficult to see how such statement, even by stretched implication, is false or misleading.[6] Hardie appears to argue that consumers accept LP and Kruse's materials as gospel, but cannot present a plausible argument as to why reliance on its own should be any different.

(ii) *Workers are required to warn neighbors or use caution tape when cutting Hardie's products*. At its deposition, Hardie was unable to identify any LP employee who has ever said workers are required to warn neighbors while cutting fiber cement. JH Dep. at 37:19-38:4; 40:24-42:11. Hardie does not even know at which Kruse training event the statement was allegedly made. *Id*. at 38:5-40:9.

Assuming *arguendo* that the statement was even made (which both LP and Kruse dispute), the statement is not false. Hardie's 2018 Installation Guide specifically states in the "Silica Warning" that "…you must…(3) warn others in the area to avoid breathing the dust…" *Id*. at 134:7:136:18 and Ex. K24. In addition, the model "Exposure Control Plan" distributed by Hardie (*id*. at Ex. K3 at 7) to its customers expressly references using tape to warn other employees and individuals when cutting fiber cement when not using a vacuum collection system:

| | Construction Task | Applicable Control(s) | Dust Mask Required? | Site Specific Note(s) | OSHA Compliant? |
|---|---|---|---|---|---|
| 8 | Working near a cutting station where James Hardie fiber cement is being cut using a circular saw that <u>does not have a vacuum collection system</u>. | Keep other employees and individuals at least 25 feet from cutting station.<br><br>Use Red Danger Tape with Signage stating:<br><br>DANGER<br>RESPIRABLE CRYSTALLINE SILICA<br>MAY CAUSE CANCER<br>CAUSES DAMAGE TO LUNGS<br>WEAR RESPIRATORY PROTECTION IN THIS AREA<br>AUTHORIZED PERSONNEL ONLY | Not required. | | Employees working more than 25 feet from a cutting station that is not equipped with a vacuum collection system will not be exposed to silica dust in excess of the OSHA Action Level of 0.025 mg/m³ (25 ug/m³) under all foreseeable circumstances. |

The reason for taping the area and posting a sign regarding the danger of RCS is simple. An installer cutting fiber cement in a manner that produces RCS above the PEL without a dust

---

[6] Oddly, the OSHA Standard decreased the PEL by 80% yet Hardie changed in its warning label for the 2018 Installation Guide to lessen the requirement for wearing a respirator. JH Dep. at 151:15-152:21 and Exs. K24 at 8, K28 at 8.

collection system can produce an expansive cloud of dust. Under such circumstances, the installers would be protected by wearing respirators, but the respirator only protects each individual wearer. Individuals in the area would not be protected. When installing siding on zero-lot-line homes, this could mean that many people – including neighbors could be impacted by the dust cloud. This justifies both warning and taping off the area.

_Rose Sign_: To the extent Hardie alleges that Mr. Rose's sign ("The easiest way to operate safely with silica dust is don't create it") is a literally false or misleading statement, the statement on the sign is absolutely true. This statement is consistent with the OSHA hierarchy of control in worker safety. At the top of the hierarchy is "elimination/substation" which means that one obtains maximum effectiveness by eliminating exposure before it can occur. *See, e.g.,* https://www.osha.gov/dsg/safer_chemicals/why_transition.html (last visited Sept. 13, 2018); JH Dep. at 208:1-210:17. In describing the hierarchy, OSHA stated:

> It is widely recognized that the most effective method to eliminate or reduce adverse health and safety outcomes in the workplace is to eliminate hazards at the source, before applying other, less effective forms of protection. This industrial hygiene principle, known as the hierarchy of controls, has been well-studied, widely accepted and prominently incorporated into practice by businesses and industrial hygiene professionals throughout the world.

*Id*. Hardie's statement to OSHA also admits that not producing RCS dust is a means to manage silica exposure. *Id*. at Ex. K27 ("There are two very basic ways to manage silica exposure on a job site when working with fiber cement board: (1) do not produce dust...").

### (c) Relief Request No. 3 – Safety Citation Statements

Third, Hardie requests an injunction prohibiting LP from stating, representing, or implying:

> Continued use of fiber cement products will subject consumers to safety citations and risks under the OSHA Standard, including but not limited to, that OSHA is "cracking down on the Silica dust created from cutting James Hardie Fiber Cement Siding;" that OSHA has issued a significant number (100+) citations against siding contractors since enforcement of the OSHA Standard commenced; and that siding contractors are at high risk of being fined by OSHA for violations of the OSHA Standard.

19

At its deposition, Hardie could only cite to one instance where an LP employee allegedly made a statement about the OSHA Standard and resulting citations. JH Dep. at 47:21-49:14; 55:9-56:5. The sole instance pertained to the LinkedIn share previously discussed. The identified share does not mention Hardie or fiber cement. It refers specifically to "cladding," which is a general category of exterior materials that includes stucco, brick, and fiber cement. *Id*. at 56:3-58:23. All of the foregoing types of cladding are covered by the OSHA Standard. Accordingly, any reference to the OSHA Standard and cladding is true.

There also is nothing literally false or misleading in the identified LinkedIn share's reference to an article regarding 116 citations in 6 months. As explained above, the LinkedIn share is sharing an article under the title "Silica citations hits 116 in 6 months." The original source of the title and the underlying truthful fact is an article by Bloomberg News, which is a respected news authority, as admitted by Hardie. *Id*. at 59:3-13 and Ex. K10. Hardie does not dispute that there have been at least 116 citations issued in the construction industry under the OSHA Standard. *Id*. at 59:3-13. In fact, Hardie admits that citations have been issued to contractors installing its products. *Id*. at 60:5-16. Further, the image in the LinkedIn share is not of any siding product. It is a picture of a man cutting concrete on the ground. *Id*. at 88:5-15.

The only other evidence Hardie provides in support of its third relief request is an email containing a screen capture of a Facebook post made by an LP customer. JH Dep. at Ex. K7. The sender of the email simply notifies fellow LP employees of the post. Nothing in the email adopts, affirms, or approves the statements contained in the customer's Facebook post. Simply notifying fellow employees of its existence is wholly insufficient to impute LP with its contents. Furthermore, there is no evidence that the Facebook post has been shared outside of LP.

Because the statements – or, more accurately, categories of speech – identified by Hardie

are truthful and not misleading, Hardie's Motion should be denied.

*(3) Hardie fails to prove any actual deception for each of the statements-at-issue.*

Hardie has not shown that any of the alleged statements are literally false. Hardie, therefore, is not entitled any presumption of actual deception. Instead, if the Court finds any statement misleading, Hardie must prove identifiable consumers have actually been deceived. *Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. Of Podiatric Surgery, Inc*., 185 F.3d 606, 614 (6th Cir. 1999). Hardie did not produce a survey or report of a survey expert by the expert disclosure deadline on September 10, 2018. Accordingly, it must prove actual deception.

Hardie testified at its deposition that it has not lost any distributors, dealers, or customers as a result of the alleged statements. JH Dep. at 64:12-24; 193:17-195:3. It also testified that it has no evidence of lost sales. *Id*. at 194:4-195:3. Other than distributors or dealers that were allegedly deceived by Mr. Rose's "standard circular saw" email, Hardie has not identified any company or person that was actually deceived by any other alleged statement by LP or Kruse. *Id*. at 185:10-192:20.

Hardie has an obligation to produce admissible evidence to support the alleged deception allegedly caused by Mr. Rose's email. Simply because the evidentiary rules are slightly relaxed in a preliminary injunction setting, it does not mean that the rules do not exist. July 30, 2018 Hearing Trans. at 82:7-12, 83:4-10 (Dkt. 146). Hardie has not produced any first-hand testimony from any distributor, dealer, or customer who was allegedly deceived. The only alleged evidence are the pure hearsay statements made by Mr. King, a Hardie sales representative, who claims that distributors, dealers, and customers told him they were confused and were going to pull their business as a result of Mr. Rose's email. King Dep. at 45:8-21; 47:21-49:11; 50:2-51:5; 52:11-25; 53:7-55:10.

Without any admissible evidence to support their claims, Hardie fails to meet its burden on this crucial element.

*(4) Hardie has not shown that the statements-at-issue are material.*

Hardie must prove materiality. It is insufficient for Hardie to simply state that because the statements were made then the statements must be materials. *See*, *e.g.*, MISO at 24. Courts have repeatedly stated that because a statement is made does not prove materiality. *Seem e.g., Nellcor Puritan Bennett LLC v. Cas Medical Sys., Inc.*, 11 F.Supp.3d 861, 878 (E.D.Mich. 2014); *Federal Exp. Corp. v. U.S. Postal Serv.*, 40 F.Supp.2d 943, 953 (W.D.Tenn. 1999).

Hardie also misapprehends the statements-at-issue. The statements do not pertain to "inherent qualities or characteristics" of Hardie's products or fiber cement generally. The statements pertain to the OSHA Standard. Hardie confirmed this to be true in its Notice filed on September 14, 2018, where Hardie stated, "JH states that it has always sought narrow injunctive relief tailored to stop Counter-Defendant Louisiana-Pacific Corporation's and Third-Party Defendant The Kruse Brothers, Inc.'s false and misleading statements **about the provisions of OSHA's Final Rule on Silica for Construction**…" (Dkt. 208) (emphasis added)). Hardie simply seeks to stop all discussion of the OSHA Standard, which is material to all silica-based construction products generally. This genre of building products includes any product involved with sand, stone, concrete, brick, and mortar. Hardie is not the sole company in the silica-based building products market, JH Dep. at 231:5-21, and cannot claim the statements are targeted at only fiber cement. For example, the LinkedIn post does not mention fiber cement or Hardie and displays a picture of a worker cutting concrete. (Dkt. 60-2).

Hardie has not shown willful deception. However, even if deception is found, Hardie cannot rely upon any presumption to meet the materiality element where Hardie is not expressly and directly referenced in a comparative matter. *See* Order (Dkt. 171) at 14. A statement referring

to "cladding" or "fiber cement" is insufficient because Hardie is only a small portion of the overall cladding market and 80% of the fiber cement market. JH Dep. at 90:4-91:5; 198:25-199:10. Hardie has at least two other notable competitors in the fiber cement market. *Id*. at 198:25-199:10.

Finally, the absence of evidence of materiality is self-evident from Hardie's lack of lost customers and sales. The only identified individuals/companies that were allegedly deceived by Mr. Rose's email were distributors and/or dealers. This is particularly relevant because such individuals/companies had purchased products from Hardie for years. There is no indication the vast majority of distributors and dealers actually would not have continued to purchase products from Hardie despite Mr. Rose's email. The failure to provide admissible evidence from the distributors or dealers solidifies the lack of materiality to those individuals/companies. *Cf. A.L.S. Enters. v. Robinson Outdoor Prods., LLC*, 2017 WL 11946, *6 (W.D. Mich. Jan. 20, 2017).

Further, the OSHA Standard applies to any product containing silica that is used in construction. The statement that contractors using silica-containing products are subject to fines if caught violating the OSHA Standard is not a "scare tactic," as Hardie calls it, but an elementary fact of life – one who breaks a rule is subject to the proscribed punishment for that rule. Although the existence of regulatory and safety risks may well be considered by consumers in their purchasing decisions, they are not "qualities or characteristics" of Hardie's products.

*(5) Many of the alleged statements were not made in interstate commerce or in Tennessee.*

As noted previously, LP did not make many of the statements above and certainly not in interstate commerce and, therefore, are not the subject to the Lanham Act. "Plaintiffs must show that the statements were introduced into interstate commerce." *Grubbs*, 807 F.3d at 802. The internal distribution of the Facebook post was not in interstate commerce. Kruse's alleged statements are made to third-parties in person at training events in a single location at a time.

Kruse's statements do not rise to the level of interstate commerce. The same is true regarding Mr. Rose's statements and emails. Those statements and the statements in the emails were made in Florida by Rose to third-parties who are in Florida. Rose Dep. at 18:14-15. The use of email does not *per se* render the communication in interstate commerce. *Cf. Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*, 193 F. Supp. 3d 556, 574 (E.D. Va. 2016), aff'd, 700 F. App'x 251 (4th Cir. 2017) (emails sent throughout country constitute interstate commerce). Similarly, any statements allegedly made by Ms. Kieta were made by Ms. Kieta in Wisconsin to third-parties in Wisconsin and, therefore, are not in interstate commerce. (Transcript not yet available- will be late filed exhibit). Just as a trademark is not subject to protection under the Lanham Act unless it is used in interstate commerce, so too must a statement alleged in false advertising under the Lanham Act be made across state lines.

Similarly, Hardie's Tennessee Consumer Protection Act ("TCPA") claims fail for most statements. The TCPA applies only to acts "committed in Tennessee in whole or in part." *Tucker*, 180 S.W.3d at 115. Hardie has not identified any statements made by Kruse or LP in Tennessee. The internal Facebook post email was not sent to any consumer in Tennessee. There is no evidence that Mr. Rose's and Ms. Kieta's statements were made in Tennessee or made to any consumer in Tennessee. Accordingly, any statement not made in Tennessee or to a consumer in Tennessee is outside the scope of the TCPA and cannot be a basis for violation of the TCPA.

*(6) Hardie fails to establish a causal link.*

Hardie cannot point to any harm it has suffered at all, or explain with any measure of certainty how such alleged harm befell it solely at the hands of LP. JH Dep. at 193:9-194:11. Quite the opposite is true. Hardie admits that it has not lost a single customer or sale as a result of the statements identified in its Motion. JH Dep. at 194:19-195:3. Hardie has not shown that its sales are decreasing and refused to produce any financial documents related to its sales. Indeed, LP

sought the sales records in a motion to compel that the Magistrate Judge denied. Dkts. 180, 181, 194. Thus, even if the Court finds a presumption of causation and harm, LP has rebutted the presumption by showing no lost customers, lost sales, decrease in revenue, or other harm has occurred.

### b. *Hardie's Claims for Tortious Interference Fail.*

Hardie's claim of tortious interference fails for at least four reasons. First, as discussed in section A(1)(A)(1) *supra*, Hardie's claim for tortious interference regarding the Facebook post and LinkedIn share are barred by the CDA. Second, Hardie has not presented evidence that LP knew of a specific relationship or prospective relationship that was interfered with by LP making each of the statements-at-issue. Hardie has only identified a handful of third parties in Florida that were allegedly interfered with by Mr. Rose's email and supported the allegation with hearsay. Without admissible evidence of interference with a specific relationship or potential relationship for each statement, Hardie fails to meet this element. Order (Dkt. 171) at 21 (citing *Trau-Med of America, Inc. v. Allstate Ins. Co.*, 71 S.W.2d 691, 701 (Tenn. 2002)). Third, there is no evidence of any improper motive or improper means undertaken by LP. As explained *supra*, LP either did not make the statements or the statements are not literally false or deceptively misleading. Fourth, Hardie cannot show damages resulting from the alleged tortious interference. Hardie has no evidence of any damages resulting from any alleged tortious interference. JH Dep. at 193:9-195:3. It cannot even identify a single lost customer or sale resulting from any of the alleged LP statements. *Id*. Without the termination of a business relationship, Hardie's tortious interference claim necessarily fails. *Pers. Computer Sys., Inc. v. Cent. Knox, Inc.*, 2012 WL 1108245, at *4 (E.D. Tenn. Mar. 30, 2012).

### 2. **Hardie will not suffer immediate and irreparable harm if its Motion is denied.**

Hardie must show it will suffer "immediate and irreparable harm absent injunctive relief."

*Abney v. Amgen, Inc.*, 443 F.3d 540, 551 (6th Cir. 2006). The possibility of legal action initially came to Hardie's attention no later than March 2017. <u>Exhibit 2</u> - Email re: "specialty tools." Hardie's delay in filing its Motion until July 12, 2018 – sixteen months later and nearly 2 months <u>after</u> LP filed this case – speaks volumes. "Delay 'militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief.'" *Plate, LLC v. Elite Tactical Systems, LLC*, 2018 WL 3747799, *5 (E.D. Tenn. Aug. 7, 2018). *See also, e.g., R.M. & G. Products, Inc. v. R.E.F. Golf Co.*, 1994 WL 653531, *3 (N.D. Ohio June 21, 1994); *King Pharm., Inc. v. Zymogenetics, Inc.*, 2009 WL 4931238, *4 (E.D. Tenn. Dec. 10, 2009) ("undue delay in seeking relief suggests that there is no irreparable harm"). In addition, Hardie has "no evidence of sales, customer relationships, market share, or goodwill" that have been lost. JH Dep. at 64:18-24. Hardie has little to lose in the absence of injunctive relief.

Hardie also cannot show that an injunction will resolve any irreparable harm with respect to at least the Facebook post and constructiondive.com article. The Motion does not seek an injunction against constructiondive.com, Bloomberg News, or the third party who posted the Facebook post. All of those published statements remain in the public. Accordingly, there is no irreparable harm caused by LP that will be remedied by an injunction solely against LP. Such injunction would be futile.

### 3. Both LP and Third Parties Will Suffer Substantial Harm if Hardie's Motion is Granted.

Silencing LP as to the OSHA Standard conveniently eliminates it from the conversation with which the construction industry has become so infatuated. Inability to address the subject when asked will undermine LP's credibility and inevitably lose the trust and goodwill of its customers.

26

### 4. Granting Hardie's Motion Goes Directly Against the Public's Interest in the Free Flow of Health and Safety Related Information.

"The focus in assessing this fourth factor is whether there exists some critical public interest that would be injured by the grant of preliminary relief." *Lambton Mfg. Ltd. v. Young*, 833 F.Supp. 610, 617 (W.D. Ky. 1993) (citing *Hybritech Inc. v. Abbott Laboratories*, 849 F.2d 1446, 1458 (Fed. Cir. 1988)). Negative impact on the public, if significant, can overcome even a strong showing by the movant on the other three factors. *Wothington Goods, Inc. v. Kellogg Co.*, 732 F.Supp 1417, 1463 (S.D. Ohio 1990). *See also Yakus v. U.S.*, 321 U.S. 414, 440 (1944) (""where an injunction . . . will adversely affect a public interest . . . , the court may . . . withhold relief until a final determination of the rights of the parties . . . ."). "Generalizing, society . . . may have a strong interest in the free flow of commercial information." *Virginia Bd. of Pharmacy*, 425 U.S. at 764. That interest may be "as keen, if not keener by far, than his interest in the day's most urgent political debate." *Id*. In this sense, "the free flow of commercial information is indispensable." *Id.*, 765. Even in cases involving potentially misleading commercial speech, the preferred remedy is more disclosure, rather than less. *International Dairy Foods Ass'n v. Boggs*, 622 F.3d 628, 636 (6th Cir. 2010); *Bates v. State Bar of Ariz.*, 433 U.S. 350, 374-75 (1977).

Hardie does not dispute that RCS is dangerous, including the dust released by cutting its own fiber cement products. Inhaling it increases risk of developing silicosis, an incurable disease that can lead to disability and death; lung cancer; chronic obstructive pulmonary disease; and kidney disease. The OSHA Standard was put in place for precisely this reason. It serves to protect construction workers from the health effects of exposure to RCS by placing tight restrictions on employees' exposure. Increased public awareness of the dangers of RCS and the OSHA Standard can only serve to promote public health and safety.

Hardie's proposed injunction seeks to deny LP the ability and opportunity to educate

people on information put out by OSHA, the government regulatory agency charged with informing and protecting the public from this type of information. Such restriction weighs heavily against the public interest such that an injunction should be denied.

**B.** **HARDIE'S MOTION REQUESTS AN UNCONSTITUTIONAL PRIOR RESTRAINT ON SPEECH PROTECTED BY THE FIRST AMENDMENT.**

Hardie has not identified specific advertisements or phraseology utilized by LP as part of an organized, targeted marketing campaign. *See, generally*, Motion and MISO. Instead, Hardie has identified sweeping categories of speech in vague and overbroad terms, citing what it posits as examples of speech Hardie finds offensive through its subjective lens as a producer of a product that exposes consumers to hazardous dust during installation. *Id.; see also* JH Dep. at 67:10-13. In so doing, Hardie asks the Court to enjoin LP from making any statements concerning OSHA Standards whatsoever, without regard for the truthfulness of those statements, many of which are strictly educational and designed to inform third parties about precautions a governmental agency now requires to protect against exposure to RCS. *See id*. at Ex. K28 at 9. Without a defined narrow scope of statements already made, the requested injunction would, if granted, impose an unconstitutional prior restraint on LP's First Amendment right of free speech. *See, e.g., Alexander v. U.S.*, 509 U.S. 544, 550 (1993); *Taubman Co. v. Webfeats*, 319 F.3d 770, 773-774 (6th Cir. 2003); *Polaris Amphitheater Concerns, Inc. v. City of Westerville*, 267 F.3d 503, 506 (6th Cir. 2001). Hardie's requested injunction would prevent LP from making any reference to OSHA or safety generally in relation to any product, including but not limited to LP's own products.

A prime example of the overbreadth of Hardie's requested relief is the 39th question on the training questionnaire. JH Dep. at Ex. 13. Hardie seeks to enjoin the question "Which of the following safety equipment is NOT necessary by LP when working with SmartSide products" and the answer of "An OSHA-approved respirator." Hardie admits respirators are not required while

28

cutting LP SmartSide products. *Id.* at 35:9-25; 36:1-37:3. Yet it says this truthful statement that does not reference Hardie, fiber cement products, silica or even the OSHA Standard is misleading.

If the requested injunction is granted, to ensure avoidance of accusations that it has violated the injunction, LP would be forced to remove the word "OSHA" from its vocabulary entirely. This chilling effect on speech is exactly the harm that the First Amendment was designed to prevent.[7] *See, e.g., Central Hudson Gas & Elec. Corp. v. Public Service Commission of New York*, 447 U.S. 557, 562 (1980) ("People will perceive their own best interests if only they are well enough informed, and . . . the best means to that end is to open the channels of communication rather than to close them . . . "). Therefore, the requested injunction cannot be granted because to do so would violate the First Amendment.

### III. **CONCLUSION**

For the foregoing reasons, LP respectfully requests Hardie's Motion for Preliminary Injunction be denied in its entirety.

Respectfully submitted,

/s/ Samuel F. Miller
Samuel F. Miller (BPR No. 022936)
Nicholas R. Valenti (BPR No. 035420)
A. Grace Van Dyke James (BPR No. 035667)
MILLER LEGAL PARTNERS PLLC
Fifth Third Center – Suite 2000
424 Church Street
Nashville, TN 37219
Telephone/Fax: (615) 988.9011
Email: Smiller@millerlegalpartners.com
　　　　　Nvalenti@millerlegalpartners.com
　　　　　Gjames@millerlegalpartners.com
*Attorneys for Plaintiff Louisiana-Pacific Corporation*

---

[7] Regardless of whether the identified speech is deemed "pure" or commercial, it is it is nevertheless "settled" and "beyond serious dispute" that "speech does not lose its First Amendment protection because money is spent to project it…" *See Virginia Bd. Of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 761 (1976).

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of September 2018, the foregoing document was served via ECF upon the following:

Tony Swafford
Rocky King
Maia T. Woodhouse
ADAMS & REESE LLP
Fifth Third Center
424 Church Street, Suite 2700
Nashville, Tennessee 37219
Tel: (615) 259-1450
Fax: (615) 259-1470
Email: tony.swafford@arlaw.com
        rocky.king@arlaw.com
        maia.woodhouse@arlaw.com

Brian T. Boyd
William M. Leech III
LAW OFFICE OF BRIAN T. BOYD
750 Old Hickory Blvd., Bldg., 2, Suite 150
Brentwood, Tennessee 37027
Tel: (615) 371-6119
Fax: (615) 523-2595
Email: brian@boydlegal.co
        will@boydlegal.co

Adam Massey
ADAMS & REESE LLP
LyondellBasell Tower
1221 McKinney, Suite 4400
Houston, TX 77010
Tel: 713.652.5151
Email: adam.massey@arlaw.com

Tara L. Swafford
THE SWAFFORD LAW FIRM, PLLC
207 Third Avenue North
Franklin, Tennessee 37064
Tel: (615) 599-8406
Fax: (615) 807-2355
Email: tara@swaffordlawfirm.com

/s/ Samuel F. Miller
Samuel F. Miller