**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**AT NASHVILLE**

| | | |
|---|---|---|
| **LOUISIANA-PACIFIC CORPORATION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 3:18-cv-00447** |
| | ) | |
| **JAMES HARDIE BUILDING PRODUCTS, INC.,** | ) | **JUDGE MCCALLA** |
| | ) | |
| | ) | **MAGISTRATE JUDGE HOLMES** |
| **Defendant/Counter-Plaintiff/ Third-Party Plaintiff.** | ) | |
| | ) | |
| | ) | **JURY DEMAND** |
| **v.** | ) | |
| | ) | |
| **THE KRUSE BROTHERS, INC.,** | ) | |
| | ) | |
| **Third-Party Defendant.** | ) | |

---

### LOUISIANA-PACIFIC CORPORATION'S FIRST AMENDED COMPLAINT

---

Plaintiff Louisiana-Pacific Corporation ("LP"), for its First Amended Complaint against Defendant James Hardie Building Products, Inc. ("Defendant") states as follows:

### I.     THE PARTIES

1.     LP is a Delaware corporation with its principal place of business at 414 Union Street, Suite 2000, Nashville, TN 37219.

2.     Defendant is a Nevada corporation with its principal place of business located at 231 S. LaSalle Street, Suite 2000, Chicago, IL 60604.  Defendant is registered with the Tennessee Secretary of State to do business in Tennessee.  Defendant's registered agent for service of process is United Agent Group Inc., 205 Powell Place, Brentwood, Tennessee 37027.

## II.    NATURE OF ACTION

3.    LP and Defendant are direct competitors and compete for market share in the manufactured siding industry.  LP offers strand-based engineered wood  siding products under the SmartSide® brand.  Defendant routinely and consistently refers to LP's strand-based engineered wood siding products as oriented strand board (commonly called "OSB") even though there are significant  differences between the SmartSide® siding products and common OSB.  Defendant offers fiber cement siding under the James Hardie or JH brand.

4.    LP asserts Defendant has made and continues to make literally false and/or deceptively misleading statements in advertising and promoting Defendant's siding that constitute (a) false advertising in violations of Section 43 of the Trademark Act of 1946 (also known as the Lanham Act), as amended, 15 U.S.C. § 1125; (b) unfair competition under Tennessee law; (c) violations of the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-1041 *et seq*.; and (d) tortious interference under Tennessee law.

## III.    JURISDICTION AND VENUE

5.    This Court has subject matter jurisdiction over this action under 15 U.S.C. § 1121 and 28 U.S.C. § 1338 in that this case arises under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, and 28 U.S.C. § 1331 as it involves a federal question.

6.    This Court has subject matter jurisdiction over the unfair competition claims herein under the provisions of 28 U.S.C. § 1338(b) in that said claims are joined with a substantial and related claim under the Lanham Act, 15 U.S.C. § 1051 *et seq.*

7.    This Court has supplemental jurisdiction over the claims that arise under Tennessee law pursuant to 28 U.S.C. § 1367(a) because they are substantially related to the claims that arise under the Lanham Act of the United States.  Furthermore, this Court has supplemental jurisdiction

because both the state and federal claims are derived from a common nucleus of operative facts and considerations of judicial economy dictate the state and federal issues be consolidated for a single trial.

8.     This Court has general personal jurisdiction over Defendant based on Defendant's continuous and systematic minimum contacts with residents of Tennessee through the distribution and sale of its products in Tennessee and its sales representatives' promotion and marketing activities in Tennessee.  This Court also has specific personal jurisdiction over Defendant based on its purposeful direction of its promotional and advertising activities and sales of its products to residents and customers in Tennessee.  Additionally, this Court has personal jurisdiction under Tenn. Code Ann. § 20-2-201 *et seq*., because (1) Defendant has transacted business in Tennessee; (2) the tortious acts or omissions occurred in Tennessee; (3) the damages occurred in Tennessee to corporation with a principal place of business; and (4) jurisdiction based on Defendant's contacts with Tennessee (including, but not limited to, sales of products) is not inconsistent with the Constitution of the State of Tennessee or the Constitution of the United States.

9.     Venue is proper in the Court under 28 U.S.C. § 1391(b) and § 1391(c), and because Defendant is subject to personal jurisdiction pursuant to Tennessee's long arm statute, Tenn. Code Ann. § 20-2-201 *et seq*.

## IV.     THE CONTROVERSY

### A.     LP and its LP'S SMARTSIDE® SIDING PRODUCTS

10.     Since 1972, LP has been a market leader in the manufacture and distribution of building materials.

11.     LP sells its building materials and related products throughout the world.

3

12.     LP operates in four primary business segments: OSB, Siding, Engineered Wood Products, and South America.

13.     LP manufactures and distributes strand-based engineered wood siding products that include, in part,  wood strands arranged in layers and bonded with resin.

14.     LP has invested significant amounts of time, money, and personnel into research and development of strand-based engineered wood siding products to continuously improve the quality of the products.

15.     Since its first strand-based engineered wood product over twenty years ago, LP or its associates have refined the production of its siding products by improving, *inter alia*, pest resistance, moisture resistance, and ease of maintenance.

16.     LP's current version of strand-based engineered wood siding is sold under the SmartSide® brand.

17.     The SmartSide® siding products are treated with a zinc borate-based process that resists damages from termites and other pests.

18.     The SmartSide® siding products comply with applicable building and safety codes throughout the United States and abroad.

19.     The SmartSide® siding products are treated to the core with LP's proprietary SmartGuard® process that resists weather-related damage including rain, hail, snow, and other contact with water or moisture.

20.     LP's SmartSide® siding requires no more maintenance or repainting than any of Defendant's siding products.

21.     LP continues to advance its innovative line of siding products.

22.    LP is the undisputed leading manufacturer and distributor of strand-based engineered wood siding products in the United States.

### B.    DEFENDANT'S FIBER CEMENT SIDING PRODUCTS

23.    Defendant manufactures and distributes fiber cement building products under the James Hardie or JH brands.

24.    Upon information and belief, Defendant's fiber cement siding product is composed of water, cellulose fiber (such as wood pulp), a filler (such as fly ash or silica), and cement that binds the other ingredients together.

25.    Defendant's siding products compete directly with LP's SmartSide® siding products.

26.    Defendant's siding products are marketed as an alternative to LP's siding products.

27.    Defendant markets its siding products to distributors, retailers, subcontractors, contractors, and directly to end consumers through brochures, websites (*e.g.,* www.nowoodisgood.com, www.jameshardie.com), industry and trade gatherings, direct mail marketing, and other means.

### C.    DEFENDANT'S PATTERN OF FALSE AND MISLEADING STATEMENTS

28.    In both oral communications and advertising and promoting its products, Defendant routinely and consistently refers to LP's strand-based engineered wood siding products, including but not limited to SmartSide® siding, as "OSB" siding.

29.    In an effort to usurp Plaintiff's market share in the manufactured siding market and drive consumers to purchase and/or recommend Defendant's siding products, Defendant has and continues to propagate a campaign of literally false and/or deceptively misleading statements in advertising and promoting Defendant's siding products.

### (i)     Defendant's Websites

30.     Defendant owns and operates the websites located at the domain names www.nowoodisgood.com and nowoodsgood.com (the "Offending Websites").

31.     A true and correct copy of the screenshot from www.nowoodisgood.com website as shown at the time of filing the original Complaint is attached hereto as <u>Exhibit 1</u>.

32.     True and correct copies of screenshots from the Offending Websites as shown on November 1, 2018 are attached as <u>Exhibit 1A </u>and <u>3</u>.

33.     The Offending Websites prominently feature Defendant's name and trademarks.

34.     The Offending Websites have the following copyright notice at the bottom of the home page: "© 2018 James Hardie Building Products Inc. All Rights Reserved."

35.      The Offending Websites contain numerous links to other websites owned by Defendant.

36.     The Offending Websites (and other marketing and promotional materials discussed *infra*) predominantly display the phrase "NO WOOD IS GOOD."

37.     The "NO WOOD IS GOOD" phrase is intended to influence consumers not to purchase LP's engineered wood siding and trim products.

38.     Defendant's use of "NO WOOD IS GOOD" is literally false and/or deceptively misleading because, upon information and belief, Defendant's fiber cement products contain cellulose in an amount of less than 15% as shown in Defendant's Material Data Safety Sheets. True and correct copies of the Material Data Safety Sheets for the medium density and low density versions of Defendant's fiber cement lap siding products (and other products) are attached hereto as <u>Exhibits 4</u> and <u>5</u>.

39.     Upon information and belief, the cellulose in Defendant's fiber cement products is wood pulp.  A true and correct copy of one of Defendant's websites showing the use of wood pulp is attached hereto as Exhibit 6. In an interview of Mark Chamberland, a former employee of Defendant, Mr. Chamberland, while he was employed by Defendant, stated "All Hardie's siding starts the same…we start with silica sand that's then ground into a fine powder.  We then mix in wood pulp and pour it in cement, which is then mixed together to form a fiber-cement slurry."  A true and correct copy of the interview as published on www.homeshowradio.com is attached hereto as Exhibit 7.  Upon information and belief, Defendant also published a video showing Defendant's manufacturing process in which the narrator states that wood pulp is a key ingredient in Defendant's fiber cement products.  The video is available at https://www.youtube.com/watch?v=CXAW7iX5OxQ (last visited Nov. 1, 2018).

40.     Upon information and belief, Defendant first starting using cellulose in its fiber cement products in the 1980's as a replacement for asbestos that was used in its fiber cement products.

41.     Prior to changes made by Defendant after the initiation of this lawsuit, the Offending Websites presented a graphic depicting alleged advantages of fiber cement siding over "OSB" siding under the title "OSB SIDING V. JAMES HARDIE SIDING."

42.     As shown on Exhibits 1A and 3, Defendant's Offending Websites states, as part of a graphic depicting alleged disadvantages of "Engineered Wood Siding" (which was previously identified as "OSB" siding as depicted in Exhibit 1 to the original Complaint) compared to fiber cement siding, "PESTS LOVE IT" with a caption above a picture of a woodpecker penetrating a segment of LP's strand-based engineered wood siding.

43.    Next to the picture of the woodpecker on the www.nowoodisgood.com website, Defendant or its agent(s) placed the words "Subject to damage caused by woodpeckers, termites and other pests that can harm wood."

44.    Next to the picture of the woodpecker on the www.nowoodsgood.com website, Defendant or its agent(s) placed the words "Subject to damage caused by woodpeckers, termites and other pests, which can lead to costly repairs."

45.    The "PESTS LOVE IT" section is literally false and/or deceptively misleading because, among other reasons, LP's SmartSide® siding is treated with a zinc borate-based process that resists damages from termites and other pests.

46.    In fact, LP tested its SmartSide® siding's resistance to pests by exposing samples of the siding to Formosan termites, widely recognized as one of the world's most destructive pests. The testing showed that after over two decades of exposure, the siding continues exhibit no structural damage.

47.    The reference to "woodpeckers" in the "PESTS LOVE IT" section is literally false and/or deceptively misleading because, among other reasons, LP's SmartSide® siding is treated with a zinc borate-based process that resists damages from termites and other pests that would attract woodpeckers.

48.    The reference to "termites" in the "PESTS LOVE IT" section is literally false and/or deceptively misleading because, among other reasons LP's SmartSide® siding is treated with a zinc borate-based process that resists damages from termites and/or the reference falsely implies structural damage may occur to LP's SmartSide® siding.

49.    The "PESTS LOVE IT" section is literally false and/or deceptively misleading because, among other reasons, Defendant or its agent(s) "photoshopped" the image of the hole to

remove the edges around it and the materials in the hole and appear deeper, darker, and generally more substantial along with accentuating the grains in the engineered wood siding, and/or the hole cannot be conclusively found to have been created in whole or in part by a woodpecker.

50. The "PESTS LOVE IT" section is literally false and/or deceptively misleading because, among other reasons, Defendant or its agent(s) "photoshopped" the image to include a woodpecker stock photo and/or stock video in a panel of LP's SmartSide® siding.

51. The "PESTS LOVE IT" section is literally false and/or deceptively misleading because, among other reasons, Defendant or its agent(s) combined the false and/or deceptively misleading woodpecker stock photo and/or video and the false and/or deceptively misleading "photoshopped" hole.

52. The image of the termite (or similar insect) graphic in the "PESTS LOVE IT" section is literally false and/or deceptively misleading because, among other reasons, LP's SmartSide® siding is treated with a zinc borate-based process that resists damages from termites and/or the reference falsely implies structural damage may occur to LP's SmartSide® siding

53. Defendant's Offending Websites state, as a part of a graphic depicting alleged disadvantages of "Engineered Wood siding" (previously stated as "OSB" siding) compared to fiber cement siding, "SOAKS UP TROUBLE" with a caption above a photograph of buckled exterior siding, and the caption to the picture reads "Susceptible to water absorption, which can lead to expansion, buckling or edge checking.**" The two asterisks reference a disclaimer written in small font at the bottom of the webpage that states "Representation of engineered wood product buckling; improper installation may have been a contributing factor."

54. The photograph of buckled exterior siding is LP's hardwood siding or fiber siding and/or is intended to represent LP's strand-based engineered wood siding.

9

55. The "SOAKS UP TROUBLE" section is literally false and/or deceptively misleading because LP's SmartSide® siding is treated to the core with LP's proprietary SmartGuard® process that stands up to weather including rain and other contact with water. Accordingly, LP SmartSide® siding, if properly installed, does not have the issues that Defendant alleges. Defendant's tiny print in an end note does not sufficiently indicate to the viewer that the alleged damages is a result of likely improper installation.

56. Defendant's Offending Websites stats, as part of a graphic depicting alleged disadvantages of "OSB" siding compared to fiber cement siding, "WON'T WEATHER WELL" with a caption above a photograph of exterior siding with faded and dilapidated paint, and the caption to the picture reads "OSB siding painted by 3rd party pre-finishers can show loss of paint after extended exposure to sunlight.***" The three asterisks reference a disclaimer written in small font at the bottom of the webpage that states "Representation of prefinished engineered wood after the equivalent of 12 years of solar exposure per ASTM G90."

57. The photograph of exterior siding is LP's strand-based engineered wood siding or is intended to represent LP's strand-based engineered wood siding.

58. The "WON'T WEATHER WELL" section is literally false and/or deceptively misleading because pre-finishers are third-parties over which LP has no control such that the durability of pre-finishing is not tied to any characteristic or purported lack of quality of LP's SmartSide® siding.

**(ii) Defendant's Promotional Flier**

59. Defendant published and distributed a flier that states in large font and bold letters "James Hardie® siding outperforms wood-based siding."

60. A true and correct copy of the "Offending Flier" is attached as Exhibit 2.

61.     Upon information and belief, copies of the Offending Flier have distributed widely at trade shows and elsewhere.

62.     The Offending Flier presents a side-by-side comparison of purported advantages of "JAMES HARDIE ® SIDING vs. WOOD-BASED SIDING".

63.     Included in the column representing the alleged disadvantages of strand-based engineered wood siding, a picture of distorted siding is next to the statement "Shrinks and swells when exposed to moisture, causing paint to crack and peel. Requires frequent upkeep to maintain appearance."

64.     Included in the column representing the alleged disadvantages of strand-based engineered wood siding, a picture of a distorted piece of siding is next to the statement "Swelling or edge checking normally occurs in all wood-based products as they expand and contract due to changes in climate conditions."

65.     Included in the column representing the alleged disadvantages of strand-based engineered wood siding, a picture of a piece of particle board is next to the statement "Susceptible to water absorption, which can lead to expansion, buckling, cracking and mold."

66.     Included in the column representing the alleged disadvantages of strand-based engineered wood siding, a picture of a piece of particle board with pest damage is next to the statement "Subject to damage caused by woodpeckers, termites and other pests."

67.     The foregoing statements in Defendant's Offending Flier are literally false and/or deceptively misleading for the same and/or similar reasons set forth against the Offending Websites.

### (iii) Other Materials and Circumstances in Which Defendant Made Statements

68.     The foregoing are only examples of literally false and/or misleading statements made by Defendant.  The same or similar literally false and/or misleading statements have been made in promotional materials, marketing, print and electronic advertising, signs in windows, magazine advertisements, and orally to actual and potential customers.  All such documents and things are hereby incorporated by reference herein.  Discovery remains ongoing.  LP reserves the right amend Complaint again to add additional documents and things as necessary and/or appropriate.

### (iv) Defendant's Direct Outreach to Prospective Customers

69.     Upon information and belief, Defendant (directly or through its agents or representatives) directly markets to retailers, contractors, and other relevant consumers in or related to the construction and/or building supplies industries and made the same or similar statements as those found on the Offending Websites and in the Offending Flier.

### D.      LP'S IRREPARABLE HARM

70.     As a direct and proximate result of Defendant's intentional actions and statements, LP has suffered irreparable harm to the reputation of its products.

71.     The harm to the reputation of LP's products is *per se* irreparable.

72.     The harm also is irreparable because it cannot be completely remedied.

73.     The harm further is irreparable because given the nature of the advertising and promoting the loss of identifiable consumers is not readily obtainable.  For example, LP will not ever be able to tell the exact identities of the customers that it lost and the result loss of volumes of sales of LP's siding products from particular customers.

# V.    CAUSES OF ACTION

## COUNT I

## VIOLATION OF 15 U.S.C. § 1125(a)

74.    LP incorporates the preceding paragraphs as though fully set forth herein.

75.    Defendant's explicit and implicit promotional claims in interstate commerce about its fiber cement siding products are literally and/or impliedly false and/or deceptively misleading.

76.    Defendant's explicit and implicit promotional claims in interstate commerce about OSB siding products, particularly LP's SmartSide® siding products, are literally and/or impliedly false and misleading.

77.    Defendant's implicit and explicit claims violate Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), subsection (1) of which provides:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

78.    Defendant's false and/or misleading statements regarding its fiber cement siding products are material in that the statements will likely influence existing and potential buyers of siding products and building materials and LP's SmartSide® products in particular.

79.    Buyers of Defendant's fiber cement siding products (and buyers of siding products generally, especially those without expertise in the construction industry) often have no choice but

to trust statements made by Defendant (directly or through its agents or representatives) that fiber cement siding products have the nature, characteristics, and qualities claimed by Defendant.

80.     Defendant's false and/or misleading statements regarding LP's siding products are material in that the statements will likely influence existing and potential buyers of (a) siding products and building materials generally; (b) Defendant's fiber cement siding products; and (c) LP's SmartSide® and other siding products.

81.     Buyers of Defendant's fiber cement siding products (and buyers of siding products generally, especially those without expertise in the construction industry) often have no choice but to trust statements made by Defendant (directly or through its agents or representatives) that LP's siding products have the nature, characteristics, and qualities claimed by Defendant.

82.     Defendant's false and/or misleading statements regarding LP's siding products have actually deceived or have the capacity to deceive a substantial portion of the intended audience for such statements.

83.     Defendant willfully, knowingly, intentionally, maliciously, or recklessly is using in commerce false and/or misleading descriptions of fact or misleading representations of fact concerning the nature, characteristics, and qualities of Defendant's fiber cement siding products and LP's siding products.

84.     Defendant's false and/or misleading statements have caused LP damage.

85.     LP has been injured by Defendant's actions and representations because customers who would otherwise have purchased from LP have made or will make purchasing decisions based upon Defendant's false and misleading representations concerning the attributes of Defendant's fiber cement siding products and LP siding products.

86.    Unless enjoined by this Court, Defendant's acts will irreparably injure LP's goodwill and erode its sales, customer base, and share in the exterior siding and building supplies market.

87.    LP is entitled to all available remedies provided under the Lanham Act, including with limitation preliminary and permanent injunctive relief; Defendant's profits; any damages sustained by LP; costs; destruction of all packaging, containers, devices, products, literature, advertising, and any other material bearing false, deceptive, and/or misleading statement and/or any variants thereof (or similar wording); and other equitable relief.

88.    Pursuant to 15 U.S.C § 1117, LP seeks judgment for three times the amount of Defendant's profits or LP's damages, whichever is greater due to the nature of Defendant's conduct.

89.    Defendant's acts are willful, wanton, and calculated to deceive, and are undertaken in bad faith, making this an exceptional case entitling LP to recover additional damages and reasonable attorney fees pursuant to 15 U.S.C § 1117.

<u>**COUNT II**</u>

**COMMON LAW UNFAIR COMPETITION**

90.    LP incorporates the preceding paragraphs as though fully set forth herein.

91.    Defendant's explicit and implicit promotional claims about LP's siding products are literally and impliedly false and/or deceptively misleading.

92.    Defendant's explicit and implicit claims about its fiber cement siding products are also literally and impliedly false and/or deceptively misleading.

93.    Defendant's foregoing acts constitute unfair competition and infringement of LP's common law rights for which LP has no adequate remedy at law.

94. To the extent that this Court determines that there is an adequate remedy at law, LP has been damaged in an amount to be determined at trial, plus pre-judgment and post- judgment interest, attorney fees (if available), expenses, and costs.

95. LP is entitled to punitive damages because Defendant's conduct was intentional, willful, malicious, or made with reckless disregard for the rights of others.

96. Defendant's acts as alleged herein were committed with the intent to deceive and defraud the public in order to gain an increase in its sales, customer base, and share in the exterior siding and building materials market and/or eliminate LP from the exterior siding and building materials market.

## COUNT III

### TENNESSEE CONSUMER PROTECTION ACT VIOLATIONS

97. LP incorporates the preceding paragraphs as though fully set forth herein.

98. Defendant's statement, actions and/or omissions constitute unfair and/or deceptive practice in violation of the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101 *et seq.*, including, but not limited to:

- Representing that goods or services have sponsorships, approval, characteristics, ingredients, uses, benefits or quantities that they do not have (Tenn. Code Ann. § 47-18-104(5));

- Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another (Tenn. Code Ann. § 47-18-104(7));

- Disparaging the goods, services or business of another by false or misleading representations of fact (Tenn. Code Ann. § 47-18-104(8)); and

- Using statements or illustrations in any advertisement which create a false impression of the grade, quality, quantity, make, value, age, size, color, usability or origin of the goods offered in such a manner that later, on the disclosure of the true facts, there is a likelihood that the buyer may be switched from the advertised goods or services to other goods or services (Tenn. Code Ann. § 47-18-104(21)).

16

99.    LP has suffered an ascertainable loss of money and market share as a result of the use or employment by Defendant of the aforementioned unfair or deceptive acts or practices.

100.    Defendant's acts are and were willful and knowing, thus entitling LP to all available remedies pursuant to the Tennessee Consumer Protection Act, including, but not limited to, preliminary and permanent injunctive relief; LP's damages; Defendant's profits; treble damages; attorney fees; expenses; costs; pre-judgment and post-judgment interest; and other equitable relief.

## COUNT IV

### TORTIOUS INTERFERENCE WITH EXISTING AND PROSPECTIVE ECONOMIC RELATIONS

101.    LP incorporates the preceding paragraphs as though fully set forth herein.

102.    LP possessed existing relationships with customers of its siding products.

103.    LP also has identifiable classes of potential customers of its siding products that includes at least distributors, retailers, subcontractors, contractors, and end consumers.

104.    Defendant had knowledge of the aforementioned relationships and identifiable class of potential customers.

105.    Defendant intended to and, upon information and belief, has caused termination of business with LP's existing customers of its siding products.

106.    Defendant intended to and, upon information and belief, has caused prospective business relationships not to be created with potential customers of its siding products.

107.    Defendant's false and/or deceptively misleading statements including but not limited to those in the Offending Websites, Offending Flier, and other similar documents and things are an improper means of advertising and promoting Defendant's fiber cement siding and increasing its market share.

108.     As a direct and proximate result of Defendant's wrongful actions with LP's, LP has been damaged in an amount to be determined at trial, plus pre-judgment and post-judgment interest, attorney fees, expenses, and costs.

## VI.     REQUEST FOR RELIEF

Wherefore, LP requests the following relief:

1.     Entry of judgment in favor of LP and against Defendant as to each of the above Counts;

2.     Awarded LP all relief to which it is entitled under the Lanham Act; TENN. CODE ANN. §§ 47-18-101 *et seq.*; and Tennessee common law;

3.     Entry of a preliminary and permanent injunction that enjoins Defendant, its officers, agents, servants, employees, and attorneys, and any other persons who are in active concert or participation with any of the foregoing, from continued publication of the Offending Websites, Offending Flier, and similar documents and things;

4.     Entry of a preliminary and permanent injunction that enjoins Defendant, its officers, agents, servants, employees, and attorneys, and any other persons who are in active concert or participation with any of the foregoing, from continuing to state and/or imply that LP's siding products are more susceptible and/or vulnerable to pest damage (including individually or collectively, woodpeckers and/or termites) than Defendant's siding products;

5.     Entry of a preliminary and permanent injunction that enjoins Defendant, its officers, agents, servants, employees, and attorneys, and any other persons who are in active concert or participation with any of the foregoing, from continuing to state that LP's siding products are more difficult to maintain than Defendant's siding products;

6.     Entry of a preliminary and permanent injunction that enjoins Defendant, its officers, agents, servants, employees, and attorneys, and any other persons who are in active concert or participation with any of the foregoing, from continuing to state that LP's siding products are more susceptible and/or vulnerable to water or moisture damage than Defendant's siding products;

7.     Entry of an order that mandates Defendant, its officers, agents, servants, employees, and attorneys, and any other persons who are in active concert or participation with any of the foregoing, shall destroy all copies of the Offending Websites, Offending Flier, and similar documents and things;

8.     Entry of an order that mandates Defendant publish and distribute corrective advertising (including, but not limited to, on its websites and in journals where it has advertised, or sponsored studies were published) to reduce the effects of the literally false or impliedly false and/or deceptively misleading statements regarding fiber cement siding products and LP's siding products;

9.     Determination by the Court that Defendant's acts are deemed exceptional under 15 U.S.C. § 1117;

10.    Entry of an award in favor of LP and against Defendant for monetary damages based on Defendant's profits, LP's damages, treble damages, punitive damages, reasonable attorney fees, litigation expenses, costs, prejudgment interest, and post-judgment interest; and

11.    Entry and award of such other and further relief the Court deems just and proper.

## VII.    <u>JURY DEMAND</u>

LP requests trial by jury for all issues, claims, and defenses so triable.

Respectfully submitted,

/s/ Samuel F. Miller
Samuel F. Miller (BPR No. 022936)
Nicholas R. Valenti (BPR No. 035420)
A. Grace Van Dyke James (BPR No. 035667)
MILLER LEGAL PARTNERS PLLC
Fifth Third Center – Suite 2000
424 Church Street
Nashville, TN 37219
Telephone/Fax: (615) 988.9011
Email: Smiller@millerlegalpartners.com
       Nvalenti@millerlegalpartners.com
       Gjames@millerlegalpartners.com

*Attorneys for Plaintiff Louisiana-Pacific Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of November 2018, the foregoing document was served via email upon the following:

Tony Swafford
Rocky King
Maia T. Woodhouse
ADAMS & REESE LLP
Fifth Third Center
424 Church Street, Suite 2700
Nashville, Tennessee 37219
Tel: (615) 259-1450
Fax: (615) 259-1470
Email: tony.swafford@arlaw.com
       rocky.king@arlaw.com
       maia.woodhouse@arlaw.com

Adam Massey
ADAMS & REESE LLP
LyondellBasell Tower
1221 McKinney, Suite 4400
Houston, TX 77010
Tel: 713.652.5151
Email: adam.massey@arlaw.com

Brian T. Boyd
William M. Leech III
LAW OFFICE OF BRIAN T. BOYD
214 Overlook Circle, Suite 275
Brentwood, Tennessee 37027
Tel: (615) 371-6119
Fax: (615) 523-2595
Email: brian@boydlegal.co
       will@boydlegal.co

Tara L. Swafford
THE SWAFFORD LAW FIRM, PLLC
207 Third Avenue North
Franklin, Tennessee 37064
Tel: (615) 599-8406
Fax: (615) 807-2355
Email: tara@swaffordlawfirm.com

/s/ Samuel F. Miller
Samuel F. Miller

20



Request a Sample

# THE UGLY TRUTH ABOUT OSB SIDING

No matter how it is treated or processed, it still acts like wood. Don't be fooled – weather can ravage it, water can warp it and fire can burn it to a crisp. Put your trust in the uncompromising performance of James Hardie® fiber cement siding.

OSB SIDING     VS     JAMES HARDIE SIDING

**PESTS LOVE IT**

Subject to damage caused by woodpeckers, termites and other pests that can harm wood.

**WAY TOO TOUGH**

Our fiber cement holds no appeal for woodpeckers, termites and other pests.





**NATURAL FUEL FOR FIRE**

Can burn, putting your customer's homes at greater risk for fire damage

**FIRE RESISTANT**

Won't burn and is recognized by fire departments nationwide.*

Susceptible to water absorption, which can lead to expansion, buckling or edge checking.**

Uniquely formulated to resist the effects of water absorption; also resists mold damage.

**WON'T WEATHER WELL**

OSB siding painted by 3rd party pre-finishers can show loss of paint after extended exposure to sunlight.***

**BEAUTY THAT LASTS**

Our ColorPlus® Technology provides a more durable finish and keeps its good looks longer.

## JAMES HARDIE® FIBER CEMENT SIDING PROTECTS YOUR HOMES AND REPUTATION

Every home deserves the authentic design and uncompromising performance of North America's #1 brand of siding. James Hardie siding is made of the purest, highest quality ingredients for a specific purpose: to resist the long-term effects of weather, moisture, fire and pests that can ravage engineered wood siding. And only our siding is specifically Engineered for Climate® to perform beautifully, despite what nature brings.

**BEWARE OF WARRANTIES THAT DON'T COVER REAL WORLD PROBLEMS**
Some engineered wood siding warranties do not cover swelling or edge checking, problems they acknowledge occur over time with wood products in response to changes in weather. James Hardie gives you unprecedented peace of mind with our non-prorated 30-year substrate siding limited warranty. We stand behind our siding 100% for a full 30 years.

**UNRIVALED SUPPORT GIVES YOUR BUSINESS A COMPETITIVE EDGE**
James Hardie stays out in front with next-generation product innovations that can set your homes apart and help strengthen your reputation. And our sales force's unique personalized support, combined with easy, round-the-clock access to James Hardie installation specialists, is designed to make you the standard for excellence in your market. In our ongoing commitment to be your best possible resource, our contractor and builder programs offer unmatched business-building benefits.

# REQUEST A SAMPLE

To see the true difference between OSB and
James Hardie® siding, choose up to 3 samples
in your favorite hues from our designer-curated
ColorPlus® Technology color palette.

Choose Samples

*James Hardie siding complies with ASTM E136 as a noncombustible cladding and is recognized by fire departments

across the U.S. including Marietta, GA, Flagstaff, AZ and Orange County, CA. Fiber cement fire resistance does not

extend to applied paints or coatings, which may be damaged or char when exposed to flames.

**Representation of engineered wood product buckling; improper installation may have been a contributing factor.

***Representation of prefinished engineered wood after the equivalent of 12 years of solar exposure per ASTM G90.

| PRODUCT SPECS | INSTALLATION | EXPLORE | PRO SUPPORT |
|---|---|---|---|
| HardiePlank® Lap Siding | Browse All | HardieZone | Continuing Education |
| HardieShingle® Panels | Installation Instructions | 100% Hardie | Installation |
| HardiePanel® Vertical Siding | Best Practices | Sustainability | Request a Sample |
| HardieTrim® Boards & Moulding | Clearance Requirements | HardieDesign Contest | Dealer Locator |
| HardieSoffit® Panels | Knowledge Base | | Gov Reports & Resource Center |
| Artisan® by James Hardie | Technical Bulletins | | Newsletter Sign-Up |
| Reveal® Panel System | Warranties | | Technical Service Request |
| HardieBacker® Boards | | | Submit a Claim |
| HardieWrap® Weather Barrier | | | |

**ABOUT US**

**SEARCH INSTALL & PRODUCT INFO**

Contact Us

Our Company                    Search

News

Privacy Policy                **SHORTCUTS**

Terms & Conditions           HardieLink

Contractor Alliance Program

Silica Resource Center

JamesHardie.com

Careers

JHinsite.com

**TRADEMARKS**

© 2018 James Hardie Building Products Inc. All Rights Reserved.

Privacy & Terms

**NEED ANSWERS?** 1-888-J-HARDIE (1-888-542-7343)

Download Catalog

# NO WOOD IS GOOD



# THE UGLY TRUTH ABOUT ENGINEERED WOOD SIDING

No matter how it is treated or processed, it still acts like wood. Don't be fooled – weather can ravage it, water can warp it and fire can burn it to a crisp. Put your trust in the uncompromising performance of James Hardie® fiber cement siding.

ENGINEERED WOOD SIDING        VS        JAMES HARDIE SIDING

**PESTS LOVE IT**

Subject to damage caused by woodpeckers, termites and other pests that can harm wood.

**WAY TOO TOUGH**

Our fiber cement holds no appeal for woodpeckers, termites and other pests.



**NATURAL FUEL FOR FIRE**

Can burn, putting your customer's homes at greater risk for fire damage

**FIRE RESISTANT**

Won't burn and is recognized by fire departments nationwide.*

**SOAKS UP TROUBLE**

Susceptible to water absorption, which can lead to expansion, buckling or edge checking.**

**WATER RESISTANT**

Uniquely formulated to resist the effects of water absorption; also resists mold damage.

**WON'T WEATHER WELL**

OSB siding painted by 3rd party pre-finishers can show loss of paint after extended exposure to sunlight.***

**BEAUTY THAT LASTS**

Our ColorPlus® Technology provides a more durable finish and keeps its good looks longer.

## JAMES HARDIE® FIBER CEMENT SIDING PROTECTS YOUR HOMES AND REPUTATION

Every home deserves the authentic design and uncompromising performance of North America's #1 brand of siding. James Hardie siding is made of the purest, highest quality ingredients for a specific purpose: to resist the long-term effects of weather, moisture, fire and pests that can ravage engineered wood siding. And only our siding is specifically Engineered for Climate® to perform beautifully, despite what nature brings.



**BEWARE OF WARRANTIES THAT DON'T COVER REAL WORLD PROBLEMS**
Some engineered wood siding warranties do not cover swelling or edge checking, problems they acknowledge occur over time with wood products in response to changes in weather. James Hardie gives you unprecedented peace of mind with our non-prorated 30-year substrate siding limited warranty. We stand behind our siding 100% for a full 30 years.



**UNRIVALED SUPPORT GIVES YOUR BUSINESS A COMPETITIVE EDGE**
James Hardie stays out in front with next-generation product innovations that can set your homes apart and help strengthen your reputation. And our sales force's unique personalized support, combined with easy, round-the-clock access to James Hardie installation specialists, is designed to make you the standard for excellence in your market. In our ongoing commitment to be your best possible resource, our contractor and builder programs offer unmatched business-building

benefits.

# DOWNLOAD THE PRODUCT CATALOG

Fill out the form below to receive the Product Catalog and see the full range of James Hardie products available in your area.

First Name *                              Last Name *

Email Address *

Company Name *

Street Address *

City *                                    State *

Zip Code *                                Role *

                                          Select

☐ I agree I have read the **Terms & Conditions** and **Privacy Policy**

*Submit*

*James Hardie siding complies with ASTM E136 as a noncombustible cladding and is recognized by fire departments across the U.S. including Marietta, GA, Flagstaff, AZ and Orange County, CA. Fiber cement fire resistance does not extend to applied paints or coatings, which may be damaged or char when exposed to flames.

**Representation of engineered wood product buckling; improper installation may have been a contributing factor.

***Representation of prefinished engineered wood after the equivalent of 12 years of solar exposure per ASTM G90.

**PRODUCT SPECS**

HardiePlank® Lap Siding

HardieShingle® Panels

HardiePanel® Vertical Siding

HardieTrim® Boards & Moulding

HardieSoffit® Panels

Artisan® by James Hardie

Reveal® Panel System

HardieBacker® Boards

HardieWrap® Weather Barrier

**INSTALLATION**

Browse All

Installation Instructions

Best Practices

Clearance Requirements

Knowledge Base

Technical Bulletins

Warranties

**EXPLORE**

HardieZone

100% Hardie

Sustainability

HardieDesign Contest

**PRO SUPPORT**

Continuing Education

Installation

Request a Sample

Dealer Locator

Gov Reports & Resource Center

Newsletter Sign-Up

Technical Service Request

Submit a Claim

**ABOUT US**

Contact Us

Our Company

News

Privacy Policy

Terms & Conditions

**SEARCH INSTALL & PRODUCT INFO**

Search

**SHORTCUTS**

HardieLink

Contractor Alliance Program

Silica Resource Center

JamesHardie.com

Careers

JHinsite.com

**TRADEMARKS**

**FOLLOW JAMES HARDIE**

© 2018 James Hardie Building Products Inc. All Rights Reserved.

Privacy & Terms

**NEED ANSWERS?** 1-888-J-HARDIE (1-888-542-7343)



Download Catalog

# NO WOOD IS GOOD



# THE UGLY TRUTH ABOUT ENGINEERED WOOD SIDING

No matter how it is treated or processed, it still acts like wood. Don't be fooled – weather can ravage it, water can warp it and fire can burn it to a crisp. Put your trust in the uncompromising performance of James Hardie® fiber cement siding.

| ENGINEERED WOOD SIDING | VS | JAMES HARDIE SIDING |
| --- | --- | --- |
| **PESTS LOVE IT** | | **WAY TOO TOUGH** |
| Subject to damage caused by woodpeckers, termites and other pests that can harm wood. | | Our fiber cement holds no appeal for woodpeckers, termites and other pests. |

Case 3:18-cv-00447   Document 331   Filed 11/01/18   Page 32 of 90 PageID #: 14721



**NATURAL FUEL FOR FIRE**

Can burn, putting your customer's homes at greater risk for fire damage

**FIRE RESISTANT**

Won't burn and is recognized by fire departments nationwide.*

**SOAKS UP TROUBLE**

Susceptible to water absorption, which can lead to expansion, buckling or edge checking.**

**WATER RESISTANT**

Uniquely formulated to resist the effects of water absorption; also resists mold damage.

**WON'T WEATHER WELL**

OSB siding painted by 3rd party pre-finishers can show loss of paint after extended exposure to sunlight.***

**BEAUTY THAT LASTS**

Our ColorPlus® Technology provides a more durable finish and keeps its good looks longer.

## JAMES HARDIE® FIBER CEMENT SIDING PROTECTS YOUR HOMES AND REPUTATION

Every home deserves the authentic design and uncompromising performance of North America's #1 brand of siding. James Hardie siding is made of the purest, highest quality ingredients for a specific purpose: to resist the long-term effects of weather, moisture, fire and pests that can ravage engineered wood siding. And only our siding is specifically Engineered for Climate® to perform beautifully, despite what nature brings.



**BEWARE OF WARRANTIES THAT DON'T COVER REAL WORLD PROBLEMS**
Some engineered wood siding warranties do not cover swelling or edge checking, problems they acknowledge occur over time with wood products in response to changes in weather. James Hardie gives you unprecedented peace of mind with our non-prorated 30-year substrate siding limited warranty. We stand behind our siding 100% for a full 30 years.



**UNRIVALED SUPPORT GIVES YOUR BUSINESS A COMPETITIVE EDGE**
James Hardie stays out in front with next-generation product innovations that can set your homes apart and help strengthen your reputation. And our sales force's unique personalized support, combined with easy, round-the-clock access to James Hardie installation specialists, is designed to make you the standard for excellence in your market. In our ongoing commitment to be your best possible resource, our contractor and builder programs offer unmatched business-building

Case 3:18-cv-00447    Document 331    Filed 11/01/18    Page 34 of 90 PageID #: 14723

benefits.

# DOWNLOAD THE PRODUCT CATALOG

Fill out the form below to receive the Product Catalog and see the full range of James Hardie products available in your area.

First Name *

Last Name *

Email Address *

Company Name *

Street Address *

City *

State *

Zip Code *

Role *

Select

☐ I agree I have read the Terms & Conditions and Privacy Policy

*Submit*

*James Hardie siding complies with ASTM E136 as a noncombustible cladding and is recognized by fire departments across the U.S. including Marietta, GA, Flagstaff, AZ and Orange County, CA. Fiber cement fire resistance does not extend to applied paints or coatings, which may be damaged or char when exposed to flames.

**Representation of engineered wood product buckling; improper installation may have been a contributing factor.

***Representation of prefinished engineered wood after the equivalent of 12 years of solar exposure per ASTM G90.

**PRODUCT SPECS**

HardiePlank® Lap Siding

HardieShingle® Panels

HardiePanel® Vertical Siding

HardieTrim® Boards & Moulding

HardieSoffit® Panels

Artisan® by James Hardie

Reveal® Panel System

HardieBacker® Boards

HardieWrap® Weather Barrier

**INSTALLATION**

Browse All

Installation Instructions

Best Practices

Clearance Requirements

Knowledge Base

Technical Bulletins

Warranties

**EXPLORE**

HardieZone

100% Hardie

Sustainability

HardieDesign Contest

**PRO SUPPORT**

Continuing Education

Installation

Request a Sample

Dealer Locator

Gov Reports & Resource Center

Newsletter Sign-Up

Technical Service Request

Submit a Claim

**ABOUT US**

Contact Us

Our Company

News

Privacy Policy

Terms & Conditions

**SEARCH INSTALL & PRODUCT INFO**

Search

**SHORTCUTS**

HardieLink

Contractor Alliance Program

Silica Resource Center

JamesHardie.com

Careers

JHinsite.com

**TRADEMARKS**

**FOLLOW JAMES HARDIE**

© 2018 James Hardie Building Products Inc. All Rights Reserved.

Privacy & Terms

**NEED ANSWERS?** 1-888-J-HARDIE (1-888-542-7343)

Case 3:18-cv-00447   Document 331   Filed 11/01/18   Page 36 of 90 PageID #: 14725

SAFETY DATA SHEET

| Section 1.  Identification | |
|---|---|
| Product Identifier: | **Exterior Fiber-Cement (Medium Density)** – Includes all Generation 6 HZ5 and HZ10 products with the following product names: HardiePlank® lap siding, HardiePanel® vertical siding, HardieSoffit® panel, HardieSoffit®, Beaded Porch Panel, HardieShingle® siding, HardieShingle® notched panels, HardieShingle® individual shingles, Hardie® Reveal ™ Panel, 7/16" HardieTrim® boards |
| Manufacturer Name, Address and Phone Number: | James Hardie Building Products<br>231 S. LaSalle Street, Suite 2000<br>Chicago, IL 60604<br>1-800-942-7343 (1-800-9HARDIE) |
| Emergency Phone Number: | 1-800-942-7343 (1-800-9HARDIE) |
| Recommended Use: | Exterior Fiber-Cement (Medium Density) is used as an external wall cladding |
| Restrictions on Use: | None known |
| **Section 2.  Hazards Identification** | |
| GHS Classification: | Carcinogenity, Category 1A<br>Target Organ Systemic Toxicity Repeated Exposure, Category 1 |
| GHS Label Element(s):<br>Symbol |  |
| Signal Word | DANGER |
| Hazard Statement(s) | May cause cancer if dust from product is inhaled<br><br>Causes damage to lungs and respiratory system through prolonged or repeated inhalation of dust from product |
| Precautionary Statement(s) | Obtain special instructions before use.  Do not handle until all safety precautions have been read and understood.  Do not breathe dust from product.  Wash hands and face thoroughly after handling.  Use personal protective equipment as required.  If exposed or concerned:  Get medical advice.  If shortness of breath or other health concerns develop after exposure to dust from the product, seek medical attention.  Dispose of product in accordance with local, state and national regulations.  If there are no applicable regulations, dispose of in a secure landfill, or in a way that will not expose others to dust. |

| Section 3.  Composition / Information on Ingredients | | |
|---|---|---|
| CAS# | Chemical Ingredient | % |
| 14808-60-7 | Crystalline Silica (Quartz) | 15-45% |
| 65997-15-1 | Calcium Silicate (Hydrate) | 35-65% |

Case 3:18-cv-00447   Document 331   Filed 11/01/18   Page 37 of 90 PageID #: 14726

| 471-34-1 | Calcium Carbonate | <30% |
|---|---|---|
| N/A | Calcium Aluminum Silicate (Hydrate) | <20% |
| 9004-34-6 | Cellulose | <15% |
| 1333-86-4 | Carbon Black | <1% |

| Section 4. First Aid Measures | |
|---|---|
| Inhalation | Acute effects – Dust may cause irritation of the nose, throat and airways, resulting in coughing and sneezing. Certain susceptible individuals may experience wheezing (spasms of the bronchial airways) upon inhaling dust during cutting, rebating, drilling, routing, sawing, crushing or otherwise abrading fiber cement, and when cleaning up, disposing of or moving the dust. |
| | Chronic effects – Repeated or prolonged over exposures to crystalline silica can cause silicosis (scarring of the lung) and increases the risk of bronchitis, tuberculosis, lung cancer, renal disease, and scleroderma (a disease affecting the connective tissue of the skin, joints, blood vessels, and internal organs.) Some studies suggest that cigarette smoking increases the risk of silicosis, bronchitis and lung cancer in persons also exposed to crystalline silica. |
| | Acute silicosis – A sub-chronic disease associated with acute, massive silica exposure, is a rapidly progressive, incurable lung disease that is typically fatal. Symptoms include, but are not limited to, shortness of breath, cough, fever, weight loss and chest pain. Such exposure may cause pneumoconiosis and pulmonary fibrosis. |
| | Required treatment – If inhalation of dust occurs, remove to fresh air. If shortness of breath or wheezing develops, seek medical attention. |
| Skin | Dust may cause irritation of the skin from friction but cannot be absorbed through intact skin.<br><br>If skin contact occurs, wash with mild soap and water. Contact physician if irritation persists or later develops. |
| Eyes | Dust may irritate the eyes from mechanical abrasion causing watering or redness.<br><br>If eye contact occurs, remove contact lenses (if applicable). Flush with running water or saline for at least 15 minutes. Seek medical attention if redness persists or if visual changes occur. |
| Ingestion | Ingestion is unlikely under normal conditions of use, but swallowing the dust from the product may result in irritation or damage to the mouth and gastrointestinal tract due to alkalinity of dust.<br><br>If ingestion occurs, dilute by drinking large amounts of water. Do |

| | not induce vomiting. Seek medical attention. If unconscious, loosen tight clothing and lay the person on his/her left side. Give nothing by mouth to an individual who is not alert and conscious. |
|---|---|
| **Section 5. Fire-Fighting Measures** | |
| James Hardie® fiber-cement products are neither flammable nor explosive | |
| Suitable extinguishing techniques: | Appropriate extinguishing techniques for surrounding fire should be used. |
| Fire-fighting equipment: | Fire fighting personnel should wear normal protective equipment and positive self-contained breathing apparatus. |
| Special hazards arising from the substance or mixture: | James Hardie ® fiber-cement products are neither flammable nor explosive. Hazardous reactions will not occur under normal conditions. Fight fire with normal precautions from a reasonable distance. |
| **Section 6. Accidental Release Measures** | |
| Emergency procedures: | No special precautions are necessary in the event of an accidental release. The following precautions apply to spills or releases of dust generated during cutting, rebating, drilling, routing, sawing, crushing or otherwise abrading fiber cement. |
| Protective equipment: | Good housekeeping practices are necessary for cleaning up areas where spills or leaks have occurred. Take measures to either eliminate or minimize the creation of dust. Respirable dust and silica levels should be monitored regularly.<br><br>Wherever possible, practices likely to generate dust should be controlled with engineering such as local exhaust ventilation, dust suppression through containment (e.g. wetting loose dust), enclosure, or covers.<br><br>Use respiratory protection as described in Section 8. |
| Proper methods of containment and clean-up: | A fine water spray should be used to suppress dust when sweeping (dry sweeping should not be attempted). Vacuuming with an industrial vacuum cleaner outfitted with a high-efficiency particulate (HEPA) filter is preferred to sweeping. Dispose of product in accordance with local, state and national regulations. If there are no applicable regulations, dispose of in a secure landfill, or in a way that will not expose others to dust. |
| **Section 7. Handling and Storage** | |
| Precautions of safe handling and storage: | Fiber-cement boards in their intact state do not present a health hazard. The controls below apply to dust generated from the boards by cutting, rebating, drilling, routing, sawing, crushing or otherwise abrading fiber cement, and when cleaning up, disposing of or moving the dust. |

|  | James Hardie® recommended best practices for handling fiber-cement:<br>Keep exposure to dust as low as reasonably possible. Respirable crystalline silica limits are specified by OSHA and MSHA and identified in Section 8 of this MSDS. Exposure to respirable (fine) silica dust depends on a variety of factors, including activity rate (e.g. cutting rate), method of handling (e.g. electric shears), environmental conditions (e.g. weather conditions, workstation orientation) and control measures used.<br><br>Wherever possible, practices likely to generate dust should be carried out in well ventilated areas (e.g. outside). The work practices and engineering controls set out in Section 8 should be followed to reduce silica exposures.<br><br>Keep away from reactive products. Do not store near food, beverages or smoking materials. Avoid spilling and creating dust. Maintain appropriate dust controls during handling. Use appropriate respiratory protection during handling as described in Section 8. |
|---|---|
| Incompatibilities: | Hydrofluoric acid will dissolve silica and can generate silicon tetrafluoride, a corrosive gas.  Contact with strong oxidizing agents such as fluorine, boron trifluoride, chlorine trifluoride, manganese trifluoride or oxygen difluoride may cause fires and /or explosions. Furthermore, limestone is incompatible with acids and ammonium salts. |

**Section 8.  Exposure Controls / Personal Protection**

OSHA Permissible Exposure Standards (PEL): Exposures shall not exceed an 8-hour time weighted average (TWA) limit as stated in 29 CFR 1910.1000 Table Z-3 for mineral dusts, expressed in million particles per cubic feet (Mppcf) and/or milligrams per cubic meter ($mg/m_3$). The American Conference of Governmental Industrial Hygienists Threshold Limit Values (TLV are that organization's recommended exposure limits based on an 8-hour TWA.

|  | TLV $mg/m^3$ | PEL Mppsf | PEL $mg/m^3$ |
|---|---|---|---|
| Crystalline Silica (Quartz) | 0.025 $mg/m^3$ | 250 | 10 $mg/m^3$ |
| (Respirable) | — | %SiO + 5 | %SiO + 2 |
| Quartz (Total Dust) | — | — | 30 $mg/m^3$ |
|  |  |  | %SiO + 2 |
| Calcium Carbonate (Total Dust) | 10 $mg/m^3$ | — | 15 $mg/m^3$ |
| (Respirable) | — | — | 5 $mg/m^3$ |
| Calcium Silicate (Total Dust) | — | — | 15 $mg/m^3$ |
| (Respirable) | — | — | 5 $mg/m^3$ |
| Nuisance Dust (Not Otherwise Specified) (Total Dust) | 10 $mg/m^3$(inhalable) | 50 | 15 $mg/m^3$ |
| (Respirable) | 3 $mg/m^3$ | 15 | 5 $mg/m^3$ |
| Cellulose (Total) | — | — | 15 $mg/m^3$ |
| (Respirable) | — | — | 5 $mg/m^3$ |
| Carbon Black | 3.5 $mg/m^3$ | — | 3.5 $mg/m^3$ |

**231 S. LaSalle Street, Suite 2000**
**Chicago, IL 60604**

| | |
|---|---|
| **Other limits recommended**:  The National Institute of Occupational Safety and Health (NIOSH) also has a Recommended Exposure Limit (REL) of 0.05 mg/m$^3$ for respirable crystalline silica, based on a 10-hour time-weighted average. | |
| **Engineering Controls** | |
| Personal protection when handling products that may generate silica dust:  (1) follow James Hardie ® instructions and best practices to reduce or limit the release of dust; (2) warn others in the area to avoid the dust; (3) when using mechanical saw or high-speed cutting tools, work outdoors and use dust collection equipment, and (4) if no other dust controls are available, wear a NIOSH-approved dust mask or respirator (e.g. N95 dust mask).<br><br>During clean-up, use a well-maintained vacuum and filter appropriate for capturing fine (respirable) dust or use wet cleanup methods—never dry sweep. | |
| Cutting Outdoors | 1. Position cutting station so that wind will blow dust away from user or others in working area and allow for ample dust dissipation<br>2. Use one of the following methods based on the required cutting rate and job-site conditions:<br>BEST<br>• Score and snap using carbide-tipped scoring knife or utility knife<br>• Fiber-cement shears (electric or pneumatic)<br>BETTER<br>• Dust reducing circular saw equipped with Hardieblade $^{TM}$ saw blade and HEPA vacuum extraction<br>GOOD (for low to moderate cutting only)<br>• Dust reducing circular saw with Hardieblade $^{TM}$ saw blade |
| Cutting Indoors | • Cut only using score and snap method or with fiber-cement shears (manual, electric or pneumatic)<br>• Position cutting station in well-ventilated area to allow for dust dissipation |
| Sanding / Rebating / Drilling / Other Machining | If sanding, rebating, drilling or other machining is necessary, you should always wear a NIOSH-approved dust mask or respirator (e.g. N-95) and warn others in the immediate area. |
| Clean-Up | During clean-up of dust and debris, NEVER dry sweep as it may excite silica dust particles into the user's breathing area.  Instead, wet debris down with a fine mist to suppress dust during sweeping, or use a HEPA vacuum to collect particles. |
| Important Notes | 1. For maximum protection (lowest respirable dust production), James Hardie ® recommends always using "Best"-level cutting methods where feasible<br>2. NEVER use a power saw indoors |

| | |
|---|---|
| | 3. NEVER use a circular saw blade that does not carry the Hardieblade ™ saw blade trademark<br>4. NEVER dry sweep – use wet suppression methods or HEPA vacuum<br>5. NEVER use a grinder or continuous rim diamond blade for cutting<br>6. ALWAYS follow tool manufacturer's safety recommendations |

**Personal Protective Equipment**

- **Respiratory –** If respirators are selected, use and maintain in accordance with ANSI Standard (Z88.2) for particulate respirators. Select respirators based on the level of exposure to crystalline silica as measured by dust sampling. Use respirators that offer protection to the highest concentrations of crystalline silica if the actual concentrations are unknown. Put in place a respiratory protection and monitoring program that complies with MSHA or OSHA (e.g. 29CFR1910.134) standards, which include provisions for a user training program, respirator repair and cleaning, respirator fit-testing and other requirements. Comply with all other applicable federal and state laws.
- **Eye –** When cutting material, dust resistant safety goggles / glasses should be worn and used in compliance with ANSI Standard Z87.1 and applicable OSHA (e.g. 29CFR1910.133) standards.
- **Skin –** Loose comfortable clothing should be worn. Direct skin contact with dust and debris should be avoided by wearing long sleeved shirts and long trousers, a cap or hat, and gloves. Work clothes should be washed regularly.

## Section 9. Physical and Chemical Properties

Appearance and odor: Solid gray boards with varying dimensions according to product. Some product may have a surface coat of water-based acrylic paint or acrylic sealer

| | |
|---|---|
| Vapor Pressure: Not relevant | Flash Point: Not relevant |
| Specific Gravity: Not relevant | Autoignition Temperature: Not relevant |
| Flammability Limits: Not relevant | Volatility: Not relevant |
| Boiling Point: Not relevant | Solubility in water: Not relevant |
| Melting Point: Not relevant | Evaporation rate: Not applicable |

## Section 10. Stability and Reactivity

| | |
|---|---|
| Stability: | Crystalline silica and limestone are stable under ordinary conditions |
| Conditions to Avoid: | Excessive dust generation during storage and handling |
| Materials to Avoid: | Hydrofluoric acid will dissolve silica and can generate silicon tetrafluoride, a corrosive gas. Contact with strong oxidizing agents such as fluorine, boron trifluoride, chlorine trifluoride, manganese trifluoride or oxygen difluoride may cause fires and /or explosions. Furthermore, limestone is incompatible with acids and ammonium salts. |

## Section 11. Toxicological Information

| | |
|---|---|
| Routes of exposure: | Fiber-cement is not toxic in its intact form. The following applies to dust that may be generated during cutting, rebating, drilling, routing, sawing, crushing or otherwise abrading fiber cement. |

| | |
|---|---|
| Related symptoms: | Repeated and prolonged overexposures to dust containing crystalline silica can cause silicosis (scarring of the lung) and increases the risk of bronchitis, tuberculosis, lung cancer, renal disease and scleroderma (a disease affecting the connective tissue of the skin, joints, blood vessels and internal organs). Some studies suggest that cigarette smoking increases the risk of silicosis, bronchitis, and lung cancer in persons also exposed to crystalline silica. Acute silicosis is a rapidly progressive, incurable lung disease that is typically fatal. Symptoms include, but are not limited to: shortness of breath, cough, fever, weight loss and chest pain. Such exposure may cause pneumoconiosis and pulmonary fibrosis.<br><br>The following relates to health effects of cellulose: Based on limited animal research, it is possible that repeated chronic inhalation exposure to cellulose fiber dust over time may lead to inflammation and scarring of the lung in humans. Precautions taken for crystalline silica dust will protect against cellulose.<br><br>Medical conditions generally aggravated by exposure – Pulmonary function may be reduced by inhalation of respirable crystalline silica and / or cellulose.  If lung scarring occurs, such scarring could aggravate other lung conditions such as asthma, emphysema, pneumonia or restrictive lung diseases.  Lung scarring from crystalline silica may also increase risks to pulmonary tuberculosis.<br><br>Smoking – some studies suggest that cigarette smoking increases the risk of occupational respiratory diseases, including silica-related respiratory diseases. |
| Acute and chronic effects: | • Acute toxicity – not classified<br>• Skin corrosion / irritation – not classified<br>• Serious eye damage / irritation – not classified<br>• Respiratory or skin sensitization – not classified<br>• Germ cell mutagenicity – not classified<br>• Carcinogenity – may cause cancer if dust from product is inhaled<br>• Specific target organ toxicity (repeated exposure) – causes damage to lungs and respiratory system through prolonged or repeated inhalation of dust from product |
| Carcinogenity: | California Proposition 65 Warning:<br>　　　This product contains chemicals known to the State of California to cause cancer<br><br>International Agency for Research on Cancer (IARC):<br>　　　Crystalline silica inhaled in the forms of quartz or cristobalite from occupational sources is carcinogenic to humans<br><br>　　　Carbon black is possibly carcinogenic to humans |

| | The National Toxicology Program (NTP): |
|---|---|
| | NTP has concluded that respirable crystalline silica is a known human carcinogen |
| | LD50 (Silicon dioxide): |
| | Rat oral >22,500 mg / kg |
| | Mouse oral > 10,500 mg/kg |

**Section 12. Ecological Information**

There is a very limited amount of ecological data available on the effects of releases that may occur from this product being released into the environment. Clean up of the spilled product would not be expected to leave any hazardous material that could cause a significant adverse impact. There is a limited amount of ecological data available on crystalline silica, primarily because it is a naturally occurring mineral. An adequate representation of these data is beyond the scope of this document.

**Section 13. Disposal Considerations**

Dispose of material as inert, non-metallic mineral in conformance with local, state and federal regulations. Crystalline silica and limestone is not a RCRA hazardous waste.

**Section 14. Transport Information**

There are no special requirements for storage and transport

| UN No: | None allocated |
|---|---|
| Dangerous goods class: | None allocated |
| Hazchem code: | None allocated |
| Poisons schedule: | None allocated |
| Packing group: | Not applicable |
| Label: | Not a DOT hazardous material. Local regulations may apply |

| | |
|---|---|
| **Section 15. Regulatory Information** | |
| DOT hazard classification: | None |
| Placard requirement: | Not a DOT hazardous material. Local placarding regulations may apply |
| California Proposition 65: | **Warning: Airborne particles of respirable size of crystalline silica are known to the State of California to cause cancer.** |
| CERCLA hazardous substance (40CFR Part 302): | **Listed substance: No** **Unlisted substance: No** **Reportable quantity (RQ): None** **Characteristic(s): Not applicable** **RCRA waste number: Not applicable** |
| SARA. Title III. Sections 302 / 303 (40CFR part 355 – Emergency Planning and Notification): | **Extremely hazardous substance: No** |
| SARA. Title III. Section 311 / 312 (40CFR part 370 – Hazardous Chemical Reporting: Community Right-To-Know): | **Acute: Yes** **Chronic: Yes** **Fire: No** **Pressure: No** **Reactivity: No** |

| SARA. Title III. Section 313 (40CFR part 372 – Toxic Chemical Release Reporting: Community Right-To-Know | **Not a RCRA hazardous waste** |
|---|---|
| TSCA Inventory List: | **Yes** |
| TSCA 8(d): | **No** |
| Section 16. Other Information | |
| Prepared by Jeff Fry | **Issue Date: 06/01/15** |

---

Read label before use

**FIBER CEMENT**
Contains:
Crystalline Silica (quartz) 10-30%
Calcium Silicate (hydrate) 10-60%
Cellulose fiber<10%]

**DANGER**

May cause cancer if dust from product is inhaled.
Causes damage to lungs and respiratory system through prolonged or repeated inhalation of dust from product.

| Prevention | Response | | Disposal: |
|---|---|---|---|
| Refer to the product Safety Data Sheet before use. Do not handle until all safety precautions have been read and understood. Do not breathe dust from the product. Do not eat, drink or smoke when using this product. Wear personal protective equipment, as specified below. | Wash hands and face thoroughly after handling. If exposed or concerned: Get medical advice. If shortness of breath or other health concerns develop after exposure to dust from the product, seek medical attention. | Fiber cement is not a health hazard when handled or stored in its original, unaltered condition | Dispose of product in accordance with local, state and national regulations. If there are no applicable regulations, dispose of in a secure landfill, or in a way that will not expose others to dust. |

The hazard associated with fiber cement arises from the crystalline silica present in dust generated by activities such as cutting, rebating, drilling, routing, sawing, crushing, or otherwise abrading fiber cement, and when cleaning up, disposing of or moving dust. When doing any of these activities in a manner that generates dust: (1) follow James Hardie instructions and best practices to reduce or limit the release of dust; (2) warn others in the area to avoid dust; (3) work outdoors and use vacuum dust collection when using mechanical saws or other high speed cutting tools; (3) work outdoors and use appropriate vacuum dust collection when using mechanical saws or other high speed cutting tools and (4) wear a dust mask or respirator that meets applicable national regulations, as specified below.

During clean-up, use a well maintained vacuum and filter appropriate for capturing respirable fine dust or use wet cleanup methods - never dry sweep.

If using a dust mask or respirator, always use a NIOSH-approved dust mask or respirator (e.g., the N 95 dust mask).

**WARNING:** This product contains a chemical known to the State of California to cause cancer. For more information go to www.P65Warnings.ca.gov/product.

James Hardie Building Products, Inc.
231 S. LaSalle St., Suite 2000
Chicago, IL 60604 USA
1-888 JHARDIE
www.jameshardie.com
www.jhsafesite.com

This form has been prepared to meet current Federal OSHA hazard communication regulations and is offered without any warranty or guarantee of any type. James Hardie Building Products cannot control the use of its products, and therefore specifically disclaims liability and responsibility arising from the use, misuse and alteration of its products.

The information contained on this MSDS was produced without independent scientific or medical studies analyzing the effects of silica upon human health. The information contained herein is based upon scientific and other data James Hardie Building Products believes is valid and reliable and provides the basis for this MSDS. The information contained herein relates only to specific materials listed in the document. It does not address the effects of silica when used in combination with other materials or substances, or when used in other processes. Because conditions of use are beyond James Hardie Building Products control, the company makes no representation, guarantee or warranty of any kind in this MSDS, either express or implied, including the implied warranties of merchantability or fitness of the product for use for a particular purpose, and assumes no liability related to the information contained above.

James Hardie Building Products requires, as a condition of use of its products, that purchasers comply with all applicable federal, state, and local health and safety laws, regulations, orders, requirements, and strictly adhere to all instructions and warnings which accompany the product.

SAFETY DATA SHEET

| Section 1.  Identification | |
|---|---|
| Product Identifier: | **Exterior Fiber-Cement (Low Density)** – Includes all Generation 6 HZ5 and HZ10 products with the following product names: HardieTrim® board, HardieTrim® Fascia board, HardieTrim® Crown Moulding, HardieTrim® XLD, HardieTrim® Flex board, HardieTrim® Batten, HardieTrim® BHT, HardieTrim® 5/4 board |
| Manufacturer Name, Address and Phone Number: | James Hardie Building Products<br>231 S. LaSalle Street, Suite 2000<br>Chicago, IL 60604<br>1-800-942-7343 (1-800-9HARDIE) |
| Emergency Phone Number: | 1-800-942-7343 (1-800-9HARDIE) |
| Recommended Use: | Exterior Fiber-Cement (Low Density) is used as external wall cladding accessories |
| Restrictions on Use: | None known |

| Section 2.  Hazards Identification | |
|---|---|
| GHS Classification: | Carcinogenity, Category 1A<br>Target Organ Systemic Toxicity Repeated Exposure, Category 1 |
| GHS Label Element(s): Symbol |  |
| Signal Word | DANGER |
| Hazard Statement(s) | May cause cancer if dust from product is inhaled<br><br>Causes damage to lungs and respiratory system through prolonged or repeated inhalation of dust from product |
| Precautionary Statement(s) | Obtain special instructions before use.  Do not handle until all safety precautions have been read and understood.  Do not breathe dust from product.  Wash hands and face thoroughly after handling.  Use personal protective equipment as required.  If exposed or concerned:  Get medical advice.  If shortness of breath or other health concerns develop after exposure to dust from the product, seek medical attention.  Dispose of product in accordance with local, state and national regulations.  If there are no applicable regulations, dispose of in a secure landfill, or in a way that will not expose others to dust. |

| Section 3.  Composition / Information on Ingredients | | |
|---|---|---|
| CAS# | Chemical Ingredient | % |
| 14808-60-7 | Crystalline Silica (Quartz) | 15-30% |
| 65997-15-1 | Calcium Silicate (Hydrate) | 35-65% |

| 471-34-1 | Calcium Carbonate | <30% |
| N/A | Calcium Aluminum Silicate (Hydrate) | <20% |
| 9004-34-6 | Cellulose | <15% |
| 1333-86-4 | Carbon Black | <1% |

| Section 4.  First Aid Measures | |
|---|---|
| Inhalation | Acute effects – Dust may cause irritation of the nose, throat and airways, resulting in coughing and sneezing.  Certain susceptible individuals may experience wheezing (spasms of the bronchial airways) upon inhaling dust during cutting, rebating, drilling, routing, sawing, crushing or otherwise abrading fiber cement, and when cleaning up, disposing of or moving the dust. |
| | Chronic effects – Repeated or prolonged over exposures to crystalline silica can cause silicosis (scarring of the lung) and increases the risk of bronchitis, tuberculosis, lung cancer, renal disease, and scleroderma (a disease affecting the connective tissue of the skin, joints, blood vessels, and internal organs.)  Some studies suggest that cigarette smoking increases the risk of silicosis, bronchitis and lung cancer in persons also exposed to crystalline silica. |
| | Acute silicosis – A sub-chronic disease associated with acute, massive silica exposure, is a rapidly progressive, incurable lung disease that is typically fatal.  Symptoms include, but are not limited to, shortness of breath, cough, fever, weight loss and chest pain.  Such exposure may cause pneumoconiosis and pulmonary fibrosis. |
| | Required treatment – If inhalation of dust occurs, remove to fresh air.  If shortness of breath or wheezing develops, seek medical attention. |
| Skin | Dust may cause irritation of the skin from friction but cannot be absorbed through intact skin.

If skin contact occurs, wash with mild soap and water.  Contact physician if irritation persists or later develops. |
| Eyes | Dust may irritate the eyes from mechanical abrasion causing watering or redness.

If eye contact occurs, remove contact lenses (if applicable).  Flush with running water or saline for at least 15 minutes.  Seek medical attention if redness persists or if visual changes occur. |
| Ingestion | Ingestion is unlikely under normal conditions of use, but swallowing the dust from the product may result in irritation or damage to the mouth and gastrointestinal tract due to alkalinity of dust.

If ingestion occurs, dilute by drinking large amounts of water.  Do |

|  | not induce vomiting.  Seek medical attention.  If unconscious, loosen tight clothing and lay the person on his/her left side.  Give nothing by mouth to an individual who is not alert and conscious. |
|---|---|
| **Section 5.  Fire-Fighting Measures** | |
| James Hardie® fiber-cement products are neither flammable nor explosive | |
| Suitable extinguishing techniques: | Appropriate extinguishing techniques for surrounding fire should be used. |
| Fire-fighting equipment: | Fire fighting personnel should wear normal protective equipment and positive self-contained breathing apparatus. |
| Special hazards arising from the substance or mixture: | James Hardie ® fiber-cement products are neither flammable nor explosive.  Hazardous reactions will not occur under normal conditions.  Fight fire with normal precautions from a reasonable distance. |
| **Section 6.  Accidental Release Measures** | |
| Emergency procedures: | No special precautions are necessary in the event of an accidental release.  The following precautions apply to spills or releases of dust generated during cutting, rebating, drilling, routing, sawing, crushing or otherwise abrading fiber cement. |
| Protective equipment: | Good housekeeping practices are necessary for cleaning up areas where spills or leaks have occurred.  Take measures to either eliminate or minimize the creation of dust.  Respirable dust and silica levels should be monitored regularly.<br><br>Wherever possible, practices likely to generate dust should be controlled with engineering such as local exhaust ventilation, dust suppression through containment (e.g. wetting loose dust), enclosure, or covers.<br><br>Use respiratory protection as described in Section 8. |
| Proper methods of containment and clean-up: | A fine water spray should be used to suppress dust when sweeping (dry sweeping should not be attempted).  Vacuuming with an industrial vacuum cleaner outfitted with a high-efficiency particulate (HEPA) filter is preferred to sweeping.  Dispose of product in accordance with local, state and national regulations.  If there are no applicable regulations, dispose of in a secure landfill, or in a way that will not expose others to dust. |
| **Section 7.  Handling and Storage** | |
| Precautions of safe handling and storage: | Fiber-cement boards in their intact state do not present a health hazard.  The controls below apply to dust generated from the boards by cutting, rebating, drilling, routing, sawing, crushing or otherwise abrading fiber cement, and when cleaning up, disposing of or moving the dust. |

| | |
|---|---|
| | James Hardie® recommended best practices for handling fiber-cement: |
| | Keep exposure to dust as low as reasonably possible. Respirable crystalline silica limits are specified by OSHA and MSHA and identified in Section 8 of this MSDS. Exposure to respirable (fine) silica dust depends on a variety of factors, including activity rate (e.g. cutting rate), method of handling (e.g. electric shears), environmental conditions (e.g. weather conditions, workstation orientation) and control measures used. |
| | Wherever possible, practices likely to generate dust should be carried out in well ventilated areas (e.g. outside). The work practices and engineering controls set out in Section 8 should be followed to reduce silica exposures. |
| | Keep away from reactive products. Do not store near food, beverages or smoking materials. Avoid spilling and creating dust. Maintain appropriate dust controls during handling. Use appropriate respiratory protection during handling as described in Section 8. |
| Incompatibilities: | Hydrofluoric acid will dissolve silica and can generate silicon tetrafluoride, a corrosive gas. Contact with strong oxidizing agents such as fluorine, boron trifluoride, chlorine trifluoride, manganese trifluoride or oxygen difluoride may cause fires and /or explosions. Furthermore, limestone is incompatible with acids and ammonium salts. |

**Section 8. Exposure Controls / Personal Protection**

OSHA Permissible Exposure Standards (PEL): Exposures shall not exceed an 8-hour time weighted average (TWA) limit as stated in 29 CFR 1910.1000 Table Z-3 for mineral dusts, expressed in million particles per cubic feet (Mppcf) and/or milligrams per cubic meter ($mg/m_3$). The American Conference of Governmental Industrial Hygienists Threshold Limit Values (TLV are that organization's recommended exposure limits based on an 8-hour TWA.

| | TLV $mg/m^3$ | PEL Mppsf | PEL $mg/m^3$ |
|---|---|---|---|
| Crystalline Silica (Quartz) | 0.025 $mg/m^3$ | 250 | 10 $mg/m^3$ |
| (Respirable) | — | %SiO + 5 | %SiO + 2 |
| Quartz (Total Dust) | — | | 30 $mg/m^3$ |
| | | | %SiO + 2 |
| Calcium Carbonate (Total Dust) | 10 $mg/m^3$ | — | 15 $mg/m^3$ |
| (Respirable) | — | — | 5 $mg/m^3$ |
| Calcium Silicate (Total Dust) | — | — | 15 $mg/m^3$ |
| (Respirable) | — | — | 5 $mg/m^3$ |
| Nuisance Dust (Not Otherwise Specified) (Total Dust) | 10 $mg/m^3$(inhalable) | 50 | 15 $mg/m^3$ |
| (Respirable) | 3 $mg/m^3$ | 15 | 5 $mg/m^3$ |
| Cellulose (Total) | — | — | 15 $mg/m^3$ |
| (Respirable) | — | — | 5 $mg/m^3$ |
| Carbon Black | 3.5 $mg/m^3$ | — | 3.5 $mg/m^3$ |

| | |
|---|---|
| **Other limits recommended**: The National Institute of Occupational Safety and Health (NIOSH) also has a Recommended Exposure Limit (REL) of 0.05 mg/m$^3$ for respirable crystalline silica, based on a 10-hour time-weighted average. | |
| **Engineering Controls** | |
| Personal protection when handling products that may generate silica dust: (1) follow James Hardie ® instructions and best practices to reduce or limit the release of dust; (2) warn others in the area to avoid the dust; (3) when using mechanical saw or high-speed cutting tools, work outdoors and use dust collection equipment, and (4) if no other dust controls are available, wear a NIOSH-approved dust mask or respirator (e.g. N95 dust mask). During clean-up, use a well-maintained vacuum and filter appropriate for capturing fine (respirable) dust or use wet cleanup methods—never dry sweep. | |
| Cutting Outdoors | 1. Position cutting station so that wind will blow dust away from user or others in working area and allow for ample dust dissipation<br>2. Use one of the following methods based on the required cutting rate and job-site conditions:<br>BEST<br> • Score and snap using carbide-tipped scoring knife or utility knife<br> • Fiber-cement shears (electric or pneumatic)<br>BETTER<br> • Dust reducing circular saw equipped with Hardieblade $^{TM}$ saw blade and HEPA vacuum extraction<br>GOOD (for low to moderate cutting only)<br> • Dust reducing circular saw with Hardieblade $^{TM}$ saw blade |
| Cutting Indoors | • Cut only using score and snap method or with fiber-cement shears (manual, electric or pneumatic)<br>• Position cutting station in well-ventilated area to allow for dust dissipation |
| Sanding / Rebating / Drilling / Other Machining | If sanding, rebating, drilling or other machining is necessary, you should always wear a NIOSH-approved dust mask or respirator (e.g. N-95) and warn others in the immediate area. |
| Clean-Up | During clean-up of dust and debris, NEVER dry sweep as it may excite silica dust particles into the user's breathing area. Instead, wet debris down with a fine mist to suppress dust during sweeping, or use a HEPA vacuum to collect particles. |
| Important Notes | 1. For maximum protection (lowest respirable dust production), James Hardie ® recommends always using "Best"-level cutting methods where feasible<br>2. NEVER use a power saw indoors |

| | 3. NEVER use a circular saw blade that does not carry the Hardieblade ™ saw blade trademark<br>4. NEVER dry sweep – use wet suppression methods or HEPA vacuum<br>5. NEVER use a grinder or continuous rim diamond blade for cutting<br>6. ALWAYS follow tool manufacturer's safety recommendations |
|---|---|
| **Personal Protective Equipment** | |

- **Respiratory –** If respirators are selected, use and maintain in accordance with ANSI Standard (Z88.2) for particulate respirators. Select respirators based on the level of exposure to crystalline silica as measured by dust sampling. Use respirators that offer protection to the highest concentrations of crystalline silica if the actual concentrations are unknown. Put in place a respiratory protection and monitoring program that complies with MSHA or OSHA (e.g. 29CFR1910.134) standards, which include provisions for a user training program, respirator repair and cleaning, respirator fit-testing and other requirements. Comply with all other applicable federal and state laws.
- **Eye –** When cutting material, dust resistant safety goggles / glasses should be worn and used in compliance with ANSI Standard Z87.1 and applicable OSHA (e.g. 29CFR1910.133) standards.
- **Skin –** Loose comfortable clothing should be worn. Direct skin contact with dust and debris should be avoided by wearing long sleeved shirts and long trousers, a cap or hat, and gloves. Work clothes should be washed regularly.

## Section 9. Physical and Chemical Properties

Appearance and odor: Solid gray boards with varying dimensions according to product. Some product may have a surface coat of water-based acrylic paint or acrylic sealer

| | |
|---|---|
| Vapor Pressure: Not relevant | Flash Point: Not relevant |
| Specific Gravity: Not relevant | Autoignition Temperature: Not relevant |
| Flammability Limits: Not relevant | Volatility: Not relevant |
| Boiling Point: Not relevant | Solubility in water: Not relevant |
| Melting Point: Not relevant | Evaporation rate: Not applicable |

## Section 10. Stability and Reactivity

| | |
|---|---|
| Stability: | Crystalline silica and limestone are stable under ordinary conditions |
| Conditions to Avoid: | Excessive dust generation during storage and handling |
| Materials to Avoid: | Hydrofluoric acid will dissolve silica and can generate silicon tetrafluoride, a corrosive gas. Contact with strong oxidizing agents such as fluorine, boron trifluoride, chlorine trifluoride, manganese trifluoride or oxygen difluoride may cause fires and /or explosions. Furthermore, limestone is incompatible with acids and ammonium salts. |

## Section 11. Toxicological Information

| | |
|---|---|
| Routes of exposure: | Fiber-cement is not toxic in its intact form. The following applies to dust that may be generated during cutting, rebating, drilling, routing, sawing, crushing or otherwise abrading fiber cement. |

| | |
|---|---|
| Related symptoms: | Repeated and prolonged overexposures to dust containing crystalline silica can cause silicosis (scarring of the lung) and increases the risk of bronchitis, tuberculosis, lung cancer, renal disease and scleroderma (a disease affecting the connective tissue of the skin, joints, blood vessels and internal organs). Some studies suggest that cigarette smoking increases the risk of silicosis, bronchitis, and lung cancer in persons also exposed to crystalline silica. Acute silicosis is a rapidly progressive, incurable lung disease that is typically fatal. Symptoms include, but are not limited to: shortness of breath, cough, fever, weight loss and chest pain. Such exposure may cause pneumoconiosis and pulmonary fibrosis.<br><br>The following relates to health effects of cellulose: Based on limited animal research, it is possible that repeated chronic inhalation exposure to cellulose fiber dust over time may lead to inflammation and scarring of the lung in humans. Precautions taken for crystalline silica dust will protect against cellulose.<br><br>Medical conditions generally aggravated by exposure – Pulmonary function may be reduced by inhalation of respirable crystalline silica and / or cellulose.  If lung scarring occurs, such scarring could aggravate other lung conditions such as asthma, emphysema, pneumonia or restrictive lung diseases.  Lung scarring from crystalline silica may also increase risks to pulmonary tuberculosis.<br><br>Smoking – some studies suggest that cigarette smoking increases the risk of occupational respiratory diseases, including silica-related respiratory diseases. |
| Acute and chronic effects: | • Acute toxicity – not classified<br>• Skin corrosion / irritation – not classified<br>• Serious eye damage / irritation – not classified<br>• Respiratory or skin sensitization – not classified<br>• Germ cell mutagenicity – not classified<br>• Carcinogenicity – may cause cancer if dust from product is inhaled<br>• Specific target organ toxicity (repeated exposure) – causes damage to lungs and respiratory system through prolonged or repeated inhalation of dust from product |
| Carcinogenity: | California Proposition 65 Warning:<br>This product contains chemicals known to the State of California to cause cancer<br><br>International Agency for Research on Cancer (IARC):<br>Crystalline silica inhaled in the forms of quartz or cristobalite from occupational sources is carcinogenic to humans<br><br>Carbon black is possibly carcinogenic to humans |

| | The National Toxicology Program (NTP):<br>NTP has concluded that respirable crystalline silica is a known human carcinogen<br>LD50 (Silicon dioxide):<br>Rat oral >22,500 mg / kg<br>Mouse oral > 10,500 mg/kg |
|---|---|

**Section 12. Ecological Information**

There is a very limited amount of ecological data available on the effects of releases that may occur from this product being released into the environment. Clean up of the spilled product would not be expected to leave any hazardous material that could cause a significant adverse impact. There is a limited amount of ecological data available on crystalline silica, primarily because it is a naturally occurring mineral. An adequate representation of these data is beyond the scope of this document.

**Section 13. Disposal Considerations**

Dispose of material as inert, non-metallic mineral in conformance with local, state and federal regulations. Crystalline silica and limestone is not a RCRA hazardous waste.

**Section 14. Transport Information**

There are no special requirements for storage and transport

| UN No: | None allocated |
|---|---|
| Dangerous goods class: | None allocated |
| Hazchem code: | None allocated |
| Poisons schedule: | None allocated |
| Packing group: | Not applicable |
| Label: | Not a DOT hazardous material. Local regulations may apply |

| | |
|---|---|

**Section 15. Regulatory Information**

| DOT hazard classification: | None |
|---|---|
| Placard requirement: | Not a DOT hazardous material. Local placarding regulations may apply |
| California Proposition 65: | **Warning: Airborne particles of respirable size of crystalline silica are known to the State of California to cause cancer.** |
| CERCLA hazardous substance (40CFR Part 302): | **Listed substance: No**<br>**Unlisted substance: No**<br>**Reportable quantity (RQ): None**<br>**Characteristic(s): Not applicable**<br>**RCRA waste number: Not applicable** |
| SARA. Title III. Sections 302 / 303 (40CFR part 355 – Emergency Planning and Notification): | **Extremely hazardous substance: No** |
| SARA. Title III. Section 311 / 312 (40CFR part 370 – Hazardous Chemical Reporting: Community Right-To-Know): | **Acute: Yes**<br>**Chronic: Yes**<br>**Fire: No**<br>**Pressure: No**<br>**Reactivity: No** |

| SARA. Title III. Section 313 (40CFR part 372 – Toxic Chemical Release Reporting: Community Right-To-Know | **Not a RCRA hazardous waste** |
|---|---|
| TSCA Inventory List: | **Yes** |
| TSCA 8(d): | **No** |
| Section 16. Other Information | |
| Prepared by Jeff Fry | **Issue Date: 06/01/15** |

Read label before use

**FIBER CEMENT**
Contains:
Crystalline Silica (quartz) 10-30%
Calcium Silicate (hydrate) 10-60%
Cellulose fiber<10%]

**DANGER**

May cause cancer if dust from product is inhaled.
Causes damage to lungs and respiratory system through prolonged or repeated inhalation of dust from product.

| Prevention | Response | | Disposal: |
|---|---|---|---|
| Refer to the product Safety Data Sheet before use. Do not handle until all safety precautions have been read and understood.

Do not breathe dust from the product. Do not eat, drink or smoke when using this product. Wear personal protective equipment, as specified below. | Wash hands and face thoroughly after handling. If exposed or concerned: Get medical advice. If shortness of breath or other health concerns develop after exposure to dust from the product, seek medical attention. | Fiber cement is not a health hazard when handled or stored in its original, unaltered condition | Dispose of product in accordance with local, state and national regulations. If there are no applicable, regulations, dispose of in a secure landfill, or in a way that will not expose others to dust. |

The hazard associated with fiber cement arises from the crystalline silica present in dust generated by activities such as cutting, rebating, drilling, routing, sawing, crushing, or otherwise abrading fiber cement, and when cleaning up, disposing of or moving dust. When doing any of these activities in a manner that generates dust: (1) follow James Hardie instructions and best practices to reduce or limit the release of dust; (2) warn others in the area to avoid dust; (3) work outdoors and use vacuum dust collection when using mechanical saws or other high speed cutting tools; (3) work outdoors and use appropriate vacuum dust collection when using mechanical saws or other high speed cutting tools and (4) wear a dust mask or respirator that meets applicable national regulations, as specified below.

During clean-up, use a well maintained vacuum and filter appropriate for capturing respirable fine dust or use wet cleanup methods - never dry sweep.

If using a dust mask or respirator, always use a NIOSH-approved dust mask or respirator (e.g., the N 95 dust mask).

**WARNING:** This product contains a chemical known to the State of California to cause cancer. For more information go to www.P65Warnings.ca.gov/product.

James Hardie Building Products, Inc.
231 S. LaSalle St., Suite 2000
Chicago, IL 60604 USA
1-888 JHARDIE
www.jameshardie.com
www.jhsafesite.com

This form has been prepared to meet current Federal OSHA hazard communication regulations and is offered without any warranty or guarantee of any type. James Hardie Building Products cannot control the use of its products, and therefore specifically disclaims liability and responsibility arising from the use, misuse and alteration of its products.

The information contained on this MSDS was produced without independent scientific or medical studies analyzing the effects of silica upon human health. The information contained herein is based upon scientific and other data James Hardie Building Products believes is valid and reliable and provides the basis for this MSDS. The information contained herein relates only to specific materials listed in the document. It does not address the effects of silica when used in combination with other materials or substances, or when used in other processes. Because conditions of use are beyond James Hardie Building Products control, the company makes no representation, guarantee or warranty of any kind in this MSDS, either express or implied, including the implied warranties of merchantability or fitness of the product for use for a particular purpose, and assumes no liability related to the information contained above.

James Hardie Building Products requires, as a condition of use of its products, that purchasers comply with all applicable federal, state, and local health and safety laws, regulations, orders, requirements, and strictly adhere to all instructions and warnings which accompany the product.

[James Hardie](#)

Menu

- [Products](#)

**External Cladding**



- [Scyon™ Axon™ cladding](#)

- [Scyon™ Stria™ cladding](#)

- [Scyon™ Matrix™ cladding](#)

- [Easylap™ panel](#)

- [HardieTex™ system](#)

- [HardieFlex™ sheet](#)

- [PanelClad® sheet](#)

**Weatherboards**



- [Scyon™ Linea™ Weatherboard](#)



- [Scyon™ Stria™ cladding](#)



- [PrimeLine® weatherboard](#)

- [HardiePlank™ weatherboard](#)

**Internal Lining**

- [Villaboard® lining](#)

- [Versilux® lining](#)

- [PineRidge® lining](#)

- [HardieGroove™ lining](#)

**Pre-finished panels**



- [ARChitectural™ Inraw™ panel](#)

**Eaves and Soffits**

- [HardieFlex Eaves Lining](#)

**Building Facade**



- [ComTex® system](#)



- [ExoTec® system](#)

Case 3:18-cv-00447    Document 331    Filed 11/01/18    Page 58 of 90 PageID #: 14747

**Decking**



- [HardieDeck™ system](#)

**Structural Flooring**



- [Scyon™ Secura™ interior flooring](#)



- [Scyon™ Secura™ exterior flooring](#)

**Commercial Flooring**



- [HardiePanel™ compressed sheet](#)

**Underlays**



- [James Hardie™ ceramic tile underlay](#)

- [James Hardie™ vinyl & cork underlay](#)

**Trim**



- [Scyon™ Axent™ trim](#)

**Building Wrap**



- [HardieWrap™ weather barrier](#)

**Thermal Break**



- [HardieBreak™ thermal strip](#)

**Fencing**

- [HardieFence™ EasyLock® system](#)
- [Applications](#)



- Balcony Walls
- Bathroom Constructions
- Bracing
- Cavity Constructions
- Building Facade
- Commercial Flooring
- Decking
- Eaves and Soffits
- External Cladding
- Fencing
- Fire and Acoustically Rated Walls
- Internal Lining
- Pre-finished panels
- Sarking
- Soffits
- Structural Flooring
- Tiling External Walls
- Thermal Break



- ◦ Underlays



- ◦ Weatherboards
- Systems

**Class 1 & 10a**



- ◦ HardieSmart Blade Wall System

- ◦ HardieSmart Boundary Wall System



- ◦ HardieSmart Intertenancy Wall system

- ◦ HardieSmart Zerolot Wall System

**Class 9C**

- ◦ HardieSmart™ AgedCare wall system
- Technical
- Projects
- Where to buy

- Home
- Fibre Cement

# Fibre Cement

Fibre Reinforced Cement (FRC), or simply fibre cement, is a popular building material developed by James Hardie in the early 1980s, when pioneering the use of alternative reinforcing materials to create asbestos-free cement-based building products.

Case 3:18-cv-00447   Document 331   Filed 11/01/18   Page 61 of 90 PageID #: 14750



## What is Fibre Cement made of?

Fibre Reinforced Cement products are a mixture of:

- Cellulose fibre, from plantation-grown Radiata Pine trees
- Portland Cement
- Sand
- Water

Small amounts of other chemical additives are used to help the process, or provide products with particular characteristics.

Case 3:18-cv-00447   Document 331   Filed 11/01/18   Page 62 of 90 PageID #: 14751



Used and trusted by builders Australia-wide and known for their legendary durability.

## Why choose Fibre Reinforced Cement?

James Hardie® Fibre Reinforced Cement building products will not burn, are resistant to permanent water and termite damage, and, when installed as directed, are resistant to rotting and warping to the extent set out in James Hardie's published material current at the time of installation.

The products are easy to work with and low maintenance, making them the ideal choice for professional builders, designers and architects, DIY enthusiasts and homeowners.

## 5 Advantages of James Hardie® Fibre Cement Building Products

### 1. Stylish and Versatile

Easily design a house to suit varying ground levels on a build site and have greater flexibility in terms of mixing and matching a diverse range of exterior styles without changing the underlying method of construction.



### 2. Durable and Low Maintenance

James Hardie® fibre reinforced cement products are impact resistant and weatherproof. They don't crack, swell or warp like wood so they can hold dark colours and for longer. In fact some paints carry a 15 year warranty when used on certain James Hardie® building products.

Case 3:18-cv-00447   Document 331   Filed 11/01/18   Page 63 of 90 PageID #: 14752



### 3. Thermal Efficiency

Using lightweight, cement composite building materials can deliver significant benefits on warm days because of the materials' inherent ability to cool rapidly at night. This can give relief to sleeping areas in the night.



### 4. Increased Speed of Construction

Using Scyon™ and James Hardie® products makes the building process simpler and faster by reducing the need for wet trades on site. You can achieve a greater installation rate per day with most products, getting you to lock up faster and in the home sooner. A great benefit for both builders and homeowners!!

Case 3:18-cv-00447   Document 331   Filed 11/01/18   Page 64 of 90 PageID #: 14753



## 5. Space Maximisation

You can generate greater internal floor area and living space within a home because the walls can be thinner than traditional construction methods. Composite materials fix direct-to-frame reducing wasted space, unlike alternative construction methods.



# How is Fibre Cement made?

The fibre cement manufacturing process produces a durable, highly workable and aesthetically pleasing product by a process that substantially reduces the curing time compared to air-cured concrete products. This means your build moves along faster, with less hold ups and complications.

You can always rely on the quality of a James Hardie® building product as all our Australian manufactured fibre cement products meet ISO 9000.1 quality assurance standards. This also ensures James Hardie operates with:

- Increased quality awareness
- Improved and earlier awareness of potential problems
- Improved customer service
- Improved management of quality
- Improved product and service quality

Case 3:18-cv-00447   Document 331   Filed 11/01/18   Page 65 of 90 PageID #: 14754



## What Fibre Cement products do James Hardie make?

James Hardie manufactures the largest, most versatile and attractive range of planks, pipes, columns and building boards (otherwise known as sheets). They are all used extensively in the construction of new homes, in renovations and restorations and in commercial buildings for (link to relevant applications pages):

- External cladding
- Internal lining
- Internal and external flooring
- Wet Area Lining – Bathrooms, laundries, etc.
- Eaves, Verandas & Carports
- Fire and acoustic walls
- Bracing
- Fencing
- Decorative elements

The products are diverse, coming in numerous profiles and finishes for a range of interior and exterior building applications that suit most architectural styles.



Case 3:18-cv-00447   Document 331   Filed 11/01/18   Page 66 of 90 PageID #: 14755






James Hardie

- Resistant to fire
- Resistant to impact
- Resistant to moisture damage
- Resistant to rotting
- Resistant to termites
- James Hardie Durability

**About**

- About Us
- Company History
- Our People
- Fibre Cement
- Best Practice
- Look Books

**Quicklinks**

- Scyon Walls & Floors
- ACCEL™
- Annual Report
- Videos
- Where to buy

**Resources**

- Image Gallery
- Case Studies
- Installation Guides
- Safety Data Sheet (SDS)

Case 3:18-cv-00447   Document 331   Filed 11/01/18   Page 67 of 90 PageID #: 14756

- Distributors
- Builders
- Asbestos Fact Sheet
- The Smarter Small Home

**Support**

- Contact Us
- Environmental Protection Policy
-
  - Houzz
  - Pinterest
  - LinkedIn

- James Hardie International:
- North America
- New Zealand
- Europe
- Asia

- Investor Relations

- Copyright© 2018 James Hardie Australia Pty Ltd
- ABN 12 084 635 558
- Privacy
- Legal
- Site Map

Sydney Web & Mobile App Development



ASK TOM    VIDEOS    EARLY EDITION    HOMESHOW PROS    LISTEN

CONTACT

Search HomeShowRadio.com

YOU ARE HERE: HOME / HOMESHOW VIDEO / HARDIE SECRETS REVEALED: WHAT GIVES COLORPLUS SIDING ITS PLUS

# Hardie secrets revealed: what gives ColorPlus siding its plus



How does a pile of sand become Hardie ColorPlus siding? Come along on this behind-the-scenes factory tour. Learn the secret of how Hardie creates its longest-lasting siding product. The process is just one part of the story. See why no on-site paint project can compare with how ColorPlus is painted.

## What makes Hardie ColorPlus siding so unique

"ColorPlus is a game changer," says Pat McCollim from HES. "Customers are excited about it."

Excited about siding? That only seems over the top until you learn how its made and the advantages it gives your home.

"All Hardie's siding starts the same," says Mark Chamberland from James Hardie. "We start with silica sand that's then ground into a fine powder. We then mix in wood pulp and pour it in cement, which is then mixed together to form a fiber-cement slurry. We then take the product and press it into sheets, and then we emboss a pattern on top of it, which gives us your wood finish."

## ColorPlus siding takes an extra step

"We apply multiple coats of paint to the product in our factory setting," adds Chamberland. "This allows us to provide a 15 year paint and labor warranty on the product, ensuring that your home will look good for 15 years plus."

Factory application of the paint also eliminates the need for field apply paint and also lowers the maintenance on your home.

"When I'm in the home talking with homeowners, the thing that I find that attracts them to ColorPlus technology is the warranty that Hardie gives with it," says McCullim. "The factory applied paint job to the fiber and cement, the combination of those two things really gets them excited about ColorPlus."

The biggest advantage of using ColorPlus siding is it's made in the factory under controlled conditions. Not only the siding, but the paint job, as well. That allows Hardie to give you the strongest warranties in the business. And, of course, it looks great and holds up well to our Texas environment.

## Related Posts

Do hidden costs of wood siding make Hardie siding a better choice for you?

Siding showdown: Hardie compared to your other siding choices

Hardie Artisan Siding: is it right for your home?

Another face of Hardie siding

Think you have siding worries? Watch ColorPlus siding refresh these homes

TAGGED WITH: COATINGS, COLORS, FACTORY PAINT, HARDIE, JAMES, JAMES HARDIE, PAINT COATING, PAINT COATINGS, PAINTING PROCESS, SIDING, SIDING REPLACEMENT

---

## SUBSCRIBE TO HOMESHOW CONFIDENTIAL

Get new HomeShow videos delivered direct to your inbox

**Email** *

**Name** *

First

Last

**Zip Code** *

SUBSCRIBE NOW

---

## SEE MORE HOMESHOW VIDEOS

### Three things you need to know about property rental before being a landlord

### A Steel Building Dream Come True

## Can skipping garage door safety checkups put your family at risk?

Visit the HomeShow video archive



Find us on Google+ · Copyright © 2018 MogerMedia, Inc. · Privacy policy

Houston Home Improvement Show, Tom Tynan Texas Home Improvement Radio Show, Home improvement project tips, Home handyman tips, Texas home repair videos

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## AT NASHVILLE

| | | |
|---|---|---|
| **LOUISIANA-PACIFIC CORPORATION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 3:18-cv-00447** |
| | ) | |
| **JAMES HARDIE BUILDING PRODUCTS,** | ) | **JUDGE MCCALLA** |
| **INC.,** | ) | |
| | ) | **MAGISTRATE JUDGE HOLMES** |
| **Defendant/Counter-Plaintiff/** | ) | |
| **Third-Party Plaintiff.** | ) | |
| | ) | **JURY DEMAND** |
| **v.** | ) | |
| | ) | |
| **THE KRUSE BROTHERS, INC.,** | ) | |
| | ) | |
| **Third-Party Defendant.** | ) | |

---

### PLAINTIFF LOUISIANA-PACIFIC CORPORATION'S FIRST AMENDED ANSWER TO DEFENDANT JAMES HARDIE BUILDING PRODUTS, INC.'S COUNTERCLAIMS AND THIRD PARTY COMPLAINT

---

Plaintiff/Counter-Defendant Louisiana-Pacific Corporation ("LP") submits its First Amended Answer in response to the allegations and claims contained in Defendant/Counter-Plaintiff James Hardie Building Products, Inc.'s ("Hardie" or "Counter-Plaintiff") Answer to Complaint and Counterclaims against Louisiana-Pacific Corporation and Third Party Complaint against The Kruse Brothers, Inc. ("Kruse") (the "Counterclaims") (Dkt. 28) and states as follows:

### RESPONSES TO SPECIFIC ALLEGATIONS
### CONTAINED IN THE COMPLAINT

1.       LP lacks sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 1 of the Counterclaims of the Counterclaims and, therefore, denies  the allegations.

2.     LP admits the allegations contained in paragraph 2 of the Counterclaims.

3.     LP lacks sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 3 of the Counterclaims of the Counterclaims and, therefore, denies the allegations.

4.     LP does not dispute that Counter-Plaintiff purports to assert claims against it and/or Kruse for unfair competition and false advertising in violation of 15 U.S.C. § 1125; violations of the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101 *et seq*.; unfair competition and tortious interference with existing and prospective business relationships under Tennessee common law; and for declaratory judgment under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*.. LP denies that Counter-Plaintiff is entitled to any relief whatsoever. LP denies the remainder of the allegations contained in paragraph 4 of the Counterclaims.

5.     LP does not dispute that this Court has subject matter jurisdiction over Counter-Plaintiff's counterclaims. The remainder of the allegations contained in paragraph 5 are directed at a party other than LP and, thus, require no response. LP denies that Counter-Plaintiff is entitled to any relief whatsoever. LP denies the remainder of the allegations contained in paragraph 5 of the Counterclaims.

6.     LP does not dispute that this Court has subject matter jurisdiction over Counter-Plaintiff's counterclaims. The remainder of the allegations contained in paragraph 6 are directed to a party other than LP and, thus, require no response. LP denies that Counter-Plaintiff is entitled to any relief whatsoever. LP denies the remainder of the allegations contained in paragraph 6 of the Counterclaims.

7.     LP does not dispute that this Court has subject matter jurisdiction over Counter-Plaintiff's counterclaims. The remainder of the allegations contained in paragraph 7 are directed to a party other than LP and, thus, require no response. LP denies that Counter-Plaintiff is entitled

2

to any relief whatsoever. LP denies the remainder of the allegations contained in paragraph 7 of the Counterclaims.

8.     LP does not dispute that this Court has personal jurisdiction over LP. LP denies that Counter-Plaintiff is entitled to any relief whatsoever.

9.     LP admits that it maintains its principal place of business in this District. LP admits that it has a business relationship and entered into an agreement with Kruse. To the extent any remaining allegations in paragraph 9 of the Counterclaims are directed at LP, LP denies the allegations. To the extent any remaining allegations in paragraph 9 of the Counterclaims are directed at Kruse, no response is required from LP. Nonetheless, LP denies that Counter-Plaintiff is entitled to any relief whatsoever.

10.     LP does not dispute that this Court has personal jurisdiction over LP. LP admits that it maintains its principal place of business in this District. LP admits that it has transacted business in Tennessee and entered into contracts for services to be rendered or materials to be furnished in Tennessee. To the extent any remaining allegations in paragraph 10 of the Counterclaims are directed at LP, LP denies the allegations. To the extent any remaining allegations in paragraph 10 of the Counterclaims are directed at Kruse, no response is required from LP. Nonetheless, LP denies that Counter-Plaintiff is entitled to any relief whatsoever.

11.     LP does not dispute that venue is proper in this district. Nonetheless, LP denies that Counter-Plaintiff is entitled to any relief whatsoever.

12.     LP denies the allegations contained in paragraph 12 of the Counterclaims.

13.     LP admits that Counter-Plaintiff manufactures, advertises, and sells fiber cement siding and backerboard in the United States. LP lacks sufficient knowledge or information to form a belief as to the truth of the remainder of the allegations contained in paragraph 13 of the Counterclaims of the Counterclaims and, therefore, denies the allegations.

3

14. LP lacks sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 14 of the Counterclaims of the Counterclaims and, therefore, denies the allegations.

15. LP lacks sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 15 of the Counterclaims of the Counterclaims and, therefore, denies the allegations.

16. LP lacks sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 16 of the Counterclaims of the Counterclaims and, therefore, denies the allegations.

17. LP lacks sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 17 of the Counterclaims and, therefore, denies the allegations.

18. LP lacks sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 18 of the Counterclaims and, therefore, denies the allegations.

19. LP lacks sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 19 of the Counterclaims and, therefore, denies the allegations.

20. LP lacks sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 20 of the Counterclaims and, therefore, denies the allegations.

21. LP objects to the allegations contained in paragraph 21 of the Counterclaims as ambiguous due to inclusion of the phrase "relevant consumer," and on that basis, denies the allegations. LP also lacks sufficient knowledge or information to form a belief as to the truth of the remainder of the allegations contained in paragraph 21 of the Counterclaims and, therefore, denies the allegations.

22. LP denies the allegations contained in paragraph 22 of the Counterclaims.

4

23. In response to the allegations contained in paragraph 23 of the Counterclaims, LP denies that Counter-Plaintiff's Fiber Cement Products are high performance, cost effective, or durable and/or offer a "lifetime value." LP lacks sufficient knowledge or information as to the remainder of the allegations contained in paragraph 23 of the Counterclaims and, therefore, denies the allegations.

24. LP lacks sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 24 of the Counterclaims and, therefore, denies the allegations.

25. LP lacks sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 25 of the Counterclaims and, therefore, denies the allegations.

26. LP admits the allegations contained in paragraph 26 of the Counterclaims.

27. LP admits the allegations contained in paragraph 27 of the Counterclaims.

28. LP admits the allegations contained in paragraph 28 of the Counterclaims.

29. LP denies that it markets its SmartSide Products as alternatives to "James Hardie's Fiber Cement Products." LP admits that Counter-Plaintiff markets LP's SmartSide Products and James Hardie's Fiber Cement Products as alternatives. LP lacks sufficient information or belief as to the truth of remainder of the allegations contained in paragraph 29 of the Counterclaims and, therefore, denies the allegations.

30. LP admits the allegations contained in paragraph 30 of the Counterclaims.

31. The inclusion in paragraph 31 of the Counterclaims of the phrase "expertise of information and advertisements" renders the allegations therein ambiguous, and on that basis, LP denies the allegations contained in paragraph 31 of the Counterclaims. LP also lacks knowledge and information sufficient to form a belief as to the truth of the allegations contained in paragraph 31 of the Counterclaims and, therefore, LP denies the allegations contained in paragraph 31 of the Counterclaims.

5

32.    In response to the allegations contained in paragraph 32 of the Counterclaims, LP admits that it owns and operates the websites located at the domain names www.lpcorp.com, www.switchtolpsmartside.com, www.lpsmartside.com, and www.upsidetosmartside.com. LP refers to those websites for complete and accurate statements of their contents and denies any inconsistent allegations.

33.    In response to the allegations contained in paragraph 33 of the Counterclaims, LP admits that it advertises and promotes its products on websites, through trade publications and training programs throughout the United States. LP denies the remainder of the allegations of paragraph 33 of the Counterclaims.

34.    LP lacks knowledge and information sufficient to form a belief as to the truth of the allegations contained in paragraph 34 of the Counterclaims and, therefore, LP denies the allegations contained in paragraph 34 of the Counterclaims.

35.    In response to the allegations contained in paragraph 35 of the Counterclaims, LP admits that it provides training seminars in the United States, including in Nashville, Tennessee. LP lacks sufficient knowledge or information to form a belief as to whether "[a] true and correct copy of screen shots and photographs form Steven Kruse's Facebook page are attached hereto as **Exhibit 2** and select photographs are depicted below" of the Counterclaims and, therefore, denies the allegation. LP denies the remainder of the allegations contained in paragraph 35 of the Counterclaims.

36.    LP denies the allegations contained in paragraph 36 of the Counterclaims.

37.    LP denies the allegations contained in paragraph 37 of the Counterclaims.

38.    LP denies the allegations contained in paragraph 38 of the Counterclaims.

39.    LP denies the allegations contained in paragraph 39 of the Counterclaims.

40.    LP denies the allegations contained in paragraph 40 of the Counterclaims.

41.    LP denies the allegations contained in paragraph 41 of the Counterclaims.

42.    LP denies the allegations contained in paragraph 42 of the Counterclaims.

43.    LP denies the allegations contained in paragraph 43 of the Counterclaims.

44.    In response to the allegations contained in paragraph 44 of the Counterclaims, LP denies that it has made false and misleading advertising and promotional statements in communications to consumers and potential consumers of Fiber Cement Products and SmartSide Products. The documents cited in the allegations speak for themselves and LP denies any inconsistent allegations. LP lacks sufficient knowledge or information to form a belief as to purported oral statements made at purported in-person trainings conducted by Kruse of the Counterclaims and, therefore, denies the allegations. LP denies the remainder of the allegations contained in paragraph 44 of the Counterclaims.

45.    LP denies the allegations contained in paragraph 45 of the Counterclaims.

46.    In response to the allegations contained in paragraph 46 of the Counterclaims, LP denies that it has made false and misleading statements in advertising and promoting the SmartSide Products on its websites. The websites and articles identified in paragraph 46 speak for themselves and LP denies any inconsistent allegations. LP denies the remainder of the allegations contained in paragraph 46 of the Counterclaims.

47.    LP denies the allegations contained in paragraph 47 of the Counterclaims.

48.    In response to the allegations contained in paragraph 48 of the Counterclaims, LP denies that it has made false and misleading statements in connection with advertising and promoting LP's SmartSide Products in videos posted on its YouTube Channel. LP refers to the videos identified in paragraph 48 of the Counterclaims for complete and accurate statements of their contents and denies any inconsistent allegations. LP denies the remainder of the allegations contained in paragraph 48 of the Counterclaims.

7

49.     LP denies the allegations contained in paragraph 49 of the Counterclaims.

50.     In response to the allegations contained in paragraph 50 of the Counterclaims, LP denies that it has made false and misleading statements in connection with advertising and promoting the SmartSide Products in advertising and promotional material. LP refers to the material identified in paragraph 50 for complete and accurate statements of their contents and denies any inconsistent allegations. LP denies the remainder of the allegations contained in paragraph 50 of the Counterclaims.

51.     LP denies the allegations contained in paragraph 51 of the Counterclaims.

52.     The allegations contained in paragraph 52 of the Counterclaims are directed at a party other than LP and, thus, require no response. Nonetheless, LP denies the allegations contained in paragraph 52 of the Counterclaims.

53.     The allegations contained in paragraph 52 of the Counterclaims are directed at a party other than LP and, thus, require no response.

54.     The allegations contained in paragraph 54 of the Counterclaims are directed at a party other than LP and, thus, require no response. Nonetheless, LP denies the allegations contained in paragraph 54 of the Counterclaims.

55.     The allegations contained in paragraph 55 of the Counterclaims are directed at a party other than LP and, thus, require no response. Nonetheless, LP denies that Kruse is an agent of LP or acts or purports to act on behalf of LP. LP denies the remainder of the allegations contained in paragraph 55 of the Counterclaims.

56.     LP denies the allegations contained in paragraph 56 of the Counterclaims.

57.     LP denies the allegations contained in paragraph 57 of the Counterclaims.

58.     LP denies the allegations contained in paragraph 58 of the Counterclaims.

59.     LP admits the allegations contained in paragraph 59 of the Counterclaims.

8

60.     In response to the allegations contained in paragraph 60 of the Counterclaims, LP admits that Counter-Plaintiff has denied LP's claims in its Complaint.

61.     LP denies the allegations contained in paragraph 61 of the Counterclaims.

62.     LP denies the allegations contained in paragraph 62 of the Counterclaims .

63.     In response to the allegations contained in paragraph 63 of the Counterclaims, LP admits that Collins and Kaycan are manufacturers of engineered hardwood siding products.  LP denies the remainder of the allegations contained in paragraph 63 of the Counterclaims.

64.     LP denies the allegations contained in paragraph 64 of the Counterclaims.

65.     In response to the allegations contained in paragraph 65 of the Counterclaims, LP refers to its Complaint for a complete and accurate statement of its contents and denies any inconsistent allegation(s).

66.     LP denies the allegations contained in paragraph 64 of the Counterclaims.

67.     In response to the allegations contained in paragraph 67 of the Counterclaims, LP refers to its Complaint for a complete and accurate statement of its contents and denies any inconsistent allegation(s).

68.     LP denies the allegations contained in paragraph 68 of the Counterclaims.

69.     In response to the allegations contained in paragraph 69 of the Counterclaims, LP refers to its Complaint for a complete and accurate statement of its contents and denies any inconsistent allegation(s).

70.     LP denies the allegations contained in paragraph 70 of the Counterclaims.

71.     In response to the allegations contained in paragraph 71 of the Counterclaims, LP refers to the Complaint for a complete and accurate statement of its contents and denies any inconsistent allegation(s).

72.     LP denies the allegations contained in paragraph 72 of the Counterclaims.

73.     In response to the allegations contained in paragraph 73 of the Counterclaims, LP refers to the Complaint for a complete and accurate statement of its contents and denies any inconsistent allegation.

74.     LP denies the allegations contained in paragraph 74 of the Counterclaims.

75.     LP denies the allegations contained in paragraph 75 of the Counterclaims.

76.     In response to the allegations contained in paragraph 76 of the Counterclaims, LP hereby incorporates by reference each of the preceding responses as if incorporated herein in full.

77.     LP admits the allegations contained in paragraph 77 of the Counterclaims.

78.     In response to the allegations contained in paragraph 78 of the Counterclaims, LP denies that it wrongfully alleges false advertising, unfair competition, tortious interference, and violation of the Tennessee Consumer Protection Act. LP admits that a declaration by the Court in its favor is necessary and proper. LP denies the remainder of the allegations contained in paragraph 78 of the Counterclaims.

79.     The allegations contained in paragraph 79 of the Counterclaims are merely requests for relief and, thus, require no response from LP. Nonetheless, LP denies the allegations contained in paragraph 79 of the Counterclaims and denies that Counter-Plaintiff is entitled to any relief whatsoever.

80.     The allegations contained in paragraph 80 of the Counterclaims are merely requests for relief and, thus, require no response from LP. Nonetheless, LP denies the allegations contained in paragraph 80 of the Counterclaims and denies that Counter-Plaintiff is entitled to any relief whatsoever.

81.     The allegations contained in paragraph 81 of the Counterclaims are merely requests for relief and, thus, require no response from LP. Nonetheless, LP denies the allegations contained

10

in paragraph 81 of the Counterclaims and denies that Counter-Plaintiff is entitled to any relief whatsoever.

82.     The allegations contained in paragraph 82 of the Counterclaims are merely requests for relief and, thus, require no response from LP. Nonetheless, LP denies the allegations contained in paragraph 82 of the Counterclaims and denies that Counter-Plaintiff is entitled to any relief whatsoever.

83.     The allegations contained in paragraph 83 of the Counterclaims are merely requests for relief and, thus, require no response from LP. Nonetheless, LP denies the allegations contained in paragraph 83 of the Counterclaims and denies that Counter-Plaintiff is entitled to any relief whatsoever.

84.     The allegations contained in paragraph 84 of the Counterclaims are merely requests for relief and, thus, require no response from LP. Nonetheless, LP denies the allegations contained in paragraph 84 of the Counterclaims and denies that Counter-Plaintiff is entitled to any relief whatsoever.

85.     The allegations contained in paragraph 85 of the Counterclaims are merely requests for relief and, thus, require no response from LP. Nonetheless, LP denies the allegations contained in paragraph 85 of the Counterclaims and denies that Counter-Plaintiff is entitled to any relief whatsoever.

86.     The allegations contained in paragraph 86 of the Counterclaims are merely requests for relief and, thus, require no response from LP. Nonetheless, LP denies the allegations contained in paragraph 86 of the Counterclaims and denies that Counter-Plaintiff is entitled to any relief whatsoever.

87.     The allegations contained in paragraph 87 of the Counterclaims are merely requests for relief and, thus, require no response from LP. Nonetheless, LP denies the allegations contained

in paragraph 87 of the Counterclaims and denies that Counter-Plaintiff is entitled to any relief whatsoever.

88.     The allegations contained in paragraph 88 of the Counterclaims are merely requests for relief and, thus, require no response from LP. Nonetheless, LP denies the allegations contained in paragraph 88 of the Counterclaims and denies that Counter-Plaintiff is entitled to any relief whatsoever.

89.     The allegations contained in paragraph 89 of the Counterclaims are merely requests for relief and, thus, require no response from LP. Nonetheless, LP denies the allegations contained in paragraph 89 of the Counterclaims and denies that Counter-Plaintiff is entitled to any relief whatsoever.

90.     The allegations contained in paragraph 90 of the Counterclaims are merely requests for relief and, thus, require no response from LP. Nonetheless, LP denies the allegations contained in paragraph 90 of the Counterclaims and denies that Counter-Plaintiff is entitled to any relief whatsoever.

91.     The allegations contained in paragraph 91 of the Counterclaims are merely requests for relief and, thus, require no response from LP. Nonetheless, LP denies the allegations contained in paragraph 91 of the Counterclaims and denies that Counter-Plaintiff is entitled to any relief whatsoever.

92.     LP denies the allegations contained in paragraph 92 of the Counterclaims.

93.     In response to the allegations contained in paragraph 93 of the Counterclaims, LP hereby incorporates by reference each of the preceding responses as if incorporated herein in full.

94.     LP denies the allegations contained in paragraph 94 of the Counterclaims.

95.     LP denies the allegations contained in paragraph 95 of the Counterclaims.

96.     LP admits the allegations contained in paragraph 96 of the Counterclaims.

12

97.     To the extent that the allegations contained in paragraph 97 of the Counterclaims are directed at LP, LP admits the allegations. To the extent that the allegations contained in paragraph 97 of the Counterclaims are directed at a party other than LP, they require no response from LP.

98.     LP denies the allegations contained in paragraph 98 of the Counterclaims.

99.     LP denies the allegations contained in paragraph 99 of the Counterclaims.

100.    The inclusion in paragraph 100 of the Counterclaims of the phrase "expertise of information and advertisements" renders the allegations therein ambiguous, and on that basis, LP denies the allegations.  Subject to the General Objections and the foregoing objection, LP admits the allegations contained in paragraph 100 of the Counterclaims.

101.    LP denies the allegations contained in paragraph 101 of the Counterclaims.

102.    LP denies the allegations contained in paragraph 102 of the Counterclaims.

103.    The inclusion in paragraph 103 of the Counterclaims of the phrase "expertise of information and advertisements" renders the allegations therein ambiguous, and on that basis, LP denies the allegations.  Subject to the General Objections and the foregoing objection, LP admits the allegations contained in paragraph 100 of the Counterclaims.

104.    LP denies the allegations contained in paragraph 104 of the Counterclaims.

105.    LP denies the allegations contained in paragraph 105 of the Counterclaims.

106.    LP denies the allegations contained in paragraph 106 of the Counterclaims.

107.    LP denies the allegations contained in paragraph 107 of the Counterclaims.

108.    LP denies the allegations contained in paragraph 108 of the Counterclaims.

109.    LP denies the allegations contained in paragraph 109 of the Counterclaims.

110.    LP denies the allegations contained in paragraph 110 of the Counterclaims.

111.    LP denies the allegations contained in paragraph 111 of the Counterclaims.

13

112.    In response to the allegations contained in of the Counterclaims, LP denies that it has caused Counter-Plaintiff damages. The remainder of paragraph 112 of the Counterclaims is merely a request for relief that requires no response from LP. Nonetheless, LP denies the allegations contained in paragraph 112 of the Counterclaims and that Counter-Plaintiff is entitled to any relief whatsoever.

113.    LP denies the allegations contained in paragraph 113 of the Counterclaims.

114.    LP denies the allegations contained in paragraph 114 of the Counterclaims.

115.    LP denies the allegations contained in paragraph 115 of the Counterclaims.

116.    In response to the allegations contained in paragraph 116 of the Counterclaims, LP hereby incorporates by reference each of the preceding responses as if incorporated herein in full.

117.    The allegations contained in paragraph 117 of the Counterclaims are legal conclusions that require no response from LP. Nonetheless, LP denies that its ordinary sale of and offers for sale of LP's SmartSide Products meet the definition of "goods" and constitute "trade," "commerce," and a "consumer transaction," as defined in Tenn. Code Ann. § 47-18-103(7) and (19). LP further denies that Counter-Plaintiff can be or is entitled to any relief under the Tennessee Consumer Protection Act. To the extent the allegations contained in paragraph 117 of the Counterclaims are directed at a party other than LP, they require no response from LP. LP denies the remainder of the allegations contained in paragraph 117 of the Counterclaims.

118.    LP denies the allegations contained in paragraph 118 of the Counterclaims.

119.    LP denies the allegations contained in paragraph 119 of the Counterclaims.

120.    LP denies the allegations contained in paragraph 120 of the Counterclaims.

121.    LP denies the allegations contained in paragraph 121 of the Counterclaims.

122.    LP denies the allegations contained in paragraph 122 of the Counterclaims.

123.    LP denies the allegations contained in paragraph 123 of the Counterclaims.

14

124.    The inclusion in paragraph 124 of the Counterclaims of the phrase "acts" renders the allegations therein ambiguous, and on that basis, LP denies the allegations.

125.    LP denies the allegations contained in paragraph 125 of the Counterclaims.

126.    LP denies the allegations contained in paragraph 126 of the Counterclaims.

127.    LP denies the allegations contained in paragraph 127 of the Counterclaims.

128.    LP denies the allegations contained in paragraph 128 of the Counterclaims.

129.    In response to the allegations contained in paragraph 129 of the Counterclaims, LP hereby incorporates by reference each of the preceding responses as if incorporated herein in full.

130.    LP denies the allegations contained in paragraph 130 of the Counterclaims.

131.    LP denies the allegations contained in paragraph 131 of the Counterclaims.

132.    LP denies the allegations contained in paragraph 132 of the Counterclaims.

133.    LP denies the allegations contained in paragraph 133 of the Counterclaims.

134.    LP denies the allegations contained in paragraph 134 of the Counterclaims.

135.    LP denies the allegations contained in paragraph 135 of the Counterclaims.

136.    LP denies that Counter-Plaintiff is entitled to any relief whatsoever.

137.    Any allegation of the Counterclaims not expressly admitted above is hereby expressly denied.

## **ADDITIONAL DEFENSES**

The burden of proof with respect to any of the defenses and issues listed below are as provided by United States statutes and case law. Listing the defenses below as "Affirmative Defenses" is not intended and should not be construed to shift the burden of proof to LP with respect to any issue for which Counter-Plaintiff carries the burden of proof. LP reserves the right to further amend its Answer to additional Affirmative Defenses consistent with the facts discovered in this case. LP asserts the following additional defenses:

15

1.      Counter-Plaintiff's claims fail to state a claim upon which relief can be granted.

2.      Counter-Plaintiff's claims, separately and severally, are barred by the doctrine of waiver.

3.      Counter-Plaintiff's claims, separately and severally, are barred by the doctrine of equitable estoppel.

4.      Counter-Plaintiff's claims, separately and severally, are barred by the doctrine of judicial estoppel.

5.      Counter-Plaintiff's claims, separately and severally, are barred by the doctrine of laches.

6.      Counter-Plaintiff's claims, separately and severally, are barred by the statute of limitations.

7.      Counter-Plaintiff's claim for tortious interference with existing and prospective business relationships is barred by the defense of business competition and/or justification.

8.      Counter-Plaintiff's claims based on the statements of third parties made via any interactive computer service, including but not limited to social media, are barred by the Communications Decency Act, 47 U.S.C. § 230 *et seq*.

9.      Counter-Plaintiff's requests for injunctive relief are barred by the doctrine of unclean hands.

10.      Counter-Plaintiff is not entitled to injunctive relief, because Counter-Plaintiff will not be irreparably harmed by any of LP's conduct, at least as can be seen from Counter-Plaintiff's delay in bringing its claims.

## **REQUEST FOR RELIEF**

Wherefore, LP respectively requests the Court grant the following relief:

1.     The Court deny all Counter-Plaintiff's counterclaims and third-party claims with prejudice;

2.     The Court enter judgment in favor of LP and against Counter-Plaintiff as to all of LP's claims and Counter-Plaintiff's counterclaims;

3.     The Court determine that this is an exceptional case under the Lanham Act and enter an award in favor of LP and against Counter-Plaintiff for LP's attorney fees, expenses, and costs;

4.     The Court enter an award in favor of LP and against Counter-Plaintiff for LP's attorney fees, expenses, and costs under the Tennessee Consumer Protection Act;

5.     Should the Court enter judgment against LP, the Court award no injunctive or monetary relief in favor of Counter-Plaintiff; and

6.     The Court grant such other and further relief as may be just and proper.

## JURY DEMAND

LP demands a jury for all issues so triable.

Respectfully submitted,

/s/ Samuel F. Miller
Samuel F. Miller (BPR No. 022936)
Nicholas R. Valenti (BPR No. 035420)
A. Grace Van Dyke James (BPR No. 035667)
MILLER LEGAL PARTNERS PLLC
Fifth Third Center – Suite 2000
424 Church Street
Nashville, TN 37219
Telephone/Fax: (615) 988.9011
Email: Smiller@millerlegalpartners.com
            Nvalenti@millerlegalpartners.com
            Gjames@millerlegalpartners.com

*Attorneys for Plaintiff Louisiana-Pacific Corporation*

17

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 1st day of November 2018, the foregoing document was served via email upon the following:

Tony Swafford
Rocky King
Maia T. Woodhouse
ADAMS & REESE LLP
Fifth Third Center
424 Church Street, Suite 2700
Nashville, Tennessee 37219
Tel: (615) 259-1450
Fax: (615) 259-1470
Email: tony.swafford@arlaw.com
        rocky.king@arlaw.com
        maia.woodhouse@arlaw.com

Adam Massey
ADAMS & REESE LLP
LyondellBasell Tower
1221 McKinney, Suite 4400
Houston, TX 77010
Tel: 713.652.5151
Email: adam.massey@arlaw.com

Brian T. Boyd
William M. Leech III
LAW OFFICE OF BRIAN T. BOYD
214 Overlook Circle, Suite 275
Brentwood, Tennessee 37027
Tel: (615) 371-6119
Fax: (615) 523-2595
Email: brian@boydlegal.co
        will@boydlegal.co

Tara L. Swafford
THE SWAFFORD LAW FIRM, PLLC
207 Third Avenue North
Franklin, Tennessee 37064
Tel: (615) 599-8406
Fax: (615) 807-2355
Email: tara@swaffordlawfirm.com

/s/ Samuel F. Miller
Samuel F. Miller