**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| LOUISIANA-PACIFIC CORPORATION, | ) | |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | |
| | ) | |
| v. | ) | No. 3:18-cv-00447-JPM |
| | ) | |
| JAMES HARDIE BUILDING | ) | |
| PRODUCTS INC., | ) | |
| | ) | |
| Defendant/Counter-Plaintiff/Third- | ) | |
| Party Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE KRUSE BROTHERS, INC., | ) | |
| | ) | |
| Third-Party Defendant. | ) | |

**ORDER GRANTING IN PART AND DENYING IN PART JAMES HARDIE'S MOTION
FOR PRELIMINARY INJUNCTION**

The cause is before the Court on Defendant/Counter-Plaintiff James Hardie Building

Products Inc. ("JH")'s Motion for Preliminary Injunction filed on July 5, 2018. (ECF No. 58.)

The Court has considered the motion, Plaintiff Louisiana-Pacific Corporation ("LP") and Third-

Party Defendant The Kruse Brothers, Inc. ("The Kruse Brothers")'s response (ECF No. 223),

and JH's reply (ECF No. 257.) The Court held a hearing on the motion on September 24-25,

2018. For the reasons discussed below, JH's motion is GRANTED IN PART as to the

"Protecting Yourself from Airborne Dust" sales sheet and DENIED IN PART as to all other

marketing materials and statements.

# I. Background

## a. Factual History

This is an unfair trade practices action between two fierce competitors in the residential and multi-family home siding market. (Compl., ECF No. 1, ¶ 4.) Each has accused the other of utilizing literally false statements as to their siding products in violation of unfair competition statutes in an attempt to induce home builders, construction contractors, and siding installers to buy their product rather than their competitor's. Each is a leader in their respective product category. JH is the dominant producer of cement board with its "Hardie Board" accounting for approximately ███ of that category. (Kuizenga hearing testimony.) LP is the industry leader in the production and sale of OBS, a type of engineered wood siding and a product which is synonymous with its brand. (Compl., ECF No. 1, ¶ 3.)

Both appear to have engaged in aggressive comparative advertising and/or sales campaigns that exploit the engineering, construction, and/or safety weaknesses of their competitor's product line. On occasion both may have crossed the line dividing fair competitive criticism and literal product comparative falsity. Both have legitimate criticisms of their competitor's product.

JH asserts that LP advertises and promotes its SmartSide Products on the LP Websites, through trade publications, and training and certification programs. (JH's Answer and Counterclaim, ECF No. 28, ¶ 33.) LP uses agents such as The Kruse Brothers to provide training seminars across the U.S. that compare LP's products with others in the industry including JH. (Id., ¶ 35.) JH claims LP has made false and misleading statements about the nature, characteristics, and quality of JH's Fiber Cement Products. (Id., ¶ 36.)

In this Motion for Preliminary Injunction JH claims LP and The Kruse Brothers made false and misleading statements about requirements under the OSHA Standard, potential OSHA violations, and safety risks resulting from the use of fiber cement siding products. (JH's Amended Memo in support of Motion for Preliminary Injunction, ECF No. 150 at PageID 5138.) These include statements about required or prohibited tools under OSHA, citations and fines under OSHA, and safety risks associated with fiber cement products under OSHA. (See id.) JH alleges such statements violate the Lanham Act, the Tennessee Consumer Protection Act ("TCPA"), and amount to tortious interference. (Id. at PageID 5138.)

### b. Procedural Background

LP filed its complaint on May 13, 2018. (ECF No. 1.) On June 11, 2018, LP filed a motion for a preliminary injunction (ECF No. 10) and a motion for expedited discovery (ECF No. 13). The Court granted the motion for expedited discovery on June 12, 2018. (ECF No. 16.) The Court granted in part and denied in part LP's motion for a preliminary injunction on August 20, 2018. (ECF No. 171.) LP appealed that decision on August 30, 2018. (ECF No. 175.)

On June 15, 2018, JH filed its answer, which pled counter-claims against LP and against third-party defendant The Kruse Brothers, Inc. for unfair competition and false advertising under the Lanham Act and Tennessee statutory and common law. (ECF No. 28.) On July 5, 2018, LP filed its answer; on July 9, 2018, The Kruse Brothers filed its answer. (ECF Nos. 51, 56.)

On July 12, 2018, JH filed this motion for a preliminary injunction, seeking to enjoin LP and The Kruse Brothers from making statements that, JH alleges, violate the Lanham Act and Tennessee state laws. (ECF No. 58.) JH also requested an expedited briefing schedule on its motion for preliminary injunction, as well as expedited discovery and a motion hearing. On July

13, 2018, the Court held a telephonic status conference with the parties and discussed possible briefing schedules. JH filed an Amended Motion for Preliminary Injunction on August 9, 2018. (ECF No. 149.) On September 14, 2018 JH again amended its motion for preliminary injunction, removing one paragraph. (ECF No. 208.)

LP filed a response to JH's Motion for Preliminary Injunction on September 16, 2018. (ECF No. 223.) The Kruse Brothers filed its response on September 16, 2018. (ECF No. 232.) JH filed a reply to both The Kruse Brothers and LP on September 20, 2018. (ECF No. 257.) A hearing on this motion was held on September 24-25, 2018.

## II.     Legal Standard

JH's application for a preliminary injunction is subject to a four-factor analysis. NE. Ohio Coal. for Homeless, 467 F.3d 999, 1009 (6th Cir. 2006) (applying the four-factor analysis to a temporary restraining order in an absentee ballot voter identification case). The factors the Court must consider are: "(1) the likelihood that the movant will succeed on the merits, (2) whether the movant will suffer irreparable harm without the [injunctive relief], (3) the probability that granting the [injunction] will cause substantial harm to others[,] and (4) whether the public interest will be advanced by issuing the [injunction]." Id. at 1009. Also see Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc., 453 F.3d 377, 379 (6th Cir. 2006) (trademark infringement case applying four-factor analysis; preliminary injunction issued); Beltronics USA, Inc. v. Midwest Inventory Distribution, LLC, 562 F.3d 1067, 1070 (10th Cir. 2009) (applying the four-factor analysis to uphold the district court granting a preliminary injunction in a Lanham Act claim).

### III. Application

JH seeks to enjoin LP and The Kruse Brothers from making or using specific statements about OSHA regulations for working with silica dust. These include statements about new OSHA regulations or tools that must be used as mentioned in: (1) LP's "Protecting Yourself from Airborne Dust" sales sheet (Ex. 16); (2) emails sent by Mark Rose (Ex. 2); (3) LP's training shows run by The Kruse Brothers (Ex. 7); (4) commentary about online social media posts; and (5) LP signage indicating "the easiest way to operate safely with silica dust, is don't create it" at marketing events (Ex. 32). JH asserts that it satisfies each of the four factors involved in the analysis. (JH's Memo in Support of Preliminary Injunction, ECF No. 150.) In response, LP and The Kruse Brothers argue that JH has failed to satisfy any of the four factors of the analysis, and that JH's motion should be denied in its entirety. (ECF Nos. 223, 232.)

### a. Likelihood of Success on the Merits

The party seeking a temporary restraining order or preliminary injunction must establish a "strong likelihood of success on the merits[.]" NE. Ohio Coal. for Homeless, 467 F.3d at 1009. JH argues that it is likely to succeed on the merits of each of its causes of action: (1) false advertising under the Lanham Act; (2) violation of the Tennessee Consumer Protection Act; and (3) tortious interference under Tennessee common law. (ECF No. 150 at PageID 5138-5139.) LP and The Kruse Brothers dispute the likelihood of success as to each claim. Each of JH's merits claims is addressed in turn.

#### i. Lanham Act

False advertising under the Lanham Act requires five elements:
(1) the defendant has made a false or misleading statement of fact concerning his own product or another's;
(2) the statement actually deceives or tends to deceive a substantial portion of the intended audience;

(3) the statement is material in that it will likely influence the deceived consumer's purchasing decisions;
(4) the statement was introduced into interstate commerce; and
(5) there is a causal link between the challenged statements and harm to the plaintiff.

Wysong Corp. v. APN, Inc., 889 F.3d 267, 270 (6th Cir. 2018). In the instant case, LP and The Kruse Brothers contest all elements. (See ECF No. 223.)

### 1. Literally false or Deceptively Misleading Statements

A plaintiff can establish Lanham Act false advertising in two ways: that the statement is literally false, or that the statement is misleading. Wysong, 889 F.3d at 270-71. "Literally false" statements must be unambiguously deceptive to reasonable consumers. Innovation Ventures, LLC v. N.V.E., Inc., 694 F.3d 723, 737 (6th Cir. 2012) (citing Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co., 290 F.3d 578, 587 (3d Cir. 2002)). Courts presume that literally false statements actually deceive a substantial portion of the intended audience. Wysong, 889 F.3d at 270-71 (citing Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Board of Podiatric Surgery, Inc., 185 F.3d 606, 614 (6th Cir. 1999)). If a statement is not literally false, it can nonetheless violate the Lanham Act by being "misleading." Statements that are not literally false but are asserted to be misleading must be shown to actually deceive a significant portion of reasonable consumers to support a violation of the Lanham Act. Id. at 271 (citing Am. Council, 185 F.3d at 616). Whether a statement is too ambiguous to be literally false is a matter of law to be decided by the Court. Service Jewlry Repair, Inc. v. Cumulus Broadcasting, LLC, 145 F. Supp. 3d 737, 746 (M.D. Tenn. 2015).

In the instant case, JH argues that each of the statements made by LP or The Kruse Brothers about OSHA standards is literally false. LP disputes that categorization for each of the statements.

JH asserts that LP and The Kruse Brothers have represented that a new OSHA Standard "requires" or "prohibits" certain equipment, dust control methods, and work practices when working with fiber cement. (ECF No. 150 at PageID 5140.) Respirable crystalline silica ("RCS") is a potentially dangerous dust byproduct from cutting fiber cement. (Id. at PageID 1541.) The applicable OSHA standards articulate when levels of RCS require additional safety measures. (Id.) An Action Level (25 micrograms per cubic meter of air averaged over an 8-hour work day) triggers a specific standard. (Ex. 6, 29 C.F.R. § 1926.1153(a).) The standard does not apply if a worker is exposed to less than the Action Level. (Id.) At the Action Level employers can follow a suggested table of safety measures meant to assess and limit exposure by independently deciding which dust controls work best to limit exposure to a permissible level. (ECF No. 150 at PageID 5141-42; Kuizenga Decl. Ex. 1; Kubeldis Report, ECF No. 292 at ¶ 36.)

Some of the OSHA's table's suggested options include not using a circular saw, warning other people nearby, and, in certain circumstances, using a respirator. (Ex. 6 at Table 1.) JH asserts LP and The Kruse Brothers made statements that circular saws are now prohibited and respirators are a requirement when cutting fiber cement. (ECF No. 150 at PageID 5143-44.) JH claims those statements are literally false because OSHA's suggestions in their table do not apply if RCS does not rise to the Action Level or if the employer assess and limits exposure below the permissible level. (Id.)

LP has published marketing materials entitled "Protecting Yourself from Airborne Dust" (LP's "OSHA sale sheet") in both English and Spanish. (Ex. 16.) Witness Lane Williams, who works in LP's marketing department testified that the OSHA sale sheet is an advertisement

intended to convert individuals to use LP Smartside products. (Williams Depo, ECF No. 232-8 at Page 188, lines 10-17.) LP's OSHA sale sheet includes a summary of the requirements of new OSHA Regulations related to silica dust, working with fiber cement and engineered wood siding, and specific tools that are required for cutting fiber cement. (Ex. 16.) Under the heading "Special Tools Now Required For Cutting Fiber Cement," LP's OSHA sale sheet states:

> The new OSHA regulations require builders to use these tools when cutting fiber cement:
> - Saw equipped with an integrated water delivery system that continuously feeds water to the blade
> - Saw equipped with a 99% efficient dust collection system
> - Drill equipped with commercially available shroud or cowling with duct collection system
> - Respirator

(Ex. 16.)

LP's OSHA sale sheet does not state that these requirements only apply in certain circumstances. (Ex 16; Williams Depo, ECF No. 232-8 at Page 189, lines 7-19.) As listed in LP's OSHA sale sheet, LP's language conveys that a worker cannot comply with OSHA regulations without following each of the bulleted requirements. (Ex. 16.) Labeling those bullets points as requirements is literally false. For example, the OSHA regulations states that respirators would only need to be used "[w]here specified by Table 1," or when exposures exceed the permissible exposure limit ("PEL") and an employer "has implemented all feasible engineering and work practice controls such controls are not sufficient to reduce exposures to or below the PEL." (Ex. 6, OSHA regulations for respirable crystalline silica, 29 C.F.R. § 1926.1153.) Respirators are not required in any other circumstance. (Id.) The use of a respirator under the OSHA Silica Standard is the least preferred exposure control method. (Kubeldis Report, ECF No. 292 at ¶ 51.)

Similarly, using a saw equipped with a 99% efficient dust collection system is listed under Table 1 for blade diameters of 8 inches or less, but is not required when the Table 1 safe harbor is not used. (Ex. 6, Table 1; Kubeldis Report, ECF No. 292 at ¶19.) Employers do not need to rely on Table 1 to comply with the OSHA regulation for respirable crystalline silica. (Ex. 6.) The employer can assess and limit exposure of silica dust so it is below the PEL. (Id.) Listing a saw with a 99% efficient dust collection system as a requirement is literally false.

LP does not provide any qualification to their marketing materials in the OSHA sale sheet such as "only required in certain circumstances," "if an employer chooses to follow the Table 1 safe harbor they may be required to…" Without that or equivalent language, the bulleted statements in the OSHA sale sheet would be understood as categorical. Absent such qualifying language it is literally false for LP to make a blanket statement that the above bullet points are required.

STATEMENTS IN MARK ROSE'S EMAILS

Mark Rose, the channel manager and LP representative for Florida, sent an email to various third parties, customers, and potential customers after the new OSHA silica rule came out. (Rose Depo, ECF No. 287 at Page 18 line 4 - Page 19 line 1; Ex. 2, email from Michael Patrick to Kuizenga.) It stated that "OSHA regulations prohibit the utilization of a standard circular saw for cutting fiber cement siding. Doing so, could result in an OSHA imposed citation." (Ex. 2.) Rose later acknowledged that a circular could be used with a dust collection system to cut fiber cement siding. (Rose Depo, ECF No. 287-1 at Page 91 line 25 – Page 92 line 6.)

Even in the Table 1 safe harbor provisions OSHA expressly states that stationary masonry saws and handheld power saws can be used for cutting fiber-cement board. (Ex. 6,

Table 1.)  Those saws would need to have a dust collection system with 99% or greater efficiency or a water delivery system to qualify for the Table 1 safe harbor.  (Id.)  As explained above, none of the restrictions in Table 1 are required if the employer independently measures silica dust and uses engineering and control methods of their choice to stay within the PEL. The OSHA regulations for silica dust do not just allow circular saws to be used, but they give specific recommendations as to how they can be used within the Table 1 safe harbor provisions.  (Id.)  Rose's statement that "OSHA regulations prohibit the utilization of a standard circular saw for cutting fiber cement siding" is literally false.

Rose's second statement that using a standard circular saw for cutting fiber cement "could result in an OSHA imposed citation" is accurate.  An employer could use a standard circular saw without the precautions set out in Table 1 and if the silica dust was above the PEL, OSHA could impose a citation on the employer.  (Ex. 6.)  Rose's statement makes no claim about the likelihood of a citation, but simply states that one could be issued.  (Ex. 2.)  That portion of his email is neither literally false nor misleading.

LP'S TRAINING SHOWS RUN BY THE KRUSE BROTHERS

Addison Garner and Matt Kopczynski are both JH employees who testified about an LP training session conducted by The Kruse Brothers that each of them attended.  LP hires The Kruse Brothers as independent contractors to conduct training sessions throughout the country for using and installing LP SmartSide.  (Event Support Agreement, Ex. 15.)  Garner testified that during the training session he attended he took brief notes on his phone from which he typed a short memo as soon as he got home from the three-hour training session.  The memo Garner wrote and sent to his boss at JH noted that the presenters stating that workers would need to place caution tape around the entire home and warn all the neighbors that a potentially dangerous

product is being installed when installing fiber cement.  (Ex. 13.)  There is some uncertainty about exactly what was said since Garner testified that his notes were taken on his phone intermittently during the three-hour period.  Kopczynski testified that at the training session he attended, The Kruse Brothers presenters said that people cutting fiber cement needed to wear respirators and that "when cutting, the neighbors have to have windows closed and pets in."

With respect to the statements Garner and Kopczynski heard at the training session, the OSHA regulations do not require tape to be placed around the entire house, pets to be kept inside, or workers to use respirators when installing fiber cement.  (See Ex. 6.)  While those statements as remembered by the two witnesses are literally false, neither one took contemporaneous notes during the training.  It is unclear exactly what was said.  If there were any qualifications such as someone "may" be required to warn neighbors, use a respirator, etc. then the statements would be neither literally false nor misleading.

Randall Kruse has testified that The Kruse Brothers have not discussed the silica rule at any LP training events.  (Randall Kruse Depo, ECF No. 232-1 at Page 159, lines 15-25.)  Kruse went on to explain that silica dust is not part of their normal outline for training events, and that someone in the audience might randomly talk about it.  (Id. at Page 161, line 23 – Page 162, line 24.)  Kruse testified that they respond by telling audience members "[f]ollow installation rules" but do not "provide guidance on what installation rules."  (Id.)  LP specifically told The Kruse Brothers that they should not discuss the silica rule.  (Williams Depo, ECF No. 232-8 at Page 102 lines 2-9.)  Given the uncertainty of what The Kruse Brothers have actually said about silica dust and that it is not part of their regular training materials, it is unclear if those statements are literally false or misleading.  It does not appear that those statements, if made, are repeated with any frequency during the trainings.

Both Kopczynski and Garner were given an LP Smartside Installation Training Test at the end of the training session. (Ex. 7.) At the preliminary injunction hearing JH argued that question 39 on the quiz was literally false or misleading. It states:

> Which of the following safety equipment is NOT necessary by LP when working with SmartSide products?
> a. Safety glasses with side shields
> b. Steel-toe boots and hardhats
> c. An OHSA-approved respirator
> d. Hearing protection

(Ex. 7.)

The correct answer to the quiz was "c": an OHSA-approved respirator is NOT necessary by LP when working with SmartSide products. This statement is neither literally false nor misleading. LP does not require an OSHA-approved respirator when SmartSide is being installed. Nothing about that answer suggests that a respirator is required to install other materials, let alone JH's fiber cement.

COMMENTARY ABOUT SOCIAL MEDIA POSTS

JH argues that LP's statements that the use of fiber cement will result in OSHA citations and fines are literally false by necessary implication. (ECF No. 150 at PageID 5145.) JH claims LP made the statements:

- We are definitely making Hardie nervous (in response to one of its contractor's statements that OSHA is cracking down on the Silica dust created from cutting James Hardie Fiber Cement Siding)
- Use of a circular saw could result in an OSHA imposed citation
- Moral of the story. Don't want to be stung by OSHA. Use LP Smartside as your exterior cladding of choice
- Silica citations hit 116 in 6 months (implying that those citations were issued to siding contractors using fiber cement products.)

(ECF No. 150 at PageID 5146.)

LP argues that the above statements are not false and were not all actually made by them. (ECF No. 223 at PageID 8872-73.) They argue that "cladding" is a broad term and is not directed at JH's products. (Id.) LP claims the 116 citations are true, and LP has not made such an implication since they only forwarded an article with those statistics from the Bloomberg News. (Id.) JH responds that LP's characterization of the article "Don't want to be stung by OSHA. Use LP…" makes the statements impliedly false. (ECF No. 257 at PageID 11077.)

JH has not provided evidence to establish than any of the above statements are literally false or misleading. LP's comment that they are making Hardie nervous as a response to a contractor is not misleading. LP is saying that they think they are making one of their biggest competitors in the siding market, JH, nervous. That is not a factual statement. It is an opinion that would not mislead consumers.

LP is correct that using a circular saw could result in an OSHA imposed citation if it is not used according to the Table 1 safe harbors and the PEL is exceeded. (Ex. 6.) That statement is not literally false or misleading.

LP's reference to 116 citations in a LinkedIn post and their comment that if people don't want to be stung by OSHA they can use LP SmartSide is neither literally false nor misleading. The number of OSHA citations is a factual assertion that JH does not dispute. (ECF No. 150 at PageID 5146.) JH claims that most of those citations were not issued for siding contractors. (Id.) JH provides no support that LP claimed the citations were issued for siding; they simply reference the number of citations and encourage customers to use their product to avoid OSHA citations.

JH argues that LP's statements are part of a campaign to incorrectly suggest that fiber cement siding products are the target of OSHA standards and fines and, therefore, "unsafe." (ECF No. 150 at PageID 5147.)  During LP's trade shows Adam King testified that LP uses the slogan "the easiest way to operate safely with silica dust is don't create it."  (Ex. 32.)  JH argues that this statement is false and misleading because many tasks involving fiber cement do not generate actionable levels of RCS.  (ECF No. 150 at PageID 5148.)  LP responds that their statement is true; if there is not any silica dust then it is not a safety hazard.  (ECF No. 223 at PageID 8872.)  LP is correct.  The marketing slogan does not say or suggest that if silica dust is created it cannot be operated with safely.  LP is accurately describing one way of operating to avoid safety risks of silica dust.

At the hearing on September 24-25, 2018 King also testified that at a trade show he overheard JH employee Mark Rose say that people cannot use a standard circular saw multiple times.  King did not write down exactly what was said or in what context, and JH did not provide support regarding the context of Rose's statements at that trade show.  As explained above, if Rose said people cannot use a standard circular saw to cut fiber cement without any qualification that would be literally false.  Without additional context about exactly what Rose told people at his booth across from King, this Court does not have enough evidence to establish whether his statements were literally false or misleading.

## 2.  *Actually Deceives or Tends to Deceive*

The second element of false advertising under the Lanham Act is whether the allegedly misleading statements actually deceive or tend to deceive.  Wysong Corp. 889 F.3d at 270.  JH claims that the above statements are literally false so "[a]ctual deception is presumed." (ECF No.

Case 3:18-cv-00447   Document 348   Filed 12/20/18   Page 14 of 24 PageID #: 15603

150 at PageID 5148 (citing <u>Fed. Express Corp. v. UPS,</u> 765 F. Supp. 2d 1011, 1017 (W.D. Tenn. 2010).)  The only statements by LP that JH has shown to have a likelihood of success of being literally false or misleading are the requirements listed in LP's OSHA sale sheet (Ex. 16.) and Mark Rose's email stating that "OSHA regulations prohibit the utilization of a standard circular saw for cutting fiber cement siding."  (Ex. 2.)  Both of those statements are literally false, so actual deception is presumed.

### 3.  Material for Customers' Decision Making

The third element of false advertising under the Lanham Act is whether the allegedly misleading statement were material.  <u>Wysong Corp.</u> 889 F.3d at 270.  Materiality is "defined in terms of a statement's propensity to have some effect on consumers' purchasing decisions."  <u>Fed. Express Corp. v. United States Postal Serv.,</u> 40 F. Supp. 2d 943, 953 (W.D. Tenn. 1999).  A showing of materiality requires factual evidence concerning the relevant consumer market and the perspective of the potential customer in that market.  (<u>Id.</u>)  JH claims that LP has used an aggressive messaging campaign based on the OSHA rules to attract more customers.  (ECF No. 257 at PageID 11071) (referencing Woodhouse Decl., ECF No. 264-3.)  To support its position, JH points to an LP commissioned market survey with the stated objective "to learn how can LP take advantage of the situation [the OSHA rules and regulations] in an appropriate way."  (<u>Id.</u> citing Woodhouse [counsel for JH] Decl. Ex. 3., ECF No. 264-3 at PageID 11614) (attaching an LP PowerPoint dated December 22, 2017.)

LP argues that the statements do not specifically mention fiber cement or JH so they should not be considered material.  (ECF No. 223 at PageID 8875.)  LP is confusing the standard for materiality; the false statements do not have to be targeted at the injured party, they simply must have some effect on consumers' purchasing decision.  <u>Fed. Express,</u> 40 F. Supp. 2d at 953.

The evidence cited by JH for the statements actually deceiving customers, supports a finding of materiality as well. LP has acknowledged that its OSHA sale sheet, "Protecting Yourself From Airborne Dust," was created to be distributed to third parties in order to convert individuals to use SmartSide products. (Williams Depo, ECF No. 232-8 at Page180 lines 13-21; Page 188 lines 10-17.) LP has had internal communications encouraging its sales team to distribute the LP OSHA sale sheet "as much as possible." (Id. at Page 228 lines 17-22.) LP's OSHA sale sheet focuses on RCS, mentions fiber cement siding contains crystalline silica, and compares working with fiber cement siding to working with engineered wood siding. (Ex. 16.) LP's push to use its OSHA sale sheet to covert customers and the specific information in the sale sheet demonstrate LP was using that to affect consumers' purchasing decision. JH is likely to succeed in showing that LP's OSHA sale sheet is material.

As to the Rose email, JH claims at least six customers were actually deceived by LP's email stating the OSHA Standard "prohibits" use of a standard circular saw. (ECF No. 150 at PageID 5149.) For example, ███████████████ informed JH that she intended to discontinue future work with JH because she believed from LP's email (sent by Mark Rose, Ex. 2) that circular saws could not be used to cut fiber cement boards. (Id. at PageID 5150.) JH claims another customer, ██████████████, forwarded the Rose email to other potential customers to inform them that circular saws are no longer an option when cutting fiber cement board. (Id.) These examples demonstrate that the Rose email had the propensity to have some effect on consumers' purchasing decision. The Rose email is likely material.

### 4. Interstate Commerce

The fourth element of a Lanham Act claim, whether the statements were made in interstate commerce, is determined by whether the sale or transport of the subject goods or

services would be subject to Congress's power under the Commerce Clause. See Christian Faith Fellowship Church v. Adidas AG, 841 F.3d 986, 989 (Fed. Cir. 2016.) Here, the subject goods are siding used in the residential housing market. It is undisputed that fiber cement and wood engineered siding are sold throughout the country. Taken in the aggregate, these products would likely be subject to Congress's powers over interstate commerce. JH is likely to prevail on its argument that both Mark Rose's email and LP's OSHA sale sheet were introduced into interstate commerce.

*Causation of Harm*

Plaintiffs are not typically required to quantify their damages in order to obtain injunctive relief; logical likelihood of damages is sufficient. E.g., American Rockwool, Inc. v. Owens-Corning Fiberglas Corp., 640 F.Supp. 1411, 1443 (E.D. N.C. 1986). JH argues there is a logical likelihood of damages because their consumers have been actually deceived by LP's statements in the Rose email and sought to terminate relationships with JH. (ECF No. 150 at PageID 5152.) Comments by their customers such as █████████████████████████████ tend to show a likelihood of harm. (Id. at PageID 5150.)

LP's OSHA sale sheet was designed and distributed to encourage people to switch to LP SmartSide by stating "requirements" and dangers of Fiber Cement siding. (Williams Depo, ECF No. 232-8 at Page180 lines 13-21; Page 188 lines 10-17.) LP acknowledges that its OSHA sale sheet has been sent to numerous third parties. (Id. at Pages 239-263.) LP's OSHA sale sheet is very likely to impact the fiber cement community, particularly in light of the evidence that LP encouraged its sales team to use the sale sheet as a marketing tool. JH technology manager Marcus Kuizenga testified that there are only two other fiber cement manufacturers and that JH controls ████████████ of the fiber cement market. Because LP's OSHA sale sheet is

targeted at fiber cement and silica dust that is created from cutting fiber cement, JH is likely to demonstrate causation of harm.  (See Ex. 16.)

Based on the foregoing, JH has established a strong likelihood of success as to its Lanham Act claim regarding the Mark Rose email (Ex. 2) and LP's OSHA sale sheet in both English and Spanish.  (Ex. 16.)  JH has not presented sufficient evidence to show that other statements made during LP's training sessions, in response to social media, or as signage about LP not creating silica dust are likely to be found literally false or misleading.  For those categories of statements that are not likely to violate the Lanham Act, a preliminary injunction would not be appropriate.

### ii.  Tennessee Consumer Protection Act

The Tennessee Consumer Protection Act ("TCPA"), Tenn. Code Ann. § 47-18-104(b), prohibits, *inter alia*:

> (8) Disparaging the goods, services or business of another by false or misleading representations of fact; . . .

Several district courts have interpreted subsection (8) of the TCPA to be the state law equivalent of a Lanham Act false advertising claim.  See Medison America, Inc. v. Preferred Medical Systems, LLC, 548 F. Supp. 2d 567, 585 (W.D. Tenn. 2007) and Service Jewelry Repair, Inc. v. Cumulus Broadcasting, Inc., 145 F. Supp. 3d 737, 750 (M.D. Tenn. 2015).  The Sixth Circuit differentiated the analyses of Lanham Act false advertising claims and violations of TCPA subsection (5) in Moore v. Weinstein Co., LLC, 545 Fed. Appx. 405, 412 (6th Cir. 2013) (analyzing a false advertising claim under subsection 5 without

mentioning the Lanham Act, but applying Lanham Act unfair competition analysis to a different TCPA claim.)

In either case, a TCPA claim requires an ascertainable loss of money or property under the TCPA. Wendy's of Bowling Green, Inc. v. March USA, Inc., No. 3-10-1043, 2012 U.S. Dist. LEXIS 13075, at *14 (M.D. Tenn. Feb. 3, 2012). At this point JH has not directed the court to evidence that would likely show such a loss. Statements that customers said they were thinking about leaving but ended up staying with JH do not make it likely JH will succeed in this respect. Without evidence of an ascertainable amount of money, a preliminary injunction should not be granted based on claims under the TCPA.

### iii.   Common Law Tortious Interference

Tortious interference requires five elements: (1) a prospective relationship with an identifiable class of third persons; (2) that Defendant knew of the relationship(s); (3) that Defendant intended to cause the termination of the business relationship; (4) that Defendant acted with "improper motives" or employ "improper means"; and (5) damages caused by the interference. Watsons's Carpet & Floor Coverings, Inc. v. McCormick, 247 S.W.3d 169, 176-77 (Tenn. Ct. App. 2007).

JH claims that (1) LP's aggressive campaign against JH, (2) LP's intentionally directed communications and marketing material to JH customers, and (3) LP's attack on fiber siding, a product as to which JH occupies a dominant market position, all show that the false statements meet the requirements for tortious interference. (ECF No. 150 at PageID 5153.) LP argues that JH has not demonstrated a specific relationship that was interfered with by LP making the statements at issue, has not shown damages from the alleged tortious interference, and has not provided evidence of improper motive or means. (ECF No. 223 at PageID 8878.) JH relies on

the six customers who approached JH in response to the Rose email to show damages, but JH has not provided any evidence that any of those customers switched to LP or decreased their JH purchases as a result. (ECF No. 257 at PageIDs 11079-80.) JH also argues that 60+ third parties have been contacted by LP, but JH has not shown it will be likely to prove damages since there has been no indication that JH was actually financially hurt. (Id.)

The Tennessee Supreme Court has held that element (2)—that Defendant knew of the relationship—refers to knowledge of a specific relationship or prospective relationship, "and not a mere awareness of the plaintiff's business dealings with others in general." Trau-Med of America, Inc. v. Allstate Ins. Co., 71 S.W.2d 691, 701 (Tenn. 2002). JH has not identified a specific relationship or prospective relationship with which LP has interfered. At this stage there is insufficient evidence to suggest a likelihood of success on JH's claim of Common Law Tortious Interference. A preliminary injunction will not be granted based on that claim.

### b. Irreparable Harm

JH argues that absent a preliminary injunction, it will suffer reputational harm, loss of good will, current customers, and future customers, and that those harms are categorically irreparable. (ECF No. 150 at PageID 5154.) In response, LP argues that JH is not entitled to a presumption of irreparable harm because JH has not established a likelihood of success on the merits and therefore will not suffer irreparable harm. (ECF No. 223 at PageID 8879.)

Irreparable harm is typically presumed where reputational injuries are at risk due to unfair competition. Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc., 453 F.3d 377, 382 (6th Cir. 2006) (citing Circuit City Stores, Inc. v. CarMax, Inc., 165 F.3d 1047, 1056 (6th Cir. 1999)). The inquiry is "whether the movant will suffer irreparable harm without the injunction[.]" Id., at 380. In the instant case, JH *will* suffer reputational harm without the

injunction.  That injury is considered irreparable due to an inability to quantify it and the difficulty in returning the injured party to the pre-injury position.  Id.  In the instant case, harm through the loss of customers who think JH's fiber cement siding is unsafe or requires additional safety precautions is at risk.  The factor of irreparable harm weighs in favor of granting a preliminary injunction.

### c. Substantial Harm to Others

To determine whether the injunction will cause substantial harm to others, the Court must first know who will be affected by the injunction.  In the instant case, JH implies, but does not state, that LP and The Kruse Brothers will be the only parties affected by the injunction.  This appears to be correct; the proposed injunction is focused on LP's and The Kruse Brothers' discussion of OSHA requirements.  Moreover, the consideration of harm to others includes the harm to the defendant.  E.g., Overstreet v. Lexington-Fayette Urban Cnty. Gov't,. 305 F.3d 566, 579 (6th Cir. 2002) (considering harm to a defendant subject to the injunction under this factor). The second inquiry is whether LP's and The Kruse Brothers' burden of compliance with the injunction would cause it substantial harm.  LP has not supplied any proof on this issue.

LP argues it would suffer substantial harm because the preliminary injunction would silence LP as to the OSHA Standard and prevent them from addressing important safety concerns.  (ECF No. 223 at PageID 8879.)  LP's claims are a broad overstatement of what would be prevented by a preliminary injunction if one were granted.  If a preliminary injunction is granted, LP would not be prevented from talking about the OSHA standard, they would be prevented from making specific statements that are false or misleading when made out of context.  LP's concerns about being silenced are not an issue if the preliminary injunction is narrowly focused.  LP has not demonstrated that there would be substantial harm to others if a

preliminary injunction is granted, so this factor weighs in favor of granting a preliminary injunction.

### d. Public Interest

JH argues that the public interest would be hurt if LP and The Kruse Brothers were to continue making false statements because the public would believe JH's fiber cement is unsafe. (ECF No. 150 at PageID 5157.) JH claims that ensuring consumers are informed with accurate information about the safety of different products and standards is important. (Id.) A preliminary injunction that restricts specific inaccurate information that could deceive consumers would help achieve that goal.

LP argues that being able to discuss safety standards with the public is extremely important and that preventing LP from discussing safety standards would unconstitutionally restrain its First Amendment speech. (ECF No. 223 at PageID 8880-81.) LP's overstatement of the effect a preliminary injunction would have is not persuasive. A preliminary injunction would not prevent discussion of OSHA standards. It would only prevent false or misleading statements from being made about those standards. The factor of public interest weighs in favor of granting the preliminary injunction.

### e.  Weighing the Factors

Factor (1), the likelihood of success on the merits, favors granting the motion only as to LP's OSHA sale sheet, "Protecting Yourself from Airborne Dust," and the Mark Rose email about the OSHA regulations prohibiting circular saws. Factor (2), irreparable harm, favors granting the motion based on reputational damage to JH, but only with respect to LP's OSHA sale sheet. The Rose email was only sent out at one specific time. There is no evidence that

Mark Rose continues to send out the email or that there is any risk of the email being sent out again. A preliminary injunction would not prevent harm that has already been done, that is, it can only prevent future harm. LP's OSHA sale sheet, however, has continued to be used as a marketing tool with the intention of distributing it to as many potential customers as possible. (Williams Depo, ECF No. 232-8 at Page180 lines 13-21; Page 188 lines 10-17.) Factor (3), the harm to others, weighs in favor of granting the motion because there is no evidence that the cost of complying with the injunction to stop distributing the OSHA sale sheet would be high or that companies such as LP would be prevented from accurately discussing safety standards. Factor (4), the public interest, also favors granting the motion so consumers can make informed decisions based on accurate safety information.

Because all four factors weigh in favor of granting the injunction as to LP's OSHA sale sheet (Ex. 16,) the motion is GRANTED with respect to that piece of marketing material.

The factors do not weigh in favor of granting the injunction as to the remaining marketing materials. Factor (1), the likelihood of success on the merits, weighs against granting this injunction. Given the lack of evidence as to several of the elements of JH's claims at this time, factor (1) weighs heavily against granting the injunction. With factor (1) not satisfied, factor (2) is given less weight because the risk of unfair irreparable harm is lower. Factors (3) and (4) both weigh in favor of granting the injunction, but not heavily, because LP would still incur some harm if the injunction is granted and because the public's interest in vigorous competition, which weighs against granting the injunction must be considered. Analyzing all four factors, the Court finds that factors (2), (3), and (4) do not outweigh factor (1). The injunction is therefore DENIED as to the marketing materials other than LP's OSHA sale sheet in English and Spanish (Ex. 16.)

**IV.    Security**

Federal Rule of Civil Procedure 65(c) provides:

The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.

In the Sixth Circuit, "the district court possesses discretion over whether to require the posting of security" for preliminary injunctions.  Moltan Co. v. Eagle-Picher Indus., Inc., 55 F.3d 1171, 1176 (6th Cir. 1995).  When determining whether to require the party seeking an injunction to give security, courts have considered factors such as the strength of the movant's case and whether a strong public interest is present.  Id. at 1176.  In the instant case, little financial information has been submitted on this issue and the amount of an appropriate bond. The Court finds on the current record that the inevitability of harm, the strength of JH's case and the public interest favor the requirement that JH post a modest security bond in the amount of $10,000.

Upon JH's posting of the security bond, LP is hereby ENJOINED from distributing or displaying LP's OSHA sale sheet entitled "Protecting Yourself from Airborne Dust" in English or Spanish (Ex. 16) until the resolution of this action.

**SO ORDERED**, this 20th day of December, 2018.

      /s/ Jon P. McCalla

      JON P. McCALLA
      UNITED STATES DISTRICT JUDGE