**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**AT NASHVILLE**

| | | |
|---|---|---|
| **LOUISIANA-PACIFIC CORPORATION** | ) | |
| | ) | |
| **Plaintiff/Counter-Defendant,** | ) | **Civil Action No. 3:18-cv-00447** |
| | ) | |
| **v.** | ) | **JUDGE MCCALLA** |
| | ) | |
| **JAMES HARDIE BUILDING PRODUCTS, INC.,** | ) | **MAGISTRATE JUDGE HOLMES** |
| | ) | |
| | ) | |
| **Defendant/Counter-Plaintiff/ Third-Party Plaintiff,** | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **THE KRUSE BROTHERS, INC.,** | ) | |
| | ) | |
| **Third-Party Defendant.** | ) | |

---

**PLAINTIFF LOUISIANA-PACIFIC CORPORATION'S OPPOSITION TO DEFENDANT JAMES HARDIE BUILDING PRODUCTS, INC.'S MOTION TO EXCLUDE EXPERT REPORT AND OPINIONS OF MICHAEL LASINSKI**

---

Plaintiff Louisiana-Pacific Corporation ("LP") submits this opposition to Defendant James Hardie Building Products, Inc.'s ("JH") "Motion to Exclude the Expert Report and Opinions of Michael Lasinski" and asks that the Court deny JH's motion in its entirety.

## INTRODUCTION

Mr. Lasinski is LP's damages expert, and, though JH gives little indication of it in its motion, Mr. Lasinski is impeccably qualified for the job. He offers three separate calculations in connection with monetary relief available to LP: (1) JH's revenue growth (for use in assessing JH's profits); (2) LP's actual damages in the form of lost profits; and (3) a break-even number representing the sales JH needed to generate to cover the expense of its false advertising campaign. JH seeks to exclude all three at trial, but it is on Mr. Lasinski's lost profits calculation that JH focuses the most in its motion.

The majority of JH's arguments are based on the false premise that Mr. Lasinski intends to testify regarding causation. Mr. Lasinski is a damages expert, not a causation expert. He said no less than nine times in his report and deposition that he will assume liability and testify only as to damages. Because Mr. Lasinski will not testify about causation, the greater part of JH's motion can be discounted at the start as immaterial.

While JH's other arguments tend to revert to a quarrel about causation, JH also faults Mr. Lasinski's methodology in calculating lost profits and his break-even calculation, as well as the underlying evidence on which Mr. Lasinski relies. JH's argument is a gross mischaracterization of the work done by Mr. Lasinski and of his testimony. LP will set the record straight below.

Additionally, much of JH's argument speaks strictly to the weight of Mr. Lasinski's testimony, not its admissibility. Rarely do two experts give the same weight to the exact same facts. A disagreement about the weight certain facts should be given in reaching an expert opinion

does not render the opinion inadmissible. Damages calculations involve consideration of a multitude of factors. JH will have the opportunity to cross-examine Mr. Lasinski at trial with all the rigor the Court permits, and JH had the ability to present its own expert in rebuttal. The trial process is designed to allow the parties to confront each other in this very way so the jury can weigh all the evidence and make a decision.

Finally, JH argues that both Mr. Lasinski's calculation of JH's revenue growth and his break-even calculation should be excluded. JH says that Mr. Lasinski's calculation of JH's revenue growth should be excluded because the parties should be able to stipulate to those numbers. Whether or not JH believes it should be handled by stipulation, no such stipulation exists at this time, and it is no reason to exclude Mr. Lasinski's testimony on a pre-trial motion. JH argues that Mr. Lasinski's break-even calculation is not an acceptable measure of damages. LP will demonstrate that Mr. Lasinski's break-even calculation is an acceptable and reliable means of establishing a floor for the lost profits LP incurred.

Mr. Lasinski is a highly qualified damages expert with 25 years of experience, he employs widely-accepted financial principles, and the methodology he employs to reach his conclusions is accepted by Federal Courts. He has demonstrated both in his report and in his deposition that the underlying evidence upon which he bases his calculations is reliable and is the type of evidence CPAs regularly use to make such calculations. Mr. Lasinski has done no more than what any damages expert is asked to do when calculating financial damages, and his methods are both accepted and reasonable.

## SUMMARY OF MR. LASINSKI'S QUALIFICATIONS AND METHODOLOGY

### I. Mr. Lasinski's Qualifications

Although JH does not directly challenge Mr. Lasinski's qualifications to calculate damages, it certainly questions his qualifications in connection with its misplaced causation argument. Therefore, as a threshold matter, LP will address Mr. Lasinski's qualifications and then provide an accurate summary of his methodology to make for a clearer discussion of JH's arguments.

Mr. Lasinski is a recognized expert in finance related to intellectual property. He is an eminently qualified damages expert and has been performing damages analyses for 25 years. Ex. 1, Lasinski dep. at 192. He has provided litigation support in approximately 300 cases. *Id*. at 14. He has consulted on hundreds of engagements pertaining to intellectual property transactions, valuations,[1] and damages. Ex. 2, Lasinski CV, Appendix A to Lasinski Report. Mr. Lasinski's consulting experience includes a broad cross section of industries, such as advertising, computers, Internet, e-commerce, and many others. *Id*. Mr. Lasinski is a founding member of his professional services firm that focuses on intellectual property valuation, litigation consulting, strategy, and transactional services. *Id*. He has an M.B.A. in Finance and Accounting, is a C.P.A., and is Certified in Financial Forensics by the American Institute of Certified Public Accountants. *Id*. He has been published in the field of intellectual property multiple times. *Id*. He has been president and chair of several distinguished intellectual property groups and has taught courses at universities and law schools on intellectual property valuation. *Id*. Mr. Lasinski has provided expert financial and damages testimony in many matters involving high profile companies such as Samsung, Coca-Cola, Nokia, Amazon, Canon, Proctor & Gamble, Ortho-McNeil Pharmaceutical,

---

[1] Although JH argues that Mr. Lasinski works solely in valuation, that is clearly not true based on the experiences listed in his CV. In any event, the same education, knowledge, skills, and training is used in valuation as it is for estimating lost profits. *See* Matt Connors & Robert P.K. Mooney, *Business Valuation Applications to Economic Damages for Lost Profits*, Utah B.J., Jan./Feb. 2011, at 25 (copy attached as Exhibit 3).

Intel, and UPS, among others. (*Id*.) Mr. Lasinski has been retained and testified as an expert in federal, ITC, state, tax, and arbitration proceedings alike. *Id*. He has never had his opinions rejected by a court under *Daubert* based on his work, qualifications, or methodologies. Ex. 1, Lasinski dep. at 23-25.

Mr. Lasinski's consulting work focuses on intellectual property, including strategy, damages, tax, bankruptcy, valuation, false advertising, patent infringement, and licensing. The percentage of his work each year dedicated to litigation consulting varies from 20-60%. Specific to this case, Mr. Lasinski has previously consulted on several false advertising cases, and he has testified in at least one false advertising matter. Ex. 1, Lasinski dep. 7-8, 10, 18-20, 192. He has also consulted on patent infringement cases dealing with web impressions, which is of interest in this case. *Id*. at 70. Also of interest in this case, Mr. Lasinski has completed marketing courses in connection with obtaining his M.B.A., and he has used marketing information in his damages calculations regularly over the past 25 years. *Id*. at 194-95. In fact, he uses market reports and expectations around 80% of the time in his litigation consulting practice. *Id*.

## II. <u>Mr. Lasinski's Calculations</u>[2]

### A. <u>LP's lost profits</u>

Mr. Lasinski used what is sometimes referred to as the "yardstick" method for determining LP's lost profits. Redacted [redacted]

[2] JH does not take issue with Mr. Lasinski's calculation of JH's revenue growth, so LP will not take up the court's time with the details of that calculation.

[3] Though JH chose in its motion to refer to its false advertising campaign as the "No Wood Is Good" or "NWIG" campaign, it is undisputed that JH internally referred to the campaign as the "LP Campaign," and LP was the focus of the campaign. Ex. 4, Lasinski Report ¶ 31. Therefore, LP will refer to it as the "LP Campaign" in this Opposition Brief.

Redacted [redacted]

[redacted]

[redacted]

[4] As controller, Mr. Faust was in charge of all finance and accounting for the siding segment at LP. Ex. 5, Faust dep. at 6.

**B. Break-even analysis**

As an alternative, to calculate a floor for LP's lost profits, Mr. Lasinski calculated the sales revenue that JH would have had to make to cover the expense of the LP Campaign. Then he determined what profit LP would have earned on those sales. Ex. 4, Lasinski Report ¶ 18.

Redacted

**REBUTTAL ARGUMENT**

To summarize JH's motion, JH seeks to exclude Mr. Lasinski's expert testimony at trial because, according to JH:

1) Mr. Lasinski improperly gives a causation opinion.
2) Mr. Lasinski's purported causation opinion is not supported by a reliable methodology or reliable evidence.
3) Mr. Lasinski's purported causation opinion is based entirely on *ipse dixit*.
4) Mr. Lasinski's break-even damages calculation is factually and legally unsupported.
5) The parties should be able to stipulate to Mr. Lasinski's calculation of JH's revenue growth.

LP will address each of these arguments in turn.

## I. Mr. Lasinski is not a causation expert, and none of his opinions go beyond the ordinary purview of damages experts.

Mr. Lasinski said no less than nine times between his report and deposition that he will assume liability and testify only as to damages. Ex. 4, Lasinski Report at ¶ 9; Ex. 1, Lasinski dep. at 21-22, 49, 53, 59, 64-65, 88-89, 102, 109. He is not a causation expert and does not intend to testify as one at trial. JH nonetheless approaches its motion as if Mr. Lasinski intends to testify on causation and bases nearly its entire motion on this false premise.

JH conflates legal causation (i.e., the fact of injury) with proof of damages (i.e., the amount of loss resulting from the injury). LP has to prove legal causation as an element of its false advertising claim, and Mr. Lasinski, as a damages expert, is required to assume that LP will prove that at trial for purposes of his calculations. However, to estimate lost profits, a damages expert necessarily has to consider the causal fact resulting in the damages. A damages expert must consider other factors leading to the plaintiff's losses and define the correct damages time period. Matt Connors & Robert P.K. Mooney, *Business Valuation Applications to Economic Damages for Lost Profits*, Utah B.J., Jan./Feb. 2011, at 25-26 ("There is a distinction, however, in the legal requirement of causation and proof of the amount of damages. The plaintiff must show that damages were proximately caused by the defendant. The plaintiff expert must calculate a reasonable estimate of damages without undue speculation. Arriving at a reasonable estimate means that the expert should consider and take into account other factors that could be partially responsible for a plaintiff's lost profits.").[5] In other words, he must determine which lost profits *result from* or are *attributable to* or are *caused by* (whatever the term used, it means the same, and

[5] *Daubert* requires the Court to act as a gatekeeper to make sure that experts use methodologies generally accepted by others in the expert's field. This article was authored jointly by a CPA and a lawyer. *Id*. at n.a.1 & a.2.

it does not mean legal causation) the injury that he has assumed. *Id*. He is not required to prove causation and indeed, if this were the law, no monetary damages expert testimony would ever be permitted a trial because only there can causation be proven. Accordingly, the normal method is to assume causation (i.e. liability).

This is what Mr. Lasinski has done in this case, and it is no more than any other damages expert has been permitted to do when testifying as to lost profits at trial. Mr. Lasinski's lost profits calculation "controls for other known events that could have inhibited [LP] from reaching [its] growth targets," i.e., he calculated lost profits *related to* the false advertising and not other causes. Ex. 9, Lasinski dep. at 88-89. And, Mr. Lasinski defined the damages period as the start of the LP Campaign until December 2018.[6] There is more than sufficient evidence for Mr. Lasinski's opinions to be admitted at trial and for a reasonable jury to award damages to LP.[7]

JH points to Mr. Lasinski's use of the words "as a result of" and "attributable to" in his Report, but that is just semantics. A court in this Circuit recognized as much in a recent patent infringement case. In *Static Control Components, Inc. v. Lexmark International, Inc.*, a federal district court in Kentucky found a damages expert's testimony to be both relevant and reliable and denied the motion *in limine* to exclude his testimony at trial where the movant argued, like JH does here, that the expert improperly intended to testify on causation. *See Static Control Components, Inc. v. Lexmark Int'l, Inc.*, CIVA5:02-571, 2007 WL 7083655, at *6-7 (E.D. Ky. May 12, 2007).

[6] JH launched the LP Campaign April 9, 2018. Ex. 4, Lasinski Report ¶ 37 & n.54. The LP Campaign websites (www.nowoodisgood.com and www.nowoodsgood.com) remain available to the public. The LP Campaign collateral materials continue to be available and ordered by JH's sales representatives. ECF No. 417 at Exs 2-3; Ex. 6, Kuizenga Dep. 259-263, Mar. 26, 2019.

[7] JH laments that Mr. Lasinski is not an expert in the siding industry or the advertising field and lacks experience to express opinions on how JH's false advertising caused LP injury. Because Mr. Lasinski is not proffered as a causation expert, these arguments are irrelevant to the admissibility of his testimony.

Like LP, the non-movant replied that the expert was a damages expert and did not intend to testify as to causation, but rather assumed liability for patent infringement. *Id*. at *6. The court agreed that the expert was a damages expert, noting that the expert said as much in his report and his deposition, just as Mr. Lasinski has here. *Id*. at *6. The court disregarded the movant's argument based on the expert's use of words like "contributory" and "enable," finding it "semantical rather than substantive." *Id*.

JH cites a few cases from other circuits to support its misplaced theory that Mr. Lasinski's testimony should be excluded as improper causation opinion, but none fits this case.[8] First, JH cites *Robroy Indus. – Texas, LLC v. Thomas & Betts Corp*., No. 2:15-CV-512-WCB, 2017 WL 1319553 (E.D. Tex. Apr. 10, 2017), in which a Texas federal court refused to allow the *defendant's damages expert* to testify regarding legal causation. But, the case has the opposite effect here from what JH intends. *Id*. at *10. The defendant's expert, who was an economist with no expertise or experience in the relevant product market, sought to testify that the plaintiff had failed to demonstrate legal causation and to testify as to all the other reasons the customers switched to the defendant to purchase products. *Id*. at *9. In contrast, Mr. Lasinski offers no opinions as to the effect JH's false advertising had on customers' buying decisions, and he offers no opinions on legal causation. *See id*. at n.1.

Rather, Mr. Lasinski offers opinions similar to the *plaintiff's damages expert* in *Robroy*, which the court did not exclude. The plaintiffs' damages expert was set to testify regarding "only the issue of damages *resulting from*" the defendant's false advertising. *Id*. at *1 (emphasis added). Similar to Mr. Lasinski, he calculated damages for both disgorgement of the defendant's profits

[8] Notably, JH cites no case law from this Circuit on this point. In fact, it cites little Sixth Circuit case law at all aside from quoting general propositions of law.

and for the plaintiff's lost profits. *Id*. at *1. In a motion *in limine*, the defendant argued that the plaintiff's expert's testimony should be excluded because he gave no basis for a causal link between the false advertising and the lost sales that he calculated. *Id*. at *4. The court noted, however, that the expert only assumed liability and did not seek to opine that the assumptions underlying his opinions were true in fact. *Id*. Therefore, his testimony was admissible. *Id.* In sum, *Robroy* actually supports the admissibility of Mr. Lasinski's testimony.

JH also cites *Parkway Garage, Inc. v. Philadelphia*, No. CIV. A. 90-7752, 1994 WL 412430 (E.D. Pa. Aug. 3, 1994). *Parkway Garage*, however, does not involve a pre-trial *Daubert* motion, and its facts render it inapposite. *Id*. at *7. The damages expert in *Parkway Garage* testified at trial that the wrongful interruption of a parking garage's business caused permanent damage to its reputation and therefore caused future loss of revenue for the remaining nine years of its lease. *Id*. at *7. The Pennsylvania federal court granted the defendants' motions for remittitur after, not surprisingly, it found that the damages expert went entirely beyond his expertise. *Id*. at *7. The court held that the expert's opinions about "what causal effect, if any, the closing of the garage for a total of six weeks may have had on the parking habits of urban commuters for the next nine years was clearly unreliable because it was based on pure speculation and it was outside the knowledge and experience of his discipline as an accountant" and not based on any evidence in the record. *Id*. at *8. The court noted that the plaintiff had not produced any expert witness in the field of urban planning, transportation, or engineering to opine on the long term effect of the closure. *Id*.

Not only does *Parkway Garage* very clearly not apply here by its facts, but, in its motion, JH mischaracterizes that court's holding, intimating that the court found the expert's entire lost profits calculation inadmissible. It did not. In fact, the court upheld the portion of the verdict that

was based on the damages expert's opinions and calculations regarding *past* profits lost, which he based on past financial statements and estimated expenses the garage's Vice President of Finance testified about on the stand. *Id*. at *17.

Finally, JH cites *Snac Lite, LLC v. Nuts 'N More, LLC*, No. 2:14-cv-01695, 2016 WL 6778268 (N.D. Ala. Nov. 16, 2016). However, as the *Robroy* court noted in distinguishing *Snac Lite*, the expert in *Snac Lite* reportedly sought to actually testify about causation. *Robroy*, 1319553, at *6.[9]

While LP will now address the remainder of JH's arguments, much of JH's motion should be discounted on its face because it focuses on the false premise that Mr. Lasinski will testify as to causation. On this, the court's observations in *Robroy* apply with equal weight here: "Much of T&B's motion, which focuses almost entirely on the issue of causation, is therefore beside the point. Even when T&B purports to address the issue of damages, its arguments frequently bleed over into quarrels with Robroy's proof of causation." *Id*. at *6.

## II. **Mr. Lasinski's calculations are reliable, and his methodology is sound and based on widely-accepted accounting principles.**

Mr. Lasinski applied a yardstick methodology to calculate LP's lost profits, which is a widely-accepted method recognized by CPAs and by courts. *See, e.g.*, *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 793 (6th Cir. 2002) (regression analyses, yardstick, and before-and-after tests are all "generally accepted methods" for proving antitrust damages). *See also* AICPA

[9]Moreover, the court in *Snac Lite* only granted the motion in part, to exclude opinions about causation. *Id*. at *8 (stating expert was not qualified to testify as to causation, but not addressing arguments that his damages calculations were inadmissible). Also, the filings on the *Snac Lite* docket state that the expert had never testified as an expert before, had never been accepted as an expert to testify before, and had not authored any publications of any kind. Ex. 7, *Snac Lite, LLC* docket, Doc. 90. This sits in obvious contrast to Mr. Lasinski's impressive qualifications and the experience he has gained over the past quarter of a century.

Practice Aid at 25-26, excerpt of which is attached hereto as Exhibit 8 (listing pre-litigation projections as possible yardstick for calculation). The yardstick method measures the plaintiff's actual profits against a yardstick, such as past budget results, industry averages, or pre-litigation projections, to determine losses. *See* Connors, *supra* at 25-26. Here, Mr. Lasinski used the 2018 LP Projections, *i.e.*, pre-litigation projections, and LP's historical sales as a measure of what LP's growth rate would have been in 2018 but for JH's false advertising, and he compared it to LP's actual profits during the LP Campaign to determine LP's losses.

Mr. Lasinski started with the 2018 LP Projections, the sales guidance LP's Chief Executive Officer, Brad Southern, provided to LP's investors. Ex. 4, Lasinski Report ¶¶ 59-60. He did not, as JH claims, simply accept them as reliable without verification. Mr. Lasinski found the 2018 LP Projections to be reliable for several reasons. First, they were made pre-litigation in the ordinary course of LP's business as public guidance for its investors. The 2018 LP Projections were generated just after the 2018 first quarter actual sales numbers came out (Ex. 1, Lasinski dep. at 138) and just as the LP Campaign began. Therefore, LP was able to factor in actual first quarter sales, and because they were pre-litigation, there was no risk of artificial inflation of sales projections for litigation purposes. Moreover, because they were intended as public guidance for investors in LP, which is a publicly-traded company, the projections inherently carry indicia of reliability, and in Mr. Lasinski's broad experience, companies pay very significant attention to the guidance they give their investors. *Id.* at 120-21. Second, Mr. Lasinski checked Redacted

. Ex. 4, Lasinski Report ¶¶ 28, 60 (2017's growth rate was over 13%); Ex. 1, Lasinski dep. at 122. Third, Mr. Lasinski confirmed through the deposition testimony of, and conversations with, LP's Business Controller for the Siding Segment (Mr. Faust) that LP consistently achieved its sales

guidance projections year after year and consistently had strong growth. Ex. 4, Lasinski Report ¶ 60 n.93; Ex.1, Lasinski dep. at 121.[10] Fourth, Mr. Faust confirmed that LP tracks the marketplace very closely and LP's projections have historically been consistent with their expectations in the marketplace. *Id*. LP is not a new company, having been in the market for over twenty years, so its projections were not at risk of being speculative. Ex. 4, Lasinski Report ¶ 28. Fifth, Mr. Faust confirmed that [redacted]. Ex. 1, Lasinski dep. at 120-21. Finally, Mr. Lasinski did not simply calculate losses using the most aggressive projections. Instead, he provides a high and low calculation based on [redacted], (Ex. 4, Lasinski Report ¶¶ 15-17), and he also provides an alternative break-even analysis to establish a floor for LP's lost sales and profits.

After verifying the reliability of the 2018 LP Projections, Mr. Lasinski used third-party market research reports to measure [redacted], and he adjusted the projected growth rate accordingly. Ex. 4, Lasinski Report ¶ 60. Mr. Lasinski found this data to be reliable because it was third-party data of actual sales in the market and because LP used it in benchmarking itself. Ex. 1, Lasinski dep. at 144, 148-49. And, Mr. Lasinski confirmed through LP documents and discussions with LP's Director of Marketing Strategy and Demand Generation (Ms. Le) the appropriate products against which to benchmark LP's sales. Ex. 4, Lasinski Report ¶ 22 & n.95.

---

[10] JH prefers to focus on a single year, when in 2015 the polar vortex caused unexpected slower growth, and LP did not meet its projected growth models. One year does not affect the reliability of LP's otherwise consistent growth patterns. And, given that there was no polar vortex in 2018, JH's focus on 2015's anomaly is misplaced. While JH lists several weather events as factors it claims Mr. Lasinski failed to consider in his calculations for 2018, JH has submitted no evidence that those events had an impact on sales. In any event, these matters go to the weight of the testimony, not its admissibility.

Mr. Lasinski asked Mr. Faust whether there were other known events that could have caused the downward sales impact in 2018, but would not have already been reflected in the third-party market data. Ex. 4, Lasinski Report ¶ 51. Mr. Faust knew of no other events that could have disproportionately affected LP's sales at that time in relation to the broader market. *Id.*; Ex. 1, Lasinski dep. at 43-44. Mr. Lasinski found it reasonable to rely on Mr. Faust for this information because he is the controller and because he was designated as the 30(b)(6) representative for LP on these issues. *Id.* at 44. Thus, [redacted]. *Id.* at 159-60. JH argues that Mr. Lasinski did not factor in slow growth in the new home construction market for 2018, but that was a known factor when the 2018 LP Projections were generated, so it was factored in already. *Id.* at 162-63. Moreover, Mr. Lasinski used third-party market data, which showed what actually happened in the marketplace and included the slow new home market growth, to make adjustments to his calculations to account for the slowdown. *Id.* In any event, for his testimony to be admissible, Mr. Lasinski is not required to account for all possible variables, particularly when he had no evidence of other relevant variables. *Conwood*, 290 F.3d at 794 (for his testimony to be admissible, damages expert was not required to account for all market variables that could have caused losses).

Though JH takes issue with Mr. Lasinski relying on information from LP's controller, Mr. Lasinski clearly relied on information from multiple sources at JH, LP, and third-parties. Mr. Lasinski neither parroted Mr. Faust nor relied solely on information provided to him by Mr. Faust. Mr. Lasinski relied on the 2018 LP Projections, conversations with Mr. Faust, his staff's conversations with Ms. Le, Kenneth Hollander's expert report and opinions, the Principia data, the

Fredonia focus report from January 2019, LP's SEC 10-K filing for the 2018 fiscal year,[11] LP's reports for the actual first quarter results in 2018, multiple legal filings in this case, and the depositions of Mr. Faust, as well as those of Marc Setty, Sean Gadd, Ms. Le, and others. (*See generally* Lasinski Report.) In any event, Mr. Lasinski's use of information from LP witnesses does not render his opinions inadmissible. *See*, *e.g.*, *EFCO Corp. v. Symons Corp*., 219 F.3d 735, 739 (8th Cir. 2000) (in false advertising case, district court did not abuse discretion in allowing defendant's damages expert to testify where expert based calculations on information received from both parties regarding their revenue and from defendant's CFO and sales manager; plaintiff's criticisms of expert's approach was for the jury to weigh).

JH's argument that Mr. Lasinski failed to personally conduct market research and failed to personally investigate causation is, again, irrelevant. Mr. Lasinski assumes liability, and therefore, did not himself investigate consumer effects of the LP Campaign. Ex. 1, Lasinski dep. at 48-49. What Mr. Lasinski did, however, was to appropriately rely on the expert report of Mr. Kenneth Hollander, who conducted two national surveys comprising 800 respondents and found that when exposed to JH's false advertising materials, [redacted]. Ex. 4 Lasinski Report ¶ 54.

Nonetheless, to the extent Mr. Lasinski needed to consider causal facts for purposes of his damages opinion, he did not, as JH claims, simply take Mr. Faust's word for it. Mr. Lasinski considered the following: (a) [redacted] (Ex. 4, Lasinski Report ¶¶ 30-37);[12] (b) testimony

[11] Lasinski used LP's SEC filings to quantify net sales for SmartSide and fiber siding in 2018. Ex. 1, Lasinski dep. at 38.
[12] This was the more refined way of wording JH's goal. One document states more colorfully: [redacted]

of Warren Legner, JH's Marketing Manager in charge of the LP Campaign, Redacted (*Id.* at ¶¶ 21, 33); (c) documents produced by JH showing that Redacted (*Id.* at ¶¶ 39-40); (d) testimony by Marc Setty, Director of Marketing at JH, Redacted (*Id.* at ¶¶ 41-42); (e) Redacted (*Id.* at ¶ 54);[13] and (f) LP's records showing that Redacted (*Id.* at ¶ 46).[14]

JH further argues that Mr. Lasinski's market adjustment for the slow growth in 2018 was insufficient because Redacted. Mr. Lasinski described in his report that Redacted. Ex. 4, Lasinski Report ¶ 22. Therefore, Mr. Lasinski found it inappropriate to Redacted He confirmed this understanding of the market with Ms. Le and against third-party market data. *Id.* at n.28, n.95, Figure 3. Moreover, there can be no dispute from JH's own materials reviewed by Mr. Lasinski that Redacted. *Id.* at ¶ 30.

---

Redacted (Ex. 4, Lasinski Report ¶ 34.)

[13] Mr. Hollander found that Redacted (Ex. 1, Lasinski dep. at 46-47, 55-56.) Those findings were consistent with what Redacted. (*Id.* at 47.)

[14] LP Campaign materials were Redacted (Ex. 4, Lasinski Report ¶ 37.)

None of the cases cited by JH support the exclusion of Mr. Lasinski's testimony in this case. The *McGlinchy* court excluded the experts' testimony because one expert (who was proffered to forecast future lost profits) could not recall one single wrongful act by the defendants to cause the losses he calculated and he said that the cause could have been "anything." *McGlinchy v. Shell Chemical Co*., 845 F.2d 802, 806 (9th Cir. 1988). The court held the inconsistencies would create confusion and excluded the testimony under Rule 403. *Id*. That expert also planned to testify about gross sales, did not know which product lines actually declined in sales, and could not distinguish between sales in the U.S. versus sales outside the country. *Id*. at 807. The other excluded expert (also under Rule 403) acknowledged that he "divined" a total sales figure and then worked backward to plug in a growth rate to arrive at the actual growth figure. *Id*. He also divined the expenses associated with the sales and assumed expenses would have been stagnant for over nine years. *Id*. at 806-07. Under such facts, the court unsurprisingly upheld exclusion of the experts' testimony. But, no such facts exist in this case.

In *Bruno v. Bozzuto's, Inc*., the court applied the Third Circuit's *Daubert*-based standard, known as the "Paoli II" standard, which includes four additional factors to those required by *Daubert*, *Bruno v. Bozzuto's, Inc*., 311 F.R.D. 124, 136, 138 (M.D. Pa. 2015) (noting "this Circuit's reliability requirement"), and it seemed to note a propensity of Pennsylvania federal courts to strike expert evidence on the grounds that the expert relied on "questionable data," *id*. at 137-38 (stating that striking expert evidence for questionable data is "not a novel course of action among Pennsylvania federal courts"). While federal cases in other circuits certainly provide a pool of persuasive law, this is not a Pennsylvania federal court, and it does not apply Third Circuit law, and the *Bruno* court seems to be suggesting that the distinction matters. Regardless, however, of whether the Third Circuit or Pennsylvania federal courts have some unique or more exacting

application of *Daubert* or not, the facts in *Bruno* nonetheless render it inapposite here. First, the *Bruno* court says that experts cannot rely solely on secondary sources without verification of the information contained therein. *Id*. at 137-38. Mr. Lasinski has demonstrated that he did not rely without verification in this case. Second, the expert in *Bruno* relied on a pro forma that was generated not as a basis for sales or damages projections, but to determine if the company could break even if it made a loan. *Id*. at 128, 134. Here, the 2018 LP Projections were generated for investors for the purpose of sales projections. Third, actual sales data was released that sharply diverged from the pro forma that the expert relied upon, but the expert did not change his opinions. *Id*. at 132-34. Here, Mr. Lasinski compared the 2018 LP Projections to actual sales data from both LP and third-parties to confirm its reliability.

In *JMJ Enterprises, Inc. v. Via Veneto Italian Ice, Inc*., also a Pennsylvania federal case (as are many of the cases cited by JH), the defendant's damages expert made a sales projection using only 1996 and half of 1997, but labeled it a "trend" of annually doubling sales. *JMJ Enter., Inc. v. Via Veneto Italian Ice, Inc.*, No. CIV.A. 97-CV-0652, 1998 WL 175888, at *6-7 (E.D. Pa. Apr. 15, 1998). He also relied on tax returns for sales information, without verifying the information contained in the tax returns against actual sales data and despite testimony that the tax returns were inaccurate for failure to report some sales. *Id*. at *7-8. Mr. Lasinski did not rely on tax returns for his analysis, and he verified the information upon which he relied.

## III. Mr. Lasinski's conclusions are not *ipse dixit*.

Like much of JH's other arguments, its *ipse dixit* argument bleeds over into quarreling with proof of causation and, in turn, Mr. Lasinski's qualifications to opine on causation. As demonstrated, this is immaterial. However, LP addresses the argument now.

JH argues that Mr. Lasinski had no evidence the lost profits he calculated were caused by JH's false advertising, making a distinction between temporal correlation and causation.[15] JH latches onto one statement by Mr. Lasinski in his deposition, taken out of context, to claim that his opinion on lost profits is *ipse dixit*. As a part of Mr. Lasinski's response to JH's attorney's assertion that there is no evidence of lost sales, he stated "I do not agree that there is no evidence of lost sales because there is. I calculated lost profits, and so there is evidence of lost profits." Ex. 1, Lasinski dep. at 88.[16] Mr. Lasinski clearly did not literally mean that LP has lost profits because

---

[15] JH argues that the subject market has many competitors and, therefore, there is no basis to correlate JH's sales to LP's lost profits. This argument is disingenuous. JH's LP Campaign directly and specifically targeted LP's products by comparing its fiber cement siding to "OSB" siding and engineered wood siding. LP is the only siding manufacturer of strand-based engineered wood siding and is the largest producer of engineered wood siding in the United States. Ex. 4, Lasinski Report at ¶ 28. Moreover, Redacted

[16] The exchange between Mr. Lasinski and JH's lawyer was as follows:

> Q. Are you aware that LP has no evidence of any sales that have been lost as a result of the No Wood is Good?
>
> [Objection]
>
> A. So I am aware of Miss Lee's testimony as it relates to identifying a specific lost customer which is in part an answer to that question. I do not agree that there is no evidence of lost sales because there is. I calculated lost profits, and so there is evidence of lost profits.
>
> Q. The question I had, lost sales as a result of the No Wood is Good campaign. I know you've calculated, but you – the question I have is whether there's proof of lost sales because of the No Wood is Good campaign, and you don't calculate that. You just assume what caused it. You assume liability, and then you make a calculation. Am I saying that wrong?
>
> [Objection]
>
> A. It is correct that I have assumed liability, but my calculation as I state in my report for lost profits controls for other known events

he says so. The remainder of his response goes on to list the evidence he relied on when he calculated the lost profits incurred as a result of JH's false advertising. That included, in part,



Mr. Lasinski's report certainly laid out evidence of the connection between JH's false advertising and the lost profits he calculated. To simply ignore his report and deposition answers, as JH does in its motion, is fallacious.

Mr. Lasinski actively sought to isolate the impact of the LP Campaign by choosing the proper damages time period (i.e., when the false advertising began); adjusting the 2018 projections to reflect changes in the overall market; and establishing that there were no other known factors to cause the lost sales in 2018. Ex. 4, Lasinski Report ¶¶ 51, 59, and 60 & n.93, 95. The evidence Mr. Lasinski relied upon to isolate the impact of the LP Campaign was reliable and sufficient to support his conclusions. *See*, *e.g.*, *Playtex Prod., Inc. v. Procter & Gamble Co*., 126 Fed. App'x 32, 35 (2d Cir. 2005) (circumstantial evidence of causation is "of no less value than direct evidence" and "can

---

> that could have inhibited them from reaching their growth targets, meaning LP's growth targets, and so, therefore, it would relate to the advertising campaign that we've been discussing.

Ex. 1, Lasinski dep. at 87-88.

be sufficient to prove causation in a false advertising case"; trial court did not err in allowing damages expert to testify where expert adjusted profit losses to account for other factors affecting sales and market was dominated by small number of large sellers).

JH also argues that Mr. Lasinski admitted there was no evidence of any sales made by JH or sales lost by LP as a result of the LP Campaign and no single customer has been identified as a lost sale. This argument does not speak to the admissibility of Mr. Lasinski's lost profits calculation, but again is quarrelling with LP's proof of causation. In any event, it is clear from Mr. Lasinski's report and deposition testimony that there is evidence JH's false advertising affected customers' buying decisions, as discussed previously. *See* Ex. 4, Lasinski Report ¶¶ 32-34, 39-42, 46, 54. This includes Mr. Hollander's expert report in which he concludes after conducting two national surveys that consumers exposed to JH's false ads "were significantly less likely to choose [LP] siding than those exposed to the ads [without the false] elements." *Id.* at ¶ 54. Mr. Lasinski also noted that in the first quarter of 2018, Redacted which precisely corresponded with the LP Campaign. *See* Ex. 1, Lasinski dep. at 114. This has meaning when it is taken together with the other evidence that Mr. Lasinski considered.

Moreover, as Mr. Lasinski explained, the deposition testimony establishes that LP does not maintain records of actual sales decisions by end customers. This is because LP does not sell siding directly to the end user, but instead uses distributors and dealers. Ex. 1, Lasinski dep. at 92-93. Ex. 4, Lasinski Report ¶ 45.

Though JH focuses on whether LP can identify a specific lost customer and cites cases from other jurisdictions on the issue, the Sixth Circuit presumes actual damages where there is literal falsity and willful deception in comparative advertising, like with the LP Campaign. *Balance*

*Dynamics Corp. v. Schmitt Indus., Inc.*, 204 F.3d 683, 694-95 (6th Cir. 2000). As the Court previously recognized, the image of buckled siding labeled as "OSB Siding" "constitutes willful deception that targeted LP, and the presumption of money damages applies to those marketing materials." ECF No. 171 at 16.[17]

JH also claims Mr. Lasinski misrepresented facts about the success of the LP Campaign. Namely, JH argues that Mr. Lasinski "relied on web impressions as a proxy for LP's lost sales" during the LP Campaign. This simply is untrue. Mr. Lasinski testified repeatedly that he did not use web impressions as a direct measure of sales. Ex. 1, Lasinski dep. at 68, 73-74. Rather, JH's own witnesses and internal records show that [redacted] Ex. 4, Lasinski Report ¶¶ 39-42. JH's own [redacted] makes them reliable information from which Mr. Lasinski can infer the LP Campaign's success.[18]

JH claims Mr. Lasinski misrepresented that JH's Director of Marketing, Marc Setty, testified the LP campaign was successful. In relation to this argument, JH takes issue with Mr. Lasinski's decision not to discuss in his report the testimony by Sean Gadd, the Executive Vice President North America Commercial at JH, that *early* in the LP campaign, it "underperformed"

---

[17] JH cites *Aviva Sports, Inc. v. Fingerhut Direct Marketing, Inc.*, 829 F. Supp. 2d 802 (D. Minn. 2011). The court in *Aviva Sports*, however, distinguished its facts where there was no comparative advertising from cases in which, like here and *EFCO Corp*., the advertising was comparative. *Id.* at 816. The distinction matters because in comparative advertising cases, the link between the false advertising and the loss is inferred. *Id.*

[18] JH argues that Mr. Lasinski has no experience with web impressions and does not understand them. This is beside the point, as [redacted] Further, while Mr. Lasinski does not have specific, formal training in the area of how web impressions translate to sales, he has had marketing classes and has experience in using web impressions in his damages analysis. Ex. 1, Lasinski dep. at 69. Lasinski has dealt with numerous cases involving web impressions. *Id.* at 70. He is an expert in what factors could impact sales, and that includes web impressions and sessions where applicable. *Id.* at 69.

with regard to leads, as opposed to web impressions or sessions. Ex. 9, Gadd dep. at 52. As Mr. Lasinski noted in his report, Warren Legner, the Marketing Manager at JH, testified that [redacted] Ex. 4, Lasinski Report n.60. *See also* Ex. 10, Setty dep. at 43-45. It is unclear how Mr. Gadd could know the extent of the leads generated by the LP Campaign and thus opine that the LP Campaign had "underperformed" given this lack of lead information. Ex. 1, Lasinski dep. at 78. In short, Mr. Lasinski did not ignore Mr. Gadd's testimony; he considered it in conjunction with Mr. Legner's testimony [redacted] *Id*. at 79. It was reasonable for Mr. Lasinski to rely on the testimony of Mr. Setty that other indicators used by JH itself to gauge success, indicators that were accurately measured – web impression and web sessions included – showed success. *Id*. at 66. This indicated success, particularly where LP's corresponding sales were negatively impacted. *Id*. at 67.[19]

Regardless, the fact that Mr. Lasinski did not specifically cite portions of either deposition transcript is not a basis for exclusion of his testimony at trial because he did, in fact, consider the testimony in reaching his opinions. JH's argument goes to weight, not admissibility, and JH will have ample opportunity for cross-examination and rebuttal testimony at trial. *See*, *e.g.*, *In re Smartalk Teleservices, Inc. Sec. Litig.*, 487 F. Supp. 2d 940, 944 (S.D. Ohio 2007) (where expert took into consideration market information in forming opinion, but made judgments about impact of information in his analysis, his methodology was not rendered deficient and argument went to weight of testimony, not admissibility). *See also ID Security Sys. Canada, Inc. v. Checkpoint Sys., Inc.*, 249 F. Supp. 2d 622, 692-93 (E.D. Pa. 2003) (where party's experts rely on conflicting facts,

[19] By June 2018, [redacted] Ex. 4, Lasinski Report ¶¶ 39-40, 49.

it does not cast doubt on admissibility, but rather goes to weight of testimony and can be addressed in cross-examination and rebuttal).

## IV. **Mr. Lasinski's Break-Even calculation is an accepted accounting methodology with a sound basis in the evidence.**

Mr. Lasinski also provides a calculation based on the sales JH had to generate to cover the expense of its LP Campaign, which he then used to determine the profits LP would have earned on those sales. Ex. 4, Lasinski Report ¶ 18. He uses this to set a floor for lost profits based on the fact that for-profit companies like JH intend to make money on their advertising investments. Mr. Lasinski refers to this calculation as his break-even analysis. JH takes issue with this on two fronts. First, JH says the break-even analysis is not accepted in case law. Second, JH argues that evidence does not support Mr. Lasinski's inference that the LP Campaign was successful.

As for the acceptability of the break-even methodology, it is accepted by CPAs and has been used by courts in false advertising cases. *See*, *e.g*., Uniform CPA Examination Business Environment and Concepts (BEC) Blueprint, American Institute of CPAs, May 31, 2018; A Quick Guide to Breakeven Analysis, Harvard Business Review, July 2, 2014 (copy attached as Exhibit 11). *See also U-Haul Int'l, Inc. v. Jartran, Inc*., 793 F.2d 1034, 1042 (9th Cir. 1986) (in false advertising case, affirming district court's award of damages based on defendant's cost of its false advertising campaign and finding that district court was not clearly erroneous when it "assumed that the [defendant's] financial benefit was at least equal to the advertising expenditures").

Regarding JH's argument that it did not consider its LP Campaign to be successful, JH's fact witnesses and JH's documents establish that it achieved or exceeded JH's own internal metrics valuation. Lasinski Report ¶¶ 39, 40, 42. Moreover, Mr. Setty testified that the purpose of any JH marketing campaign is to grow the company and that JH assessed return on investment of its marketing campaigns by establishing these quantitative metrics. *Id*. at ¶¶ 68, 70. JH also believed

in its LP Campaign's success enough to share it with JH's investors. *Id*. at ¶ 43. Finally, the LP Campaign was successful enough that it was extended beyond its original run, and many of its elements continue to be available and used today. *Id*. at ¶ 44. There is, therefore, a substantial basis for assuming that JH revenue at least covered the cost of its LP Campaign, and Mr. Lasinski's break-even analysis takes the conservative approach to measuring losses based on the minimum sales necessary for JH to break even. Likewise, Mr. Lasinski's conclusion that JH's sales from the LP Campaign likely came at the expense of LP is soundly based in the record evidence discussed above regarding the LP Campaign's likely influence on customer buying decisions, as well as its Redacted LP. *Id*. at ¶¶ 31-34, 46, 54.

**V. <u>Mr. Lasinski's opinion and calculation of JH's sales growth should not be excluded.</u>**

JH does not take issue with Mr. Lasinski's calculation of JH's revenue growth, except to argue that the parties should stipulate as to the numbers. No such stipulation exists at this time, and the parties have not even preliminarily agreed to any stipulation related to the disgorgement calculation. JH has given no other reasons for the exclusion of Mr. Lasinski's disgorgement calculations and testimony. Mr. Lasinski's testimony in this regard, therefore, should not be excluded on a *Daubert* motion.

## <u>CONCLUSION</u>

Mr. Lasinski is certainly qualified, and his work is reliable. The methodologies, calculations, and evidentiary bases for his findings are those regularly used by CPAs when calculating economic damages. His testimony should be admitted at trial, and any quarrel JH has with his testimony should be addressed on cross-examination and rebuttal. Based on the evidence and argument in this Opposition, LP respectfully asks the Court to deny JH's motion *in limine* to exclude testimony of Mr. Lasinski at trial.

Respectfully submitted,

*/s/ S. Fraser Reid, III*

Russel Myles (admitted *pro hac vice*)
S. Fraser Reid, III (admitted *pro hac vice*)
MCDOWELL KNIGHT ROEDDER
& SLEDGE, LLC
11 N. Water Street, Suite 13290
Mobile, AL 36602
Tel: 251-432-5300
Fax: 251-432-5303
Email: rmyles@mcdowellknight.com
freid@mcdowellknight.com

Samuel F. Miller, TN Bar No. 22936
Nicholas R. Valenti, TN Bar No. 35420
Sara R. Ellis, TN Bar No. 30760
MILLER LEGAL PARTNERS PLLC
Fifth Third Center – Suite 2000
424 Church Street
Nashville, Tennessee 37219
Tel/Fax: (615) 988-9011
Email: smiller@millerlegalpartners.com
nvalenti@millerlegalpartners.com
sellis@millerlegalpartners.com

*Attorneys for Plaintiff Louisiana-Pacific Corporation*

**CERTIFICATE OF SERVICE**

The undersigned certifies that on this 14th day of June, 2019, a copy of the foregoing was served on counsel listed below via the Court EM/ECF system:

Tony Swafford
Rocky King
Maia T. Woodhouse
ADAMS & REESE LLP
Fifth Third Center
424 Church Street, Suite 2700
Nashville, Tennessee 37219
Tel: (615) 259-1450
Fax: (615) 259-1470
Email: tony.swafford@arlaw.com
rocky.king@arlaw.com
maia.woodhouse@arlaw.com

Adam Massey
ADAMS & REESE LLP
LyondellBasell Tower
1221 McKinney, Suite 4400
Houston, TX 77010
Tel: 713.652.5151
Email: adam.massey@arlaw.com

Brian T. Boyd
Bennett J. Wills
Richard Brenton Urick
LAW OFFICE OF BRIAN T. BOYD
214 Overlook Circle, Suite 275
Brentwood, Tennessee 37027
Tel: (615) 371-6119
Fax: (615) 523-2595
Email: brian@boydlegal.co
bennett@boydlegal.co
brenton@boydlegal.co

Tara L. Swafford
THE SWAFFORD LAW FIRM, PLLC
207 Third Avenue North
Franklin, Tennessee 37064
Tel: (615) 599-8406
Fax: (615) 807-2355
Email: tara@swaffordlawfirm.com

/s/ S. Fraser Reid, III